Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 888-318-0075
mike@mgmoorelaw.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

Brian Wright
15074 South Placita Rancho Verano
Sahuarita, Arizona 85629,

   and

Irlanda Wright
15074 South Placita Rancho Verano
Sahuarita, Arizona 85629,

   and

LAW, a minor, by his Father and Next
Friend, Brian Wright,

   and

LW, a minor, by her Father and Next
Friend, Brian Wright,

   and

MG-Z, a minor, by his Step-Father and
Next Friend, Brian Wright,

   and

MW, a minor, by her Father and Next
Friend, Brian Wright,

CIVIL ACTION NO. _____

JURY DEMAND ENDORSED HEREON

1

Plaintiffs.

vs.

Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Marie Fordney
Executive Director
Southern Arizona Children's
Advocacy Center, an Arizona
corporation
2239 East Ajo Way
Tucson, Arizona 85713,
and

Dale Woolridge, M.D.
Medical Director
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Maria Garrick
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Natalie Barragan Dojaque
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Morgan Rau
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

The Town Council of The Town of
Sahuarita, Arizona,
a municipal subdivision
375 West Sahuarita Center Way
Sahuarita, Arizona 85629,

and

Thomas Johnston
Detective
Sahuarita Police Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

and

Melina Carrizosa
Police Officer
Sahuarita Police Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

and

Christin Pelayo
Detective
Sahuarita Police Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

Defendants.

# COMPLAINT AND COMPLAINT FOR DECLARATORY JUDGMENT

## SUMMARY OF CLAIMS

1.     This civil rights action arises out of the seizure from his school of Plaintiff LAW on December 16, 2020, by Defendants Thomas Johnston [hereafter, "Johnston"] and Melina Carrizosa [hereafter "Carrizosa"], officers and employees of the Defendant The Town Council of Sahuarita, Arizona [hereafter, "the Town Council"], followed by the unconsented search of LAW's person, and his transportation to the Defendant Southern Arizona Children's Advocacy Center, Inc. [hereafter "SACAC"]; where LAW was seized and subjected to the unconsented and invasive medical examination performed upon the minor in the absence of attendance by the parents and without their consent, by and at the direction of Defendant Dale Woolridge, M.D. [hereafter, "Woolridge"] and Defendants Johnston and Carrizosa. Also participating in the forced medical examination were Defendants Maria Garrick [hereafter, "Garrick"], Natalie Dojaque [hereafter "Dojaque"] and Morgan Rau, [hereafter "Rau"], collectively, ["the SACAC Defendants"]. At the time, Woolridge and the other named Defendants were acting in the capacity of state actors, engaged in a joint investigation with Johnston and Carrizosa of allegations of criminal child abuse made against Plaintiffs Brian and Irlanda Wright. Defendant Woolridge directed and performed the examination within his authority as the Medical Director of the SACAC and with the approval and authority of Defendant Marie Fordney, SACAC Executive Director [hereafter, "Fordney"];

2.     Following the unconstitutional seizure and searches, LAW was held in custody by the above-named Defendants while Johnston returned to his office, engaged Defendant Christin Pelayo [hereafter "Pelayo"], another detective, and directed her in securing a search warrant for the home of Plaintiffs;

3.     That afternoon, directed by Johnston and Pelayo, multiple officers of the Sahuarita Police Department [hereafter, "SPD"], descended on the cul-de-sac where Plaintiffs live and engaged in the unconstitutional searches and seizures described herein;

4.     The family was traumatized by these unconstitutional activities and continue to suffer injuries and damages therefrom;

## PARTIES AND JURISDICTION

5.     At all times pertinent hereto, Plaintiffs Brian and Irlanda Wright were husband and wife;

6.     Minors LAW and LW are children born of Mr. Wright and a separate biological mother;

7.     Minor MZ-G is the child of Irlanda Wright by a separate biological father;

8.     Minor MW is the daughter of Brian and Irlanda Wright;

9.     At the time the incidents set forth herein commenced, the parents had nearly concluded the process for adoption of MZ-G by Brian, and of LAW and LW by Irlanda;

