Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 888-318-0075
mike@mgmoorelaw.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright<br>15074 South Placita Rancho Verano<br>Sahuarita, Arizona 85629, | Case No.:  4:21-cv-00257-JGZ |
| and | |
| Irlanda Wright<br>15074 South Placita Rancho Verano<br>Sahuarita, Arizona 85629, | **FIRST AMENDED COMPLAINT AND COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>Hon. Jennifer G. Zipps |
| and | |
| LAW, a minor, by his Father and<br>Personal Representative,<br>Brian Wright, | |
| and | |
| LW, a minor, by her Father and Personal<br>Representative, Brian Wright | |
| and | |
| MG-Z, a minor, by his Mother and<br>Personal Representative, Irlanda Wright, | |
| and | |

MW, a minor, by her Father and Personal
Representative, Brian Wright,

Plaintiffs,

vs.

Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Marie Fordney
Chief Executive Officer
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Dale Woolridge, M.D.
Medical Director
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Maria Garrick
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

and

Natalie Dojaque
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

    and

Morgan Rau
Southern Arizona Children's Advocacy
Center, an Arizona corporation
2239 East Ajo Way
Tucson, Arizona 85713,

    and

The Town Council of The Town of
Sahuarita, Arizona
A municipal subdivision
375 West Sahuarita Center Way
Sahuarita, Arizona 85629

    and

Thomas Johnston
Detective
City of Sahuarita, Arizona Police
Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

    and

Melina Carrizosa
Police Officer
City of Sahuarita, Arizona Police
Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

    and

3

Christin Pelayo
Detective
City of Sahuarita, Arizona Police
Department
315 West Sahuarita Center Way
Sahuarita, Arizona 85629,

and

Gerardo Talamantes
Child Safety Specialist
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

and

Jason Dedmon
Supervisor
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

and

Meghean Francisco
Supervisor
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

and

Brian Maldanado
Facilitator
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

and

Joana Encinas
On-Going Case Manager
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

     and

Jeannette L. Sheldon
Supervisor
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

     and

Betina Noriega
Supervisor
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713,

     and

Michelle Orozco
Program Manager, South Region
Arizona Department of Child Safety
2760 South Fourth Avenue
Tucson, Arizona 85713

          Defendants.

## SUMMARY OF CLAIMS

1.    This civil rights action arises out of the seizure from his school of Plaintiff LAW on December 16, 2020, and the unconsented and invasive medical examination performed upon the minor in the absence of attendance by the parents and

without their consent, by and at the direction of Defendant Dale Woolridge, M.D. [hereafter, "Woolridge"] and Defendants Thomas Johnston [hereafter, "Johnston"] and Melina Carrizosa [hereafter "Carrizosa"] and Christin Pelayo [hereafter "Pelayo"]. Also participating in the forced medical examination were Defendants Maria Garrick [hereafter, "Garrick"], Natalie Dojaque [hereafter "Dojaque"] and Morgan Rau [hereafter, "Rau"]. At the time, Woolridge and the other named Defendants were acting in the capacity of state actors, engaged in a joint investigation with Johnston and Carrizosa of allegations of criminal child abuse made against Plaintiffs Brian and Irlanda Wright. Defendant Woolridge directed and performed the examination within his authority as the Medical Director of the Defendant Southern Arizona Children's Advocacy Center, Inc. [hereafter "SACAC"] and with the approval and authority of Defendant Marie Fordney, Chief Executive Officer [hereafter, "Fordney"]. Thereafter, these Defendants collaborated with Defendant Gerardo Talamantes [hereafter, "Talamantes"}, facilitating Talamantes in his investigation of allegations of child abuse;

2.       Following the unconstitutional seizure and searches, LAW was held in custody by the above-named Defendants while Johnston returned to his office, engaged Defendant Christin Pelayo [hereafter "Pelayo"], another detective, and directed her in securing a search warrant for the home of Plaintiffs;

3.       That afternoon, directed by Johnston and Pelayo, multiple officers of the Sahuarita Police Department [hereafter, "SPD"], descended on the cul-de-sac where

Plaintiffs live and engaged in the unconstitutional searches and seizures described herein

4.      On and after December, 16, 2020, Talamantes engaged in documenting misrepresentations, fabrications and material omissions of exculpatory facts from the agency records, and, with the collaboration and approval of his Supervisors, Defendants Jason Dedmon [hereafter, "Dedmon"] and Meghean Francisco [hereafter "Francisco"], secured, on December 28, 2020, an *ex parte* order authorizing these Defendants to seize LAW from the custody of his parents and place LAW in foster care. No order would have issued in the absence of the material misrepresentations, fabrications and material omissions of exculpatory facts from the sworn application submitted by Talamantes to the Maricopa County Magistrate with the authority and approval of his Supervisors. Talamantes and Francisco then convened a Team Decisionmaking Meeting, facilitated by AZDCS employee Brian Maldanado [hereafter, "Maldanado], at the conclusion of which the Defendants seized LAW, as had been the intent leading up to the meeting. Subsequently, Maldanado, with the approval of Talamantes and Francisco, falsified the resulting report, the "TDM Summary;"

5.      Talamantes and the Supervisors then applied to the Attorney General for issuance of a Petition commencing a dependency action against Mr. Wright supported by the sworn application for the *ex parte* removal order, a copy of the Temporary Custody Notice prepared by Talamantes, and the TDM Summary, all of which

contained material misrepresentations, fabrications and material omissions of exculpatory facts. Relying on the false documentation, a Dependency Petition was prepared and filed with the Superior Court of Pima County, Arizona, Juvenile Division, on December 31, 2202assigned Case No. JD20200802;

6.     Thereafter, the Defendants Joana Encinas [hereafter "Encinas"], Jeanette Sheldon [hereafter "Sheldon"], Betina Noriega [hereafter "Noriega"] and Michelle Orozco [hereafter "Orozco"] collaborated to interfere with the Wright family's association. Such interference included, but was not limited to, falsifying information regarding the actions of the parents in communications with the Attorney General and in reports to the Juvenile Court; manipulating the services the family was seeking in order to delay the parents' receiving services so that the separation would be extended; refusing to agree to the discharge of Brian Wright from the care of the therapist who he has been ordered to counsel with, despite the therapist's professional judgment that Mr. Wright was not in need of therapy; demanding, that, as the dispositive condition of agreeing to the re-unification of the family, that Mr. Wright admit that his wife, Irlanda, had physically abused LAW, knowing that Mr. Wright's admission would be communicated to law enforcement, subjecting him to criminal prosecution; demanding without justification that the parents submit to psychological evaluations by a provider of the agency's choosing, disregarding the opinions of professional who were actually providing therapy, and seizing LAW twice without justification;

7.     The State prosecuted the dependency case for ten (10) months;

8.     On October 14, 2021, the Juvenile Judge dismissed the dependency case;

9.     The family was traumatized by these unconstitutional activities and continue to suffer injuries and damages therefrom;

## PARTIES AND JURISDICTION

10.     At all times pertinent hereto, Plaintiffs Brian and Irlanda Wright were husband and wife;

11.     Minors LAW and LW are children born of Mr. Wright and a separate biological mother;

12.     Minor MZ-G is the child of Irlanda Wright by a separate biological father;

13.     Minor MW is the daughter of Brian and Irlanda Wright;

14.     At the time the incidents set forth herein commenced, the parents had nearly concluded the process for adoption LAW and LW by Irlanda Wright, and the adoption of MZ-G by Brian Wright;

15.     At all times pertinent hereto, Defendants Talamantes, Dedmon, Francisco, Maldanado, Encinas, Sheldon, Noriega and Orozco were employees of the Arizona Department of Child Safety [hereafter, "AZDCS"] and the acts and omissions of each were done within his or her capacity as a state actor. These Defendants' actions were motivated by malice and/or reckless disregard of the federally-protected rights of the Plaintiffs. Each is sued in his or her individual capacity;

16.     At all times pertinent hereto, the SACAC was a not-for-profit corporation organized under the laws of the State of Arizona. SACAC's mission is, among other

things, to collaborate with law enforcement in the investigation of allegations of criminal child abuse. SACAC is signatory to agreements and memoranda of understanding with AZDCS and Pima County law enforcement agencies in which SACAC and Pima County law enforcement agencies, in which SACAC undertakes to conduct "forensic interviews" of children brought to SACAC by law enforcement and AZDCS, and to conduct invasive medical examinations of such children, in cooperation with AZDCS agents and/or law enforcement, and to report its "findings" to law enforcement and AZDCS. SACAC's joint criminal investigative activities, including forensic interviews and medical examinations and the gathering and processing of evidence for the benefit of law enforcement, is set forth in the Pima County Protocols for The Multidisciplinary Investigation of Child Abuse (Sixth ed., 2014) under the "Medical Protocol" and Appendix D, "Forensic Medical Examinations" [hereafter, the "Pima County Protocols"]. The Protocols were promulgated under A.R.S. §8-817, which contemplated collaboration between AZDCS, county law enforcement and "medical experts" in the formulation and implementation of the Protocols. The referred documents are appended hereto, collectively, as Appendix A. It is the policy of SACAC, with the approval of AZDCS, the Pima County Attorney and Pima County law enforcement, including the Town Council of Sahuarita, Arizona, to conduct the "forensic interviews" and invasive medical examinations for the purpose of obtaining evidence of the crime of child abuse without parental notice or consent, and without first securing a court order

authorizing such invasions of privacy of the child and interference with the parents' right to the control of decisions regarding medical examinations and treatment of their children. Detention of the child for such "forensic interviews" and examinations constitute searches within the ambit of the Fourth Amendment to the Constitution of the United States, and interference with the First and Fourteenth Amendment rights of parents and children to familial association and due process of law;

17.   Defendants Woolridge and Fordney, in their capacities with SACAC, approved and implemented the policy set forth above. Defendants Garrick, Dojaque and Rau, at the direction of Defendant Johnston, conducted the "forensic interview" of LAW and participated in the subsequent forensic examination as observers and/or providing resources and assistance to Woolridge. Woolridge and Fordney are sued as state actors in their official and individual capacities. Garrick, Dojaque and Rau are sued in their individual capacities. These Defendants are alleged to have acted with reckless disregard of the federally-protected rights of the Plaintiffs;

18.   At all times pertinent hereto, the Defendant the Town Council of Sahuarita, Arizona [hereafter, the "Town Council"] was and is the final policymaking body of the municipality of Sahuarita, Arizona, and responsible for the policies, procedures and protocols implemented by the Police Department of the municipality. The unconstitutional actions of the individual Sahuarita Defendants in conducting the search and seizure at Copper View Elementary School, transport and detention of LAW at SACAC, the "forensic interview" and the forensic medical examination

performed on LAW was in accordance with the Town Council's approval and implementation of the Pima County Protocols, or other such protocols or policies authorizing its agent to seize and search a child outside the home, transport the child to SACAC and detain him or her there, direct the child to be interviewed and participate in such interviews, and to order forensic medical examinations and the collection and processing of evidence of alleged child abuse crimes, all without notice to parents, consent of parents, or the securing of a warrant authorizing such actions. This policy is memorialized, in the Protocols, among others, in Appendix B, appended hereto. This Defendant is sued in its official capacity;

19.    At all times pertinent hereto, Defendants Johnston, Carrizosa and Pelayo were employed as police officers by the Defendant Town Council. The actions and omissions alleged herein were done within their capacities as state actors. These Defendants are sued in their individual capacities. Their actions were done with reckless disregard of the federally-protected rights of the Plaintiffs;

