Case 4:21-cv-00257-JGZ Document 282-1 Filed 12/20/23 Page 1 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

SUPERIOR COURT FOR THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PIMA

Brian Wright, et al.,                )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )      Case No.
                                     )      4:21-cv-00257-JGZ
Southern Arizona Children's          )
Advocacy Center, et al.,             )
                                     )
        Defendants.                  )
                                     )
_____      )

DEPOSITION OF

DALE WOOLRIDGE, MD

June 2, 2023
9:32 a.m.

4801 East Broadway Boulevard, Suite 301
Tucson, Arizona

REPORTED BY:   RICHAEL M. SILVIA, RMR, CRR, CRCR
               Arizona CR No. 51017
               New Mexico CR No. 554

COLVILLE & DIPPEL, LLC
1309 East Broadway Boulevard
Tucson, Arizona   85719-5824
ArizonaDepos.com
Arizona RRF No. R1129

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 2 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 2

1    The deposition of DALE WOOLRIDGE, MD, noticed

2   by Plaintiffs, was taken on June 2, 2023, from

3   9:32 a.m. to 1:00 p.m., at Slutes, Sakrison & Rogers,

4   P.C., 4801 East Broadway Boulevard, Suite 301, Tucson,

5   Arizona, before Richael M. Silvia, Registered Merit

6   Reporter, Certified Realtime Reporter, Colorado

7   Realtime Certified Reporter and Arizona Certified

8   Reporter No. 51017.

9                    APPEARANCES OF COUNSEL

10

     For the Plaintiffs:
11
                    LAW OFFICE OF MICHAEL GARTH MOORE
12                  BY:  MICHAEL GARTH MOORE, ESQ.
                    6336 North Oracle Road
13                  Suite 326, No. 119
                    Tucson, Arizona  85742
14                  (520) 437-9440
                    mike@mgmoorelaw.com
15

16   For the Defendant Southern Arizona Children's Advocacy
     Center & Marie Fordney:
17
                    GRASSO LAW FIRM, P.C.
18                  BY:   PARI K. SCROGGIN, ESQ.
                    2250 East Germann Road
19                  Suite 10
                    Chandler, Arizona  85286
20                  (480) 739-1203
                    pscroggin@grassolawfirm.com
21
     For the Defendant Dale Woolridge, MD:
22
                    SLUTES, SAKRISON & ROGERS P.C.
23                  BY:  TOM SLUTES, ESQ.
                    4801 East Broadway Boulevard
24                  Suite 301
                    Tucson, Arizona 85711
25                  (520) 624-6691
                    tslutes@sluteslaw.com

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 3 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 3

1                    APPEARANCES OF COUNSEL (Continued)

2

    For the Defendant Town of Sahuarita:
3
                        JELLISON & ROBENS PLLC
4                       BY:  RODNEY STATES, ESQ.
                        18801 N Thompson Peak Pkwy
5                       Suite D235
                        Scottsdale, Arizona 85255
6                       (602) 277-6009
                        rodney@jrlawaz.com
7

8   For the Defendants Orozco, Francisco, Noriega, Encinas,
    Talamantes, & Sheldon:
9
                        OFFICE OF THE ATTORNEY GENERAL
10                      BY:  CLAUDIA ACOSTA COLLINGS, ESQ.
                            JULIE RHODES, ESQ. (Via Zoom)
11                      400 West Congress
                        South Building, Suite 315
12                      Tucson, Arizona 85701
                        (520) 628-6504
13                      claudia.collings@azag.gov

14  Also Present:

15                      Brian Wright

16

17

18

19

20

21

22

23

24

25

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 4 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 4

```
 1                          I N D E X

 2                                                      PAGE
     EXAMINATION OF DALE WOOLRIDGE, MD:
 3   June 2, 2023

 4   By Mr. Moore:                                         5
     By Ms. Scroggin:                                     --
 5   By Mr. Slutes:                                       --
     By Mr. States:                                       --
 6   By Ms. Collings:                                     --
     By Ms. Rhodes:                                       --
 7

 8                                                 INITIAL
     DEPOSITION EXHIBITS                           REFERENCE
 9   (None.)

10
     PREVIOUSLY MARKED DEPOSITION                  INITIAL
11   EXHIBITS:                                     REFERENCE

12
     Exhibit 1    Pima County Protocols for the        13
13                Multidisciplinary Investigation of
                  Child Abuse (SACAC 00045 through
14                00180)

15   Exhibit 3    National Children's Alliance          12
                  Standards for Accredited Members,
16                2017 Edition (ASWRIGHT007408 through
                  007471)
17
     Exhibit 7    Children's Advocacy Center Intake     10
18                Form Paperwork (SACAC 00001 through
                  00029)
19
     Exhibit 12   Color Photographs with deponent      108
20                markings on assorted photographs
                  (KC12A13J through KC12A149)
21

22   INFORMATION REQUESTED:
     (None.)
23
     QUESTIONS INSTRUCTED NOT TO ANSWER:
24   (None.)

25
```

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 5 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 5

1    The following proceedings were taken pursuant

2    to the Arizona Rules of Civil Procedure.

3                        DALE WOOLRIDGE, MD,

4    having been first duly sworn to state the whole truth,

5    testified as follows:

6                        EXAMINATION

7    BY MR. MOORE:

8         Q.    Good morning, Doctor.

9         A.    **Good morning.**

10        Q.    We're here to take your deposition in a case

11   that, as you know, was filed by Mr. Wright and his

12   family.

13        Let me ask you first, because I know a bit

14   about your history, are you still the executive

15   director of the Southern Arizona Child Advocacy Center?

16        A.    **No, sir.  I'm the medical director.**

17        Q.    Medical director.  Okay.

18        And for ease of this deposition, I'm just

19   going to refer to it as "the Center," is that okay?

20        A.    **That's fine.**

21        Q.    Okay.  And my understanding is you've been

22   the medical director since 2007?

23        A.    **Yes, sir.**

24        Q.    Still the medical director today?

25        A.    **Yes, sir.**

1          Q.    Okay.  And I understand you're on contract

2     with the Center?

3          A.    Yes, sir.

4          Q.    According to the document I have, you are

5     paid $4,000 a month as the medical director.

6                It's still 4,000 a month?

7          A.    It is.

8          Q.    Okay.  And I understand you're also paid --

9     and let me ask you this, what is -- what's the acronym

10    SANE mean?

11         A.    Sexual assault nurse examiner --

12         Q.    Okay.

13         A.    -- is what the acronym stands for.

14         Q.    I understand you're paid $500 for each exam

15    that you conduct at the center?

16         A.    That is correct.

17         Q.    Okay.  And that's been true since 2007; in

18    other words, you're on a sal- -- or a contract price

19    plus an amount for each exam?

20         A.    For the after-hour exams that are considered

21    priority one, there is a monetary award or payment --

22         Q.    Sure.

23         A.    -- for each exam, and that amount is

24    increased over time.  I couldn't tell you the scale and

25    when the increases have occurred, but it is currently

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 7 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 7

1  500.

