Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al., | Case No.:  4:21-cv-00257-JGZ |
| Plaintiffs, | |
| vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF BRIAN WRIGHT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DALE WOOLRIDGE** |
| Southern Arizona Children's Advocacy Center, | |
| Defendants. | |
| | Hon. Jennifer G. Zipps<br>United States District Judge |

## I.    DEFENDANT WOOLRIDGE'S CONDUCT OF THE FORENSIC MEDICAL EXAMINATION ON L.A.W. WAS DONE AS A STATE ACTOR

It is axiomatic that constitutional obligations do not extend to private parties, Section 1983's reach is limited to state actors. *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). The standard for summary judgment is well-known as well. *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). In sum, "'Where the record taken as a whole could

1

not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). It is submitted that the record undisputed evidence in the instant case points to only one conclusion – Defendant Woolridge was a state actor who is subject to liability if there was a constitutional violation in the forensic medical examination [hereafter, "FME"] conducted without parental notification and consent.

Title 42 U.S.C. § 1983's actual language is of prime importance. It provides that *"[e]very person* who, under color of any … *custom, or usage*, of any State . . . subjects … any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law" (emphasis added).

Here, the evidence we submit is indisputable, Woolridge's FME could only have been accomplished under color of state custom and usage.

At bottom the question to be answered is: "[I]s the alleged infringement of federal rights fairly attributable to the [government]?" *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 835 (9th Cir. 1999) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). The Ninth Circuit recognizes four tests which may be applied to the facts to determine whether a private party must answer for his actions under Section 1983. *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020). Determination of private party state action is a "fact-bound inquiry.*" Lugar v. Edmondson Oil Co.,* 457 U.S. 922,

939 (1982). Here, it is submitted, the "close nexus/joint action" test first announced in *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) applies and is dispositive.

Joint action "exists where a private party is a willful participant in joint action with the [s]tate or its agents." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir.1989) (citation omitted). The lynchpin of a finding of "joint action" is the existence of "a substantial degree of cooperative action." *Id.* Joint action exists when the government "has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Id.* (alteration in original). Thus, the joint action test will be satisfied when the actions of the state and the private party are intertwined or when the parties have a symbiotic relationship. See, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298- 99 (2001).[1]

As the Supreme Court stated a good while ago, "In the typical case raising a state-action issue, *a private party has taken the decisive step* that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur ... if [the State] knowingly accepts the benefits derived from unconstitutional behavior." *Nat'l Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 192 (1988) (emphasis added). In the instant case, the "decisive

---

[1] This test is distinguished from the Section 1983 conspiracy claim in that plaintiff is not required to prove that the private party agreed with the state actor to violate the victim's constitutional rights. Hence, that element of *scienter* is not relevant to disposition of the joint action test. *Cf., Crowe v. County of Los Angeles,* 608 F. 3d 406, 440 (9th Cir. 2010)

step" without which no harm would have been visited on the child and his father was the FME by Defendant Woolridge; the state not only accepted the benefits of Woolridge's examination, law enforcement initiated the FME and collaborated with the doctor in securing those benefits. Statement of Facts, Doc. ___, ⁋42 [hereafter, "SOF ⁋__"].

Of pivotal significance in the instant case, the presence of an agreement between the government and the private party is also a significant factor in applying the joint action test. "The Supreme Court has said [the joint action test] is satisfied when the plaintiff is able to establish an agreement … between a government actor and a private party." *Berger v. Hanlon*, 129 F.3d 505, 514 (9th Cir.1997), (citing *Dennis*, 449 U.S. at 27-28) rev'd on other grounds, 526 U.S. 808 (per curiam), opinion reinstated, 188 F.3d 1155 (9th Cir.1999).

