KRISTIN K. MAYES
ATTORNEY GENERAL

CLAUDIA ACOSTA COLLINGS (021647)
Assistant Attorney General
416 West Congress, 2nd Floor
Tucson, Arizona 85701-1315
(520) 638-2815 • Fax (520) 628-6050
Claudia.Collings@azag.gov

JULIE M. RHODES (016313)
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85007-2926
Telephone: (602) 542-7612
Fax: (602) 542-3393
Julie.Rhodes@azag.gov

Attorneys for DCS Defendants Francisco, Talamantes, Orozco, Noriega, Encinas & Sheldon

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Brian Wright, et al.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Southern Arizona Children's Advocacy Center, et al.,<br><br>　　　　Defendants. | No. CV-21-00257-TUC-JGZ<br><br>**DCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Department of Child Safety ("DCS") Defendants Talamantes, Francisco, Encinas, Sheldon, Noriega, and Orozco ("DCS Defendants") through counsel, respectfully move for summary judgment[1] under Federal Rule of Civil Procedure 56. This Motion is supported by the Defendants' Statement of Facts (DSOF) and the following Memorandum of Points and Authorities.

---

[1] This Court previously granted Defendants' motion to file two summary judgment motions. (Doc. 237.) This first Motion seeks summary judgment on preclusion grounds.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. SUMMARY OF REMAINING CLAIMS AGAINST DCS DEFENDANTS

The operative complaint is the Third Amended Complaint ("TAC") filed August 14, 2023. (Doc. 204.) The following claims remain against the following DCS Defendants: **Seventeenth Claim**—Wright and L.A.W. allege Talamantes and Francisco committed judicial deception and violated their Fourth and Fourteenth Amendment rights by filing the Declaration to seize L.A.W. (Doc. 204 ¶¶ 208-219.) **Nineteenth Claim**—Wright and L.A.W. allege Talamantes and Francisco committed judicial deception and violated their Fourth and Fourteenth Amendment rights by filing the Dependency Petition. (*Id.* ¶¶ 220-231.) **Twenty Second Claim**—Plaintiffs allege Sheldon, Encinas, Noriega, and Orozco retaliated against them in violation of their First Amendment rights by proceeding with the underlying dependency matter over Wright's protests and complaints. (*Id.* ¶¶ 232-240.)

## II. SUMMARY OF ARGUMENT

- Plaintiffs' claims are not extrinsic fraud because Plaintiffs' were not prevented from presenting their claims in state court and did present them in state court; thus, the claims are barred by the *Rooker-Feldman* doctrine.

- Plaintiffs are precluded from proceeding with the TAC under the doctrine of issue preclusion because (1) the issues (judicial deception and retaliation) at stake were identical in both proceedings; (2) the issues were actually litigated and decided in the prior proceeding; (3) there was a full and fair opportunity to litigate the issues; and (4) the issues were necessary to decide the merits in the state court case and this proceeding.

- Plaintiffs are precluded from proceeding with the TAC under the doctrine of claim preclusion because there was (1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the state court case and this proceeding.

## III. FACTUAL BACKGROUND

DCS involvement with the Wright family began on December 16, 2020, when a 911 call was made to Sahuarita Police Department ("SPD") and a hotline call was made to DCS and assigned to investigator Geraldo Talamantes. (DSOF ¶¶ 1-3.) L.A.W. was brought to the Southern Arizona Child Advocacy Center ("SACAC") by SPD and Talamantes did not arrive until 3:45 p.m. when he learned about the allegations, the child's statements, and the results of the medical examination. (DSOF ¶ 1.) That evening, SPD executed a search warrant at the Wright residence and Talamantes was present in the home for a period of time during the search and interviewed Wright. (DSOF ¶¶ 1, 7.) Talamantes did not take custody of L.A.W. on December 16, 2020, but instead spoke with Wright's mother Lisa Pugliano ("Pugliano") and she agreed to live with the family until DCS concluded its investigation. (DSOF ¶¶ 4-6.) Pugliano initialed and signed the Present Danger Plan ("Plan"), and transported L.A.W. to the Wright residence. (DSOF ¶¶ 4, 6.)

Between December 16 and 28, 2020, Talamantes investigated the allegations of physical abuse by conducting multiple interviews with family members including Wright, Irlanda, L.A.W., and his siblings. (DSOF ¶ 8.) Talamantes watched the SACAC forensic interview; toured the Wright home; requested and received the SPD report, #S20210504; requested photographs taken by law enforcement at the SACAC; and received photographs from Wright. (DSOF ¶¶ 8-13.) Wright and Irlanda provided multiple explanations for the child's injuries. (DSOF ¶ 14.) L.A.W.'s explanations about his bruises were also inconsistent as he initially reported to the school officials that he did not know how the injury occurred but that he got the bruises yesterday. (DSOF ¶ 1.) The school officials described his behavior during this admission as "not normal." (DSOF ¶ 1.) L.A.W. later admitted in a forensic interview at the SACAC that Irlanda had hit him on the butt more than one time and the last time was five days ago. (DSOF ¶ 15.) He further

reported that Irlanda spanked him on other occasions with a Hot Wheels track and with a brown belt more than one time. (DSOF ¶ 15.)