10.   At all times pertinent hereto, the SACAC was a not-for-profit corporation organized under the laws of the State of Arizona. SACAC's mission is, among other things, to collaborate with law enforcement in the investigation of allegations of criminal child abuse. SACAC is signatory to agreements and memoranda of understanding with Arizona Department of Child Safety [hereafter, "AZDCS"], the Pima County Attorney and Pima County law enforcement agencies, under which SACAC undertakes to conduct "forensic interviews" of children brought to SACAC by law enforcement and AZDCS, and to conduct invasive medical examinations of such children, in cooperation with AZDCS agents and/or law enforcement, and to report its "findings" to law enforcement and AZDCS. SACAC's joint criminal investigative activities, including "forensic interviews and medical examinations, is set forth in the Pima County Protocols for The Multidisciplinary Investigation of Child Abuse under the "Medical Protocol" [hereafter, the "Pima County Protocols"], among other written and unwritten protocols and policies. The excerpts are appended hereto as Appendix A. It is the policy of SACAC, with the approval of the AZDCS, the Pima County Attorney and law enforcement agencies, to conduct the invasive medical examinations for the purpose of obtaining evidence of the crime of child abuse without parental notice or consent, and without first securing a court order authorizing such invasions of privacy of the child and interference with the parents' right to the control of decisions regarding medical examinations and treatment of their children. Such examinations constitute searches within the ambit of the Fourth Amendment to the

Constitution of the United States, and interference with the First and Fourteenth Amendment rights of parents and children to familial association and due process of law;

11.     Defendants Woolridge and Fordney, in their capacities with SACAC, approved and implemented the policy set forth above. Defendants Garrick, Dojaque and Rau participated in the examination as observers and/or providing resources and assistance to Woolridge. Woolridge and Fordney are sued as state actors in their official and individual capacities. Garrick, Dojaque and Rau are sued in their individual capacities. These Defendants are alleged to have acted with reckless disregard of the federally-protected rights of the Plaintiffs;

12.     At all times pertinent hereto, the Defendant the Town Council was and is the final policymaking body of the municipality of Sahuarita, Arizona, and responsible for the policies, procedures and protocols implemented by the Police Department of the municipality. The unconstitutional actions of the individual Sahuarita Defendants in conducting the medical examination performed on LAW was in accordance with the Town Council's approval and implementation of the Pima County Protocols, or other such protocols or policies authorizing unconstitutional forensic medical examinations of minors. This Defendant is sued in its official capacity;

13.     At all times pertinent hereto, Defendants Johnston, Carrizosa and Pelayo were employed as police officers by the Defendant Town Council. The actions and omissions alleged herein were done within their capacities as state actors. These

Defendants are sued in their individual capacities. Their actions were done with reckless disregard of the federally-protected rights of the Plaintiffs;

14.     The Court has jurisdiction of this case under federal question jurisdiction, §28 U.S.C. §1331;

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391;

16.     The claims asserted by Plaintiffs are brought to vindicate rights guaranteed Plaintiffs under 42 U.S.C. §1983. Declaratory relief is proper under the Declaratory Judgment Act, 28 U.S.C. §2201, et seq.; and Fed. R. Civ. Pro 57. Injunctive relief is proper under Fed.R.Civ.P. 65;

**OPERATIVE FACTS**

17.     Plaintiffs reallege Paragraphs 1 through 16 as if fully set forth herein;

**The Wright Family and History of LAW**

18.     In or around his fourth year of age**,** LAW was diagnosed with a medical condition named "encopresis," which is defined as "repeated passage of feces into inappropriate places." Diagnostic and Statistical Manual of Mental Disorders 5; §307.7 (F98.1);

19.     When LAW's incontinence became a concern, Brian and Irlanda began having LAW seen by medical and other professionals. By February, 2019, LAW had come under the care of Ramon Montes, M.D., at Phoenix Children's Hospital. The parents paid out of pocket for a full evaluation of LAW, including endoscopy and sigmoidoscopy;

20.     After the work-up, Dr. Montes advised the parents that LAW would grow out of the condition, probably by the time he reached seven (7) or eight (8) years of age. The parents relied on this diagnosis and prognosis;

21.     In the 2019-2020 school year, LAW was enrolled in kindergarten at Copper View Elementary School [hereafter, "CVES"] in the Sahuarita Unified School District. As a result of his diagnosis, CVES administration and parents entered into an agreement. The key feature of the agreement was that, as needed, LAW would report to the school nurse's office, which was staffed by Jessica Mendez, and Ms. Mendez would change LAW's "pull-ups" [essentially, a diaper]. LAW wore the pull-ups twenty-four (24) hours each day;

22.     In so doing, Ms. Mendez, who is, under Arizona law a "mandatory reporter" of suspicions of child abuse or neglect, and had substantial previous experience, would have full view of LAW's buttocks, low back, and legs;