20.   The Court has jurisdiction of this case under federal question jurisdiction, §28 U.S.C. §1331;

21.     Venue is proper in this Court pursuant to 28 U.S.C. §1391;

22.    The claims asserted by Plaintiffs are brought to vindicate rights guaranteed Plaintiffs under 42 U.S.C. §1983. Declaratory relief is proper under the Declaratory Judgment Act, 28 U.S.C. §2201, et seq.; and Fed. R. Civ. Pro 57. Injunctive relief is proper under Fed. R. Civ. Pro. 65;

## OPERATIVE FACTS

23.     Plaintiffs reallege Paragraphs 1 through 22 as if fully set forth herein;

**The Wright Family and History of LAW**

24.      In or around his fourth year of age**,** LAW was diagnosed with a medical condition named "encopresis," which is defined as "repeated passage of feces into inappropriate places." Diagnostic and Statistical Manual of Mental Disorders 5; §307.7 (F98.1);

25.     When LAW's incontinence became a concern, Brian and Irlanda began having LAW seen by medical and other professionals. In February, 2019, LAW came under the care of Ramon Montes, M.D., at Phoenix Children's Hospital. The parents paid out of pocket for a full evaluation of LAW, including endoscopy and sigmoidoscopy;

26.      After the work-up, Dr. Montes advised the parents that LAW would grow out of the condition, probably by the time he reached seven (7) or eight (8) years of age. The parents relied on this diagnosis and prognosis. Despite his medical condition, LAW was a happy, active young boy, who lived with loving parents and siblings (image inserted on next page):



27.     In the school year 2019-20, LAW was enrolled in kindergarten in the Copper View Elementary School [hereafter, "CVES"] in the Sahuarita Unified School District. As a result of his diagnosis, the CVES administration and parents entered into an agreement. The key feature of the agreement was that, as needed, LAW would report to the school nurse's office, which was staffed by Jessica Mendez, and Ms. Mendez would change LAW's "pull ups" [essentially, a diaper]. LAW wore the pull ups twenty-four (24) hours each day;

28.   In so doing, Ms. Mendez, who is, under Arizona law a "mandatory reporter" of suspicions of child abuse or neglect, and had substantial previous experience, would have full view of LAW's buttocks, low back, and legs;

29.     LAW, at the beginning of the 2020-21 school year, was advanced to the first grade, and continued under the agreement. Ms. Mendez continued to attend to LAW's needs. Up to the date of December 15, 2020, Ms. Mendez had changed LAW's

14

pull ups over four hundred (400) times, never observing any evidence that caused her suspicion of possible child abuse. Ms. Mendez did observe "little boy bruises" on LAW consistent with his age;

30.    The Plaintiffs live in a two-story home in a middle-class subdivision of Sahuarita. The two boys, LAW and MZ-G, shared a bedroom with bunk beds. The boys, and their sister, LW, were very active. The children were enrolled in martial arts classes, and the boys would "play-fight" in and around the home. Occasionally, as was later reported to Defendant Talamantes, the children would kick, fight and scratch each other;

**The Events of December 15, 2020**

31.   On December 15, 2020, LAW attended CVES for a full day of school. He required changing by Ms. Mendez that day, who noticed small marks/bruises on LAW that corresponded to the "little boy bruises" she had previously seen;

32.    On the evening of December 15, 2020, the parents put the children to bed, then themselves retired to their room;

33.    At or around 9:30 p.m., Brian and Irlanda heard banging coming from the boys' room, across the hall from their room, and heard LAW cry out, "Ow, it hurts, he hit me!" Irlanda went into the boys' room, and found them both standing, each holding a curved section of blue track from a "Hot Wheels" set. Irlanda took the pieces from the boys, gave each a single spank on the bottom over their clothes and ordered them to bed. The boys each were wearing pajamas and because LAW was not crying, nor

complaining that he was in pain, she made no inspection to try to determine if and where MZ-G had hit him;

34.      She removed the Hot Wheels set from the room, and the next morning, discarded it into the trash;

35.      The next morning, in the usual course of events of the parents trying to get the children ready for school and take care of their own needs, one of them, probably Irlanda, changed LAW's pull-up readying him for school. No obvious mark that could have been caused by a blow from the plastic track was seen, though the parents were not specifically looking for it;

36.      The three older children were taken to CVES, and Brian went on to his work as General Manager of The Canoa Ranch Golf Resort;

37.      At approximately 10:00 a.m., Ms. Mendez, while changing LAW, noticed a horizontal mark approximately one inch (1") wide across his left hamstring midway between the bottom of the buttock and the knee;

38.      Ms. Mendez consulted with Deborah Ramirez, an Administrative Assistant at CVES, who suggested that the mark looked like it could have been caused by a belt. With that information, the two decided to make a mandatory report to the AZDCS "Hotline" as well as a 911 call to the Sahuarita Police Department;

39.      Ramirez made both calls at 10:13 a.m.;

40.      Defendant Carrizosa was dispatched to CVES, arriving at 10:18 a.m. Defendant Johnston reportedly arrived soon after;

41.     Carrizosa, after interviewing Mendez and Ramirez, who both stated LAW told them he didn't know how he got the mark, had Mendez assist in pulling down LAW's pants, searched his body, and confirmed the mark. As he had with the CVES staff, when questioned by Carrizosa, LAW replied he did not know how he got it, but that he got it yesterday;

42. Johnstone then arrived, and Carrizosa reported to him her interview of the staff, including that Ms. Mendez had seen the "little boy bruises" that day before, but that the mark reported by them to police and AZDCS was not seen on the 15th, and reported to Johnston what she had observed and photographed, and how LAW had responded to questions;

43.     At 11:30 a.m. Defendants Carrizosa and Johnston, who, according to them, could not get ahold of AZDCS, "took custody" of LAW and transported him to SACAC;

44.     Defendants did not inform either parent of the existence of the mark, nor that they were investigating felony child abuse, nor that both parents were suspects – which both were;

45.     Defendants, with LAW in custody, arrived at SACAC at noon;

46.     At SACAC, Defendants met and conferred with Morgan Rau, the SACAC designated "forensic interviewer." SACAC took custody of LAW. At approximately 12:15 p.m., Rau, at the direction of Defendants Johnston and Carrizosa, took LAW into a room dedicated to these interviews, equipped with a one-way mirror

and a video/audio recorder, and questioned LAW. Defendants Carrizosa and Johnston observed the questioning through the one-way mirror and heard the questions and answers through a speaker. Defendants did not inform the parents that LAW was being detained and questioned. None informed LAW that he could refuse to answer questions, could ask for a parent to be present, or that he could stop their activities at any time;

47.     In the interview, LAW again reiterated that he did not remember how he got the mark, that it did not hurt; that when his parents spanked him it did not cause pain; stated that his mother had hit him with a Hot Wheels track when he was four (4) years old; and once hit him with a belt when he was five (5) years old. He denied his parents ever causing a bruise or mark on him. When asked when was the last time his mother spanked him, he recounted in some detail an incident five (5) days earlier when she had caught him and MZ-G stealing some granola and spanked him on his bottom with her open hand. He also stated he felt safe at home, except for his sister, LW, who, he stated, MZ-G protected him from, that LW scratched MZ-G and that he, LAW, had punched her "like 30 times on the back" to make her stop. The interviewer did not follow up on that volunteered information, but left the room. She returned after conferring with Defendants, and began questioning LAW again about the events of five (5) days before. This time LAW stated that his mom spanked him with a belt, contradicting he previous statement. The interviewer only asked him to repeat that

statement, which he did, then she ended the interview. She did not question LAW about the discrepancy between that and the previous statement;

48.    At the conclusion of the interview, Defendant Johnston, who knew Defendant Woolridge from previous encounters at SACAC, called Woolridge and asked him to come to the SACAC and conduct a medical examination of LAW;

49.    Woolridge complied, came to SACAC and at 1:00 p.m., commenced the medical examination, with the participation and cooperation of Johnston, Carrizosa, and SACAC employees Garrick, Dojaque and Rau;

50.    Before the examination, Defendants gave LAW a number of toys, which they informed him were gifts for him to take home for himself and for his siblings. Defendants told LAW he would have these gifts if he just cooperated with Defendants in their activities;

51.    Per policy, neither Woolridge, nor any other Defendant, sought to inform the parents that a medical examination was contemplated, nor to seek any consent from them for the examination. Nor did Defendants make any effort to secure a court order authorizing the invasive medical examination contemplated. Woolridge knew that legal custody of LAW resided with the parents, and was aware of the statutory and constitutional restrictions on the conduct of a forensic medical examination;

52.    Woolridge had, and recorded, no family or medical history regarding LAW's possible medical conditions, except that he was informed of the diagnosis of encopresis and was informed that LAW was changed by school staff. Woolridge made

no effort, before, during or after the examination, to obtain any family or medical history. Woolridge made no request for medical records from CVES regarding LAW, nor to speak with the mandatory reporter, Mendez, about her previous experience with LAW.  All of these omissions violated the "Standards for Accredited Members (2017)" governing the SACAC's procedures, issued by the National Children's Alliance, the umbrella organization under which SACAC operates and is accredited;

53.  Woolridge conducted an examination of LAW, directing Defendant Johnston to document and photograph what Woolridge pointed out. Photographs taken of LAW during the medical examination show him with one of the toys he had previously been given:



54.    Although there were no allegations, nor complaints by LAW of any sexual abuse, Woolridge made invasive examination of LAW's genital and rectal areas, causing LAW pain and discomfort which Wooldridge documented in his report as LAW being "resistant" to the procedure;

55.    Woolridge, in addition to the mark that had brought the SPD to the school, and LAW to SACAC originally, documented in his report two small oval

bruises on LAW's right buttock and right thigh, and three small scratches on his right leg, and upper right buttock. Woolridge described these marks as "multiple contusions – location & nature of lesions concerning for inflicted injury." He described the original mark on the left hamstring as "wrapping effect implies flexible nature of impact object" and "impact silhouette indicating nature and shape of implement used." He concluded, "contusions @ different stages of healing suggests injury events over a series of days . . .". These other marks were those having been conveyed by Ms. Mendez as common marks seen on LAW over the past two (2) years, but neither Johnston nor Carrizosa made Woolridge aware of that fact, nor did Woolridge inquire;

56.   Woolridge did not ask for, nor was he provided, the video or audio recording of the interview of LAW;

57.   Woolridge's opinions, which he did not so state in the report, were possibilities only. He could not, to a degree of medical probability, state the who, the what, or the how of any of the marks he documented on LAW. Indeed, at least two (2) of the "linear contusions" were so faint that they could barely be discerned from Johnston's photographs. Johnston left the facility shortly thereafter, to organize a search of the Wright residence and a "welfare check" of the other siblings. Defendant Carrizosa was left with LAW to await the arrival of a DCS investigator, and LAW remained in the custody of SPD and SACAC;

58.   After two hours of delay, at 3:45 p.m., Talamantes arrived at SACAC, having been assigned the investigation by Defendant Francisco. Before leaving his

office for the SACAC, he confirmed that there were no previous instances of Brian or Irlanda being reported to DCS. Defendant read the Hotline narrative of CVES Ramirez's call. Other than searching the criminal background of each parent, Talamantes engaged in no other investigative activities;

59.   Upon arrival at SCAC, Talamantes spoke with Carrizosa, and secured a CD of the interview video and audio, and a copy of Woolridge's report. Talamantes learned then, if not before, of the encopresis and that the mandatory reporter had observed LAW's body more than once each school day for the past two (2) school years;

60.   Without attempting to contact the CVES staff, or do any other investigatory acts, Talamantes telephoned, and spoke with Francisco and/or Dedmon, and the AZDCS agents decided to claim that LAW was in imminent danger of physical abuse and would not be released from custody until Talamantes had had Brian and Irlanda sign off on a AZDCS "Present Danger Plan" which would require, among other limits on the parents' right to control the upbringing of LAW, that a "safety monitor" be found to live in the home 24/7 and that neither parent would have contact with LAW in the absence of the safety monitor;