2  Q.  Not a problem.  So as I understand it, from

3  2007 through 2019, just before Covid, you conducted 3

4  to 4 exams per month.

5  Does that sound right?

6  A.  It seems reasonable.

7  Q.  Okay.  And I understand there are two

8  associate directors, at least there were a couple years

9  ago, doctors -- and I forget their names, I apologize.

10  Are they still associate directors?

11  A.  They are.

12  Q.  And would you give us their names, please?

13  A.  Dr. Chan Lowe and Dr. Rachel Cramtom.

14  Q.  And have you had these folks as associate

15  directors since you took over in 2007?

16  A.  It's been since then.  I don't remember the

17  exact year that that may have occurred, but it has been

18  a handful of years.

19  Q.  And I understand they also conduct these

20  exams?

21  A.  Yes.

22  Q.  But I take it you don't know the frequency

23  with which they conduct examinations?

24  A.  I do not.

25  Q.  Okay.  In addition to your work at the

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 8 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 8

1   Center, do you work as a doctor elsewhere?

2        A.   I do.

3        Q.   And where is that?

4        A.   Banner University Medical Center.

5        Q.   And what's your position there?

6        A.   I'm in the Department of Emergency Medicine

7   in Pediatrics.

8        Q.   Okay.  Could you tell us, and this may have

9   changed, but I'm interested now in the period of 2020,

10  the percentage of time that you would spend working as

11  a director -- the medical director of the Center as

12  opposed to working in your work at Banner?

13       A.   I'm currently .7 FTE with the university.

14  And there's not an FTE equivalent for the efficacy

15  center, that's independent contracting.  The .7 that I

16  do with the university is not solely clinical because I

17  teach a lot at the College of Medicine.  So my duties

18  at the university are more in the classroom, and have

19  been in the last handful of years, than they are in the

20  clinical environment.

21       Q.   Okay.

22       A.   But currently, .7 FTE university.

23       Q.   And you're --

24       A.   So I'm part-time.

25       Q.   I apologize.

1          (Deponent perused document.)

2     A.   Much of the -- I think you said 29-page

3 document -- much of this, I'm not familiar with nor

4 have I seen.  But there is a portion, particularly that

5 of my medical documentation, that I am aware of.

6     Q.   (BY MR. MOORE)  Okay.  We'll -- understand.

7          So in addition to -- did you familiarize

8 yourself with the report before your deposition?

9     A.   Not in the recent few days.  But

10 historically, I have.

11     Q.   Okay.  In terms of preparation for your

12 testimony today, have you done anything else other

13 than, in the past, reviewed the report?

14     A.   I was forwarded an interview that you had

15 done of me in 2021 a handful of days ago by Mr. Slutes

16 and I was able to look through that.

17     Q.   Okay.  Fair enough.

18          The Center is a member, I believe, of the

19 Children's Health Alliance?

20     A.   Yes, sir.

21     Q.   Is that the name?

22          And also, I understand as a member of --

23     A.   And I --

24     Q.   I'm sorry, go ahead.

25     A.   I -- semantics, but I -- it's the National

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 10 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 12

1    Health Alliance.

2           THE DEPONENT:  Am I stating the acronym

3    right?

4           MS. FORDNEY:  I can't --

5       Q.  (BY MR. MOORE)  Probably haven't seen --

6       A.  We'll need to look it up.  But, yes.

7       Q.  Sure.  Sure.  I've got a document here that

8    we've marked.  We produced it as -- it's Exhibit 3.  We

9    produced it as page 7408 through 7471, so it's long,

10   but I'm just going to hand you the whole thing.  Not

11   going to go into this in any detail --

12      A.  Yeah, National Children's Alliance.

13      Q.  Okay.  That's the organization that the

14   Center is affiliated with, correct?

15      A.  Yes.

16      Q.  Okay.  And these standards, these are

17   standards for accredited members.  That's a 2017

18   edition, it's the latest edition we were able to

19   locate.

20           Is it your understanding that the activities

21   of the Center are to be in compliance with these

22   standards?

23      A.  That is my understanding.

24      Q.  Okay.

25           (Deposition Exhibit 3 was marked.)

1    Q.   (BY MR. MOORE)  Do you have anything to do

2    with the development of standards in the Center and --

3    developing those in compliance with the NCA standards?

4        A.   Developing, no.

5        Q.   Okay.  Does the Center have its own internal

6    standards?

7        A.   **My understanding is that we comply with the**

8    **requirements to be -- to maintain our membership.**

9        Q.   Okay.  Cool.  One more, and this is a big

10   one.  Do you know what I'm going to do is ask -- rather

11   than getting this thing out of order, I'm gonna -- if

12   you would hand me back that Number 7 and I'll -- we'll

13   be dealing with this later.

14           If you could take this in front of you.

15       A.   Goodness.

16       Q.   Yeah, sorry.

17           So I've marked as Exhibit 1 the document that

18   was, again, produced by the Center, Pima County

19   Protocols for the multidisciplinary Investigation of

20   Child Abuse.  And we've marked it as Plaintiff's

21   Exhibit Number 1.  The first page of this was produced

22   as SACAC 0045, and this is obviously a big document.

23   Total 135 pages.

24           Have you had a chance to review these

25   protocols any time recently?

1    recollection of -- of drafting any of this.

2          Q.    No problem.

3                I may have asked you this already, and I

4    apologize.  But as the medical director, what

5    involvement do you have in the development or

6    implementation of the internal standards in the Center?

7          A.    Development, none.

8          Q.    Okay.

9          A.    Compliance and making sure that we follow

10   what's req- -- what's required of the medical

11   processing, yes.

12         Q.    Okay.  Okay.  I'm referring now to -- I don't

13   know if you've ever seen this or not.  But in a case

14   like this, I filed a complaint on behalf of my clients

15   and your lawyer, Tom, files an answer.

16               Do you recall reviewing the answer that was

17   filed?

18         A.    I don't have a specific recollection.  I

19   mean, we've communicated.

20         Q.    Okay.  Sure.

21         A.    Whether or not something like that happened,

22   I don't have a recollection.

23         Q.    Well, I just want to refer to paragraph 5 of

24   the Affirmative Defenses, which is on page 7.

25         A.    May I?

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 13 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 16

1    Q.   It's not a -- it's not an exhibit.  I'm
2  referring to the answer that was filed in this case.
3    A.   I apologize.
4    Q.   Document 25.  And Mr. Slutes wrote, your
5  actions -- "Dr. Woolridge's actions were done in good
6  faith and under the authority of valid statutes and
7  recognized public policy.  To the best of his
8  knowledge, the Pima County protocols for the
9  multidisciplinary investigation of child abuse were in
10 effect at the time of his examination of the minor and
11 were authorized by State law.  He asserts that he had a
12 right to rely on them."
13         And that's in the answer in this case.
14         In performing the examination that you did on
15 December 16, 2020, were you relying on these Pima
16 County protocols?
17    A.   I know I was in compliance with them.
18    Q.   Okay.
19    A.   So I think the statement you just read is --
20 is factual.
21    Q.   So when you say you were in compliance with
22 them, that means, of course, that you had read them and
23 knew what they say, right?
24    A.   That is not true.
25    Q.   Okay.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 14 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 29

1   member or caregiver."