Dr. Woolridge is the Medical Director of the Southern Arizona Child Advocacy Center [hereafter, "SACAC"], and has been so since 2007. SOF ⁋1. Two other doctors, Associate Medical Directors, also act as forensic examiners. SOF ⁋⁋2-3. The SACAC's operations are sanctioned by the Pima County Protocols for the Multi-Disciplinary Investigation of Child Abuse [hereafter the "PCP" or "Protocols"] which were promulgated pursuant to mandate of A.R.S. §8-817(B). SOF ⁋ 7. SACAC practice is also in compliance with Standards promulgated by the National Children's Alliance. Id. To be sure, these protocols say nothing about parental notification. But liability here is premised on custom or useage. When policy is embodied in custom or usage, it is actionable even

4

if it contradicts written charter, regulation or other official pronouncements. *City of St. Louis v. Prapotnik,* 485 U.S. 112, 130-131 (1988); *Los Angeles County v. Humphries,* 562 U.S. 29, 36 (2010); *Christie v. Iopa,* 176 F.3d 1231, 1235 (9th Cir. 1999). Here there is no contradiction, simply a complete omission of reference to notification and consent.

Woolridge, from 2007 to the date of the examination at issue, conducted between 450-550 such examinations. His colleagues conducted them as well. SOF ¶¶4-5.

The SACAC's documented function is, first, to be the "colocation of relevant agencies in *the investigation and prosecution of cases of child maltreatment*." SOF ¶9. (emphasis added). SACAC's agents partner with, among other agencies, the Pima County Attorney's Office and local law enforcement as part of the Multi-Disciplinary Team [hereafter, "MDT"] that, among other activities, collaborates in the "monitoring investigations of criminal conduct (as defined in A.R.S §8-801)." SOF ¶¶ 9-10, 12.

SACAC has two functions: (1) conducting "forensic interviews" of children [hereafter, "FI"] and (2) conducting forensic medical examinations of children [hereafter, "FME"]. SOF ¶¶13-14, 16, 18. SACAC conducts either a FI or an FME *only* upon referral by law enforcement or DCS. A parent or caregiver cannot refer a child for examination or treatment. SOF, ¶¶ 6-7. When the child is subjected to the FI and FME, no parental notification is made. SOF ¶ 20.[2] Nor is the child asked if *he* consents to such examinations

---

[2] SPD did not have legal custody of L.A.W. SOF ¶33. Not only was there no probable cause, or even reasonable suspicion that Brian Wright had abused his child, there was no exigency of imminent danger of abuse which justified seizing and detaining the child. In

5

– which include, as a matter of standard practice, invasive "genital/anal" examinations, addressed *infra.* SOF ‖21.

When a child is brought to the Center by law enforcement, the FI is conducted before an FME is performed. The purpose of an FI, according to Morgan Rau, SACAC's Director of Interviewing, is "interviewing a child for court." SOF ¶15. As SACAC publicizes, the FI may obtain "information from the child that may be helpful in a criminal investigation." SOF ¶14. Interviews are observed by law enforcement and/or DCS. Defense attorneys and parents suspected of child abuse are barred from observing. SOF, ¶13. The FI is recorded, and a copy of the video and audio are then supplied to law enforcement. Id.

The FME follows upon the FI, at the direction of law enforcement. "Medical exams are needed in most physical abuse incidents wherein legal proceedings are anticipated. *It will be necessary to collect physical evidence related to the child's condition or injuries*." SOF ¶16 (emphasis added). "The collection and documentation of possible forensically significant findings are *vital*." SOF ¶18 (emphasis added). Following the FME, a complete medical report is "distributed to DCS and Law Enforcement." SOF ‖19.

---

any event, pursuant to A.R.S. §8-823 the officer must prepare and serve on the parent a detailed temporary custody notice. None was done in this case.

SACAC publicizes that the MDT approach used "leads to more timely investigations, faster filing of charges, and a *dramatic increase in felony prosecutions ….*" SOF, ¶22 (emphasis added).

Law enforcement always participates in the FME. In the case of L.A.W.'s appearance at the SACAC in the company of Sahuarita Police Officer Carrizosa at noon on December 16, 2020, the FI was conducted by Morgan Rau [SOF ¶30] and then Sahuarita Police Detective Tom Johnston reached out to Defendant Woolridge to conduct the FME. SOF ¶¶25-28. The FME commenced at 1:00 p.m. SOF ¶31. The examination was a "coordinated effort" between Dr. Woolridge and the Detective. SOF ¶42. The Detective took numerous photographs with Dr. Woolridge pointing out specific parts of the child's body to photograph. SOF ¶40. Defendant understands that the images secured are to assist law enforcement in investigation of child abuse. SOF ¶41. That these images have no medical relevance is confirmed by the fact that the SACAC does not request nor receive copies for the file. The photographs taken by Johnston are found in Plaintiffs' Exhibit 12. SOF ¶40.