After L.A.W.'s disclosures in the forensic interview, Dr. Woolridge conducted a medical examination and found multiple circular bruises on L.A.W.'s left buttock, two horizontal marks located above the circular bruises on his left buttock, a horizontal mark on his lower back above his right buttock, and another horizontal mark on his right leg underneath his right buttock. (DSOF ¶ 16.) Dr. Woolridge further found that the bruising on L.A.W. was consistent with his disclosures of a belt being used, that the nature and shape of the injuries indicated a flexible implement was used, and that the contusions were at different stages of healing over a series of days. (DSOF ¶ 16.)

On December 28, 2020, Talamantes prepared and filed a Declaration for Court Authorized Removal ("Declaration") prior to the scheduled Team Decision Making Meeting ("TDM") and that same day, Judge Gregory Gnepper executed the order. (DSOF ¶¶ 17, 19.) Wright was served later that evening and L.A.W. was removed. (DSOF ¶ 21.) On December 29, 2020, Wright filed a complaint with the Ombudsman office for actions taken by Talamantes and an unidentified DCS employee during the removal, but Talamantes testified he was unaware of the complaint. (DSOF ¶ 22.)

On December 31, 2020, DCS filed a Dependency Petition ("Petition") requesting temporary custody of L.A.W., which included a proposed Temporary Orders and Findings ("Temporary Orders") that was executed by Judge Lori B. Jones that same day. (DSOF ¶¶ 23, 24.) Wright appeared for the Preliminary Protective Hearing with counsel on January 5, 2021, challenged L.A.W.'s removal from his home, presented exhibits to the juvenile court, and Talamantes testified. (DSOF ¶ 25.) The court found temporary custody was clearly necessary to prevent abuse or neglect pending completion of the temporary custody hearing and scheduled additional hearing dates. (DSOF ¶ 25.) Wright then contested L.A.W.'s removal during a multi-day temporary custody hearing before Judge

Lisa Abrams, which concluded on January 15, 2021. (DSOF ¶ 26.) Wright, who was represented by Ruby Becker and Michael Moore, testified in court, cross-examined Talamantes, and admitted multiple exhibits. (DSOF ¶ 26.) At the conclusion of the hearing, Judge Abrams ordered that L.A.W. be returned to Wright's care "with a safety supervisor in the home," but the child went to live with Pugliano in her home because she would not agree to stay the Wright home. (DSOF ¶¶ 26, 32.) Wright requested an Order to Show Cause hearing to challenge L.A.W.'s living arrangement, which was held on February 10, 2021, and Judge Abrams affirmed her prior orders. (DSOF ¶ 33.) Judge Abrams also presided over a multi-day dependency trial and on May 28, 2021, she adjudicated L.A.W. dependent as to Wright. (DSOF ¶ 27.) Judge Abrams questioned the ongoing DCS worker, Encinas, about services available through Casa de los Ninos and other providers and the barriers with getting services scheduled; but did not enter any orders that DCS offer services until later. (DSOF ¶¶ 34-38.) Wright acknowledged difficulties in obtaining therapy services for his family because they were not on AHCCCS. (DSOF ¶ 39.) The juvenile court specifically addressed the provision of services at multiple points during the dependency and specifically directed DCS to offer services on April 14, 2021. (DSOF ¶ 42.) The state court addressed DCS's position that Wright "be aligned with his son" and his minimization of concerns during the April 14, 2021, trial setting. (DSOF ¶¶ 43-45.) The Court again addressed this issue in its May 28, 2021, dependency adjudication, stating "the issue of Father being aligned with, or at the very minimum concerned about the fact that his child had bruising on his legs and buttocks has not been resolved". (DSOF ¶ 28.)

The state court heard Wright testify about knowledge of his son's hospitalization. (DSOF ¶ 47.) And, the state court addressed the issues that Wright had with the various safety monitor. Specifically, on May 28, 2021, the state court found that Wright had participated in "safety monitor gymnastics" and attempted to manipulate L.A.W.'s

placement. (DSOF ¶ 28.) The state court monitored the family and DCS's services throughout the open dependency action and ultimately dismissed it on October 14, 2021. (DSOF ¶¶ 29-30.)