23.     LAW, at the beginning of the 2020-21 school year, was advanced to the first grade, and continued under the agreement. Ms. Mendez continued to attend to LAW's needs. Up to the date of December 15, 2020, Ms. Mendez had changed LAW's pull ups over four hundred (400) times, never observing any evidence that caused her suspicion of possible child abuse. Ms. Mendez did observe "little boy bruises" on LAW consistent with his age;

24.     The Plaintiffs live in a two story home in a middle-class subdivision of Sahuarita. The two boys, LAW and MZ-G, shared a bedroom with bunk beds. The

boys, and their sister, LW, were very active. The children were enrolled in martial arts classes, and the boys would "play-fight" in and around the home;

**The Events of December 15, 2020**

25.     On December 14, 2020, LAW attended CVES for a full day of school. He required changing by Ms. Mendez that day, who noticed small marks/bruises on LAW that corresponded to the "little boy bruises" she had previously seen;

26.     On the evening of December 15, 2020, the parents put the children to bed, then themselves retired to their room;

27.     At or around 9:30 p.m., Brian and Irlanda heard banging coming from the boys' room, across the hall from their room, and heard LAW cry out, "Ow, it hurts, he hit me!". Irlanda went into the boys' room, and found them both standing, each holding a curved section of blue track from a "Hot Wheels" set. Irlanda took the pieces from the boys, gave each a single spank on the bottom over their clothes with her open hand, and ordered them to bed. The boys each were wearing pajamas and because LAW was not crying, nor complaining that he was in pain, she made no inspection to try to determine if and where MZ-G had hit him;

28.     Irlanda removed the Hot Wheels set from the room, and the next morning, discarded it into the trash;

29.     The next morning, in the usual course of events of the parents trying to get the children ready for school and take care of their own needs, Irlanda changed LAW's pull ups readying him for school. No obvious mark that could have been caused by a

blow from the plastic track was seen, and Irlanda was not specifically looking for a mark;

30.     Brian drove LAW to CVES, and went on to his work as General Manager of Canoa Ranch Golf Resort;

31.     At approximately 10:00 a.m., Ms. Mendez, while changing LAW, noticed a horizontal mark approximately one inch (1") wide across his left hamstring midway between the bottom of the buttock and the knee;

32.     Ms. Mendez consulted with another CVES staffer, Deborah Ramirez, who suggested that the mark looked like it could have been caused by a belt. With that information, the two decided to make a mandatory report to the AZDCS "Hotline" as well as to the Sahuarita Police Department;

33.     Ramirez made both calls at 10:13 a.m.;

34.     Defendant Carrizosa was dispatched to CVES, arriving at 10:18 a.m.;

35.     Carrizosa, after interviewing Mendez and Ramirez, who both stated LAW told them he didn't know how he got the mark, had Mendez assist in pulling down LAW's pants, searched his body and confirmed the mark. As he had with the CVES staff, when questioned by Carrizosa, LAW replied he did not know how he got it, but that he got it yesterday;

36.     Johnston then arrived, and Carrizosa reported to him her interview of the staff, including that Ms. Mendez had seen the "little boy bruises" the day before, but that the mark reported by them to police and AZDCS was not seen on the 15th, and

reported to Johnston what she had observed and photographed, and how LAW had responded to questions;

37.     At 11:30 a.m. Defendants Carrizosa and Johnston, who, according to them, could not get ahold of AZDCS, "took custody" of LAW and transported him to SACAC;

38.     Defendants did not inform either parent of the existence of the mark, nor that they were investigating felony child abuse, nor that both parents were suspects – which both were;

39.     Defendants, with LAW in custody, arrived at SACAC at noon;

40.     At SACAC, Defendants met and conferred with Morgan Rau, the SACAC designated "forensic interviewer." SACAC took custody of LAW. At approximately 12:15 p.m., Rau took LAW into a room dedicated to these interviews, equipped with a one-way mirror and a video/audio recorder, and questioned LAW. Defendants Carrizosa and Johnston observed the questioning through the one-way mirror and hear the questions and answers through a speaker;