61.   During this time, Irlanda drove to CVES to collect her children at the end of the school day. The two other siblings appeared, but LAW did not. Irlanda inquired of the principal of CVES as to the whereabouts of LAW, was told he was at SACAC, but that there was no other information, and that the Sahuarita police were involved;

62.     Irlanda was stunned and afraid and immediately called and spoke to Brian, informing him of the situation. Brian immediately drove to the Sahuarita Police Department, and eventually spoke with an officer – believed to be Defendant Johnston – who gave him little more information. This happened at 2:00 p.m.;

63.     At 4:00 P.M., Brian was contacted by Talamantes who informed him of the AZDCS determination that the parents would have to agree to the Present Danger Plan if they didn't want their son put in foster care. Under duress, Brian agreed, and immediately made arrangements for the paternal grandmother, Lisa Pugliano, to drive from Scottsdale to AZDCS, where LAW would be released in her custody. Brian only agreed to the demand because of Talamantes' threat that he would seize Lance if the parents did not agree. At the time, nor at any time, did Talamantes have reasonable suspicion that Brian had physically abused Lance, nor that he had enabled abuse;

64.     While this was happening, Johnston conferred with Defendant Pelayo, conveying to her what had occurred at SACAC. At Johnston's direction, at 4:17 p.m., Pelayo placed a phone call to Superior Court Judge Bernini, requesting issuance of a search warrant upon the home of the Wrights. Based on Pelayo's sworn facts, Bernini authorized the search warrant, which as limited to search and seizure of "a small brown belt and a track from a 'hot wheels' racetrack," and "[a]ny other fruits, instrumentalities or evidence of the crime(s) of Assault of a Minor or Physical Abuse of a Minor". The application did not identify nor describe the other three siblings in

the home, nor seek authorization to conduct searches or seizures from those three siblings;

65.     At 4:45 p.m., Brian, and the other three siblings were home when Johnston, Pelayo, and a group of SPD officers arrived and obtrusively set up outside the home. along the cul-de-sac. Johnston, Pelayo, and other officers then entered the home, informed Brian of the search warrant, and Johnston sat Brian at his kitchen table and interviewed him while other officers searched throughout the home. Irlanda arrived shortly after the search began, and was separated from Brian and questioned by Pelayo;

66.     As the events commenced, Talamantes arrived at the home, sat down at the kitchen table, and observed Johnston's questions to Brian, and heard Brian's answers;

67.     At some point, Johnston asked Brian if the two older children would change into their swimsuits. Brian agreed, and LW and MZ-G went to each of their bedrooms, put on the swimsuits and were then photographed by one of the SPD officers. With the approval and authorization of Johnston and Pelayo, MZ-G was directed to pull down his suit, exposing his genitals and buttocks, and the SPD officer took photographs of the unclothed child. Neither Brian nor Irlanda were advised this would be done, nor given the opportunity to object. The image of MZ-G as photographed by the SPD officer, is reproduced below with redaction:



68.     At the conclusion of approximately three (3) hours of searches and

seizures, and after Brian and Irlanda had cooperated fully with SPD, the police left the

home. SPD seized the Hot Wheels set which they recovered from the trash, and two

belts from the parents' bedroom closet. During the questioning, which Talamantes

heard, Brian had informed Johnston of the events the night before, summarized in ¶32-

33 above;

69.     Johnston  examined the belts seized, and recognized that they could not

have caused the mark on LAW's leg. He further recognized that the Hot Wheels track

was of the dimensions that could well have caused the mark. Based on the evidence he

gathered, Johnston concluded that all the marks seen on LAW were likely the result of

roughhousing  by siblings and determined there was no probable cause to bring

charges against either parent. SPD closed the investigation that night;

70.     Talamantes remained behind, and presented the Present Danger Plan to

Brian, who signed off on it. During this period, Mrs. Pugliano was driving down from

Scottsdale. Later, having been given the address of the AZDCS office, she arrived, met

with an unidentified AZDCS agent, agreed to act as safety monitor following the agency's conducting a criminal and agency background check. At the conclusion, the Defendants released LAW, who had been moved from SACAC to the AZDCS office, into the custody of the safety monitor, and she drove to the Wright home with the child;

### From December 16 to December 28, 2020

71.    Between the 16th of December, and the 28th, Talamantes' entire investigation consisted of: (1) watching the CAC forensic interview video recorded on the 16th; (2) interviewing Brian, Irlanda, and, each separately, LW and MZ-G; (3) touring the home with Brian; (3) interviewing Brian and Irlanda a second time, on December 21st; (4) requesting, and on December 23rd, receiving and reading the SPD Report No. S20210504;

72.    During Talamantes' visits to the home, Brian also informed Talamantes that the marks he saw on LAW were consistent with bruising he had seen previously on LAW and other children which resulted from roughhousing;

73.    In his interview of LW, the eldest child, Talamantes learned that LW confirmed the parents' report that the children were spanked with an open hand only as a last resort after other progressive disciplinary actions, i.e., removing electronics, time outs, failed. LW also confirmed that she and her brothers would kick, scratch and fight each other. Talamantes asked, and LW confirmed, that she feels safe at home. Talamantes did not ask MZ-G if he feels safe;

74.     On the 21st, both parents confirmed the events of the night of the 15th, that Talamantes already knew from the parents' interviews by SPD detectives on the evening of the 16th;

75.     During the home visit on December 21st, Brian showed Talamantes photos he had taken of LAW's buttocks and legs twenty-four (24) hours after LAW was seen by Woolridge on the 16th. Brian then texted the images to Talamantes;

76.     On the 23rd  the family requested leave to travel to Mexico to have Christmas with Irlanda's family. Mrs. Pugliano could not accompany them, so Talamantes approved the paternal grandfather, Patrick Wright, as safety monitor and the family left the country, returning on December 27th;

77.     On or about December 27th, Talamantes conferred with Defendant Francisco, and conveyed to her all the information he had gleaned from his investigation and Francisco knew, as well, what Talamantes had omitted to do. The two Defendants decided that Talamantes would file a sworn application with the Maricopa County, Superior Court, for authorization for *ex parte* seizure of LAW. Talamantes prepared the application, which Francisco reviewed and approved;

78.     The next morning, December 28 at 9:00 a.m., Talamantes transmitted the application to Maricopa County Superior Court. At 9:07 a.m., the *ex parte* removal was authorized;

79.     After he had secured the order, Talamantes convened "Team Decisionmaking Meeting" [hereafter, "TDM"] which had been previously scheduled.

Before the meeting, on information and belief, Talamantes conferred with the facilitator, Maldanado, to advise him that the *ex parte* order had already been secured, and the outcome of the meeting was pre-ordained. AZDCS agents delayed the start of the meeting in order to secure the removal order. At the conclusion of the meeting, Talamantes announced that he had secured the *ex parte* order and that the parents had to accept that AZDCS was taking custody of LAW. Maldanado facilitated and acquiesced in that action;

80.    Approximately two hours later, Talamantes, along with another AZDCS employee whose name was not given, arrived at the Wright's home, presented Brian with a "Temporary Custody Notice" giving custody and control of LAW to AZDCS, and seized LAW. In the process, the other AZDCS employee threatened and intimidated Brian, and was abusive and dismissive of the parents after Brian noted and pointed out that the agents did not have a safe and appropriate car seat to transport LAW. No information regarding where LAW was being placed, nor when or how the parents could communicate with him, were given;

**December 29, 2020 to January 15, 2021**

81.    On the morning of December 29th, Brian prepared and submitted to the AZDCS Ombudsman a formal complaint for the actions of the AZDCS agent during the seizure of LAW;

82.    Between December 29th and the 31st, Talamantes and Francisco met with Arizona Assistant Attorney General Nansi D. Naranjo [hereafter, "Naranjo"], and

provided what alleged facts the investigation had revealed, and the following

documents: (1) the TDM Summary prepared by Maldanado; (2) the Temporary

Custody Notice Talamantes had prepared previously; and (3) the Application for the *ex

parte* order [hereafter, the "CAR"] and the order that issued. It is believed that the

Defendants prepared and provided to Naranjo a Dependency Petition Worksheet which

reiterated the allegations;

83.     Relying on the information and contents of the documents presented by

Talamantes and Francisco, Naranjo prepared and filed – along with the Application,

CAR and TDM Summary -- the "DCS'S DEPENDENCY PETITION AND

PETITION FOR PATERNITY AND/OR CHILD SUPPORT" [hereafter, "the

Petition"] in the Pima County Superior Court, Juvenile Division, assigned Case No.

20200802. The case was assigned to the Honorable Leslie Abrams, Judge;

84.     The operative facts of the Petition, sworn out by Talamantes as true and

correct, were set out in Paragraph VI(A)(1), as follows:

> The father neglects [LAW]. [LAW] disclosed his step-mother regularly
> uses physical discipline with him and his siblings in the home. [LAW] reports
> his step-mother hits him with objects including a belt and a Hot Wheels racing
> track. [LAW] completed a forensic medical exam on December 16, 2020.
> Multiple lesions and contusions were found on [LAW]'s body in varied stages
> of healing. There is an ongoing criminal investigation into the father and step-
> mother. The father and step-mother both admit to using physical discipline on
> [LAW]. The father and step-mother report the step-mother spanked [LAW]
> and his siblings around bedtime on December 15, 2020. The father reports he
> examined [LAW] on December 17, 2020 after law enforcement became
> involved, and he saw multiple marks and bruises on [LAW]'s body. The father
> reported the penny shaped bruises on [LAW]'s buttocks may have been caused
> by the mother spanking [LAW]. The father described the bruises as not being
> that bad. The father and step-mother both minimized the concerns about

[LAW] being physically disciplined resulting in him receiving bruises and lesions.

85.    Between December 28, 2020 and January 4, 2021, Defendants Encinas and Sheldon took over the case for AZDCS, Encinas as "On-Going Case Manager" and Sheldon her supervisor;

86.    Before assuming responsibility, Encinas and Sheldon were briefed by Talamantes on his investigation, and reviewed the documents and video records that Talamantes had secured in the investigation;

87.    Before January 4, 2021, these Defendants collaborated on the preparation of a "REPORT TO THE JUVENILE COURT FOR PRELIMINARY PROTECTIVE HEARING AND/OR INITIAL DEPENDENCY HEARING" [hereafter, "the Report"]. Talamantes and Francisco put their names to the Report. It was then transmitted to the Assistant Attorney General [hereafter, "the AAG"], with another copy of the TDM Summary appended. In support of the decision to secure *ex parte* removal of LAW, and placement of him in a foster home, and in reliance on the facts set out by the Defendants, the AAG filed the Report with the Juvenile Court;

88.    On or about January 5, 2021, Talamantes, with the approval of Francisco, made a proposed finding in AZDCS "CHILDS" databased that, among other allegations, "On and/or around December 16, 2020, Irlanda Wright abused [LAW], aged 6, when she spanked him with a toy causing him to sustain several injuries.";

89.     At the commencement of the Preliminary Protective Hearing on January 4, 2021 the Court accepted the Petition and Report as *prima facie* evidence of physical abuse having been inflicted by Irlanda on LAW, and Brian's complicity in that crime;

90.     At the conclusion of the Preliminary Hearing on Friday, January 15th, the Court ruled that the State had not proved the necessity of temporary custody of the child, but did not dismiss the dependency, and ordered that the in-home safety monitor Present Danger Plan be re-instituted. Yet despite that Order, that night, the Defendants Encinas and Sheldon demanded that LAW be placed outside the home, in the care of the paternal grandmother, in Scottsdale. All the restrictions and limitations on the rights of the parents to the custody and control of LAW's upbringing were continued. Brian was denied even the opportunity to accompany LAW to Scottsdale or to visit him. The dependency continued, with trial dates set in the future;