2           Is that your understanding as to how these

3   children come to the Center?

4           MS. SCROGGIN:  Let me object to misleading

5   and incomplete.

6           MR. STATES:  Join.

7           MS. COLLINGS:  Same.

8           MS. SCROGGIN:  Can we have one for all

9   objection?

10          MS. COLLINGS:  I would like that.

11          MR. MOORE:  I think if anybody objects,

12   everybody's objecting.

13          MR. SLUTES:  Fair enough.

14          MR. MOORE:  But, I mean, we can make

15   that a --

16          MS. COLLINGS:  You mean one person objects?

17          MR. SLUTES:  Standard rule throughout the

18   case?

19          MR. MOORE:  Yeah, sure.

20          MR. SLUTES:  Okay.

21      A.   Would you mind reading the statement again.

22      Q.   (BY MR. MOORE)  Yeah, I will.

23           "When law enforcement or the Department of

24   Child Safety believe a child may be experiencing abuse,

25   the child is brought to the Children's Advocacy Center,

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 15 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 30

1   a safe, trauma-informed, child-focused environment by a

2   non-offending family member or caregiver."

3           Is that your understanding, in general, how

4   these children are brought to the Center?

5           MS. SCROGGIN:  Same objections.

6       A.   Yes and no.  I mean, it's really the last

7   phrase that I think -- the statement of caregiver and

8   family member, I think, needs to be defined.  They may

9   have been transported, but a child can't be -- obtain

10  services at the Center without law enforcement or DCS

11  referral.

12      Q.   (BY MR. MOORE)  Excellent.  Okay.  So let me

13  ask you, you talk about terms being defined.

14           You're familiar with the term non-offending

15  family member; is that something you're familiar with?

16      A.   Yes.

17      Q.   Okay.  And how -- how do you -- what do you

18  understand that term to mean?

19      A.   Only in that it's an individual that the

20  child is deemed to be safe around.

21      Q.   Okay.  Excuse me.

22           So do you know who it is that makes a

23  decision that a family member is a non-offending family

24  member?

25      A.   I think it would vary --

1           MS. SCROGGIN:  Foundation.

2     Q.   (BY MR. MOORE)  Go ahead.

3     A.   I think it would vary case-by-case.  But,

4  presumably, it's whichever initiate- -- investigating

5  agency is involved with the case.

6     Q.   Yeah.  That's not your job?

7     A.   It's not my job.

8     Q.   To determine --

9     A.   Yeah, that is correct.

10     Q.   Okay.  And in terms of -- with regard to the

11  term caregiver, is that a term you mentioned about

12  definitions; is that a term you can give us a

13  definition for that you understand?

14     A.   Person who is actively taking care of the

15  child.

16     Q.   Fair enough.

17     A.   At a given moment.

18     Q.   Okay.  So is it your understanding that a

19  caregiver can be a police officer that brings a child

20  to the Center?

21     A.   Yes.

22     Q.   That's your understanding of the process?

23     A.   Yes.

24     Q.   Okay.  Moving on down.  And we can go into

25  the protocol of this, but -- excuse me for a moment.  I

1    injuries that you find on the child in these exams?

2        A.    Typically, yes.

3        Q.    And, typically, are those photographs taken

4    by the law enforcement individual or the DCS agent?

5        A.    It is my personal preference, although we

6    have the ability to capture images at the Center,

7    again, we do that for medical benefit because we'll

8    have a child who -- if we have injuries that are

9    concerned about the degree of healing, we want to photo

10   document them to essentially document healing on the

11   subsequent visit.

12          So we do have the capacity to do images at

13   the Center.  But in this regard, I think, and again, no

14   specific recollection that it was the -- either the

15   detective or the officer who was taking the photos.

16       Q.    Okay.  And in most instances, is it the

17   detective or the DCS agent that takes the photos?

18       A.    If it's body images.

19       Q.    Yeah.

20       A.    If it's genital images, no.

21       Q.    Okay.

22       A.    But if it's body images, yes, because, I mean

23   there are regions of the body that are exposed through

24   the medical exam that the nonmedical person wouldn't be

25   privy to because they're not going to undress the

1   child.  So I think in that regard, as a component of

2   the exam when I was observing them, if -- if an agency

3   is present and able to take those images over my

4   shoulder during the exam, that's allowed.

5       Q.   Okay.  And in the cases where the law

6   enforcement or the DCS agent is the one that's taking

7   the photographs of your examination, is it the common

8   practice -- is it the accepted practice that the law

9   enforcement folks or the DCS agent copy the Center with

10  copies of the photographs that were taken for the file?

11      A.   For the file, no.  We almost invariably don't

12  see them unless we're asked for the medical opinion

13  about them.

14      Q.   Okay.  So you understood in the case where a

15  law enforcement officer brings the child to the Center

16  and is taking images of photographs of the marks,

17  bruises, lesions that you are -- that you find on the

18  body, that those photographs are intended to assist in

19  an investigation of child abuse, you know that?

20      A.   I can infer that, yes.

21      Q.   Okay.  You understood when you did this

22  examination that if you concurred that there was

23  possible child abuse in this case because of what you

24  found in the marks, that your findings and your report

25  would be considered as part of the investigation by the

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 19 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 78

1        A.    I think we use that comment in reference to
2   the phone call.
3        Q.    All right.  So --
4        A.    To -- to activate my driving in.
5        Q.    So tell us what you got from either the
6   detective or the staff as to why this patient was being
7   brought for medical examination?
8             MR. STATES:  Asked and answered.
9             MR. SLUTES:  Object to the form.
10       A.    No specific recollection.
11       Q.    (BY MR. MOORE)  Well, let me ask you what you
12  put in here on page 3.
13       A.    Would you like me to read it?
14       Q.    Yes.
15       A.    "6-year-old male presents with law
16  enforcement for a medical evaluation concerning regards
17  of bruising, noted by teacher at school.  Patient at
18  school two times per week.  Patient has encopresis
19  requiring changes of his pull-up.  When teacher was
20  changing child, noted bruising to leg and called law
21  enforcement to report.  Patient interviewed at CAC.
22  Patient disclosed mother hit with belt."
23       Q.    "Patient interviewed at CAC.  Patient
24  disclosed mother hit with belt."
25             Is that the -- all the total sum of

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 20 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 79

1  information you had about this child and what had

2  happened to him in -- to cause him to be brought in?