At the time Dr. Woolridge first encountered L.A.W.. Defendant took no medical or social history of the child because, according his report, there was "no guardian present." SOF ¶¶35-36, 38. Yet, SACAC personnel had documented the identity of Brian Wright and his contact information. SOF ¶29. The child had no complaints of pain, there

was no report of any need for urgent medical care, nor was there any allegation of sexual abuse. SOF ¶39.

Despite the absence of any indication of sexual abuse – the only allegation known to him being that L.A.W. was "hit with a belt" - Dr. Woolridge conducted an "anal/genital exam." SOF, ¶42. This requires that the child's undergarments be removed, the child be positioned, and the buttocks "retracted" to allow access to the anus to check for any "contusions or abrasions." SOF, ¶42. Dr. Woolridge, at some point -- he does not recall when -- stopped that part of the exam because the child was "resistant." SOF, ¶43.

In his examination, Dr. Woolridge was referring to, and checking for, the specific conditions identified by Arizona statute A.R.S. §13-3623 as constituting "Serious Physical Injury." SOF, ¶45-46. He found none of these in his examination. SOF, ¶47. These conditions track those set out in A.R.S. §8-201(34), with the exception that the latter includes an injury that "causes significant physical pain" – a condition also absent on December 16, 2020. SOF ¶46.

Under "exam/findings/diagnosis" Dr. Woolridge wrote "Multiple contusions – locations & nature of lesions concerning for inflicted injury." SOF ¶50. When asked for his definition of "inflicted," the Defendant stated that the term means either intentional or accidentally-caused injury by an "outside source." SOF ¶51. The lesions he found are "consistent with accidental play." SOF ¶52. The "linear lesions" he marked in the body diagram page of the report consisted of "very superficial hyperemic lesions" which "tend

to clear very fast…" SOF ¶¶44, 48. He could not date the mark on the back of L.A.W.'s left hamstring that brought the child to the attention of SPD in the first instance, but it showed no sign of healing. SOF ¶49.

As part of the SACAC quality assurance program, Associate Medical Director Dr. Crampton reviewed Woolridge's report on January 5, 2021. She did not have the photographs, and noted that she "Cannot comment on nature of lesions without images." SOF ¶52.

Dr. Woolridge testified that "trained professionals," who would be the ones reviewing his report, would not "extrapolate inaccurately" that his examination confirmed the lesions were caused by deliberate action – or, necessarily by a belt – rather than the equally likely cause of accidental play. SOF ¶51.

With these facts, the Court's attention is directed to *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000), the seminal decision. Jensen was arrested and jailed for "aggravated menacing." While in jail, his supervisor from work reported concern about Jensen's behavior at work, and the supervisor's fear of Jensen. That report brought in a county mental health worker, who then brought in Defendant Dr. Robbins who was a contract psychiatrist affiliated with a private group called Psychiatric Associates ("PA"). PA had a contract with the county to provide psychiatric services. Robbins then signed an order that confined Jensen to the county psychiatric hospital, after which Robbins examined Jensen and continued the confinement. After five (5) days, another doctor

opined that there was no reason for Jensen's involuntary confinement, and he was released, back to jail. Id., at 572-573. Jensen sued, among others, Robbins for substantial due process violations.

In the trial Court, Robbins was granted summary judgment grounded on his actions not constituting state action. Not only did the Ninth Circuit reverse, the Court held, as a matter of law, that Robbins was indeed a state actor. The Court wrote that

> The record is clear that Dr. Robbins and the County through its employees *have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others.* County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both PA psychiatrists and county crisis workers), and PA helps to develop and maintain the mental health policies of LCPH. We are convinced that the state has so deeply insinuated itself into this process that there is a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself.

*Id.*, 575 (emphasis added).

*Rawson v. Recovery Innovations, Inc.*, *supra,* 975 F.3d 742, substantially augments and expands the reasoning in *Jensen*. Rawson was involuntarily committed to a facility owned and operated by Recovery Innovations [in the decision, "RII"] at the direction of its Medical Director Halarnakar and "Mental Health Professional" French after being detained by county sheriff deputies. Both Defendants completed a petition for continued involuntary detention. After an independent expert evaluation found no psychiatric condition, Rawson was released, and sued RII and the two individuals. 975 F.3d at 745-

10

46. The trial court dismissed the case, on the ground that "the 'joint action'/'close nexus' test was not satisfied because Rawson did not establish 'government *involvement sufficient to override the purely medical judgment of the private individual.*'" *Id*., at 746 (emphasis added).