## IV. SEVERAL DOCTRINES OF PRECLUSION BAR PLAINTIFFS' CLAIMS

### A. The *Rooker-Feldman* Doctrine Bars Plaintiffs' Claims Because the Alleged Fraud is Intrinsic Fraud not Extrinsic Fraud.

Defendants first raised the *Rooker-Feldman* doctrine in the Motion to Dismiss filed on January 18, 2022. (Doc. 33.) This Court unequivocally denied application of the doctrine in its Order dated September 30, 2022. (Doc. 76.) In its Order dated December 26, 2023, denying Defendants' Motion to Exceed Page Limitation for Motion for Summary Judgment, the Court cited *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1143 (9th Cir. 2021), and explained that *Rooker-Feldman* did not apply and that Defendants had not addressed the alleged extrinsic fraud. (Doc. 290.) The Defendants again assert that *Rooker-Feldman* may apply, attempt to distinguish *Benavidez,* and remedy their previous shortcomings.

#### 1. Judicial Deception—Counts 17 and 19.

Defendants contend that *Benavidez* is not controlling because that decision is premised on allegations of extrinsic fraud. The holding states "[W]here a party alleges extrinsic fraud by an adverse party in procuring a state court judgment, the *Rooker-Feldman* doctrine does not apply, because such a claim does not challenge the state court decision directly." *Benavide* at 1143. Plaintiffs allege two judicial deception claims, which at first glance appear to be claims of extrinsic fraud; but when looking more critically, it is clear that these fraud allegations were presented to the state court and are thereby properly defined as intrinsic fraud. (Doc. 204 ¶ 217.) The distinction is critical.

Although the facts of *Benavidez* appear consistent with the case at bar; a closer review notes some significant disparities. First, in *Benavidez,* Plaintiffs asserted claims of

judicial deception in securing a court order that ultimately resulted in medical examinations of minors without notice or consent of the parents. *Benavidez* at 1140. Specifically, the Benavidezes appealed the juvenile court decision to remove the minors from their home, but they did not challenge the medical examinations or any of the related orders in the state court proceeding. *Id*. at 1140. In part, *Benavidez* concluded that the Plaintiffs' were effectively prohibited in state court from challenging the medical examinations because the examinations had already occurred by the time Plaintiffs were told. *Id*. at 1140. Because these examinations occurred before the Plaintiffs were provided the opportunity to challenge them, the district court action was the first actual challenge to the misrepresentations that resulted in the examinations.

In contrast, Wright was not precluded—but actually did litigate in state court—all of the alleged misrepresentations and omissions contained in the Declaration and the Petition and is now attempting to re-litigate those same issues in district court. (DSOF ¶¶ 1, 8-17, 25-28, 51-60.) Because Wright "presented his claims" of misrepresentation and omissions to the state court, they are not claims of extrinsic fraud.

It is well established that extrinsic fraud is not an error committed by the court, rather it is a wrongful act committed by the party who engaged in the fraud. *See Kougasian v. TMSL, Inc*. 359 F.3d 1136, 1142 (2004). This typically encompasses claims of judicial deception; however, the definition of extrinsic fraud is actually narrower. "Extrinsic fraud is conduct which **prevents a party from presenting his claim in court**." *Wood v. McEwen*, 644 F.2d 797, 801 (9th Cir. 1981) (emphasis added); *see also Green v. Ancora-Citronelle Corp.*, 577 F.2d 1380, 1384 (9th Cir. 1978) ("In order to be considered intrinsic fraud, the alleged fraud must be such that it prevents a party from having an opportunity to present his claim or defense in court."). In *Wood*, the record established (1) the state judge considered the critical report (containing the alleged misrepresentations) and (2) found Wood had fully participated in the proceeding. Because he did so, the court

concluded it was not a case of extrinsic fraud, but at most constituted intrinsic fraud.

Here, as in *Wood* and *Green*, State Defendants never prevented Wright from presenting his claims of judicial deception to the state court. (DSOF ¶¶ 1, 8-17, 2-28, 51-60.) (Litigation included the following facts (1) the police determination of no probable cause because roughhousing occurred, (2) terminology regarding regular physical discipline, (3) exculpatory statements of the siblings, (4) alleged errors in the investigation, (4) medical findings, and (5) statements in the forensic interview.) *See* Chart "A" *infra* at page 12-13, incorporated here by reference (contrasting and comparing specific alleged misrepresentations and omissions in the TAC with factual determinations in the state court regarding the judicial deception claims). The fraud alleged in counts seventeen and nineteen cannot and should not be deemed to be extrinsic fraud; but instead properly defined as intrinsic fraud.