41.     In the interview, LAW again reiterated that he did not remember how he got the mark, that it did not hurt; that when his parents spanked him it did not cause pain; stated that his mother had hit him with a Hot Wheels track when he was four (4) years old; and once hit him with a belt when he was five (5) years old. He denied his parents ever causing a bruise or mark on him. When asked when was the last time his mother spanked him, he recounted in some detail an incident five (5) days earlier

when, he said, she had caught him and MZ-G stealing some granola bars and spanked him on his bottom with her open hand. He also stated he felt safe at home, except for his sister, LW, who, he stated, MZ-G protected him from, that LW scratched MZ-G and that he, LAW, had punched her "like 30 times on the back" to make her stop. The interviewer did not follow up on that volunteered information, but left the room. She returned after conferring with Defendants, and began questioning LAW again about the events of five (5) days before. This time LAW stated that his mom spanked him with a belt, contradicting his previous statement. The interviewer only asked him to repeat that statement, which he did, then she ended the interview. She did not question LAW about the discrepancy between that and the previous statement;

42.   At the conclusion of the interview, Defendant Johnston, who knew Defendant Woolridge from previous encounters at SACAC, called Woolridge and asked him to come to the SACAC and conduct a medical examination of LAW;

43.   Woolridge complied, came to SACAC and at 1:00 p.m. commenced the medical examination, with the participation and cooperation of Johnston, Carrizosa, and SACAC employees Garrick, Dojaque and Rau;

44.   Before the examination, Defendants gave LAW a number of toys, which, upon information and belief, they informed him were gifts for him to take home for himself and for his siblings. Defendants told LAW he would have these gifts if he just cooperated with Defendants;

45.     Per policy, neither Woolridge, nor any other Defendant, sought to inform the parents that a medical examination was contemplated, nor to seek any consent from them for the examination. Nor did Defendants make any effort to secure a court order authorizing the invasive medical examination contemplated;

46.     Woolridge possessed no family or medical history regarding LAW's possible medical conditions, except that he was informed of the diagnosis of encopresis and was informed that LAW was changed by school staff. Woolridge made no effort, before, during or after the examination, to obtain any family or medical history. Woolridge made no request for medical records from CVES regarding LAW, nor to speak with the mandatory reporter, Mendez, about her previous experience with LAW.  All of these omissions violated the "Standards for Accredited Members (2017)" governing the SACAC's procedures, issued by the National Children's Alliance, the umbrella organization under which the SACAC operates;

47.     Woolridge conducted a full examination of LAW, directing Defendant Johnston to document and photograph what Woolridge pointed out. Photographs taken of LAW during the medical examination show him with one of the toys he had previously been given:



48.     Although there were no allegations, nor complaints by LAW of any sexual abuse, Woolridge made invasive examination of LAW's genital and rectal areas, causing LAW pain and discomfort which Wooldridge documented in his report as LAW being "resistant" to the procedure;

49.     Woolridge, in addition to the mark that had brought the SPD to the school, and LAW to SACAC originally, documented in his report two small oval bruises on LAW's right buttock and right thigh, and three small scratches on his right leg, and upper right buttock. Woolridge described these marks as "multiple contusions – location & nature of lesions concerning for inflicted injury." He described the original mark on the left hamstring as "wrapping effect implies flexible nature of impact object" and "impact silhouette indicating nature and shape of implement used." He concluded, "contusions @ different stages of healing suggests injury events over a series of days…." These other marks were those having been conveyed by Ms. Mendez as common marks seen on LAW over the past two (2) years, but neither Johnston nor Carrizosa made Woolridge aware of that fact, nor did Woolridge inquire;

50.     Woolridge did not ask for, nor was he provided, the video or audio recording of the interview of LAW;

51.     Woolridge's opinions were possibilities only. He could not, to a degree of medical probability, state the who, what or how of any of the marks he documented on LAW. Indeed, at least two (2) of the "linear contusions" were so faint that they could barely be discerned from Johnston's photographs. Johnston left the facility shortly

thereafter, to organize a search of the Wright residence and a "welfare check" of the other siblings. Defendant Carrizosa was left with LAW to await the arrival of a DCS investigator. LAW remained in the custody of SPD and SACAC;

52.   During this time, Irlanda drove to CVES to collect LAW at the end of the school day. LAW did not appear. Irlanda inquired of the principal of CVES as to the whereabouts of LAW, was told he was "with the police", but that there was no other information;

53.   Irlanda was stunned and afraid and immediately called and spoke to Brian, informing him of the situation. Brian called the principal, who refused to give any more information, and Brian immediately drove to the Sahuarita Police Department, and eventually spoke with an officer – believe to be Defendant Johnston – who gave him little more information. This happened at 2:00 p.m.;