91.     Commencing on that date, the parents began seeking to satisfy AZDCS's demands for services that would, so the Defendants said, satisfy the agency that the parents were not threat to LAW and allow the agency to agree to full return of custody to them;

**January 15, 2021 to October 14, 2021**

92.     However, over the succeeding weeks, Defendants Encinas, Sheldon, and, subsequently, Noriega [on and after April 7, 2021], obstructed the parents' efforts to secure the services for the family and for LAW. Encinas and Sheldon terminated Brian's efforts to have the provider, Casa de los Ninos, engage in in-home and other

services. In so doing, Sheldon lied about Brian allegedly not informing the provider that the family was engaged in a dependency;

93.     The three Defendants maintained throughout that AZDCS would oppose re-unification of the family so long as Brain did not "align himself" with the agency's allegations of child abuse. When Brian repeatedly pointed out that he had reviewed the CAC forensic interview, and that LAW had denied ever being hurt by a parent, that he felt safe at home; that the inconsistency in LAW's single statement that he had been hit with a belt five (5) days before the 16th of December could not have been true, because there was no reported injury by CVES until the 16th; that the bruise on the left hamstring was consistent with the brother, MZ-G's hitting LAW the night of the 15th with the Hot Wheels track, and the other marks consistent with roughhousing; that the police report concluded the marks were from the boys roughhousing; and that the parents had pledged that they would never spank an child again, the response from Defendant Sheldon, for example, on February 8, 2021, was that "best case scenario, if your child got repeated bruises from being hit by his brother, that in itself is a failure to protect.";

94.     Despite Brian's repeated avowals that if he was ever told by LAW, or any of his children, that a person had hurt them, he would believe the child and confront the person, and that, having seen the video of the forensic interview, his son did not assert that either parent had abused him, Sheldon and Encinas continued to claim that

Brian "minimized" the situation, and used that falsehood, and others, as grounds to oppose reunification;

95.    Defendants Sheldon, later Noriega, and Encinas "staffed" the case with Defendant Orozco, fully apprised of the facts, approved the demand that Brian "align himself" with AZDCS's allegations of abuse, and authorized Defendants to continue to obstruct reunification. Following the assignment of Noriega to the case on or about April 7, 2021, Orozco continued to be apprised of the facts, and continued to authorize the obstruction;

96.    Defendants knew and intended that, if Brian would have made the statement that his wife had physically abused LAW, they would notify SPD of the admission, causing SPD to re-open the closed criminal investigation and exposing both parents to felony prosecution for child abuse;

97.    While in foster care, as a result of the manner of the seizure, and the seizure itself, LAW's mental and emotional state had begun to decompensate emotionally and physically. After he was transferred to the care of Mrs. Pugliano on January 15, 2021, the deterioration of the child continued and was exacerbated. The comfort of his existence was removed, including the loss of his siblings, his parents, and his school. All this stress exacerbated the encopresis, and LAW was hospitalized in Phoenix Children's Hospital where he underwent medical procedures. Defendants did not inform the family of this emergency situation until after LAW was admitted as

an inpatient, and obstructed Brian seeing him and being advised of his condition, diagnosis and prognosis;

98.     As a result of the meeting of February 8, 2021, Encinas and Sheldon demanded the parents accept a "Case Plan" that required them, among other demands, to enroll in, and complete a number of services. Brian was ordered to complete a psychological evaluation, "Masters Counselling Individual", parenting classes and family counselling"; for Irlanda, the same, plus anger management classes, and parent aid services. Brian was required to pay for such services as the "Master Counselling Individual." In addition to these required actions, Brian sought out, enrolled in, and successfully completed a "Nurturing Fathers" class sponsored the Family Involvement Center;

99.     Although the agency was responsible for facilitating the prompt enrollment in these classes and services, the Defendants intentionally delayed and obstructed the parents' efforts to engage the services and complete them;

100.     When, weeks later, both parents and LAW's two older siblings were approaching the successful completion of the required services, Defendants Encinas and Noriega, with the knowledge and approval of Orozco, engaged in further obstruction of the parents' efforts to comply;

101.     On April 30, 2021 and again on May 3, 2021, Brian forwarded to Defendants certificates of completion of parenting classes, anger management and others;

102.    On April 15, 2021, Brian's therapist inquired of Encinas regarding Brian's progress and success in individual therapy, reporting his success. On May 5, 2021, despite the therapist's informing Encinas that Brian no longer required any therapy, Encinas, as part of the agreement of the Defendants to obstruct reunification, refused to authorize completion, informing the therapist that Brian would be required to attend for as long as "the case is in trial;"

103.    The Case Plan mandated individual therapy for LAW, and Brian repeatedly pleaded with Defendants to commence that therapy. Brian repeatedly told Defendants that AZDCS' actions had severely impacted LAW's mental and emotional state, however, his pleas were ignored by Defendants, causing increasing decompensation and damage to LAW. When questioned by Brian about why LAW was not in therapy, Defendants lied, saying that LAW was in therapy;

104.    On April 18, 2021, LAW was returned to the Wright's home by order of the juvenile judge with Ms. Pugliano continuing as "safety monitor." These Defendants opposed the return. Brian had earlier had communications with Defendants regarding the agency approving one Dana Carillo as an additional safety monitor. Ms. Carillo had also had communications in efforts to obtain approval. However, the Defendants continued to delay approving Ms. Carillo though there were no grounds to do so and even though she had been residing in the home since April 16, 2021;

105.    On April 22, 2021, Ms. Pugliano informed Encinas that she saw no need for any safety monitor, that there was no danger in the home, and that she intended to return to Scottsdale;

106.    On April 27, 2021, the agency convened an "emergency TDM." At that meeting Encinas, with prior approval of Noriega, repeated the false allegations of abuse and Brian's facilitation of them, repeated that the parents were required to "align" with allegations of abuse, and again reiterated the demand that the parents undergo psychological evaluations. Encinas then presented the parents with a revised "Case Plan" which incorporated these conditions;

107.    On April 28, 2021, during a trial session, Ms. Pugliano informed the Juvenile Judge of her observations that there was no safety concern for LAW, and her decision to return home to Scottsdale;

108.    On May 3, 2021, Ms. Pugliano left the home shortly after Encinas presented Brian with a revised Safety Plan which for the first time recognized Ms. Carillo as a safety monitor;

109.    Following LAW's return home on April 18th  LAW was re-enrolled in CVES, attending five (5) days each week, and being seen each day by Ms. Mendez. Gradually, LAW's behaviors began to improve, and the previous oppositional behaviors he had displayed in Scottsdale diminished;

110.    Immediately, Brian began to ask for AZDCS and Intermountain to include LAW in the family therapy sessions that had been on-going, by having them become

face-to-face in the home. Over the next weeks, the obstruction and delays continued through the agency and Intermountain. There were no sessions held until May 18, 2021, when Ivette Molera of Intermountain Centers came to the home, and, thereafter on a regular basis;

111.   It was not until July 6, 2021, that LAW's individual therapy with Intermountain's Peter Tolhurst, commenced;

112.   After she had been safety monitor for about four (4) weeks, Dana Carillo told Brian that she desired to take personal time to return to New Jersey to visit. Ms. Carillo had been attempting to reach Encinas about her desire to have a break, but Encinas would not return her calls. Brian had already commenced a search for a back-up safety monitor. He located Samantha Gomez and when she agreed to come to Tucson and live with the family, he invested over $15,000.00 in securing her availability, including paying for her tuition to the University of Arizona, a stipend for her acting as safety monitor, and, eventually, purchasing a car for her use;

113.   As early as mid-May, Brian informed  Encinas of the availability of Ms. Gomez to take on the responsibilities. He provided Defendants with documentation of her commitment, including records of her admission to the U of A. Despite that, Defendants continued to delay and obstruct the approval of Ms. Gomez;

114.   As she had so notified the family and agency, on May 29, 2021, Ms. Carillo left Tucson. The night before, Brian put in another emergency call to Encinas that Ms. Carillo was departing. Encinas never returned his voicemail;

115.    Rather, for the first time, that evening, Encinas put a call into Ms. Gomez, and scheduled a call with Ms. Gomez for the next Wednesday;

116.    Having had no communication from Encinas, at 7:00 p.m., Brian emailed her to confirm that Ms. Carillo would be leaving the next morning, and asking Encinas for guidance on what to do;

117.    Encinas ignored the communications, until 8:00 a.m. on Tuesday, June 1st. She then called Brian, claiming ignorance of the situation. Encinas advised she would call him back, and advise where LAW was;

118.    Without calling or communicating in any way with Brian, at 10:33 a.m., Brian received a panicked call from Irlanda that Encinas and another AZDCS agent were at the door to take LAW;

119.    Brian immediately drove home, and while driving home, called his sister, Gina Hollman, already approved by AZDCS as a supervisor for LAW, asking if she and her family could take LAW in for a couple weeks until he could get the situation stabilized. Mrs. Hollman agreed immediately;

120.    When Brian arrived at the home there was a chaotic incident which traumatized all the Plaintiffs, including the other children. Brian immediately on arrival informed Encinas that Mrs. Hollman was waiting for LAW to be brought to her home. Encinas refused. The two AZDCS agents seized LAW and left the home, Encinas only telling Brian and Irlanda that "we don't know what's happening" and "we have to figure out what we are going to do." Following the seizure, at 12:15 p.m.,

Brian emailed Encinas his concerns, among other topics, and made clear about concerns about LAW's safety and his continued routine for his physical and mental health; and that Ms. Gomez would arrive in Tucson in the next two days; that he requested constant communications about LAW's whereabouts and the agency's plans. Encinas responded to some, but by no means all, these requests;

121.   LAW, Brian was informed, would spend the night in the "Welcome Center" in Tucson. Noriega and Encinas refused to allow Brian to ride along with Encinas to transport LAW to Mrs. Hollman's home;

122.   The next day, LAW was transported to Phoenix, and turned over to the Hollmans;

123.   Brian continued to supply the Defendants with documentation confirming Ms. Gomez's willingness and fitness to take over safety monitor responsibilities in the family home. The Defendants continued to slow-walk the process;

124.   LAW's behavior dramatically deteriorated after this second seizure. The Hollmans informed Brian and also confirmed their previous plan to vacation out of state starting June 21, 2021;

125.   On June 9, 2021, Brian emailed Encinas, confirming that LAW's individual therapy he had set up had been cancelled because of the seizure and transport to Phoenix. That same day, he emailed Encinas, Noriega and Orozco, demanding an emergency TDM, and informing them of his intent to file a formal complaint arising out of the actions. In a third email, he notified Defendants of the

availability of another woman, a life-time resident of Tucson, as safety monitor and conveyed contact information;

126.   Defendants did not (1) convene an emergency TDM, (2) respond to the notice of Brian's intent to file a complaint, nor (3) promptly investigate and approve the alternative monitor proposed;

127.   On Monday, June 14th, Brian spoke to Orozco, and put to her a number of questions and concerns, and relayed the incident of the seizure of LAW on the 1st. Orozco promised him responses;

128.   Following an in-home session with the family on June 16, 2021, Ms. Molera, emailed Encinas about the "imperative" need for LAW to get some stability from the recent trauma from the agency removal and disruptions in his life;

129.   Despite the knowledge that the child was decompensating rapidly because of the separation, Defendants took no action;

130.   On Monday, June 14, 2021, the Hollman's reported to Encinas that they were "very concerned" because LAW "is displaying aggressive behaviors and is not at home with his family. After his visit this weekend [with the Wrights] he is extremely sad and we had trouble calming him down. Can you please let us know when you plan on returning him home to his family?" These Defendants did nothing in the face of this emergency situation;