3       MR. STATES:  Asked and answered.

4       MR. SLUTES:  Object to the form.

5    A.  That's all I wrote down.

6    Q.  (BY MR. MOORE)  I understand it's all you

7  wrote down.

8    Q.  Do you have any other recollection --

9    A.  No.

10   Q.  -- of any other information?

11   A.  No.

12   Q.  Is this the kind of information, this minimal

13  information, that you usually get?

14       MR. SLUTES:  Object to the form.

15       MS. SCROGGIN:  Argumentative, asked and

16  answered.

17       MR. MOORE:  Withdraw that.

18   Q.  (BY MR. MOORE)  You know there was a forensic

19  interview conducted, you knew that when you came in,

20  correct?

21   A.  Correct.

22   Q.  Okay.  Who was it that told you what the

23  child disclosed in the forensic interview?

24   A.  I did not document the source of that

25  information.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 21 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 83

1  prolonged.  It varies highly.

2      Q.   But you have to ask the child if they want to

3  go with you?

4      A.   Yes, I do.

5      Q.   Okay.  And since you're the doctor, you're

6  the one that's talking to the kid, right?

7      A.   That's correct.

8      Q.   Okay.  So you say to the child, hey, do you

9  want to follow me?

10      A.   That wouldn't be an uncommon thing to say.

11      Q.   Well, do you say to the child, hey, I want to

12  conduct a medical examination of you, is that okay with

13  you?

14          Do you do that?

15      A.   No.  I don't think those are the terms we've

16  used.

17      Q.   Well, tell me what you do --

18      A.   Well --

19      Q.   -- to get compliance?

20      A.   -- again, those specifics --

21      Q.   Let me finish.  Tell me what you do, what

22  words you use to get the compliance of a child for you

23  to do the examination such as the one done here?

24      A.   So, again, no specific recollection of this

25  case.

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 22 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 84

1      Q.    Okay.

2      A.    But a typical -- a typical conversation would

3   be -- would be, I want -- I want to see that you're

4   okay.  I'm a doctor, do you know what a doctor is?  You

5   know, does anything hurt, do you have any owies?  I

6   heard you had an owie, do you mind if I see it and see

7   if I can make it better?

8            Those would be more of an age-appropriate

9   conversation.

10     Q.    And is there any evidence in the record that

11  you engaged in this exchange with LAW before the

12  examination commenced?

13     A.    No, but there wouldn't typically be that.

14     Q.    Why not?

15     A.    Because it's a standard practice of

16  pediatrics to do that.

17     Q.    I understand it's a standard practice of

18  pediatrics, but you are talking about getting the child

19  to consent to this medical examination, correct?

20     A.    Children -- I infer participation in that the

21  child is not resistant.  And that is a natural tendency

22  and a natural strategy of a pediatric physician.

23     Q.    Okay.  So while you are playing with the

24  child in the playroom, is the police officer present or

25  the DCS agent present with you at the time?

1    A.    Typically not.

2    Q.    Okay.

3    A.    The advocate is one that we do typically have

4  present at all times.

5    Q.    So in this case, the advocate was -- I'm

6  starting to do this again.

7         How is it that I lose my pages?

8         THE DEPONENT:  I think you took out the nine

9  pages from that.  I think it's in here.

10        MR. MOORE:  I got them reversed.  You're

11 right, my mistake.

12        THE DEPONENT:  I think it's right here.

13        MR. MOORE:  I got it.  I got it.

14   Q.    (BY MR. MOORE)  So if the advocate is with

15 the patient at all times, in this case, either Garrick

16 or -- excuse me -- we'll identify who it is, but

17 whoever is identified as the patient advocate in this

18 record would be someone you expect to be with the child

19 at all times, correct?

20   A.    We don't leave children alone.

21   Q.    Okay.  So in the ordinary case where you're

22 in the playroom with the child, the victim's advocate

23 will be present?

24   A.    Almost routinely, I --

25   Q.    Okay.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 24 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 87

1   have the detective present.

2        Q.   I understand about one reason.  But you

3   testified that in cases, there are -- where law

4   enforcement's in the room or DCS is in the room and

5   they're photographing the examination, right?  That

6   happens, correct?

7        A.   In this case.

8        Q.   Well, in this case, but in many other cases

9   as well, correct?

10       A.   Yeah, possibly.

11       Q.   Okay.  Well, when you say possibly, is it

12   your recollection that -- give me a frequency of how

13   often a law enforcement or DCS --

14       A.   I can't do that.

15       Q.   Give me a best guess.  50 percent of the

16   time?

17       A.   Depends on if it's physical or sexual.  We do

18   not have agency in the room during sexual assault

19   because of the regions of the body we're examining.

20   Physical abuse, if we have a chaperone who's the

21   advocate there, very often it's the advocate.  But if I

22   need to point out injuries to that agency member who is

23   going to take over the care of the child after my exam,

24   then, yes, I routinely have them there.

25       Q.   You keep saying if it's necessary to point

Case 4:21-cv-00257-JGZ Document 282-1 Filed 12/20/23 Page 25 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 88

1     out the injuries for purposes of where the care is

2     going to be afterwards.  Since you don't have all that

3     information before you go into the medical examination,

4     wouldn't it be your practice to have law enforcement or

5     DCV in the examination at all times?  Withdraw that.

6            Let me ask you this, are you saying that you

7     can't -- you give the medical report that you create to

8     law enforcement, correct?

9         A.   Yeah.  Yes.

10        Q.   To DCS if they are there, you give them the

11    medical record?

12        A.   Yes.

13        Q.   You give them your findings, you give them

14    results of the exam.

15           All of that information is there in the

16    report, correct?

17        A.   Correct.

18        Q.   So why would it be necessary in certain

19    instances that you have law enforcement in the room or

20    DCS in the room to point out the injuries while you're

21    going through the exam, what would be the reason for

22    that?

23        A.   It's not always necessary.

24        Q.   To do what?

25        A.   To point out all the injuries in the exam.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 26 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center
Page 89

1   But if I need to demonstrate ongoing care, then I think

2   that's medical grounds to do that.

3        Q.   Well then, I take it you would call the law

4   enforcement or DCS agent into the room at that point to

5   show them the injuries that you found?

6        A.   Yes, that happens.

7        Q.   Okay.  Do you know if, in this case, law

8   enforcement was in the room when the medical exam

9   commenced?

10            MR. SLUTES:  Or he can say he's been called

11   to exam.

12            MR. MOORE:  I know.

13        A.   Unless it's in the documents, I don't have a

14   specific recollection.

15        Q.   (BY MR. MOORE)  Okay.  Very good.

16            Is there any record that you created that LAW

17   had any complaints of pain or discomfort that day when

18   you --

19        A.   I think I said on one of the pages that he

20   did not have any complaints.

21        Q.   Okay.  When you first saw him, he was calm,

22   correct -- oh, you don't remember, I'm sorry.