In the instant case, of course, the SACAC is not only deeply intertwined with law enforcement in the investigation of criminal child abuse allegations, *it literally exists to collaborate with law enforcement in the furtherance of such investigations*. It operates in partnership with Pima County prosecution and law enforcement in the investigation and prosecution of child abuse. The forensic medical examiner, here, Defendant Woolridge, acts in cooperation with the police to secure and document forensic evidence of "vital" importance to such investigations.

As in *Rawson*, Defendant is charged with "applying state protocols and criteria in making evaluation and … recommendations, and [is] 'affirmatively command[ed]' by the state to [conduct the forensic medical examination] without informed consent [of the person subjected to the examination] in many circumstances." 975 F.3d at 755-56. Here, all facts compel the conclusion of joint action.

Under this constellation of material facts, it is respectfully submitted that there is no genuine issue of material fact that Defendant Woolridge's examination of the child was accomplished "under color of state … custom, or usage" and subjects Defendant to liability for any constitutional violation of which he was an integral participant.

11

## II.   SIXTH CLAIM: WOOLRIDGE'S CONDUCT OF THE FORENSIC MEDICAL EXAMINATION, IN THE ABSENCE OF NOTIFICATION TO, AND CONSENT OF, THE PARENT VIOLATED THE CHILD AND FATHER'S RIGHT TO FAMILIAL ASSOCIATION: FIFTH CLAIM

On December 16, 2020, Brian Wright was the father and legal guardian of L.A.W. He and the child enjoyed a fundamental right, under the First and Fourteenth Amendments, to familial association. That right included the right of both for the father to make medical decisions as to the child. As stated in *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

> The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests); *see also Calabretta v. Floyd,* 189 F.3d (9th Cir. 1999) (holding that "[t]he government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents.").

Of course, every person, including a child, enjoys a right of bodily integrity and springs from the Fourth Amendment provision against unreasonable searches and seizures.

*Wallis* announced the rule that

[T]he Constitution assures parents that, in the absence of parental consent, *physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials* unless a *judicial officer* has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist

12

and that *the administration of the procedure is reasonable under all the circumstances.*

*Id.* (emphasis added, citation omitted).

Further explicating the right of the parent and child under such conditions, the Court wrote that

Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations - particularly those, such as here, that are invasive or upsetting.

*Id.*, at 1142 (footnotes omitted).

Eighteen (18) years later, and two (2) years before L.A.W. was seized and subjected to Woolridge's "genital/anal" examination, the Ninth Circuit had occasion to revisit and reaffirm *Wallis*. In *Mann v. Ct'y of San Diego*, 907 F.3d 1154 (9th Cir. 2018), the parents' four (4) children were removed and taken, as was routine, to the County's Polinsky Children's Center where they were subjected to medical examinations without notification to, or consent of, the parents. *Id.*, at 1156-57. On appeal from the trial Court's decision dismissing the case, the plaintiff parents, individually and on behalf of their children, the Court reversed.

While the Manns were appearing in juvenile court upon a detention hearing resulting from the children's services investigator securing a removal order, the children, all girls, at Polinsky, were being subjected to medical examinations, which included "a

gynecological and rectal exam, which involved a visual and tactile inspection of the children. For the gynecological exam, Dr. Graff testified that she asked the girls to "kind of drop their legs into a frog leg situation," and "separate[d] the labia and look[ed] at the hymen." *Id*., at 1158. As in the instant case, there was no allegation that the girls had been sexually abused. And, in the instant case of course, Woolridge and Detective Johnston "cooperated" in positioning the child, and then "retracting" the child's buttocks to access the anus.

In *Mann,* only long after these intrusions, after the court case was concluded, did the parents learn of the examinations. They sued. The case came before the Ninth Circuit solely on the question of liability for the medical examinations.