*Doe & Assoc. Law Offices v. Napolitano*, 252 F.3d. 1026, 1029 (9th Cir. 2001) provides further clarification. In *Doe*, the district court denied jurisdiction under the *Rooker-Feldman* doctrine because the state court had "considered and rejected" the constitutional arguments. The Ninth Circuit in *Doe* explained that "[I]f consideration and decision have been accomplished, action in federal court is an impermissible appeal from the state court decision." *Id*. at 1029 (citing *Worldwide Church of God v. McNair,* 805 F.2d 888, 892 (9th Cir. 1994)). Like in *Doe,* the underlying state court record establishes that the state court "considered and rejected" Plaintiffs' arguments regarding the various misrepresentations and omissions contained in the Declaration and Petition. (DSOF ¶¶ 1, 8-17, 25-28, 51-60.) It is clear the state court considered and rejected these alleged errors because they are discussed repeatedly in the trial proceedings and included in the state court's written decision. (DSOF ¶¶ 1, 8-17, 25-28, 51-60.) Plaintiffs' judicial deception claims simply cannot be considered "extrinsic fraud" because Plaintiffs fully participated in the underlying state court proceedings, distinct from the facts of *Benavidez*. The level

of Plaintiffs' participation in the underlying state action is not in dispute.

Second, the focus of *Rooker-Feldman* has expanded to apply to *de facto* appeals from state court judgments when the claims raised are "inextricably intertwined." *See Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 859 (9th Cir. 2008). In *Reusser*, the court held *Rooker-Feldman* applied because the record revealed the state court decision was based on the state court judge's consideration of motions, pleadings, and argument. The *Reusser* court found:

> The only reasonable conclusions are that the state court refused to credit the Reussers' factual allegations, or that it held that the allegations of fraud, misrepresentation, or other misconduct of an adverse party, were insufficient to permit vacatur of the default judgment. Thus, even drawing all reasonable inference from the complaint in Reussers' favor (citation omitted) we must conclude that the state court rejected the claimed extrinsic fraud on its merits. Accordingly, the Reussers' § 1983 claims constitute a *de facto* appeal of the state court decision and are therefore barred by the *Rooker-Feldman* doctrine. That is, even assuming that the misconduct that the Reussers allege rises to the level of extrinsic fraud, such claim was itself separately litigated before and rejected by the Oregon state court.

*Id*. at 859. Similar to *Reusser*, Plaintiffs are now challenging the state court's decisions rendered after that court considered and rejected their arguments and defenses—a *de facto* appeal. (DSOF ¶¶ 25-31, 33, 45, 49, 51, 55-60, 62.) Here, the only reasonable conclusion is that the state court did not accept as deceptive the alleged misrepresentations and omissions Wright presented in that proceedings; which are identical to the claims presented in this proceeding. *See* Chart "A" *infra* at page 12-13, incorporated here by reference.

Third, in order for Plaintiffs to succeed in the district court, it is necessary for this court to find that the state court was wrong. *Ezell v. Franklin County Children's Services*, CV-09-05769-GAF (VBK), 2009 WL 426034, *5 (C.D. Cal. Nov. 19, 2009) (To challenge wrongful removal of child based on a false complaint the district court would

need to determine whether the state court decisions were correct.) Specifically, to rule in Wright's favor in this litigation would require this court to review the validity of the state court's decisions and determine that the state court erred three times in (1) finding probable cause to remove L.A.W. (2) finding temporary custody was necessary, and (3) finding the child was dependent. "Where the district court must hold that the state court was wrong in order to find in favor of the plaintiff, the issues presented to both courts are inextricably intertwined." *Doe & Assoc.*, 252 F.3d at 1030. Plaintiffs' claims are thus inextricably intertwined with the state court's decisions because the facts used to support the TAC are identical to the facts presented in the state court case.

Finally, it is well-established that *Rooker-Feldman* can bar jurisdiction even when the damages sought are monetary and not injunctive relief. *See, e.g. Mothershed v. Justices of Supreme Court,* 410 F.3d 602, 606-07 (9th Cir. 2005). So, even though Wright seeks monetary compensation in this case versus injunctive relief in the state case, *Rooker-Feldman* still applies. (D0c. 204.)

## 2. Retaliation—Count 22.

The Ninth Circuit has also applied *Rooker-Feldman* to preclude jurisdiction of retaliation claims. *See Poe v. Moon*, 22 Fed.Appx. 795, 796 (9th Cir. 2001) (mem. dec.) (citing *Doe & Assoc.*, 252 F.3d at 1029). The same analysis applies…whether the claims are inextricably intertwined and the facts presented to the state court are intertwined with the claims in Wright's district court case. In the state court proceedings, Plaintiffs specifically outlined the facts supporting his current claims for retaliations. (DSOF ¶¶ 13, 24-29, 33-49, 51, 54-59-62.) (Litigation included the following facts (1) delays in offering services, (2) false statements, (3) Plaintiffs' alignment with L.A.W. and minimization of concerns, (4) DCS ignoring provider reports.) *See* Chart "B" *infra* at page 18-19, incorporated here by reference (contrasting and comparing specific alleged retaliatory acts in the TAC with factual determinations in the state court regarding the retaliation claim).