54.   More than three (3) hours after the medical examination, at 3:45 p.m., Gerardo Talamantes, investigator employed by AZDCS, arrived at SACAC;

55.   At 4:00 P.M., Brian was contacted by Talamantes who informed him of the AZDCS determination that the parents would have to agree to the Safety Plan if they didn't want their son put in foster care. Under this duress, Brian agreed, and immediately made arrangements for the paternal grandmother, Lisa Pugliano, to drive from Scottsdale to AZDCS, where LAW would be released in her custody;

56.   During this period, Johnston conferred with Defendant Pelayo, conveying some information to her. At Johnston's direction, at 4:17 p.m., Pelayo placed a phone

call to Superior Court Judge Bernini, requesting issuance of a search warrant upon the home of the Wrights. Based on Pelayo's sworn facts, Bernini executed the search warrant, which as limited to search and seizure of "a small brown belt and a track from a 'hot wheels' racetrack," and "[a]ny other fruits, instrumentalities or evidence of the crime(s) of Assault of a Minor or Physical Abuse of a Minor." The application did not identify nor describe the other three siblings in the home, nor seek authorization to conduct searches or seizures from those three siblings;

57.     At 4:45 p.m., Brian, LW and MZ-G were home when Johnston, Pelayo, and a multitude of SPD officers arrived and obtrusively set up outside the home along the cul-de-sac. Johnston, Pelayo, and other officers then entered the home, informed Brian of the search warrant, and Johnston sat Brian at his kitchen table and interviewed him while other officers searched throughout the home. Irlanda arrived shortly after the search began with their baby, and was separated from Brian and questioned by Pelayo;

58.     As the events commenced, Talamantes arrived at the home, sat down at the kitchen table, and observed Johnston's questions to Brian, and heard Brian's answers;

59.     About 6:30 p.m., Johnston asked Brian if the two older children would change into their swimsuits. Brian agreed, and LW and MZ-G went to each of their bedrooms, put on the swimsuits and were then photographed by one of the SPD officers. With the approval and authorization of Johnston and Pelayo, MZ-G was

17

directed to pull down his suit, exposing his genitals and buttocks, and the SPD officer took photographs of the unclothed child. Neither Brian nor Irlanda were advised this would be done, nor given the opportunity to object. The image of MZ-G as photographed by the SPD officer, is reproduced here with redaction:



60.     At the conclusion of approximately three (3) hours of searches and seizures, and after Brian and Irlanda had cooperated fully with SPD, the police left the home. Unknown to Plaintiffs, SPD seized the Hot Wheels set which they recovered from the trash, and two belts belonging to Irlanda from the parents' bedroom closet. During the questioning, which Talamantes overheard, Brian had informed Johnston of the events the night before, summarized in ⁋27 above;

61.     Johnston examined the belts seized, and recognized that they could not have caused the mark on LAW's leg. He further recognized that the Hot Wheels track was of the dimensions that could well have caused the mark. Based on the evidence he had gathered, Johnston concluded that all the marks seen on LAW were likely the

result of roughhousing and determined there was no probable cause to bring charges against either parent. SPD closed the investigation that night;

**FIRST CLAIM: CLAIM OF PLAINTIFF LAW AGAINST DEFENDANTS CARRIZOSA AND JOHNSTON: VIOLATIONS OF THE FOURTH AMENDMENT: SEARCH AND SEIZURE AT CVES, TRANSPORT TO SACAC AND CONTINUING DETENTION AT SACAC**

62.     Plaintiffs reallege Paragraphs 1 through 61 as if fully set forth herein;

63.     This Claim is brought to vindicate LAW's right to be free of unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States;

64.     From the time they arrived at CVES and began investigating, LAW was in the custody of the Defendants Carrizosa and Johnston;

65.     The Defendants' action, of searching LAW for evidence of the crime of child physical abuse while at CVES lacked probable cause to justify the unconsented search in the absence of a warrant authorizing the seizure and search;

66.     The continuation of the seizure, the transport to, and detaining of LAW at, and in the custody of SPD and SACAC was a continuing violation of the Fourth Amendment, done without probable cause that LAW had been the victim of child abuse;

67.     As a direct and proximate result, Plaintiff LAW suffered a deprivation of his liberty, privacy, emotional distress and other intangible damages;