131.   The night of June 16th LAW punched the Hollman's daughter in the face. Justin Hollman contacted Encinas the next day, informing her that LAW would have

to be removed from their home no later than 4 p.m., the next day, June 18, 2021. At 5:04 p.m., he emailed Brian, copying Defendants, on the incident and informing all of the "severe negative impact on [LAW] … and that "[LAW] has never displayed this kind of behavior until the State removed him from his home." Mr. Hollman concluded that the best course, in his opinion would be to "place him in the custody of the approved safety monitor Samantha and have [LAW] return home;"

132.    Defendants' only response to Mr. Hollman's email was a reply by Noriega falsely claiming that the Hollmans "are disrupting as [LAW] has been moved about serval (sic) times these past few months.";

133.    Despite Brian's frantic efforts in the ensuing twenty-four (24) hours to secure approval of Mr. Hollman's recommendation, Defendants did nothing. On the morning of June 18th, two unknown male AZDCS agents appeared at the Hollman home and again seized LAW. Neither Brian nor the Hollmans were given any reasonable notice to prepare LAW for this third seizure;

134.    Before the agents appeared at the Hollmans' door, Brian emailed Orozco, including specific questions and items of concern, again requesting that she act and respond. Orozco never responded to the specifics;

135.    Defendants actually placed LAW in a group home, while Encinas falsely informed the family that he was living in a foster home. They also informed the AAG that the Hollmans and Brian had caused a "disruption" and falsely claimed concern about "continued efforts to manipulate the placement situation." Defendants refused to

hold an emergency TDM to disclose to the family the facts of the removal, continuing to delay and obstruct the reunification. Defendants, further, refused visitation by Brian and other family members, such as his aunt, who had previously been vetted and approved by the agency. Defendants engaged in this conduct to prevent the family from witnessing the conditions under which LAW was being housed and to further sever the familial association;

136.   Defendants continued to delay until June 25th, when they convened a TDM, following which LAW was returned home for a second time, this time with Ms. Gomez finally approved as the approved safety monitor;

137.   Upon return home, LAW's emotional condition and behaviors had regressed from the progress he had made before June 1st. On July 6, 2021 he finally began receiving individual therapy with Intermountain;

138.   On July 12, 2021, Brian received and forwarded to Encinas his scores given on the "Adult-Adolescent Parenting Inventory – 2.1". These were all outstanding, 10 out of a possible 10 on all criteria. Defendants never acknowledged this result. However, they informed the AAG that they suspected the scores were fraudulent, a claim the AAG later repeated to the juvenile judge;

139.   On July 13, 2021, Ms. Molera emailed Defendants that the family had made significant progress in family counselling and that Intermountain would be concluding the sessions, but that LAW should remain in therapy;

140.    On July 23, 2021, after months of insisting both parents submit to AZDCS psychological evaluations as a condition of the full return of custody, Encinas notified Brain that this demand was being dropped;

141.    On August 19, 2021, the Defendants convened another TDM. Both Encinas and Noriega directed the session. During the session, the Defendants repeatedly stated that they no longer had any safety concerns and that the agency would move, on August 26, 2021 [the next-scheduled Dependency Review conducted by the judge] to dismiss the case. The TDM summary included the statement, "Based on today's discussion the Department will recommend to lift the safety plan and allow the court to dismiss the case. At this time, there are no safety threats as to [LAW].";

142.    However, despite this admission, and the stated commitment that the case be dismissed, between the date of the TDM and the hearing, Defendants reversed their position, and on August 26th, the AAG informed the judge that the State would not move for dismissal, but would continue the dependency, and continue legal custody and control of LAW;

143.    On no grounds whatsoever, then, Defendants obstructed the return of legal custody and control of LAW to the parents for the next 50 days;

**FIRST CLAIM: CLAIM OF PLAINTIFF LAW AGAINST DEFENDANTS CARRIZOSA AND JOHNSTON: VIOLATIONS OF THE FOURTH AMENDMENT: SEARCH AND SEIZURE AT CVES, TRANSPORT TO SACAC AND SEARCH OF LAW BY FORENSIC EXAMINATION AND CONTINUING DETENTION AT SACAC**

144.   Plaintiffs reallege Paragraphs 1 through 143 as if fully set forth herein;

145.   This Claim is brought to vindicate LAW's right to be free of unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States;

146.    From the time they arrived at CVES and began investigating, LAW was in the custody of the Defendants Carrizosa and Johnston;

147.   The Defendants' action, of questioning LAW regarding his alleged abuse, and searching LAW for evidence of the crime of child physical abuse while at CVES lacked probable cause to justify the unconsented search in the absence of a warrant authorizing the interrogation, seizure and search;

148.   The continuation of the seizure, the transport to, and detaining of LAW at, and in the custody of SPD and SACAC, the interrogation of LAW and the conduct of the forensic medical examination constituted a continuing violation of the Fourth Amendment, undertaken without probable cause that LAW had been the victim of child abuse, or that either parent had engaged in child abuse;

149.   As a direct and proximate result, Plaintiff LAW suffered a deprivation of his liberty, emotional distress and other intangible damages;

44

**SECOND CLAIM: CLAIM OF BRIAN, IRLANDA AND LAW AGAINST DEFENDANTS CARRIZOSA AND JOHNSTON: VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS: SEARCH AND SEIZURE AT CVES AND TRANSPORT TO SACAC; INTERROGATION OF LAW AT SACAC, SEARCH AND DETENTION AT SACAC**

150.   Plaintiffs reallege Paragraphs 1 through 149 as if fully set forth herein;

151.   This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association and due process of law;

152.   These Defendants, Johnston and Carrizosa, authorized and participated in the "forensic interview" by the SACAC interviewer, Rau, and the invasive medical examination conducted upon LAW by Defendant Wooldridge, without the consent of the parents; without notification to the parents of their right to attend; and without the Defendants having secured a warrant to conduct the search;

153.   The unconsented seizure and search at CVES, the subsequent decision to subject LAW to the forensic interview, and, particularly, the decision and execution of the search by Woolridge, all decisions subjected to the right of the parents to control the upbringing of the child by the Constitution, constituted violations of all three Plaintiffs' right to familial association;

154.   The continuing detention of LAW following the examination also constituted a continuing violation of all three Plaintiffs' right to familial association;

155.   As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

**THIRD CLAIM: CLAIM OF LAW AGAINST TOWN COUNCIL: FOURTH AMENDMENT VIOLATION; SEIZURE OF LAW AT CVES, QUESTIONING OF LAW AT CVES, TRANSPORTATION TO SACAC, DETENTION AT SACAC, INTERROGATION AT SACAC, INVASIVE MEDICAL EXAMINATION**

156.  Plaintiffs reallege Paragraphs 1 through 155 as if fully set forth herein;

157.   This Claim is brought under the Fourth Amendments to vindicate the right of the child to freedom from unreasonable search and seizure;

158.  The medical examination of LAW was conducted pursuant to the policy and protocol approved by the Town Council, or by the Chief of Police as delegated to him by Defendant. Previous medical examinations conducted by physicians working for SACAC, with cooperation of SPD officers, were conducted under this protocol;

159.  The policy and protocol, as documented in the Pima County Protocols, or other policies and protocols adopted by the Defendant, as set out above, is unconstitutional on its face, as authorizing such unconsented interrogations, seizures, transport, detention and invasive medical examinations, in the absence of notice to the parents of the right to attend and deny consent; and without the Town Council's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

160.  As a direct and proximate result, LAW suffered fear, physical pain and suffering from the genital and rectal examinations;

161.    The Defendant's polices and/or protocols, as described above, were the moving force behind the violations by the SPD Defendants, and without which, such violations would not have happened;

**FOURTH CLAIM: CLAIM OF PLAINTIFFS LAW, BRIAN, AND IRLANDA AGAINST TOWN COUNCIL: FIRST AND FOURTEENTH AMENDMENT CLAIM: SEIZURE OF LAW AT CVES, QUESTIONING OF LAW AT CVES, TRANSPORTATION TO SACAC, DETENTION AT SACAC, INTERROGATION AT SACAC, INVASIVE MEDICAL EXAMINATION**

162.    Plaintiffs reallege Paragraphs 1 through 161 as if fully set forth herein;

163.    This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association and due process of law;

164.    The medical examination of LAW was conducted pursuant to the policy and protocol approved by the Town Council. Previous medical examinations conducted by physicians working for SACAC were conducted under this protocol;

165.    The policy and protocol, as documented in the Pima County Protocols, or other policies and protocols adopted by the Defendant as set out above, is unconstitutional on its face, as authorizing such unconsented interrogations, seizures, transport, detention and invasive medical examinations, in the absence of notice to the parents of the right to attend and deny consent; and without the Town Council's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

166.   As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

167.   The Defendant's polices and/or protocols, as described above, were the moving force behind the violations by the SPD Defendants, and without which, such violations would not have happened;

**FIFTH CLAIM: CLAIM OF LAW AGAINST DEFENDANTS WOOLRIDGE AND FORDNEY: FOURTH  AMENDMENT VIOLATION IN CONDUCT OF UNCONSENTED DETENTION, INTERROGATION AND FORENSIC MEDICAL EXAMINATION**

168.   Plaintiffs reallege Paragraphs 1 through 167 if fully set forth herein;

169.   This Claim is brought under the Fourth Amendment to vindicate the right of the child to freedom from unreasonable search and seizure;

170.   The detention at SACAC, the "forensic" interview, and the forensic medical examination conducted by Woolridge all constituted violation of the child's right to freedom from unreasonable search and seizure;

171.   Fordney had, previously, reviewed the Pima County Protocols and internal SACAC protocols and policies under which the examination was conducted, with the Medical Director, Woolridge, and approved the conduct of this, and all such, detentions, interrogations and examinations.

172.   As a direct and proximate result, Plaintiff LAW suffered a deprivation of his liberty, emotional distress and other intangible damages;

**SIXTH CLAIM: CLAIM OF PLAINTIFFS LAW, BRIAN AND IRLANDA WRIGHT AGAINST DEFENDANTS WOOLRIDGE AND FORDNEY: FIRST AND FOURTH AMENDMENT VIOLATION IN CONDUCT OF UNCONSENTED DETENTION, INTERROGATION AND FORENSIC MEDICAL EXAMINATION**

173. Plaintiffs reallege Paragraphs 1 through 172 as if fully set forth herein;

174. This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association and due process of law;

175. The detention at SACAC, the "forensic" interview, and the forensic medical examination conducted by Woolridge all constituted a violation of the child's, and parents' right to familial association and privacy, undertaken without due process of law;

176. Fordney had, previously, reviewed the Pima County Protocols and internal SACAC protocols and policies under which the examination was conducted, with the Medical Director, Woolridge, and approved the conduct of this, and all such, procedures;

177. As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

**SEVENTH CLAIM: CLAIM OF LAW AGAINST SACAC: FOURTH AMENDMENT VIOLATION: DETENTION, INTERROGATION AND CONDUCT OF FORENSIC MEDICAL EXAMINATION**

178. Plaintiffs reallege Paragraphs 1 through 177 as if fully set forth herein;

179.   This Claim is brought under the Fourth Amendment to vindicate LAW's right to be free from unreasonable searches and seizures;

180.   The detention, interrogation and forensic medical examination of LAW were  conducted pursuant to the policy and protocol approved by SACAC. Since 1996, nearly two hundred (200) unconsented procedures on children have been conducted by physicians working for the SACAC, under the protocol, all without prior parental consent, parental attendance, or a court order;

181.   The policy and protocol, as documented in the Pima County Protocols or other policies or protocols approved by SACAC, is unconstitutional on its face, as authorizing such unconsented detentions and procedures without notification to parents of their right to attend the examinations, or to deny consent; or the SACAC's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

182.   As a direct and proximate result, Plaintiff LAW suffered a deprivation of his liberty, emotional distress and other intangible damages;