23            As you understood it, before the exam

24   commenced, the teacher had found a bruise.  That's what

25   the report says, a bruise on LAW that morning.  A

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 27 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 90

1    single bruise before the exam started.

2              You understood there was a single bruise that

3    was at issue here, correct?

4              MR. SLUTES:   Object to the form.

5         A.    I won't disagree with you, but I don't

6    recall.

7         Q.   (BY MR. MOORE)   Okay.   No problem.

8              Do you learn the history of this child from

9    the folks that are there before you go into the room

10   and play and get acquainted with the child?

11        A.    Typically, yes.

12        Q.   Okay.   And so, when you go into the room, you

13   already know what visible injury the child has that has

14   been reported, correct?

15        A.    Well, again, no specific recollection.   But

16   you stated that the patient had one bruise, but I

17   documented what, six or seven?

18        Q.   I know you have.   My question is --

19        A.    So we found more injuries.

20        Q.   I realize that.   But we're talking about

21   before you go into the medical exam.

22             You understood that the mother had hit the

23   child with a belt and there was one mark on him from

24   the reports, correct?

25        A.    I don't have a specific recollection.

1    Q.    Okay.  No problem.

2          You agree that there was no presentation of

3    an urgent medical condition with this child?

4    A.    I don't agree with that.

5    Q.    Where in the records does it show urgent

6    medical condition existing with this child when you

7    commenced the exam?

8    A.    I clearly had enough grounds to drive in.

9    Q.    I didn't ask you that.  Urgent medical

10   condition requiring urgent medical care.

11         Where did you record that in this report?

12   A.    Per my written report, I don't see those

13   specific words used.

14   Q.    Okay.  There was no report of possible sexual

15   abuse of this child, true?

16   A.    Per my note, no.

17   Q.    Did Detective Johnston -- withdraw that.

18         Does law enforcement take the photographs

19   that law enforcement takes or DCS takes at your

20   direction in an exam?

21   A.    Not typically.  Although, I mean -- I mean,

22   there is some coordinated effort.  We're trying to

23   examine a child who is distractible and difficult to

24   position.  It's not -- it wouldn't be uncommon for me

25   to lift a leg to allow a better view for a photograph

1   or, you know -- you know --

2        Q.   So it's a joint effort?

3        A.   -- position a patient.

4        Q.   Sorry.

5        A.   Yes, I think that's fair.

6        Q.   Okay.  You talked about the discharge

7   instructions earlier.

8            There was no medical care that you reported

9   this child needed for any of these injuries; is that

10  correct?

11       A.   Correct.  Nonspecific care.  There wasn't

12  anything specific.

13       Q.   In the ordinary course of events -- well, let

14  me do this, because I -- I'm -- I want to go to the

15  discharge instructions again.

16           In the ordinary course of events, if a child

17  is brought into the emergency room by a parent or a

18  guardian, before you examine that child, you would need

19  the consent -- the written consent of the parent or the

20  legal guardian, correct?

21       A.   You mean in the emergency department setting?

22       Q.   Yes, sir.

23       A.   Yeah, they -- well, I mean, any -- any

24  guardian bringing a patient into the emergency

25  department signs all the forms permitting medical

1   management from the front door.

2       Q.   I understand.  I understand that.  My point

3   is, you understand that, in the context of your work in

4   the emergency department, it has to be a legal guardian

5   or it has to be a parent, a custodial parent, that

6   gives that consent, correct?

7       A.   Correct.

8       Q.   All right.  And it would be the parent or the

9   legal guardian, once you had completed your examination

10  and determined whether or not there was any treatment

11  necessary, that would be the person to whom you would

12  give the information about what you found in the exam,

13  whether or not there's treatment needed, anything like

14  that; that's the person, right?

15      A.   The -- at the Advocacy Center or are we

16  talking about the emergency department?

17      Q.   No, no, no, we're talking about the emergency

18  department.

19      A.   In the emergency department, it depends on

20  processing.  So, for example, if a child was thought to

21  be abused and the source wasn't -- we have a

22  requirement for mandatory reporting of child abuse.  We

23  have a requirement by law to report injury.

24           If DCS or law enforcement is involved, then

25  maybe that -- forgive me, but I'm mixing terms,

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 31 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 100

1  do it?

2      A.  Typically.  I mean, I'm not going to -- I

3  don't even know what the premise of this question is.

4  Can you ask it again, please.

5      Q.  Yeah sure.  There's -- we've gone through

6  this.  You've got a history about this child.  You've

7  got information from Detective Johnston about this

8  child.  That's in these forms.

9          Do you get that information -- do you write

10 that information down before, during, or after the

11 examination in the ordinary course?

12     A.  All the above.  Before, during, and after.

13     Q.  So it can vary?

14     A.  Depending on the care of the patient, yes.

15     Q.  Okay.  All right.

16         MR. MOORE:  If it's okay with you all, I'm --

17 I just need to take a short break to get reorganized

18 here, move on.  And we're getting fairly close to the

19 conclusion of my exam.

20         (Recess taken from 11:46 a.m. to 11:55 a.m.)

21     Q.  (BY MR. MOORE)  So, back to your document

22 examination, page five of the examination is the body

23 diagram that you filled out, okay.  So you talked about

24 multiple contusions, bruises on the child.

25         Did you fill -- fill out this body diagram 1

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 32 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 101

1    through 5, if you recall, during or after the exam?

2         A.    I don't recall.

3         Q.    All right.  When you marked this body diagram

4    with the findings that you made, were you attempting to

5    draw them to scale?

6         A.    No, I was not.

7         Q.    Okay.  You were attempting, obviously, I

8    would assume, to show generally where the marks were

9    and what they looked like, correct?

10        A.    That's fair, yes.

11        Q.    Okay.  So let's turn to page 7, which is

12   identified as your exam findings/diagnosis.

13              Would you just read to us what you wrote

14   under the Exam Findings and Diagnosis section?

15        A.    "Multiple contusions - location and nature of

16   lesions, concern for inflicted injury."

17              Next line, "Injuries consistent with patient

18   disclosure of belt as cause."

19              In the treatment plan section --

20        Q.    Let me stop you before you go there, I just

21   want to stick with findings and diagnosis at this

22   point.

23        A.    Okay.

24        Q.    We'll get to that.

25              Of the examinations that you conduct and your

1   have accidental injuries.

2       Q.   Okay.

3       A.   I couldn't give you a percent, though.

4       Q.   We'll get into accidental inflicted in a

5   little bit.

6            But of the exam findings/diagnosis that you

7   read to us, what part of that is the diagnosis, all of

8   it?

9       A.   Well, the diagnosis is inclusive of location,

10  nature, what the specific medical lesion was.  The last

11  line would not be -- it would be a finding but not a

12  diagnosis.  I think it's all -- it's all either a

13  finding or diagnosis.

14      Q.   All right.  When you wrote that these

15  multiple contusions were concerning for inflicted

16  injury, you intended to communicate that they were

17  possibly inflicted, correct?