After quoting the rule announced in *Wallis*, the Court rejected the County's argument that the examinations were not "investigatory medical examinations" prohibited by *Wallis*, stating that

> [T]here is no dispute here that the Polinsky medical examinations are investigatory because the "physician is looking for signs of physical and sexual abuse." Dr. Graff, who examined the Mann children and was the co-medical director of Polinsky, testified that she and her staff "look closely for any evidence of physical abuse" and document any evidence they find. The Polinsky medical examinations are not routine pediatric exams…. *That these examinations may serve dual purposes does not negate the investigatory character of the procedures*.
>
> *Id*., at 1161 (emphasis added); citing and quoting from *Greene v. Camreta*, 588 F.3d 1011, 1026- 27, 1029 (9th Cir. 2009), *vacated in part as moot* 661 F.3d 1201 (9th Cir. 2011).

14

The Court admonished that "Parental notice and consent is even more warranted when examinations have dual purposes than when the purpose is purely for health reasons." *Id*., at 1162.

The Court went on to reject the trial Court's rationale that no consent was required because the examinations were not "invasive": "A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations." *Id*., at 1163.

In the instant case, as already discussed, it is indisputable that Dr. Woolridge was a willful participant with law enforcement in the conduct of the FME. He was, in short, an arm of the state. The rule, that "in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials," means what it says. Woolridge was a state actor. He undertook the FME at the behest of the police and collaborated with the police. No court order was obtained. The custodial parent was not notified. Woolridge is therefore liable for the violation of the parent and child's right to familial association under the First and Fourteenth Amendments.

//
//
//

15

### III.   FIFTH CLAIM: WOOLRIDGE'S EXAMINATION VIOLATED L.A.W.'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES AS A MATTER OF LAW: SIXTH CLAIM

In the year this writer was born, three quarters of a century ago, the United States Supreme Court admonished all inferior courts that a person's "right to be left alone is too precious to entrust to the discretion of those whose job is the detection of crime." *McDonald v United States*, 335 US 451, 455 (1948). On reflection, a six (6) year old's right to be left alone is perhaps more precious than that of an adult who can consider, understand, comprehend and protest invasion of his privacy.

The forensic medical examination without question falls within the ambit of the Fourth Amendment prohibition on unreasonable searches and seizures. *Mann*, supra, at 1164, citing *Ferguson v. City of Charleston*, 532 U.S. 67, 76 n.9, 2001) *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990); *accord Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1206 (10th Cir. 2003) (collecting cases). See *Katz v. United States,* 389 U.S. 347, 357 (1967) (Searches conducted without a warrant are per se unreasonable under the Fourth Amendment— subject only to a few "specifically established and well-delineated exceptions.").

Children removed from their parents' custody have a legitimate expectation of privacy in not being subjected to medical examinations without their parents' notice and consent. *Id. See*, e.g., *Yin v. California,* 95 F.3d 864, 871 (9th Cir. 1996) (Persons have "a legitimate expectation of privacy in being free from an unwanted medical examination,

whether or not that examination entails any particularly intrusive procedures."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995); *Parents for Privacy v. Barr,* 949 F.3d 1210, 1222 (9th Cir. 2020).

A key consideration in the instant case, as in *Mann*, is that as a matter of course in the FME's conducted at SACAC, "[c]hildren are forced to undress and are inspected, by strangers, in their most intimate, private areas." 907 F. 3d at 1165. Finally, strengthening the conclusion of a violation against L.A.W.'s right of privacy is that in *Mann*, the children subjected to the examination were already in the custody of the state under a court order when examined – here, there was no such order. *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990), *cert. denied,* 498 U.S. 961 (1990); *accord Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1206 (10th Cir. 2003) (collecting cases). Searches conducted without a warrant are per se unreasonable under the Fourth Amendment— subject only to a few "specifically established and well-delineated exceptions." The facts are clear, and it is conceded, that there was no urgent need for any medical care and no emergency that required the instant search for evidence on intimate parts of the child's body. *See*, e.g., *United States v. Cameron*, 530 F.2d 254, 258 (9th 1976).

## IV. CONCLUSION

The record of undisputed material facts mandates that the Court grant summary judgment against Defendant Woolridge on the Fifth and Sixth Claims.

//

Respectfully submitted,
/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

Trial Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on December 20, 2023. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

Respectfully submitted,

/s/ Michael Garth Moore

18