10

*Rooker-Feldman* applies here as well to bar Plaintiffs' claims.

### B. Issue and Claim Preclusion Doctrines Apply to Section 1983 Claims.

#### 1. Issue preclusion bars Plaintiffs' claims.

As this court noted in their Order (Doc. 76), issue preclusion applies when "a fact was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it and the fact was essential to the prior judgment." *Crosby-Garbotz v. Fell in and for Cnty. of Pima*, 434 P.3d 143, 146 (Ariz. 2018) (cleaned up); *see also Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012) (citing *Montana v. United States*, 440 U.S 147, 153-54 (1979)). The Ninth Circuit has held issue preclusion applicable to relitigating § 1983 claims of familial interference because the juvenile court made factual findings supporting continued custody of the child. *Smith v. Banner Health Sys.*, 621 F.App'x 876, 880 (9th Cir. 2015) (mem. dec.); *see also Kasdan v. County of Los Angeles*, CV-12-06793, 2014 WL 6669354, *1 (C.D. Cal. Nov. 24, 2014) (court found issue preclusion barred plaintiff from relitigating the veracity of the state court witnesses in this federal civil rights lawsuit.); *Grimes v. Ayerdis*, 16-cv-06870, 2018 WL 3730314, **4-6 (N.D. Cal. 2018) ([I]ssue preclusion applies where a dissatisfied litigant claims that she lost her case because her opponent lied, falsified documents or destroyed evidence so long as the issue was addressed in the prior proceedings).

At the motion to dismiss stage, this Court concluded that State Defendants failed to establish that Plaintiffs ***actually litigated*** the issues presented in their federal complaint. (Doc. 76 at 9). After extensive discovery, that concern has now abated as the trial transcripts and state court rulings outline what was actually litigated. The TAC outlines alleged misrepresentations and omissions in the Declaration and Petition to supporting claims of judicial deception. (Doc. 204 ¶¶ 208-231.) The record now reveals that these same misrepresentations and omissions were fully litigated in state court before Judge

Abrams—including the cross-examination of Talamantes and Wright's own testimony outlining his grievances—during multiple days of testimony and admission of exhibits. (DSOF ¶¶ 26-28.) Judge Abrams made two distinct rulings with detailed findings outlining specific facts that she considered during both the temporary custody hearing and the dependency trial. (DSOF ¶¶ 25-26, 28.) The misrepresentations and omissions outlined in the TAC are directly compared to the actual litigation and findings in the state court in Chart A below. *See* Chart "A" (contrasting and comparing specific alleged misrepresentations and omissions in the TAC with factual determinations in the state court regarding the judicial deception claims).

**Chart A**

| **Misrepresentations and Omissions in Content of Declaration/Petition** | **Dependency Evidence and Rulings** |
|---|---|
| Use of term "regularly" in describing Irlanda's use of physical discipline. (Doc. 204 ¶ 217(a).) | Terminology addressed in Wright's trial brief and during April 28, 2021 hearing. (DSOF ¶¶ 51, 55.) |
| Use of term "*hits*" in describing L.A.W.'s report that Irlanda has used objects including a belt and Hot Wheels track. (Doc. 204 ¶ 217(b).) Talamantes's statement that L.A.W disclosed that Irlanda caused the marks. (Doc. 204 ¶ 224(a).) L.A.W. disclosed that he was hit by…the metal part of the belt. (Doc. 204 ¶ 224(e).) | Wright's trial brief and the juvenile court's ruling addressed L.A.W.'s specific disclosures. (DSOF ¶¶ 28, 51.) |
| Talamantes's reference to an "ongoing criminal investigation" when he completed the Declaration on December 28, 2021. (Doc. 204 ¶ 217(c).) | Talamantes testified that the criminal investigation was still open and DCS's counsel referenced the open investigation during the temporary custody hearing on January 15, 2021. (DSOF ¶¶ 28, 54.) Wright and his attorney both contacted Detective Johnston to get an update on the criminal investigation after December 28, 2021 indicating they knew the investigation was not closed. (DSOF ¶¶ 52-53.) |