**SECOND CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS CARRIZOSA AND JOHNSTON: VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS: SEARCH AND SEIZURE AT CVES AND TRANSPORT TO SACAC; SEARCH AND DETENTION AT SACAC**

68.     Plaintiffs reallege Paragraphs 1 through 67 as if fully set forth herein;

69.     This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association and privacy and due process of law;

70.     These Defendants, Johnston and Carrizosa, authorized and participated in the "forensic interview" by the SACAC interviewer, Rau, and the invasive medical examination conducted upon LAW by Defendant Wooldridge, without the consent of the parents; without notification to the parents of their right to attend; and without the Defendants having secured a warrant to conduct the search;

71.     The unconsented seizure and search at CVES, the subsequent decision to subject LAW to the forensic interview, and, particularly, the decision and execution of the search by Woolridge, all decisions subjected to the right of the parents to control the upbringing of the child by the Constitution, constituted violations of all three Plaintiffs' right to familial association;

72.     The continuing detention of LAW following the examination also constituted a continuing violation of all three Plaintiffs' right to familial association and privacy;

73.     As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

### THIRD CLAIM: CLAIM AGAINST TOWN COUNCIL: FIRST AND FOURTEENTH AMENDMENT CLAIM: INVASIVE MEDICAL EXAMINATION

74.     Plaintiffs reallege Paragraphs 1 through 73 as if fully set forth herein;

75.     This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association, privacy and due process of law;

76.     The medical examination of LAW was conducted pursuant to the policy and protocol approved by the Town Council, or by the Chief of Police as delegated to him by Defendant. Previous medical examinations conducted by physicians working for SACAC, with the cooperation of SPD officers, were conducted under this policy and protocol;

77.     The policy and protocol, as documented in Appendix A - Pima County Protocols, or other policies and protocols adopted by the Defendant and/or its agent, the Chief of Police, is unconstitutional on its face, as authorizing such unconsented invasive medical examination, in the absence of notice to the parents of the right to attend, and without the Town Council's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

78.     As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

//

//

21

**FOURTH CLAIM: CLAIM OF PLAINTIFFS LAW, BRIAN AND IRLANDA WRIGHT AGAINST DEFENDANTS WOOLRIDGE AND FORDNEY: FIRST AND FOURTEENTH AMENDMENT VIOLATION IN CONDUCT OF UNCONSENTED MEDICAL EXAMINATION**

79.     Plaintiffs reallege Paragraphs 1 through 78 as if fully set forth herein;

80.     This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association and due process of law;

81.     The medical examination conducted by Woolridge constituted a violation of the child's, and parents' right to familial association and privacy, undertaken without due process of law;

82.     Fordney had, previously, reviewed the Pima County Protocols, internal SACAC protocols and policies under which the examination was conducted, with the Medical Director, Woolridge, and approved the conduct of this, and all such, examinations;

83.     As a direct and proximate result, Plaintiffs suffered deprivations of liberty, privacy, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

**FIFTH CLAIM: CLAIM OF LAW, BRIAN AND IRLANDA WRIGHT AGAINST SACAC: FIRST AND FOURTEENTH AMENDMENT CLAIM: INVASIVE MEDICAL EXAMINATION**

84.     Plaintiffs reallege Paragraphs 1 through 83 as if fully set forth herein;

85.     This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association, privacy and due process of law;

86.     The medical examination of LAW was conducted pursuant to the policy and protocol approved by SACAC. Since 1996, over two hundred (200) forensic medical examinations have been conducted by physicians working for the SACAC, under the protocol, upon information and belief, without prior parental consent, parental attendance, or a court order;

87.     The policy and protocol, as documented in the Pima County Protocols or other policies or protocols approved by SACAC, is unconstitutional on its face, as authorizing such unconsented invasive medical examination without, notification to parents of their right to attend the examinations; or the SACAC's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

88.     As a direct and proximate result, Plaintiffs suffered deprivations of liberty, privacy, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

**SIXTH CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS JOHNSTON AND PELAYO: FOURTH AMENDMENT VIOLATION: NO PROBABLE CAUSE FOR SEARCH WARRANT FOR HOME**

89.     Plaintiffs reallege Paragraphs 1 through 88 as if fully set forth herein;

90.     This Claim is brought to vindicate rights of all Plaintiff residents of the Wright home under the unreasonable search and seizure clause and warrant clause of the Fourth Amendment;

91.     Defendants Johnston and Pelayo cooperated in the preparation and submission of the telephonic application for the search warrant on the afternoon of December 16, 2020;