183.   The Defendant's polices and/or protocols, as described above, were the moving force behind the violations by the SPD Defendants, and without which, such violations would not have happened;

**EIGHTH CLAIM: CLAIM OF LAW, BRIAN AND IRLANDA WRIGHT AGAINST SACAC: FIRST AND FOURTEENTH AMENDMENT CLAIM: DETENTION, INTERROGATION AND INVASIVE FORENSIC MEDICAL EXAMINATION**

184.   Plaintiffs reallege Paragraphs 1 through 183  as if fully set forth herein;

185.   This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association, privacy and due process of law;

186.   The detention, interrogation via "forensic interview," and the forensic medical examination of LAW were conducted pursuant to the policy and protocol approved by SACAC and set out above. Since 1996, nearly two hundred (200) detentions, interrogations and forensic medical examinations have been conducted by physicians working for the SACAC, under the protocols, and polices set out above, all without prior parental consent, parental attendance, or a court order;

187.   The policy and protocol, as documented in the Pima County Protocols or other policies or protocols approved by SACAC, is unconstitutional on its face, as authorizing such unconsented detentions and procedures without notification to parents of their right to attend the examinations, or deny consent; or the SACAC's agents first submitting a sworn application on probable cause to, and securing a warrant from, a disinterested magistrate;

188.   As a direct and proximate result, all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages. LAW, additionally, suffered fear, physical pain and suffering from the genital and rectal examinations;

189.    The Defendant's polices and/or protocols, as described above, were the moving force behind the violations by the SPD Defendants, and without which, such violations would not have happened;

**NINTH CLAIM: CLAIM OF BRIAN, IRLANDA AND LAW AGAINST WOOLRIDGE: FOURTEENTH AMENDMENT VIOLATION: JUDICIAL DECEPTION**

190.    Plaintiffs reallege Paragraphs 1 through 189 as if fully set forth herein;

191.    The medical examination conducted by Defendant was a forensic examination authorized by the SPD in order to "report to law enforcement for purposes of continuing an investigation.";

192.    In documenting his examination, Defendant acknowledged that he had no medical history of LAW upon which to rely;

193.    Defendant learned of LAW's medical condition, his attendance at school, and knew that the school would have records and information regarding LAW's past medical condition and the existence or non-existence of any marks or bruises which would corroborate, or not, the possibility that LAW had been physically abused over the previous weeks and months. Defendant failed to ask, and the SPD officers failed to disclose, that the caregiver at CVES had informed them that she had seen non-concerning "little boy bruises" on LAW on December 15th and that the only mark of "concern" was the mark on the left hamstring;

194.    Despite it being available to him, Defendant did not view the video of the interview LAW had just been subjected to;

195.    Defendant, then, consciously closed his eyes to the evidence that LAW reported, among other facts, that his parents had not injured him, nor caused him pain, nor that he felt safe at home.  Defendant consciously chose ignore that LAW reported that the last time his mother spanked him was five (5) days earlier, and that LAW had contradicted himself regarding how that spanking was done. Defendant consciously ignored evidence that the child had a history of physical altercations with his older sister, LW. Defendant, therefore, did not seek to confirm that any marks he saw on LAW were present before the morning of December 16th – had he inquired, he would have known that the mark which brought LAW to SCAC was absent on the 15th;

196.    Defendant did not take a medical history of LAW, nor ask him any questions about any marks he identified on LAW;

197.    In his report, Defendant identified seeing the mark on the left hamstring that was the subject of the Hotline report;

198.    Defendant also identified five (5) marks on LAW's low back, buttocks, and right thigh, and one on LAW's inner left thigh which he identified as "linear contusions" and two "oval/round contusions….";

199.    Although he noted a "wrapping effect [which] implies flexible nature of impact object and "impact silhouette indicates nature & shape of implement used," Defendant knew this was applicable only to the reported mark, though he reported "injuries c/o [consistent with] pt [patient] disclosed of belt as cause….;" thus

53

misrepresenting to any reader that all the marks were allegedly "consistent with" being struck by a belt;

200.   Defendant also reported "contusions @ [at] different stages of healing suggests injury events over a period of days…";

201.   Defendant knew, but did not document, that he could not, within any level of medical probability, identify the "who," "when," or "how" of any of the marks. He could not connect all but the mark on the left hamstring with any object or manner of causation;

202.   Defendant knew, but failed to document, that there is no correlation between the color and appearance of a bruise and when it was caused. In fact, Defendant knew that medical science had concluded that it was a myth that a physician could age a bruise based on its color or other characteristics, making it impossible to medically establish any rank order of the appearance of two or more bruises;

203.   Defendant knew, when he made the report, that it would be used and relied upon by law enforcement and AZDCS in investigating allegations of criminal misconduct by the parents and could be offered and admitted as evidence in subsequent criminal and dependency proceedings;

204.   Defendant's use of words and phrases, and the omission of key information, his phrasing of his "findings" as disclosing alleged "infliction" of injuries over a period of days, as well as his conscious intent to not defer his report until he obtained the evidence, including medical records and records of the school, was

intended to falsely accuse the parents of engaging in repeated physical abuse of LAW, or done with reckless disregard of the truth;

205.   Defendant's false and misleading report was provided to Talamantes, and was used by Talamantes to prepare the documentation, identified herein, which, among other evidence, was used to secure the *ex parte* order for removal and the initiation and prosecution of the Petition. Defendant's acts and omissions were central to the juvenile judge's issuance of Temporary Orders on December 31, 202, confirming AZDCS's assumption of custody and control of LAW;

206.   As a direct and proximate result, the *ex parte* order was invalid, and the subsequent seizure of LAW, and AZDCS assuming custody of the child, violated Plaintiffs' right to due process of law in the severance of familial association and custody of LAW; causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**TENTH CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS JOHNSTON AND PELAYO: FOURTH AMENDMENT VIOLATION: NO PROBABLE CAUSE FOR SEARCH WARRANT FOR HOME**

207.   Plaintiffs reallege Paragraphs 1 through 206 as if fully set forth herein;

208.   This Claim is brought to vindicate rights of all Plaintiff residents of the Wright home under the unreasonable search and seizure clause and warrant clause of the Fourth Amendment;

209.   Defendants Johnston and Pelayo cooperated in the preparation and submission of the telephonic application for the search warrant on the afternoon of December 16th;

210.   The Defendants lacked probable cause for the issuance of the warrant, and no reasonable peace officer, knowing the facts, would have sought such a warrant;

211.   As a direct and proximate result of the application, and issuance of the warrant, numerous SPD officers entered and searched the entire home, causing all Plaintiffs to suffer deprivations of liberty, emotional distress and other intangible damages;

**ELVENTH CLAIM OF PLAINTIFFS BRIAN AND IRLANDA WRIGHT, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FOURTEENTH AMENDMENT: JUDICIAL DECEPTION IN SECURING SEARCH WARRANT**

212.   Plaintiffs reallege Paragraphs 1 through 211 as if fully set forth herein;

213.   This Claim is brought to vindicate the rights of the Plaintiffs to due process of law under the Fourteenth Amendment;

214.   The operative "facts" sworn to by Pelayo, with the agreement of Johnston, to the magistrate, were as follows:

On December 16, 2020, while working, a student caretaker for student in need at a school in Sahuarita witnessed marks on a six-year-old male student while changing the child's diaper. The marks observed were below the buttocks. When the child was questioned by the caretaker of how he obtained those marks, the child deflected and would not give details on how they were obtained.
Law enforcement was contacted and the child was taken for a forensic interview. During the forensic interview, the child disclosed that he was hit by his mother, quote unquote, with a small brown belt, as well as Hot

56

Wheels track. A medical exam was conducted on the minor by Dr. Woolridge, who advised that the minor had several episodes of bruising on his person. Upon speaking with the miner's (sic) father, he disclosed his knowing that the minor's stepmother hit the minor last night.

215.   Defendants' sworn statement of facts contained falsehoods and misrepresentations, and omitted material exculpatory facts. These included, among others:

a.   Misrepresentation that LAW "deflected" questions about the "marks" found on him and "would not give details on how they were obtained";

b.   Omission that only the single mark on the left hamstring was of concern by the CVES staff, that the other marks were known to be common "little boy bruises" that predated the 16th;

c.   The omissions of the key facts and contradictions in LAW's interview set out in ¶47 above;

d.   Misrepresentation in implying that LAW reported his mother recently hit him with both a "brown belt" and a "Hot Wheels track;"

e.   Omission of LAW's statement that the last time his mother spanked him was five (5) days ago, knowing that the only mark of concern did not exist on December 15th;

f.   The falsehood that Brian disclosed that Irlanda "hit" LAW the night before;

216.   The inclusion of outright falsehoods and misrepresentations, and the omission of material exculpatory facts gave the application the false appearance of probable cause;

217.   The falsehoods, misrepresentations and material omissions were accomplished by intentional misconduct or reckless disregard of the truth, resulting in a sworn application that substantially deviated from the facts know to the Defendants;

218.   The magistrate authorized the warrant in reliance on the sworn facts, the search warrant was issued and the unconstitutional searches and seizures done;

219.   As a direct and proximate result of the application, and issuance of the warrant, numerous SPD officers entered and searched the entire home, causing all Plaintiffs to suffer deprivations of liberty, emotional distress and other intangible damages;

**TWELFTH CLAIM: CLAIM OF LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELYAO: FOURTH AMENDMENT UNREASONABLE SEARCH AND SEIZURE**

220.   Plaintiffs reallege Paragraphs 1 through 219 as if fully set forth herein;

221.   This Claim is brought to vindicate rights of the minor Plaintiffs against unreasonable searches and seizures under the Fourth Amendment;

222.   The searches of the persons of LW and MZ-G, after requiring them to disrobe, and including the search of MZ-G after he had been directed to expose his genitals and buttocks, followed by the photographing of the children, without parental consent or a warrant authorizing such searches and seizures, and after the parents had

58

independently provided the report of the events of the night before, constituted violations of the children's right to privacy guaranteed them under the Fourth Amendment;

223.   As a direct and proximate result Plaintiffs LW and MZ-G suffered deprivations of liberty, emotional distress and other intangible damages;

**THIRTEENTH CLAIM: CLAIM OF PLAINTIFFS BRIAN, IRLANDA, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FIRST AND FOURTEENTH AMENDMENT VIOLATION OF FAMILIAL ASSOCIATION IN THE SEARCH OF THE HOME**

224.   Plaintiffs reallege Paragraphs 1 through 223 as if fully set forth herein;

225.   This claim is brought to vindicate the right of the parents to care, custody and control of their children, and the childrens' right to the care and comfort of their parents, and familial privacy, guaranteed Plaintiffs under the First and Fourteenth Amendments to the Constitution;

226.   Defendants' entry into the home, separation of parents from children, detention of the children and parents while engaged in search of the entire home, examination and questioning of the children, violated the Plaintiffs' right to familial association;

227.   As a direct and proximate result all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages;

**FOURTEENTH CLAIM: CLAIM OF PLAINTIFFS BRIAN, IRLANDA, LW AND MZ-G AGAINST DEFENDANTS JOHNSTON AND PELAYO: FIRST AND FOURTEENTH AMENDMENT VIOLATION OF FAMILIAL ASSOCIATION IN THE SEARCHES AND SEIZURES OF THE CHILDREN'S PERSONS**

228.   Plaintiffs reallege Paragraphs 1 through 227 as if fully set forth herein;

229.   This claim is brought to vindicate the right of the parents to care, custody and control of their children, and the childrens' right to the care and comfort of their parents, guaranteed Plaintiffs under the First and Fourteenth Amendments to the Constitution;

230.   Defendants' searches of the children's persons, as set forth above, and the photographing of them, violated the Plaintiffs' right to familial association and privacy;