18      A.   Correct.

19           MS. COLLINGS:  Form.

20      Q.   (BY MR. MOORE)  Okay.  Let me ask you then,

21  again, you brought it up, what does inflicted mean?

22      A.   Forgive me, I'm just making sure I read it

23  one more time.

24           (Deponent perused document.)

25      A.   I think a good definition of inflicted would

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 34 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 105

1    be that it occurred from an outside source, either

2    intentionally or accidentally.

3        Q.    (BY MR. MOORE)   Okay.   Well, is that a

4    definition you've seen in any medical literature?

5        A.    I think that's a -- I think that's a common

6    categorization, yes.

7        Q.    Well, for a layman, Webster's Dictionary

8    describes inflicted as, quote, "To cause wounds as by

9    striking," unquote.

10           If I read that as a common -- just an average

11   person, inflicted to me means that somebody hit this

12   child and caused a wound.

13           Is that what you intended by inflicted?

14       A.    Yes, something -- something struck the body

15   in that region, either intentionally or accidentally,

16   and resulted in a wound.   Yeah.

17       Q.    Okay.   But you didn't -- you describe earlier

18   in testimony that there are examinations you conduct

19   where you find that the -- whatever lesion you find was

20   accidental.

21           You've made that determination, correct?

22       A.    I think, yes.   But what interview are you

23   referring to?

24       Q.    I'm not referring to an interview.

25       A.    But it seems like a reasonable statement that

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 35 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 106

1    I would make, yes.

2        Q.   I just think you just said it earlier in the

3    deposition when I asked you about that.

4        A.   Okay.

5        Q.   What's a differential diagnosis?

6        A.   It's a list of -- of -- it's a list of

7    different medical conditions that can result in the --

8    in the finding that you're referring to.

9        Q.   So you just testified that inflicted can be,

10   and I think -- we can go back, but I think inflicted

11   can mean, in your understanding as a doctor conducting

12   these, that a mark on a kid is either caused by some

13   deliberate act or it could be accident; is that

14   correct?

15            MR. STATES:   Confusing.

16            MS. COLLINGS:   Form.

17       Q.   (BY MR. MOORE)   If I'm wrong, tell me.

18       A.   Deliberate meaning inflicted?

19       Q.   Yes, sir.

20       A.   Intentionally versus accidentally, yes.   I

21   think it's either of those two.

22       Q.   When you say either of those two, in this

23   case, you said that these contusions are concerning for

24   inflicted injury, correct, that's what it says?

25       A.   Yeah.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 36 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 107

```
 1        Q.   And when you say concerning for inflicted
 2   injury, you testified -- agreed with me earlier, that's
 3   a possibility.
 4             You would agree another possibility, at least
 5   for some of these marks on the child was accidental,
 6   correct?
 7             MS. SCROGGIN:  Misstates his testimony.
 8        A.   So a couple minutes ago, inflicted could
 9   either be accidental or intentional.
10        Q.   (BY MR. MOORE)  Okay.  Okay.
11        A.   So these injuries looked inflicted to me.
12   And the question was -- and maybe I'm trying to infer
13   your question, was it intentional or accidental.
14        Q.   My question is this:  If you find that
15   injuries were accidental based on your exam, you put
16   down injuries appear to be accidental, correct?
17        A.   Correct.
18        Q.   Okay.  You don't say, injuries are inflicted,
19   which could mean intentional or accidental, right?
20        A.   No, I think I still subcategorize.  I say
21   they're inflicted, are consistent with disclosure of
22   this mechanism, are consistent with accidental play,
23   are consistent with intentional injury.  I think I
24   would -- I think the inflicted is the global term, then
25   you would subcategorize.
```

1          Isn't it a differential diagnosis on your

2   findings that these marks were caused by accident?

3          MS. SCROGGIN:  Misstates his testimony.

4      Q.   (BY MR. MOORE)  Go ahead.

5      A.   I think you just said it right there.  I'm a

6   physician, I've been trained to do a differential

7   diagnosis.  You're telling me I should jump to one

8   conclusion and not include the differential.  All I'm

9   saying is, yes, it could be accidental, but it could be

10  other things too.  That's the pure definition of a

11  differential diagnosis.  You're thinking broadly of all

12  the scenarios and all the possibilities.

13     Q.   I understand all the possibilities --

14     A.   The only mechanism I extrapolated to was a

15  disclosure of a belt and I said it could have been

16  caused by the belt.

17     Q.   And when you said it could have been caused

18  by the belt, you were talking about injury number 3 --

19  excuse me, number 1, the one that brought them -- him

20  there, the injury across the back of the left

21  hamstring?

22          MS. SCROGGIN:  Misstates his testimony.

23          MS. COLLINGS:  Form.

24     A.   I'm just referring to my notes.

25     Q.   (BY MR. MOORE)  Yeah, sure.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 38 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 123

1        (Deponent perused document.)

2        A.    So my comment was, injuries consistent with

3    patient disclosure of note.  But my -- my -- my notes

4    do not specify which of the numbered lesions.

5        Q.    (BY MR. MOORE)  Well, you described a

6    wrapping effect implies flexible nature of impact

7    object.  That's under additional comments.

8        A.    Correct.

9        Q.    Weren't you referring to the large mark that

10   brought him to you?

11       A.    It's --

12       Q.    Or not?

13       A.    It's not in my note.

14       Q.    Okay.  No problem.

15            When law enforcement or DCS brings a child in

16   and you find that there are marks on the child that are

17   concerning for infliction, which you've described as

18   either deliberately inflicted or as a result of

19   accident, do you tell that to the individual, the law

20   enforcement officer or DCS, this is what I mean when I

21   say the injuries are consistent for infliction, do you

22   tell them that?

23       A.    I think I'm very clear about describing my

24   findings.

25       Q.    Okay.

1      A.    I don't want there to be a misinterpretation,

2   by no means.

3      Q.    And that's my question.

4           You understand that nonmedical people are

5   going to be reading your report in order to understand

6   what happened, what you found, correct?

7      A.    Correct.

8      Q.    Okay.  And to your mind, do nonmedical people

9   consider the term inflicted to mean intentional or

10  accidental?

11          MS. SCROGGIN:  Argumentative.

12          MR. SLUTES:  Objection to the form.

13          MS. SCROGGIN:  Foundation.

14          THE DEPONENT:  Answer it?

15          MR. SLUTES:  If you know.

16     A.    I don't think I'm talking to simply laymen,

17  nonmedical people.  These are trained professionals who

18  work for agencies and those agencies have been endorsed

19  and trained internally on the communication and the

20  processing of how to deal with any case like this.  So

21  I am not specifically giving loose information that

22  could be extrapolated, in my opinion, inappropriately.

23     Q.    (BY MR. MOORE)  Thank you.  And I appreciate

24  that.

25          So we're going to go away from Exhibit 12 and

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 40 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 127

1    Arizona statute of child abuse?

2         A.    Well, I'm reading it and it seems very

3    appropriate.