12

| | |
|---|---|
| Talamantes's reference to Wright and Irlanda using "physical discipline." (Doc. 204 ¶ 217(d).) Talamantes's statement that physical abuse was happening in the home. (Doc. 204 ¶ 224(b).) | Wright testified that he and his wife used physical discipline and spanked the children on the butt with an open hand. (DSOF ¶ 58.) |
| Talamantes's characterization of Wright's statements and reports regarding the marks and bruises he had seen. (Doc. 204 ¶ 217(e).) Talamantes's statement that the shapes of the bruises do not match being hit by a hand. (Doc. 204 ¶ 224(f).) | Wright testified about statements attributed to him by Talamantes, and the state court's ruling included this testimony and testimony from Dr. Woolridge regarding his examination and finding multiple bruises or marks on L.A.W.'s buttocks, leg, and lower back. (DSOF ¶¶ 28, 59.) |
| Talamantes's characterization that Wright and Irlanda minimized L.A.W.'s injuries (Doc. 204 ¶ 217(f).) | The state court's ruling found Wright and Irlanda "minimize [L.A.W.]'s disclosures and bruises, and have not taken appropriate action to manage the safety threat." (DSOF ¶ 28.) |
| Talamantes's failure to include that SPD determined that the injuries were caused by roughhousing and therefore they lacked probable cause to arrest anyone. (Doc 204 ¶ 218(a).) | The state court's ruling states "The police determined they did not have probable cause to arrest either parent. They concluded that the injuries were most likely from roughhousing with siblings." (DSOF ¶¶ 1, 28.) |
| Talamantes's failure to include his presence during police interview at Wright residence. (Doc. 204 ¶ 218(b).) Talamantes's statement that the explanation of injuries was not consistent with what Brian or Irlanda said happened. (Doc. ¶ 224(c).) | The ruling outlines Wright's version of how the injuries were sustained. (DSOF ¶ 28.) |
| Talamantes's concealed statements by L.A.W. and his sister that the children scratched, kicked and fought each other. (Doc. 204 ¶ 218(c).) | Talamantes testified that L.A.W. and his sister reported the siblings fight, scratch, and kick each other. (DSOF ¶ 60.) |
| Talamantes's failure to include L.A.W.'s sister's statements. (Doc. 204 ¶ 218(d).) | The state court ruling outlines the sibling's interview including the statement that she felt safe and that they are hit only with hands. (DSOF ¶ 28.) |
| Talamantes's failure to complete a thorough investigation. (Doc. 204 ¶¶ | Talamantes testified about his investigation and the state court made findings based on |

| | |
|---|---|
| 218(e), 224(c).) | the evidence, including law enforcement's interview with the school's mandatory reporter and L.A.W's forensic interview and medical examination at the SACAC. (DSOF ¶¶ 8, 10-13, 28.) |
| Talamantes's failure to characterize the marks and bruises found on L.A.W.'s body as "tiny and nearly invisible" or as "little boy bruises." (Doc. 204 ¶ 218(f).) Talamantes's statement that marks and bruises were in different stages of healing. (Doc. ¶ 224(d).) | The state court ruling outlines extensive findings regarding the bruises and marks located on L.A.W.'s body. It also attributed the description of "little boy bruises" to the school's mandatory reporter when describing other previous bruises from his falling or playing. (DSOF ¶ 28.) |
| Talamantes's attributing a statement during the TDM to paternal grandfather. (Doc. 204 ¶ 224(g).) | The state court admitted the TDM summary as an exhibit. (DSOF ¶ 13.) |

The records demonstrate that Plaintiffs actually litigated all of the alleged facts supporting misrepresentations and omissions in the state court—these are the identical facts supporting counts seventeen and nineteen. (Doc. 204 ¶¶ 208-231.) Moreover, Plaintiff Wright was represented by the same counsel that represents him in this Court; thus, Plaintiffs were not prevented from presenting their claims to the state court. The evidence is more than an assumption that the state court followed the statutes and rules and made findings accordingly; it is the precise language the state court already considered. Because the language in both the Declaration and the Petition has been fully litigated, and the juvenile court ruled against Wright, this Court should find that issue preclusion applies to bar Plaintiffs from relitigating these issues.

### 2. Claim preclusion bars plaintiffs' claims.

The judicially created doctrine of claim preclusion "bars all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action." *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982) (internal quotations and citations omitted). In Arizona, *res judicata* will preclude a claim when a former judgment on the merits was rendered by a

court of competent jurisdiction and the matter now in issue between the same parties was, or might have been, determined in the former action. *Hall v. Lalli*, 194 Ariz. 54, 57 (1999). Arizona follows the "same evidence test" in which "the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action." *Pettit v. Pettit*, 218 Ariz. 529, 532 (App. 2008) (citation omitted) (applying Restatement of Judgments § 61 (1942)). The same evidence test is to be interpreted liberally. *See Phoenix Newspapers, Inc. v. Dep't of Corr.*, 188 Ariz. 237, 241 (App. 1985) (holding that a plaintiff may not avoid preclusion "merely by posturing the same claim as new legal theory"). In order for claim preclusion to attach under Arizona law, there must be (1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the two suits. *In Re General Adjudication of All Rights to Use Water in Gila River System and Source*, 212 Ariz. 64, 69-70 (2006).