92.     The Defendants lacked probable cause for the issuance of the warrant, and no reasonable peace officer, knowing the facts, would have sought such a warrant;

93.     As a direct and proximate result of the application, and issuance of the warrant, numerous SPD officers entered and searched the entire home, causing all Plaintiffs to suffer deprivations of liberty, emotional distress and other intangible damages;

**SEVENTH CLAIM: CLAIM OF PLAINTIFFS BRIAN AND IRLANDA WRIGHT, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FOURTEENTH AMENDMENT: JUDICIAL DECEPTION IN SECURING SEARCH WARRANT**

94.     Plaintiffs reallege Paragraphs 1 through 93 as if fully set forth herein;

95.     This Claim is brought to vindicate the rights of the Plaintiffs to due process of law under the Fourteenth Amendment;

96.     The operative "facts" sworn to by Pelayo, with the agreement of Johnston, to the magistrate, were as follows:

On December 16, 2020, while working, a student caretaker for student in need at a school in Sahuarita witnessed marks on a six-year-old male student while changing the child's diaper. The marks observed were below the buttocks. When the child was questioned by the caretaker of how he obtained those marks, the child deflected and would not give details on how they were obtained.

Law enforcement was contacted and the child was taken for a forensic interview. During the forensic interview, the child disclosed that he was hit by his mother, quote unquote, with a small brown belt, as well as Hot Wheels

track. A medical exam was conducted on the minor by Dr. Woolridge, who advised that the minor had several episodes of bruising on his person. Upon speaking with the miner's (sic) father, he disclosed his knowing that the minor's stepmother hit the minor last night.

97.    Defendants' sworn statement of facts contained falsehoods and misrepresentations, and omitted material exculpatory facts. These included, among others:

a.    Misrepresentation that LAW "deflected" questions about the "marks" found on him and "would not give details on how they were obtained";

b.    Omission that only the single mark on the left hamstring was of concern by the CVES staff, that the other marks were known to be common "little boy bruises" that predated the 16th;

c.    The omissions of the key facts and contradictions in LAW's interview set out in ¶41 above;

d.    Misrepresentation in implying that LAW reported his mother recently hit him with both a "brown belt" and a "Hot Wheels track;"

e.    Omission of LAW's statement that the last time his mother spanked him was five (5) days ago, knowing that the only mark of concern did not exist on December 15th;

f.    The falsehood that Brian disclosed that Irlanda "hit" LAW the night before;

98.    The inclusion of outright falsehoods and misrepresentations, and the omission of material exculpatory facts gave the application the false appearance of probable cause;

99.    The falsehoods, misrepresentations and material omissions were accomplished by intentional misconduct or reckless disregard of the truth;

100.    The magistrate executed the warrant in reliance on the sworn facts, the search warrant was issued and the unconstitutional searches and seizures done;

101.    As a direct and proximate result of the application, and issuance of the warrant, numerous SPD officers entered and searched the entire home, causing all Plaintiffs to suffer deprivations of liberty, emotional distress and other intangible damages;

**EIGHTH CLAIM: LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELYAO: FOURTH AMENDMENT UNREASONABLE SEARCH AND SEIZURE**

102.    Plaintiffs reallege Paragraphs 1 through 101 as if fully set forth herein;

103.    This Claim is brought to vindicate rights of the minor Plaintiffs against unreasonable searches and seizures, under the Fourth Amendment;

104.    The searches of the persons of LW and MZ-G, after requiring them to disrobe, and including the search of MZ-G after he had been directed to expose his genitals and buttocks, followed by the photographing of the children, without parental consent or a warrant authorizing such searches and seizures, constituted violations of the children's right to privacy guaranteed them under the Fourth Amendment;

105.   As a direct and proximate result Plaintiffs LW and MZ-D suffered deprivations of liberty, emotional distress and other intangible damages;

**NINTH CLAIM: CLAIM OF PLAINTIFFS BRIAN, IRLANDA, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FIRST AND FOURTEENTH AMENDMENT VIOLATION OF FAMILIAL ASSOCIATION IN THE SEARCH OF THE HOME**

106.   Plaintiffs reallege Paragraphs 1 through 105 as if fully set forth herein;

107.   This claim is brought to vindicate the right of the parents to care, custody and control of their children, and the childrens' right to the care and comfort of their parents, and familial privacy, guaranteed Plaintiffs under the First and Fourteenth Amendments to the Constitution;