231.   As a direct and proximate result all Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages;

**FIFTEENTH CLAIM: CLAIM OF PLAINTIFFS BRIAN, IRLANDA AND LAW AGAINST TALAMANTES, FRANCISCO AND DEDMON: FIRST AND FOURTEENTH AMENDMENT VIOLATION: SECURING SAFETY PLAN OF DECEMBER 16, 2020 BY COERCION**

232.   Plaintiffs reallege Paragraphs 1 through 231 as if fully set forth herein;

233.   This Claim is brought under the Fourteenth Amendments to vindicate the right to familial association under the due process of law;

234.   These Defendants were trained in the Arizona statutory protections afforded to parents in the control of the decisionmaking regarding their children's care, custody and upbringing, and the federal constitutional right of parents to govern the

upbringing of their children, and the right of children to the care and comfort of the parents;

235.    Talamantes' investigative actions were governed by statute, rule and AZDCS policy and procedure;

236.    Pursuant to A.R.S. §8-456(C)(1), Talamantes was obligated to conduct a "prompt and thorough investigation" of any report of child abuse, and to determine the "nature, extent and cause of any condition created by the parents … which would tend to support or refute the allegation that the child is a victim of abuse….";

237.    The agency promulgated provisions of the Arizona Administrative Code regarding investigations, and, in §R21-4-104(A), directs that, "In DCS Reports containing a criminal conduct allegation, a DCS Investigator shall coordinate with law enforcement pursuant to the applicable Joint Investigative Protocol.";

238.    Among other directives, AZDCS directs that the investigator "shall … interview [] or personally observ[e] the alleged child victim";

239.    AZDCS policy includes the policy, Chapter 2; Section 2 Information Gathering in its "Arizona Department of Child Safety: Policy and Procedure Manual [hereafter, "the IG Policy"], which provides, among other directives to the investigator, that he shall "collect and review" medical, school and/or behavioral health records when "[t]he current allegations are directly related to the child(ren)s (sic) physical, educational or behavioral health" and/or "[t]here is reason to believe

these records contain information that will fill a gap or reconcile inconsistency in the information about safety and risk....";

240.    The IG Policy further directs that the investigator shall, if applicable, obtain and read police reports, medical records, and, among others, school records;

241.    AZDCS policy provides for a "uniform assessment tool" to be used by the investigator in determining whether a child can remain in the home, or must be removed to foster care. That tool is set out in Chapter 2: Section 5 "Family Functioning Assessment – Investigation" set out in the Policy Manual [hereafter, "the FFA Policy"];

242.    As stated, "The purpose of the Family Functioning Assessment is to gather sufficient and relevant information to make an informed decision about whether the child is safe or unsafe.";

243.    Among other "interviews, in-person observations, and document reviews" to assess child safety, the investigation of "[c]hild functioning on a daily basis" includes healthcare history, school attendance and performance, and sibling relationships. The investigator is directed to personally observe the purported child victim and interview that child victim;

244.    On the night of December 16, 2020, these Defendants lacked any reasonable suspicion that LAW was in present danger of abuse such that the parents' rights could lawfully be curtailed and impaired;

245.    Talamantes, with the approval of his supervisors, had failed to conduct sufficient investigation to determine if LAW was in any danger at all. He ignored the immediate availability of the collaterals, the mandatory reporters at CVES to provide the history of LAW's physical and emotional condition, and knew that there had been no previous suspicion of any abuse. He further failed to obtain from the SPD Defendants the information that Mendez had previously noticed marks or bruises on LAW she described as "little boy bruises" and that such little boy bruises had been seen on December 15th, but were not suspicious of child abuse;

246.    Talamantes knew that, by the time he coerced Brian into agreeing to the Present Danger Plan with the loss of parental rights, that SPD had concluded that there was no physical abuse of LAW, but that the marks on the child were the result of roughhousing;

247.    Despite this knowledge, with his superior's approval, Talamantes lied to Brian regarding the alleged injuries that had been found on LAW, and falsely informed Brian that if he did not agree to the immediate "voluntary safety plan," that Brian's children would be immediately seized by AZDCS and taken from the home;

248.    As a direct and proximate result of the lies and coercion, Brian executed the "voluntary safety plan," and relinquished his right to the control of his children's upbringing. As a direct and proximate result Plaintiffs suffered deprivations of liberty, emotional distress and other intangible damages;

**SIXTEENTH CLAIM: FOURTEENTH AMENDMENT; CLAIM OF BRIAN, IRLANDA AND LAW AGAINST DEFENDANTS TALAMANTES, FRANCISCO AND DEDMON: FOURTEENTH AMENDMENT ABSENCE OF PROBABLE CAUSE IN SECURING THE *EX PARTE* REMOVAL ORDER**

249.    Plaintiffs reallege Paragraphs 1 through 248 as if fully set forth herein;

250.    This Claim is brought under the Fourteenth Amendments to vindicate the right to due process of law;

251.    Defendants were trained in the process of securing removals, and the agency publishes the training in its "Facilitator's Guide" for "Removal", last edition dated January 14, 2020. This document contains the agency's instructions to investigators in filling in the content of the template used by the State to apply for an *ex parte* removal order, identified as "APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF A CHILD." It was this template Talamantes used to secure the order;

252.    The investigator is directed, in entering the "circumstances that require temporary custody" to:

> Be as specific as possible by including results of in-person observations, interviews with children, parents, and collateral contacts, information from medical records, police records, education records, etc.; For present danger circumstances: include a description of the specific actions, behaviors, emotions, or out-of-control conditions in the home that are significant, and how the condition or behavior is immediately endangering the child.

253.    "Collateral contacts" are defined by the agency as any person, other than a family member, who may have knowledge relevant to the investigation;

254.   Talamantes was trained, in documenting his investigation, including reporting on information obtained from family members and collateral contacts, to document objective, verifiable facts. Talamantes was trained that the investigator is to include in the application facts known to him that both support and refute the allegation of child abuse;

255.   In his application, Talamantes, with the knowing approval of Francisco and Dedmon, and without having observed or interviewed LAW, wrote, among others, the following false statements and misrepresentations:

> [LAW] then disclosed [after stating that he got the bruise the day prior] he recently got in trouble and his mother hit him with a belt

> [LAW] disclosed his stepmother regularly uses physical discipline with him and his siblings in the home. [LAW] disclosed stepmother (sic) uses objects, to include the belt and a Hot Wheels racing track, to discipline him.

> On 12/16/20, Sahuarita Police Department executed a search warrant on the family home and currently have an ongoing investigation involving father and stepmother (SPD# ST20210504).

> Father stated he examined [LAW] on 12/17/2020, after police and DCS involvement. He reported seeing small bruises on [LAW]'s buttocks. Father stated he changed [LAW] prior to going to school and saw a mark on his leg. Father stated he observed horizontal marks in [LAW]'s inner thigh area which was approximately two inches wide. Father stated the mark was faded and discolored. Father stated he also observed a scratch mark on [LAW]'s right buttock, around the area where the buttock meets the back. Father stated the mark seemed a little open and reddish. Father stated he also observed two penny-shaped, sized bruises on his left buttock which was greyish in color.

> Father stated the penny-shaped, sized bruises on [LAW's] buttocks may have been from when stepmother spanked him.

[LAW's] multiple marks and bruises on his body not only indicate a pattern which impacts the severity of the safety threat but also supports his statements during the forensic interview;

256.   Talamantes *excluded* from the application the following material facts, among others, with the knowledge and approval of Francisco and Dedmon:

The actual statements made by LAW during the CAC forensic interview, specifics set out above in ¶47;

The evidence from CVES medically-trained mandatory reporter regarding the history of "little boy bruises" on LAW in the past, and the absence of any concerning marks until the morning of December 16th;

The fact that the agency had no previous reports of any kind against either parent;

The narrative that the parents had independently provided as to the cause of the left hamstring bruise the night of December 15th, and Brian's report that the other marks that Brian had observed were caused by roughhousing;

A description of the photographs Brian had texted to Talamantes on December 21st

The reports from both LAW and his sister that the children scratched, kicked and fought each other;

LAW and his sister's reports that they felt safe at home;

SPD Report No. S20210504 identified the criminal investigation as "closed" as of December 16, 2020;

The reason for closure by SPD, which was documented by Carrizosa in the SPD Report, as follows: "At approximately 1900 hours, Detective Johnston advised me that after conducting the interviews and welfare checks, the injuries are mostly likely from roughhousing with his siblings. No probable cause exists to arrest either parent."

257.   As a result of the evidence of which these Defendants were aware by December 28th, and the evidence which was available to them but ignored, these

66

Defendants knew that any justification for continuing investigation of the family, and for continuing to interfere with the familial association by a form of safety plan, had, if it ever existed, been extinguished by the evidence secured and available, but ignored, after December 16th;

258.    Rather than closing the investigation with the finding of "unsubstantiated,"  the Defendants chose to secure physical removal of LAW by means of the *ex parte* order which lacked probable cause;

259.    As a direct and proximate result of the absence of probable cause, the *ex parte* order was invalid, and the subsequent seizure of LAW, and AZDCS assuming custody of the child, violated Plaintiffs' right to due process of law in the severance of familial association and custody of LAW; causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; causing LAW to suffer physical pain and suffering; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**SEVENTEENTH CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST TALAMANTES, FRANCISCO AND DEDMON: FOURTEENTH AMENDMENT VIOLATION; JUDICIAL DECEPTION IN SECURING THE *EX PARTE* REMOVAL ORDER**

260.    Plaintiffs reallege Paragraphs 1 through 259 as if fully set forth herein;

261.    This Claim is brought under the Fourteenth Amendments to vindicate the right to due process of law;

262.    Defendants Talamantes, with the approval and knowledge of Francisco and Dedmon, secured the *ex parte* removal order through judicial deception, as set forth above;

263.    As a direct and proximate result of the judicial deception, the *ex parte* order was authorized, directly followed by the seizure of LAW, and AZDCS assuming custody of the child, violated all Plaintiffs' right to due process of law; causing LAW to suffer physical pain and suffering; and causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**EIGHTEENTH CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS TALAMANTES, FRANCISCO, SHELDON AND ENCINAS: FIRST AMENDMENT VIOLATION OF FAMILIAL ASSOCIATION IN SECURING *EX PARTE* REMOVAL ORDER**

264.    Plaintiffs reallege Paragraphs 1 through 263 as if fully set forth herein;

265.    This claim is brought to vindicate the right of all Plaintiffs to familial association under the First Amendment;

266.    As a direct and proximate result of the Defendants securing the *ex parte* order, directly followed by the seizure of LAW, and AZDCS assuming custody of the child, all Plaintiffs' right to familial association was violated; causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; causing LAW to suffer physical pain and suffering; and causing Plaintiff Brian Wright to incur

legal and other expense and costs. Plaintiffs continue to suffer from these injuries and

damages;

**NINTEENTH CLAIM: CLAIM OF BRIAN, IRLANDA AND LAW AGAINST DEFENDANTS TALAMANTES, FRANCISCO, SHELDON AND ENCINAS: FOURTEENTH AMENDMENT VIOLATION: JUDICIAL DECEPTION IN SECURING FILING OF DEPENDENCY CASE AND TEMPORARY ORDERS SEVERING PARENTS' LEGAL CUSTODY AND CONTROL OF LAW**

267.    Plaintiffs reallege Paragraphs 1 through 265 as if fully set forth herein;

268.    This Claim is brought under the Fourteenth Amendments to vindicate the

right to due process of law;

269.    The documents and information submitted by Talamantes, Francisco,

Sheldon and Encinas to Naranjo on or before December 31st were riddled with

misrepresentations, falsehoods and omissions of material exculpatory evidence.