4         Q.    Well, I guess my question is, are you saying

5    you were never in any meetings in -- you've never read

6    this definition before?

7         A.    I don't --

8              MS. COLLINGS:   Form.

9         Q.    (BY MR. MOORE)   Withdraw that, I apologize.

10   That's a compound question.

11             Do you have any recollection of reading this

12   material?

13        A.    Not this specific context, per se.   But the

14   content of it, absolutely.

15        Q.    All right.   So let me ask you to turn to

16   page 117.   The -- this is Appendix L, Criminal Conduct

17   Allegations, Definitions of Abuse.   And as you can see,

18   this is a discussion of Arizona law relative to legal

19   responsibility.   And you see the definition of abuse

20   per ARS 8-201.

21             Have you ever had any occasion to understand

22   or to learn what that particular definition is about

23   abuse?

24             MS. SCROGGIN:   Misstates the evidence.

25        A.    I don't have a recollection of specific study

1  or focus or 8-201.

2      Q.   (BY MR. MOORE)  All right.  And going down

3  below, there's another reference to ARS 13-3623,

4  physical injury, and it has a number of different --

5  number of different subparts as to what could be

6  physical injury.

7      A.   You lost me, where you're at.

8      Q.   I'm sorry, right at the bottom of page.

9      A.   Okay.

10     Q.   Okay.

11     A.   3623, okay.

12     Q.   Yeah.  Okay.  Have you ever -- do you see all

13  these different -- A through L, you see these different

14  renditions or examples of what could be physical

15  injury.

16          The first one is skin bruising A, right?

17     A.   Correct.

18     Q.   And then there's pressure sores, bleeding,

19  that kind of thing.  Failure to thrive, malnutrition,

20  dehydration.

21          All of these things are things that you look

22  for when you do a medical exam, right?

23     A.   Yes.

24     Q.   Okay.  Now, if you would go to the top of the

25  next page, page 118.

1          Do you see the definition of serious physical

2     injury at the top?

3          A.   I do.

4          Q.   Would you read it and then tell me when

5     you're ready -- when you've read it?

6          A.   "Serious physical injury," in quotes --

7          Q.   I'm sorry, you can just read it to yourself.

8          A.   Okay.

9          Q.   Just let me know when you're done.

10              (Deponent perused document.)

11         A.   Okay.

12         Q.   (BY MR. MOORE)   In terms of the report, and

13    we've gone over that report in detail, you still don't

14    have any -- it hasn't raised any recollections in your

15    mind, correct?

16         A.   Of the actual exam itself?

17         Q.   Yes, sir.

18         A.   No.

19         Q.   You just -- okay.

20              From the document itself, you did not

21    document that there was any reasonable risk of death to

22    LAW, correct?

23         A.   I've stated earlier, again, literature is

24    pretty replete on it, that children who are abused have

25    a risk of repeat injury and death if -- if ongoing

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 43 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 130

1    abuse is allowed to occur.  Any child with any concern,

2    even if it's minuscule, of inflicted injury, I think

3    needs to be taken seriously because of the concern of

4    future injury and future death.

5         Q.   Let's go back to the top of page 118.

6    Serious physical injury under the law -- 118.

7         A.   Okay.

8         Q.   Means, "Physical injury which creates a

9    reasonable risk of death."

10        Did you find in your examination of this

11   child that these injuries created a reasonable risk of

12   death?

13        A.   No, that's why we did the exam.

14        Q.   Okay.  The second one is serious impairment

15   of health.

16        Did you find that there had been a serious

17   impairment of LAW's health by these injuries?

18        A.   That was not a finding in my note.

19        Q.   Second, injury that causes serious or

20   permanent disfigurement.

21        You didn't find any serious or permanent

22   disfigurement, correct?

23        A.   That -- correct, that was not in my note of

24   findings.

25        Q.   And finally, loss or protracted impairment of

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 44 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 131

1    the function of any bodily limb or organ.

2            That's not in your report either, correct?

3        A.    That is correct.

4        Q.    Okay.  We've talked about consent, your

5    understanding of that, and that law enforcement, you

6    also -- you also believe -- withdraw that.

7            It's your understanding that a -- if the

8    child is brought in by a DCS agent, that the DCS agent

9    is the legal guardian who can make -- give consent for

10   the examination of a child, correct?

11       A.    Of my understanding of their role, that is

12   one of their components in purviews.

13       Q.    Okay.  Is it the practice of the Center, if

14   you know, to require the law enforcement officer or DCS

15   to present some documentation that they indeed have

16   custody of the child, legal custody?

17            MS. COLLINGS:  Foundation.

18       Q.    (BY MR. MOORE)  If you don't know, that's

19   fine.

20       A.    I would not know.  I don't do the intake.

21       Q.    No problem.  Now, I omitted one area, and I

22   apologize, to ask you about.  In your findings, you

23   reported that the injuries are in different stages of

24   healing and indicative of being inflicted over several

25   days.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 45 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center
Page 132

1            Do you remember that?

2        A.    Yeah, I think I alluded to that in my note

3    and your interview in '21.

4        Q.    You agree with me that it is a myth that a

5    bruise can be aged?

6        A.    Correct.  I clarified that in my interview in

7    '21.

8        Q.    Okay.  Understand that.

9        A.    Yeah.

10       Q.    So what we didn't get into before is this:

11   Of the injuries that you found, and we've got 1, 2, 3,

12   4, 5, in what order were they inflicted?

13       A.    You can see signs of healing --

14       Q.    I understand that.

15            All I'm asking you is, what order were they

16   inflicted?

17       A.    Are we going back to the images?

18       Q.    You can do anything you want.

19       A.    Where did they go?

20       Q.    Exhibit 12.

21       A.    Okay.  The ones that were showing signs of

22   injury -- and, again, you cannot -- you cannot

23   specifically date a bruise, but you can determine

24   whether or not there's signs of healing on a bruise.

25            The circular contusions, the very

Case 4:21-cv-00257-JGZ  Document 282-1  Filed 12/20/23  Page 46 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 133

1    superficial, what we call hyperemic lesions --

2          Q.    Whoa, stop.

3          A.    -- which are these --

4          Q.    Stop.  What's the definition of a hyper --

5          A.    The red, very peripheral red.

6          Q.    Stop, stop.  Could you spell that for our

7    court reporter?

8          A.    Hyper, h-y-p-e-r, emic, e-m-i-c.

9          Q.    Hyperemic.  That's the first time I've heard

10   that term.

11               So these are -- what are you pointing at,

12   what lesions are you pointing at?

13         A.    Well, you're not letting me finish.

14         Q.    Sure, sure, go ahead.

15         A.    Okay.  So the very superficial hyperemic

16   lesions tend to clear really fast, okay.  Again, you

17   can't chronologically say, is it going to clear in 4

18   hours, 6 hours, or 24 hours.