Here, all elements of claim preclusion are satisfied. As to the first two elements, there is an identity of claims in this Court and the state court regarding the alleged misrepresentations and omissions present in both the Declaration and the Petition. On January 15, 2021, Judge Abrams made exhaustive findings on the temporary custody hearing, and on May 28, 2021, she made extensive findings regarding the dependency. (DSOF ¶¶ 26, 28.) The state court's ruling was a final judgment on the merits, and Wright was advised that he could appeal the order (DSOF ¶ 28), which he did and later withdrew. Second, the parties are in common; DCS, Wright and L.A.W. were all parties to the previous juvenile court proceedings and Irlanda's interests were presented as well. The Arizona Supreme Court has explained that common identity, or privity, requires a "substantial identity of interests" and a "working or functional relationship ... in which the interests of the non-party are presented and protected by the party in the litigation." *Hall*,

15

194 Ariz. at 57. It is reasonable for this Court to conclude that all interests were represented and protected in the state court litigation.

Because the two lawsuits both concern the actions of DCS employees vis-à-vis Plaintiffs, the third element is satisfied. *See, e.g. Beseder, Inc. v. Osten Art, Inc.*, No. CV 05-00031-PHX-NVW, 2006 WL 2730769, at *6 (D. Ariz. Sept. 25, 2006) (finding the third element of claim preclusion satisfied where the same conduct was the subject matter of both state court counterclaims and a cause of action before the district court). The fact Plaintiffs are now arguing constitutional violations does not change the analysis. *See Ferguson v. County of Los Angeles*, CV 12-06865, 2014 WL 12949968, at *5 (C.D. Cal. June 5, 2014). In *Ferguson*, the civil lawsuit challenged the accuracy of the Department of Children and Family Services reports during the initial detention hearing and the adjudication. *Id.* at **1-4. The district court found plaintiffs' argument against claim preclusion unpersuasive and instead found that the claims were identical—because the claims were "predicated on their "well-elaborated constitutional right to live together without government interference.'" *Id.* at *5. "[C]laim preclusion prohibits a party from seeking to vindicate the same primary right that has been previously determined by bringing a subsequent action that is based on a different legal theory." *Id.*

The identical fact pattern is present here. Plaintiffs are challenging constitutional violations based on alleged judicial deception violating their 14th Amendment right to due process and familial association. (Doc. 204, Seventeenth and Nineteenth Claims.) But similar to *Ferguson*, Plaintiffs had the right and did challenge the accuracy of the reports during the temporary custody hearing and dependency trial. (DSOF ¶¶ 26, 28.) As in *Ferguson*, counsel was present and challenged the alleged false statements which are the basis for the underlying judicial deception claims. *See, e.g,* Chart "A", *supra*.

Additionally, Plaintiffs are using the same evidence in both proceedings. The state court noted that Plaintiffs' spent a great deal of time challenging the statements and

16

credibility of Talamantes and his word choice; which are the same complaints in this second action—all premised on a parent's fundamental right to the care, custody, and control of their child. (DSOF ¶¶ 55-60.) Talamantes testified on multiple occasions in the state court proceeding and has given sworn testimony in these proceedings. (DSOF ¶ 9-12, 14, 25-28, 50, 54-55, 60; Doc. 145.) For these reasons, the Court should find that claim preclusion applies here and Plaintiffs should not allowed to vindicate rights based on a different legal theory that the juvenile court previously ruled upon.

## VII. PLAINTIFFS' RETALIATION CLAIM IS EQUALLY BARRED UNDER BOTH ISSUE AND CLAIM PRECLUSION

Plaintiffs allege the DCS Defendants retaliated against them in violation of their First Amendment Rights. (Doc. 204.) The facts supporting their retaliation claim were also litigated in state court requiring preclusion in this lawsuit. Once again, a review of the transcripts and the state court's May 28, 2021, ruling demonstrate that the state court considered all these facts as outlined in Chart B, below. (*Compare* Doc. 204 ¶¶ 232-240 *with* DSOF ¶¶ 13, 24-26, 28-29, 31, 34-39, 42-49, 57-59, 61-62.)