108.   Defendants' entry into the home, separation of parents from children, detention of the children and parents while engaged in search of the entire home, examination and questioning of the children, violated the Plaintiffs' right to familial association;

109.   As a direct and proximate result all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages;

**TENTH CLAIM: CLAIM OF PLAINTIFFS BRIAN, IRLANDA, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FIRST AND FOURTEENTH AMENDMENT VIOLATION OF FAMILIAL ASSOCIATION IN THE SEARCHES AND SEIZURES OF THE CHILDREN'S PERSONS**

110.   Plaintiffs reallege Paragraphs 1 through 109 as if fully set forth herein;

111.   This claim is brought to vindicate the right of the parents to care, custody and control of their children, the familial association privacy, and the childrens' right

to the care and comfort of their parents, guaranteed Plaintiffs under the First and Fourteenth Amendments to the Constitution;

112.    Defendants' searches of the children's persons, as set forth above, and the photographing of them, violated the Plaintiffs' right to familial association and privacy;

113.    As a direct and proximate result all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages;

**ELEVENTH CLAIM: CLAIM FOR DECLARATORY JUDGMENT: TOWN COUNCIL, WOOLRIDGE, FORDNEY AND SACAC**

114.    Plaintiffs reallege Paragraphs 1 through 113 as if fully set forth herein;

115.    As held by the Ninth Circuit Court of Appeals, it is a *per se* violation of the First and Fourteenth Amendment rights of both parent and child for these Defendants to detain and examine minors without first notifying the parents and obtaining consent; or, in the alternative, securing a warrant from a magistrate. Among other authorities, this is the holding in *Mann v. County of San Diego,* 907 F. 3d 1154, 1162 (9th Cir. 2018):

> A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations. … The amount of trauma associated with a medical examination, particularly for young children, is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors. Given this reality, a parent's right to notice and consent is an essential protection for the child and the parent, no matter what procedures are used.

28

116.     The invasive forensic medical examination at issue was conducted for investigative purposes. There was no emergency that vitiated the requirement of notice and consent of the parents, not any impediment to the Defendants attempting to secure a warrant authorizing the search;

117.     The Protocols and policies, under which the Defendants conducted the medical examination of LAW are therefore facially unconstitutional;

118.     Plaintiffs are, as a result of LAW's ongoing medical condition and the ordinary roughhousing in which he engages, subject at any time to a mandatory reporter's call to AZDCS and/or SPD of a suspicion of physical abuse, and the resultant seizure and medical examination under the Protocols other policies and protocols in place authorizing these unconstitutional searches;

WHEREFORE, Plaintiffs demand judgment, jointly and severally, of these Defendants, as follows:

1.     Under the First through Tenth Claims, awards of compensatory damages to each Plaintiff in such amounts as the jury deems just;

2.     Under the First through Tenth Claims, awards of punitive damages to each Plaintiff in such amounts as the jury deems just;

3.     Under the First through the Tenth Claims, awards of special damages to Brian Wright in such amount as the jury deems just;

4.     Under the Eleventh Claim, an Order declaring the Protocols, or other such policy or protocol authorizing the forensic medical examination of a minor, without

notice to and consent of the parents, or the authority of a warrant issued by a magistrate, are in violation of the parent and child's right to familial association under the First and Fourteenth Amendment and the child's right to bodily integrity and privacy under the Fourth Amendment;

5.    Pursuant to Fed.R.Civ.P. 65, specifically, Rule 65(d)(2)(B), an injunction issued ordering that Defendants the Town Council, SACAC, Woolridge and Fordney immediately cease from conducting forensic medical examinations or participating in such examinations, in the absence of notice to parents and consent of those parents, or having, in the absence of such notice and consent, secured a warrant issued to a disinterested magistrate authorizing the forensic medical examination and:

a.    specifying the nature and extent of the examination authorized;

b.    requiring that the entirety of any such examination be recorded by video and audio;

c.    ordering that a copy of any reports, images, or recordings be delivered to the parents at the earliest practical time following the conclusion of the examination;

6.    An award of reasonable attorney fees and costs, pursuant to 42 U.S.C. §1988;

7.    An award of pre-judgment and post-judgment interest;

//

//

//

8.      Such other relief as this Court deems just.


Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
4370 North Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 520-318-0075
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*


**JURY DEMAND**

Plaintiffs demand that all issues be tried by a jury of twelve (12) persons.

/s/ Michael Garth Moore