Naranjo relied entirely upon those submissions in preparing and filing the Petition.

The materials supplied included:

a.    Misrepresentations, falsehoods and material omissions in the sworn

application for the *ex parte* order of removal that are set forth above;

b.    The TDM Summary containing, among others, the following

misrepresentations and falsehoods:

"Marks and bruises located on [LAW] and [LAW] disclosed that Irlanda caused the marks."

"Physical abuse happening in the home."

"The explanation of the injuries were (sic) not consistent with what Brian or Irlanda said happened."

"The marks and bruises were in different stages of healing which indicated different instances of physical discipline."

"Lance disclosed that he is hit by … the metal part of the belt."

"The parents both report that there was physical discipline the day before the report."

"Patrick [paternal grandfather] reports that this incident of physical abuse is not normal and is a one time thing."

"Is it possible to manage the danger in the home?... No, this condition is not met."

"Is the home environment (and behaviors) calm, consistent and predicable enough? No, this condition is not met."

That the AZDCS Defendants advised Brian and Irlanda of services, support/actions to ensure safety of LAW.

270.    The TDM Summary omitted the same exculpatory facts as Talamantes omitted from the application for the *ex parte* removal order;

271.    Additionally, the AZDCS Defendants had refused the approval of a kinship placement with one or both grandparents, though they had both been approved during the previous safety plan, in order to force LAW into foster care and further separation from Brian and Irlanda;

272.    The entirety of the additional "facts" supplied by the Defendants to Naranjo, which were incorporated into the Petition were completely false or constituted material misrepresentations;

273.    On December 31, 2020, Juvenile Judge Lori B. Jones in reliance on the "facts" submitted, issued *ex parte* Temporary Orders drafted by the AAG, which

70

stripped legal custody and control of LAW from the parents, and placed it with the agency;

274.    The Report, submitted four (4) days later, repeated and reiterated the misrepresentations and falsehoods set out in the documents, above, and omitted the exculpatory facts set forth above, among others;

275.    In Section VII of the Report, "DCS SPECIALIST'S CONCLUSIONS," Defendants Talamantes and Francisco misrepresented, among other alleged facts, "[LAW's] significant and multiple injuries [false], and the inconsistent explanation provided by his caregivers [false];" repeated the falsehood that LAW reported "regular [] physical discipline" and that "Mrs. Wright uses objects, to include the belt and a Hot Wheels track, to discipline him." Defendants further falsely claimed that SPD "has an open criminal investigation involving Mr. Wright and Mrs. Wright regarding [LAW's] injuries." In fact, the police had closed the file, and concluded that the marks on LAW were caused by roughhousing by the siblings;

276.    These misrepresentations, outright falsehoods and omissions of material exculpatory facts were done intentionally or recklessly with the goal of securing an order that the agency had made reasonable efforts to prevent or eliminate the need for removal, and the continuation of the agency's custody and control of LAW and separation from his family, and the acts and omissions were successful;

277.    As a direct and proximate result, these Plaintiffs' right to due process of law was violated; causing Plaintiffs to suffer extreme emotional distress, humiliation,

and other intangible damages; causing LAW to suffer physical pain and suffering; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**TWENTIETH CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS TALAMANTES, FRANCISCO, SHELDON AND ENCINAS: FIRST AMENDNMENT VIOLATION OF FAMILIAL ASSOCIATION IN SECURING FILING OF DEPENDENCY CASE AND TEMPORARY ORDERS CUTTING OFF PARENTS' LEGAL CUSTODY AND CONTROL OF LAW**

278.   Plaintiffs reallege Paragraphs 1 through 277 as if fully set forth herein;

279.   The acts and omissions set forth above, taken by these Defendants, violated the parents and children's right to familial association under the First Amendment;

280.   As a direct and proximate result, all Plaintiffs' right to familial association were violated; causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; causing LAW to suffer physical pain and suffering; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**TWENTY-FIRST CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS SHELDON, ENCINAS, NORIEGA AND OROZCO: FOURTEENTH AMENDMENT VIOLATION: OBSTRUCTION AND DENIAL OF FAMILIAL ASSOCIATION**

281.   Plaintiffs reallege Paragraphs 1 through 280 as if fully set forth herein;

282.   This Claim is brought under the First and Fourteenth Amendments to vindicate the right to familial association under due process of law;

283.   From December 28 through the conclusion of the dependency case, Encinas, with the approval of, and at the direction of, Sheldon, then Noriega, both of whom took direction from Orozco, and all of whom intended to obstruct the family's efforts at re-unification, took specific actions, and engaged in falsification of facts, directed at that unconstitutional end;

284.   The actions, included, but were not limited to those set forth above, and included, among others, (1) intentionally delaying approval of providers of services to the family the agency required as a condition of return of LAW to full custody, then obstructing providers' delivery of services to the family; (2) attempting to create division within the family by intimidating and making false statements to the paternal grandmother while she was acting as safety monitor in Scottsdale; (3) falsely recording claims of statements allegedly made by Brian during meetings and calls; (4) denying Brian basic information about the medical care and education being provided to LAW; (5) seizing LAW without justification, continuing the denial of legal custody; (6) placing LAW in foster care a second time, while lying to Brian about where and under what conditions LAW was living; (7) demanding the parents submit to psychological examinations as a condition of satisfying Defendant's Case Plan; (8) ignoring and misrepresenting the opinions and recommendations of the service providers in order to continue custody;  all constituting a pattern of actions which were intended to, and did, falsely justify the original removal and obstruct the family's timely completion of services demanded by the agency and closure of the dependency case;

285.    These actions were done with deliberate indifference to the constitutional rights of the Plaintiffs to familial association;

286.    As a direct and proximate result, all Plaintiffs' right to due process of law was violated; causing Plaintiffs to suffer extreme emotional distress, humiliation, and other intangible damages; Plaintiff LAW suffered physical pain and suffering; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

**TWENTY-SECOND CLAIM: CLAIM OF ALL PLAINTIFFS AGAINST DEFENDANTS SHELDON, ENCINAS, NORIEGA AND OROZCO: FIRST AMENDMENT RETALIATION**

287.    Plaintiffs reallege Paragraphs 1 through 286 as if fully set forth herein;

288.    This Claim is brought under the First Amendments to vindicate the right to free expression and the right to petition for redress of grievances;

289.    Commencing with Brian's submission of the complaint to the Ombudsman's office, and continuing in his communications and meetings with these Defendants, he expressed that the agency was falsifying information and taking actions in violation of the agency's commitments under the various Safety Plans and Case Plans;

290.    From December 28 through the dependency case, Encinas, with the approval of, and at the direction of, Sheldon, then Noriega, both of whom took direction from Orozco, all of whom intended to obstruct the family's efforts at re-unification, and in response to Brian's petition for remedy and expression of agency

74

corruption, took specific actions alleged above and engaged in falsification of facts, directed at that unconstitutional end;

291.    Further, Brian's expressions of concern regarding these Defendants' actions, in seizing LAW on June 9th, his notification of intent to file a formal complaint, all were protected expression;

292.    In response, these Defendants intentionally allowed LAW to decompensate in the care of the Hollmans, knowing the danger to him and others, and allowing the foreseeable out-of-control act of LAW in physically assaulting the Hollmans' daughter; created the crisis situation which they then used to seize LAW another time; placed the child in a group home; lied to the parents as to his condition and whereabouts; falsely accused the Hollmans' of causing "disruption," and held the child incommunicado for over two (2) weeks before being forced to return him to the family home;

293.    All these actions and intentional omissions of duty were intended to, and did, retaliate against the family because of the protected expression;

294.    As a direct and proximate result, all Plaintiffs suffered extreme emotional distress, humiliation, and other intangible damages; Plaintiff LAW suffered physical pain and suffering; and causing Plaintiff Brian Wright to incur legal and other expense and costs. Plaintiffs continue to suffer from these injuries and damages;

### TWENTY-THIRD CLAIM: CLAIM FOR DECLARATORY JUDGMENT: TOWN COUNCIL, WOOLRIDGE, FORDNEY AND SACAC

295.    Plaintiffs reallege Paragraphs 1 through 294 as if fully set forth herein;

296.    As construed by the Ninth Circuit Court of Appeals, it is a *per se* violation of the First and Fourteenth Amendment rights of both parent and child for these Defendants to engage in a practice of detaining, interrogating and conducting invasive forensic medical examining minors without first notifying the parents and obtaining consent; or, in the alternative, securing a warrant or order from a magistrate. Among other authorities, this is the holding in *Mann v. County of San Diego,* 907 F. 3d 1154, 1162 (9th Cir. 2018):

> A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations. … The amount of trauma associated with a medical examination, particularly for young children, is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors. Given this reality, a parent's right to notice and consent is an essential protection for the child and the parent, no matter what procedures are used.

297.    The seizure and detention of LAW, his interrogations by SPD officers and then the SACAC agents, and the invasive forensic medical examination at issue were conducted for law enforcement investigative purposes. There was no emergency that vitiated the requirement of notice and consent of the parents, ~~not~~ nor any impediment to the Defendants attempting to secure a warrant authorizing the detention and search

if they could establish probable cause that a crime had been committed on the body of LAW;

298.   The Protocols, under which the Defendants conducted the medical examination of LAW are therefore facially unconstitutional;

299.   Plaintiffs are, as a result of LAW's ongoing medical condition and the ordinary roughhousing in which he engages, subject at any time to a mandatory reporter's call to AZDCS and/or SPD of a suspicion of physical abuse, and the resultant seizure and medical examination under the Protocols other policies and protocols in place authorizing these unconstitutional searches;

WHEREFORE, Plaintiffs' demand judgment, jointly and severally, of these Defendants, as follows:

1.      Under the First through Twenty-second Claims, an award of compensatory damages to each Plaintiff in such amounts as the jury deems just;

2.      Under the First through Twenty-second Claims, an award of punitive damages to each Plaintiff in such amounts as the jury deems just;

3.      Under the First through Twenty-second Claims, an award of special damages to Brian Wright in such amount as the jury deems just;

4.      Under the Twenty-third Claim, an Order declaring the Protocols, or other such policy or protocol authorizing the detention, interrogation and forensic medical examination of a minor, without notice to and consent of the parents, or the authority of a warrant issued by a magistrate, are in violation of the parent and child's right to

familial association under the First and Fourteenth Amendment and the child's right to bodily integrity and privacy under the Fourth Amendment;

5.     Pursuant to Fed.R.Civ.P. 65, specifically, Rule 65(d)(2)(B), an injunction issued ordering that Defendants the Town Council, SACAC, Woolridge and Fordney immediately cease from detaining and interrogating minors or conducting forensic medical examinations or participating in such examinations, in the absence of notice to parents and consent of those parents, or having, in the absence of such notice and consent, secured a warrant issued to a disinterested magistrate authorizing the forensic medical examination and:

     a.     specifying the nature and extent of the examination authorized;

     b.     requiring that the entirety of any such examination be recorded by video and audio;

     c.     ordering that a copy of any reports, images, or recordings be delivered to the parents at the earliest practical time following the conclusion of the examination;

6.     An award of reasonable attorney fees and costs, pursuant to 42 U.S.C. §1988;

7.     An award of pre-judgment and post-judgment interest;

8.     Such other relief as this Court deems just.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
4370 North Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 520-318-0075
mike@mgmoorelaw.com

Trial Counsel for Plaintiffs


## JURY DEMAND

Plaintiffs demand trial by a jury of twelve (12) peers as to each Claim.

/s/ Michael Garth Moore


## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on November 1, 2021. Notice of this filing will be sent to all parties and counsel already appearing through the Court's filing system. Parties and counsel may access the filing through the Court's system. New party-Defendants are being served per Rule.

Respectfully submitted,
/s/ Michael Garth Moore