19               The circular lesions -- and you can see how

20   they're very hazy and they have a variable tissue

21   pattern.  This is deeper contusion that surfaced over

22   time.

23         Q.    And what number is that?

24         A.    That one is number 4.

25         Q.    Okay.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 47 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center
Page 134

1      A.    Now, can I -- so I can say that 4 is older.

2      Q.    Than what?

3      A.    Than the linear ones.

4      Q.    Okay.  So you're telling me that linear

5  lesions all happened after the circular lesions?

6      A.    I'm tell you that there's -- number 4 has

7  signs of healing, implying medically that it occurred

8  chronologically before the others.

9      Q.    And the signs of healing are what?

10     A.    Again, the deeper contusion, the blood under

11  the tissue from the contusion itself essentially

12  surfaces and then it starts to dissipate over time.  So

13  you can see the darker and lighter areas as the

14  hemosiderin, which is a breakdown product of blood, is

15  being essentially taken up by the tissues.  These are

16  the signs of healing that we see in bruises.

17           So I can tell you that these are older than

18  these.

19     Q.    Because of the color?

20     A.    Because of the healing patterns.

21     Q.    Well, when you say the healing patterns, the

22  healing patterns are determined by what you observed?

23     A.    The color and the nature and the distribution

24  of the color, yes.

25     Q.    Okay.  So tell me again, what order were

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 48 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 135

1    these five separate lesions inflicted?

2        A.   All I can tell you is that the circular

3    lesions were older.  4 shows more signing of healing

4    than 3 -- I'm sorry, than the other one in 4.  And then

5    the linear ones don't show any signs of healing.

6        Q.   I'm sorry, the what don't show any signs of

7    healing?

8        A.   The linear ones do not show -- do not show as

9    much signs of healing.

10       Q.   Because of their color?

11           MR. STATES:  And for the record, which photos

12   are you referring to when you're making these

13   statements?

14       A.   Well, in -- actually, 145 is the better

15   example for that one.  So, again, lighting,

16   characteristics, you have to take that with a grain of

17   salt when it comes to photo review.  But I think 145

18   would be the better one to use as a reference.

19       Q.   (BY MR. MOORE)  So I want to ask you now

20   about number 1, which is the -- we all agree is the

21   larger lesion on the back of the left hamstring.

22       A.   Okay.  Let me find it while you're talking,

23   go ahead.

24       Q.   Take your time.

25       A.   Okay.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 49 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 136

1      Q.    Can you tell us when that was inflicted?

2      A.    I cannot.

3      Q.    Could it be a day -- withdraw.

4      A.    I can't --

5      Q.    You can't judge?

6      A.    I can't judge chronology.  I cannot give you

7   an age to a bruise.

8      Q.    Okay.

9      A.    I can tell you if it's healing or not.

10      Q.    Okay.  And you can't tell us -- you say this

11   mark is not as old as the two oval bruises on his butt,

12   right?

13          MR. STATES:  Misstates prior testimony.

14          MR. MOORE:  It may do that, I don't know, I'm

15   just trying to find out.

16      A.    What I'm saying is, is these aren't

17   demonstrating the signs of healing, that I can feel

18   confident enough giving medical opinion on.

19      Q.    (BY MR. MOORE)  And that demonstration signs

20   of healing, you are testifying to by virtue of your

21   looking at the mark?

22      A.    Based upon my physical exam of the mark.

23      Q.    Yeah.

24      A.    Which is inclusive of looking at the mark.

25      Q.    Okay.

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 50 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 137

```
 1        A.    You're asking me to do photo review
 2   afterwards, so understand that there's limitations to
 3   that.
 4        Q.    I understand that.  Okay.
 5              Why did you commence to perform a genital
 6   anal exam on this child?
 7        A.    It's part of the body surface exam.
 8        Q.    In order to do that, you had to remove the
 9   under -- undergarments?
10        A.    Yeah.
11        Q.    Okay.
12        A.    I mean to visualize, yes.
13        Q.    So what you're telling me is, when a child
14   comes into the Center, even though there's not any kind
15   of accusation of sexual abuse, in each and every
16   examination, whatever undergarment the child has on is
17   removed and you commence a genital anal examination; is
18   that correct?
19              MS. SCROGGIN:  Misstates testimony.
20              MR. SLUTES:  Object to the form.
21              Go ahead, you can answer the question.
22        A.    We do -- we do a body surface exam, which
23   includes the areas under either a diaper or underwear.
24   It's visual, it's not manipulatory.  It's noninvasive.
25   And it all boils down to how the comfort level of the
```

Case 4:21-cv-00257-JGZ Document 282-1 Filed 12/20/23 Page 51 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center

Page 138

1  child.  If the child is resistant or hesitant, we do
2  not, by no means, cause distress in any of our
3  patients.
4      Q.   (BY MR. MOORE)  What is the anal exam,
5  specifically, that's called for when you're concerned
6  about sexual abuse of the child?
7      A.   An external visual exam.
8      Q.   That's all?
9      A.   For contusion, abrasion, correct.  If they
10  need -- if they need a deeper penetrating exam, they
11  are sent to the hospital for sedation or anxiolysis,
12  which is medications, because we don't force an
13  invasive exam on any child.
14      Q.   So if you do this exam, this sexual abuse
15  exam -- excuse me, when you do these exams, when you
16  say visual, you have to get the child in a position
17  where you can open the buttocks to see the anus,
18  correct?
19      A.   Correct.  Well --
20      Q.   And in this case, LAW -- oh, that's not true?
21      A.   No, your terminology is off.  Your
22  terminology is wrong.
23      Q.   Okay.
24      A.   We don't open the anus.  The anus is the
25  opening where poop comes out of.  We don't touch the

Case 4:21-cv-00257-JGZ   Document 282-1   Filed 12/20/23   Page 52 of 52
Deposition of DALE WOOLRIDGE, MD
Wright vs Southern Arizona Children's Advocacy Center                    Page 139

1   anus.  We visualize the anus by retracting -- forgive

2   the euphemism or the term, butt cheeks, the gluteus

3   maximus, to be able to visualize.

4       Q.   I understand that.

5       A.   So in the circumstance in which a child is

6   laying on their side like some of these images, for

7   example, and the diaper was off, there would be one

8   hand on the butt cheek gently retracting for

9   visualization.

10          Per my note, this child did not feel

11  comfortable in doing that, so we didn't.

12      Q.   Well, at what point in the examination did he

13  begin to resist?

14      A.   I don't remember.

15      Q.   You could have been involved -- you could

16  have been involved in opening the butt cheeks, correct?

17          In fact, you reported that there was fecal

18  matter?

19          MR. STATES:  Calls for speculation.

20      Q.   (BY MR. MOORE)  Isn't that true?

21      A.   Do you still have -- what was it, 12?

22      Q.   7.

23      A.   7.  Per my note, I did not document all the

24  findings on the exam other than saying that there was

25  soiled material.  But I could have seen soiled material