**Chart B**

| TAC Alleged Acts of Retaliation | Dependency Evidence and Rulings |
|---|---|
| Delaying family reunification services and requirement to align with DCS. (Doc. 204 ¶¶ 88, 236(1).) | Encinas testified about reunification services and the Court made reasonable efforts findings regarding the services. (DSOF ¶¶ 24-25, 29, 34-39, 42.)<br><br>The court received testimony about the case plan requirements and to "align" with L.A.W., and the court made specific findings. (DSOF ¶¶ 28, 43-45.) |
| Intimidating Wright's family. (Doc. 204 ¶ 236(2).) | Pugliano attended state court hearings, was questioned by the court, and had the opportunity to speak to Judge Abrams, who considered her statements and determined that Pugliano was a part of a plan designed to circumvent the court's placement orders. |

17

| | DSOF ¶¶ 26, 28, 31, 49, 61.) |
|---|---|
| Falsely recording statements made by Wright. (Doc. 204 ¶ 236(3).) | State court received Wright's testimony regarding statements attributed to him by Talamantes and the state court considered credibility. (DSOF ¶¶ 27, 57-59.) |
| Denying Wright information on medical care and education. (Doc. 204 ¶ 236(4).) | State court received testimony and exhibits regarding L.A.W.'s medical and educational needs. (DSOF ¶¶ 13, 46-48, 62.) |
| Seizing L.A.W. without justification and continuing denial of legal custody. (Doc. 204 ¶ 236(5).) | State court received testimony regarding L.A.W.'s placements including an Order to Show Cause hearing and made placement decisions. (DSOF ¶¶ 24-26, 28-29, 49.) |
| Placing L.A.W. in foster care a second time while lying to Wright. (Doc. 204 ¶ 236(6).) | State court received testimony regarding L.A.W.'s placements including an Order to Show Cause hearing and made placement decisions. (DSOF ¶¶ 28, 29, 49.) |
| Demanding psychological examinations as a condition of return. (Doc. 204 ¶ 236(7).) | The state court noted Wright's refusal to participate in a psychological evaluation, noted that parents are not required to engage in services pre-adjudication, and specifically directed psychological evaluations to be provided to Wright and Irlanda. (DSOF ¶¶ 28, 42.) |
| Ignoring and misrepresenting opinions and recommendations of providers. (Doc. 204 ¶ 236(8).) | State court received testimony and exhibits from service providers. (DSOF ¶¶ 13, 34-38, 40, 42.) |

The state court is required to ensure that reasonable efforts are being made by DCS to provide reunification services and it did so, as noted above. *See* A.R.S. § 8-846; Ariz. R. Juv. Ct. 339; (DSOF ¶ 29.) Furthermore, any movement or change of placement of L.A.W. post-removal was controlled by the state court as it has jurisdiction to direct placement of a ward of the court. *See generally* A.R.S. §§ 8-829 -842 -845 -846 -861. Finally, Defendant Encinas testified extensively in the state court case and is being deposed in this matter, which is use of the same evidence. (DSOF ¶¶ 27-28, 35-38, 44; Doc. 197.) All the facts Plaintiffs now present as "evidence" of retaliatory behavior have already been introduced, weighed, and considered by the state court in the underlying

dependency proceedings. Both preclusion doctrines prohibit Plaintiffs from proceeding with their retaliation claim.

## VIII. CONCLUSION

DCS Defendants request that the Court grant summary judgment in their favor on all three remaining counts: Seventeen, Nineteen, and Twenty-Two. First, the *Rooker-Feldman* doctrine applies to the claims of judicial deception because the alleged fraud was not extrinsic. Second, Rooker-Feldman applies to all three remaining claims because this case is a *de facto* appeal and the claims are inextricably intertwined. If this Court rules in favor of Plaintiffs on any of the three remaining counts, the effect will be to undermine the state court decisions. Third, issue and claim preclusion prohibit Plaintiffs from relitigating the comprehensive state court proceedings. A review of the state court transcripts and the orders issued by Judge Abrams solidifies this position and confirms that all remaining claims in the TAC were actually litigated. No reasonable juror could conclude that Plaintiffs did not already fully litigate the facts and issues set forth in Plaintiffs' TAC since the state court conducted fifteen separate proceedings to hear testimony and received twenty-seven exhibits on the identical allegations set forth in this lawsuit. Plaintiffs should be barred from relitigating these matters.

RESPECTFULLY SUBMITTED this  22nd  day of January, 2024.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

/s/Julie M. Rhodes
CLAUDIA ACOSTA COLLINGS
JULIE M. RHODES
Assistant Attorneys General
Attorneys for Defendants Francisco, Talamantes, Orozco, Noriega, Encinas & Sheldon

19

CERTIFICATE OF SERVICE

I hereby certify that on 22nd day of January, 2024, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael Garth Moore
mike@mgmoorelaw.com
*Attorney for Plaintiffs*

Tom Slutes
Slutes, Sakrison & Rogers, P.C.
Tslutes@sluteslaw.com
*Attorneys for Defendant Dale Woolridge, MD*

Robert Grasso, Jr.
Pari K. Scroggin
Grasso Law Firm, P.C.
rgrasso@grassolawfirm.com
pscroggin@grassolawfirm.com
*Attorneys for Defendant Southern Arizona Children's Advocacy Center*

s/slf
11796032-v2

20