1  KRISTIN K. MAYES
   ATTORNEY GENERAL
2
   CLAUDIA ACOSTA COLLINGS (021647)
3  Assistant Attorney General
   416 West Congress, 2nd Floor
4  Tucson, Arizona  85701-1315
   (520) 638-2815 • Fax (520) 628-6050
5  Claudia.Collings@azag.gov

6  JULIE M. RHODES (016313)
   Assistant Attorney General
7  2005 North Central Avenue
   Phoenix, Arizona 85007-2926
8  Telephone: (602) 542-7612
   Fax: (602) 542-3393
9  Julie.Rhodes@azag.gov

10 Attorneys for Defendants Francisco, Talamantes,
   Orozco, Noriega, Encinas & Sheldon
11

12              **UNITED STATES DISTRICT COURT**

13                **DISTRICT OF ARIZONA**

14  Brian Wright, et al.,                    No. CV-21-00257-TUC-JGZ

15                Plaintiffs,

16  v.                                       **STATE DEFENDANTS' SEPARATE
                                             STATEMENT OF FACTS IN
17  Southern Arizona Children's Advocacy     SUPPORT OF MOTION FOR
    Center, et al.,                          SUMMARY JUDGMENT**
18
                Defendants.
19

20       Defendants  Francisco,  Talamantes,  Encinas,  Sheldon,  Noriega  and  Orozco,

21 (collectively referred to as "State Defendants"), through undersigned counsel and pursuant

22 to Federal Rule of Civil Procedure 56, submits their Statement of Facts (DSOF) in support

23 of their Motion for Summary Judgment filed contemporaneously.

24 //

25 //

26

### STATE DEFENDANTS' STATEMENT OF FACTS

**Investigation**

1.      The Sahuarita Police Department ("SPD") received a report of child abuse from the Copper View Elementary School on December 16, 2020, at approximately 10:15 a.m. regarding L.A.W., a six-year-old child who showed up to school with bruises. Officer Carrizosa arrived on scene at approximately 10:18 a.m. and spoke to the source, a school healthcare assistant, and L.A.W. Detective Johnston arrived and shortly thereafter. L.A.W. was transported to the Southern Arizona Child Advocacy Center ("SACAC") to complete a forensic interview and a medical examination. A search warrant was obtained to search the Wright residence and executed later that day; and officers interviewed Brian Wright ("Wright") and Irlanda Wright ("Irlanda"). SPD did not make an arrest that day believing they did not have probable cause to arrest either parent at that time. Talamantes arrived at the SACAC after the forensic interview and medical exam were conducted and received a verbal update. **(Exhibit 1, Sahuarita Police Department Report S20120504, Wright 003680-3695.)**

2.      The first hotline call regarding L.A.W.'s bruises was made to the Department of Child Safety ("DCS") on December 16, 2020, at 10:13 a.m., and a second report was received at 1:23 p.m. **(Exhibit 2, Arizona Department of Child Safety Case Build, Wright 000382.)**

3.      The reports of physical abuse were assigned to investigator Geraldo Talamantes ("Talamantes"). **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 16:20-17:5.)**

4.      On December 16, 2020, Talamantes and Wright created a 14-day Present Danger Plan to avoid taking temporary custody of L.A.W. The Plan was created at the Wright residence and signed by Wright. The Plan required paternal grandmother, Lisa Pugliano ("Pugliano") to stay at the Wright residence 24/7 to supervise all interactions

between Wright, step-mother, Irlanda, and L.A.W. Physical discipline was prohibited under the Plan. **(Exhibit 4, Present Danger Plan, Wright 00043-44; Exhibit 5, January 15, 2021, Temporary Custody Hearing Tr. 7:6-11.)**

5. DCS did not take temporary custody of L.A.W. on the night of December 16, 2020, but later took custody on December 28, 2020. **(Exhibit 6, March 24, 2021, Dependency Trial Tr. 16:8-10.)**

6. Pugliano met with Talamantes at the Southern Arizona Child Advocacy Center ("SACAC"), discussed and signed the Plan and left with L.A.W. and went to the Wright residence. **(Exhibit 4; Exhibit 5, January 15, 2021, Temporary Custody Hearing Tr. 7:21-25; 62:1-23.)**

7. When Talamantes arrived to the Wright residence to meet, interview, and discuss the Present Danger Plan with Wright, the SPD were in the middle of executing a search warrant. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 28:12-25.)**

8. Talamantes interviewed Wright and Irlanda on December 18 and 21, 2020, and toured the residence on December 18, 2021. The siblings were interviewed on December 21, 2020. Irlanda Wright is now L.A.W.'s adoptive mother, but during the critical timeframe she had no legal relationship to the child. **(Exhibit 5, January 15, 2021, Temporary Custody Hearing Tr. 15:12-22; 20:3-24; Exhibit 32, March 15, 2021, Dependency Trial Tr. 16:16-25; 17:1-8; Doc. 204 ¶ 23.)**

**State Court Hearings**

9. The state court heard Talamantes testify on January 6, 2021, that the criminal investigation was ongoing. **(Exhibit 7, January 6, 2021, Temporary Custody Hearing Tr. 11:13-18.)**

10. The state court heard Talamantes testify that he requested the photographs taken by Sahuarita Police Department prior to the January 5, 2021, Preliminary

Protective Hearing. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 22:6-13.)**

11.     The state court heard testimony that Talamantes received a copy of the forensic interview and reviewed all information that DCS obtained from law enforcement at the time of the Preliminary Protective Hearing on January 5, 2021. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing 21:8-24, 28:9-11, 29:10-24.)**

12.     The state court heard testimony that Wright shared with Talamantes photographs of L.A.W.'s injuries that he took on December 16, 2020, after he returned from the forensic interview and medical examination. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 22:6-13.)**

13.     The state court received and admitted into evidence numerous exhibits, including photographs of L.A.W.'s injuries taken by Wright as well as copies taken by law enforcement. **(Exhibit 8, Dependency Exhibit List.)**

14.     The state court heard testimony that Wright and Irlanda provided multiple explanations for the injuries observed on L.A.W. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 17:12-25; 18:1-19:1.)**

15.     The state court received and admitted into evidence an exhibit of the SACAC forensic interview of L.A.W. with Morgan Rau conducted on December 16, 2021. **(Exhibit 9, L.A.W. Forensic Interview Tr. 14-19; Ex. 8 [listed as Father's B].)** During the interview, L.A.W. made the following disclosures.

> a.     FORENSIC INTERVIEWER: Okay. All right.
> So, Lance, what happens when you get in trouble with your mom?
>
> L.W.: She hits me in the butt.
>
> FORENSIC INTERVIEWER: She hits you in the butt?
>
> L.W.: Yep.

FORENSIC INTERVIEWER: Has that happened one time or more than one time?

L.W.: More than one time.

(Exhibit 9, Tr. at 14.)

b.    FORENSIC INTERVIEWER:  Okay. Tell me about the last time she hit you in the butt.

L.W.: It was like two -- like five more days ago.

FORENSIC INTERVIEWER: Okay. And how come she hit you in the butt?

L.W.: Because I was being bad.

(Exhibit 9, Tr. at 14-15.)

c.    FORENSIC INTERVIEWER: Has she ever hit you with something other than her hand?

L.W.: Yep.

FORENSIC INTERVIEWER: Yeah? What?

L.W.: Like this little Hot Wheels thing, but it's long, in the butt.

FORENSIC INTERVIEWER: In the butt.

FORENSIC INTERVIEWER: Okay. And has she hit you with the Hot Wheels thing one time or more than one time?

THE WITNESS: Like, it was like -- like when I was four.

(Exhibit 9, Tr. at 17-18.)

d.    FORENSIC INTERVIEWER: Okay. And so other than her hand and other than the Hot Wheels tr[a]ck, has she hit you with something else?

L.W.: Yeah.

FORENSIC INTERVIEWER: What else?

L.W.: With a belt.

FORENSIC INTERVIEWER: With a belt?

L.W.: Yeah.

FORENSIC INTERVIEWER: Has she hit you with the belt one time or more than one time?

L.W.: More than one.

(Exhibit 9, Tr. at 19.)

16.     The state court heard testimony from Dr. Woolridge that he was called to the SACAC to conduct a medical examination of L.A.W. on December 16, 2020, at approximately 1:00 p.m. He completed a report with a diagram documenting the following contusions on L.A.W. (1) Upper left back leg linear contusion 2-3 cm width; (2) upper right back leg linear contusion; (3) upper left let inner thigh linear contusion; (4) upper right buttocks two oval/round contusions; demonstrative finding; and (5) upper right buttocks towards back linear contusions. He testified consistent with these findings and his report was admitted into evidence. The state court relied on Dr. Woolridge's findings in its ruling finding L.A.W. dependent. **(Exhibit 10, March 18, 2021, Dependency Trial Tr. 18:7-32:21; Exhibit 8; Exhibit 21, May 28, 2021 Ruling; Exhibit 49 Dr. Woolridge report.)**

<u>Documents Received by State Court</u>

17.     The state court heard testimony that Talamantes had drafted an Application and Declaration for Ex-Parte Removal of Child ("Declaration") on December 28, 2021, and had submitted the Application prior to the Team Decision Making Meeting. **(Exhibit**

6

**11, Application and Declaration for Ex-Parte Removal of Child; Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 34:5-22.)**

18.    This Declaration was filed with the state court as an attachment to the Dependency Petition. **(Exhibit 12, April 2, 2021 Dependency Trial Tr. 16:18-25; 17:1-3.)**

19.    The Honorable Gregory Gnepper signed the Order for Ex-Parte Removal of Child on December 28, 2020, and this document was filed with the State Court as an attachment to the Dependency Petition. **(Exhibit 13, Order for Ex-Parte Removal of Child; Exhibit 12 at 4/2/21 Tr. 16:18-17:3.)**

20.    A Team Decision Making Meeting ("TDM") was held on December 28, 2020. At the conclusion of the meeting, it was determined that an out-of-home dependency petition would be filed, and the TDM summary was filed with the state court as an attachment to the Dependency Petition. **(Exhibit 14, Team Decision Making Meeting Summary Report; Exhibit 12 at 4/2/21 Tr. 16:18-17:3; Exhibit 5, January 15, 2021, Temporary Custody Tr. 32:16-33:18.)**

21.    A Temporary Custody Notice ("TCN") was not immediately served on Wright because he promptly left the TDM meeting. The notice was served approximately two hours later at the Wright residence and L.A.W. was removed and placed in a foster home. This notice was filed with the state court as an attachment to the Dependency Petition. **(Exhibit 15, Temporary Custody Notice; Exhibit 12 at 4/2/21 Tr. 16:18-17:3; Exhibit 5 at 1/15/21 Tr. 32:16-33:18.**

22.    On December 29, 2020, Wright filed a complaint with the DCS Ombudsman's Office regarding the actions by Talamantes and an unidentified DCS case specialist during L.A.W.'s removal. The state court heard Talamantes testify that he was unaware of the complaint. **(Exhibit 16, Ombudsman Complaint; Exhibit 17, May 3, 2021, Dependency Trial Tr. 35:10-21.)**

23.     A DCS Dependency Petition and Petition for Paternity and/or Child Support ("Petition") was filed on December 31, 2020. Attached to the Petition is the TCN, Order for Ex-Parte Removal of Child, Application and Declaration for Ex-Parte Removal of Child, and TDM Summary Report. **(Exhibit 18, DCS Dependency Petition and Petition for Paternity and/or Child Support.)**

**Court Orders**

24.     The Honorable Lori B. Jones executed the Temporary Orders and Findings on December 31, 2021.  The order stated as follows:

> IT IS ORDERED that, pending the hearing, ***[L.A.W.] is made a temporary ward of the Court, committed to the legal care, custody, and control of the Department of Child Safety (DCS or the Department) and placed in the physical custody of DCS***.
>
> THE COURT FINDS, based upon the verified allegations of the Petition that ***continuation of the child in the home would be contrary to the child's welfare.*** This finding is based on the following facts: The child is at risk for abuse and neglect in the father's care due to the father failing to protect the child from physical abuse.
>
> THE COURT FURTHER FINDS, based upon the verified allegations of the Petition ***that reasonable efforts have been made to prevent removal of the child from the home***. This finding is based on the following facts: The family was offered case management and a present danger plan.

**(Exhibit 19, Temporary Orders and Findings.)** (emphasis added).

25.     At the January 5, 2021, Preliminary Protective Hearing and Temporary Custody Hearing, the state court admitted into evidence four exhibits from Wright, the DCS court report and case plan, commenced the testimony of Talamantes. The state court then signed the Preliminary Protective Order and set the matter for additional hearings to conduct a full evidentiary hearing. It also made the following findings:

> THE COURT FINDS that temporary custody is necessary to prevent abuse or neglect pending completion of the temporary custody hearing.
>
> IT IS ORDERED that the minor shall remain placed in licensed foster care.
>
> THE COURT FINDS that the services and visitation proposed in the case plan are necessary and appropriate.

**(Exhibit 20, January 5, 2021 Minute Entry.)**

26.　The Honorable Lisa Abrams heard testimony and received exhibits on January 5, 2021, **(Exhibit 3, Exhibit 20)**, January 6, 2021, **(Exhibit 7),** and January 15, 2021, **(Exhibit 5, Exhibit 39, Exhibit 40),** during the temporary custody hearings. On January 15, 2021 at the conclusion of the hearing, Judge Abrams ordered L.A.W. returned to his father with a safety supervisor residing in the home and made numerous factual findings. The idea that L.A.W. could move to Scottsdale with Pugliano was also discussed and approved by the Court. **(Exhibit 5, January 15, 2021, Dependency Trial Tr. 85:14-105:1.)**

27.　The Honorable Lisa Abrams held a contested dependency trial on March 15, 17, 18, 22, 24, 29, April 2, 14, 28, and May 3, 19 and 25, 2021. During these proceedings Wright, Talamantes, Encinas and Dr. Woolridge testified and the state court issued its ruling on May 28, 2021. **(Exhibit 21, May 28, 2021 Ruling.)**

28.　On May 28, 2021, in a comprehensive 16-page ruling, Judge Abrams made comprehensive findings of fact. (**Exhibit 21 at 1-13**.) Judge Abrams found L.A.W. dependent as to Wright, found probable cause existed for the removal of the child, and ordered the family to participate in family reunification services. The Court opined that Wright was still not aligned with his son and that the family participated in "safety

1   monitor gymnastics" with the intent to manipulate the placement of L.A.W. **(Exhibit 21**

2   **at 13-14.)**

3       29.   In addition to the numerous court appearances for the dependency trial, the

4   parties appeared at additional state court hearings including an Order to Show Cause

5   hearing on February 10, 2021, and a Report and Review hearing on August 26, 2021. The

6   State Court denied Father's motion to dismiss at the August 26, 2021, hearing. **(Exhibit**

7   **22, February 10, 2021, Order to Show Cause hearing; Exhibit 23, August 26, 2021,**

8   **Report and Review hearing.)**

9       30.   At the final hearing on October 14, 2021, the state court dismissed the

10  dependency on Wright's Motion to Dismiss and with the consent of DCS. **(Exhibit 24,**

11  **October 14, 2021 Dismissal Hearing.)**

12      31.   After the final day of the contested temporary custody hearing on January

13  15, 2021, the court ordered the return of L.A.W. contingent on a safety supervisor residing

14  in the home. The plan was for Pugliano to stay in the residence, but after the hearing she

15  declined to stay indicating the need to return to her own residence in Scottsdale. **(Exhibit**

16  **21 at 11.)**

17      32.   Since there was no safety supervisor staying in the residence with L.A.W.

18  after the January 15, 2021 hearing, L.A.W. went to live in Pugliano's home in Scottsdale.

19  **(Exhibit 21 at 11.)**

20      33.   At the Order to Show Cause Hearing on February 10, 2021, DCS had to

21  explain why L.A.W. was not returned to Wright's care on January 15, 2021. The state

22  court confirmed its previous order that L.A.W. could only remain in Wright's care with a

23  "safety supervisor" and since none was available, the state court declined to change

24  placement. **(Exhibit 21 at 11.)**

25  ///

26  ///

**Services/Reunification Efforts**

34.     The state court heard testimony from Wright about contacting Casa de los Ninos to secure in-home services for his family. **(Exhibit 25, March 17, 2021, Dependency Trial Tr. 19:11-25; 20:1-14.)**

35.     The state court heard testimony from Encinas regarding the challenges in getting services for Wright and his family, specifically through Casa de los Ninos. **(Exhibit 26, May 19, 2021, Dependency Trial Tr. 28:7-33:19.)**

36.     The state court questioned Encinas to explain the details regarding Casa de los Ninos. **(Exhibit 26, May 19, 2021, Dependency Trial Tr. 33:1-19.)**

37.     The state court heard testimony by Encinas regarding other services completed by Wright. **(Exhibit 26, May 19, 2021, Dependency Trial Tr. 25:12-25; 26:1-7.)**

38.     The state court heard testimony from Encinas about the case plan and services offered to Wright, Irlanda and all the children including L.A.W., specifically addressing the psychological evaluations and L.A.W.'s individual therapy. The state court also admitted the case plan as an exhibit and considered these services in its dependency ruling. **(Exhibit 17, May 3, 2021, Dependency Trial Tr. 49:2-55:10; Exhibit 21 at 11-12; Exhibit 8.)**

39.     Wright recorded and transcribed Child and Family Team ("CFT") meetings. In those meetings, Wright, acknowledged challenges that he experienced in obtaining services since his family did not qualify for AHCCCS health coverage. **(Exhibit 27, March 8, 2021, Intermountain Progress Note.)**

40.     The state court received as an exhibit the Rapid Response Referral for L.A.W. completed through Intermountain Centers and a representative attended the first court hearing on January 5, 2023. This is the initial assessment done on a child in DCS custody. **(Exhibit 3, 4:23-25; 5:1-3, Exhibit 8; see also Exhibit 21 at 13.)**

41.   The start date for L.A.W.'s therapy with Peter Tolhurst was discussed during the March 8, 2021, CFT meeting that Wright attended and recorded. L.A.W.'s first therapy appointment was March 4, 2021. **(Exhibit 27 at 5-6.)**

42.   The state court addressed services and reunification efforts, and on April 14, 2021, directed DCS to immediately attempt to get in-home services in place as well as the psychological evaluation referrals. Services were also addressed at the January 5, 2021, hearing and the February 10, 2021, hearing. **(Exhibit 28, April 14, 2021, Dependency Trial Tr. 22:19-25; Exhibit 20; Exhibit 22; see also Exhibit 21 at 11-12, 13.)**

43.   The state court heard testimony from Talamantes that in order for Wright to protect L.A.W., he had to be able to take action and be aligned with L.A.W.'s statements and the information that he provided.  Talamantes also testified about why DCS needed to be involved with the family. **(Exhibit 29, March 24, 2021, Dependency Trial Tr. 19:8-17; 20:9-21:2.)**

44.   The state court heard testimony from Encinas that one of Wright's conditions for return with his son was for him to believe L.A.W.'s disclosures and be aligned with the statements that he had made during his forensic interview. **(Exhibit 17, May 3, 2021, Dependency Trial Tr. 42:16-47:3.)**

45.   During the dependency trial, the state court noted that it had "grave concerns" regarding the nature of L.A.W.'s injuries based on the testimony it had heard regarding the details of the bruising found on L.A.W.'s body.  The state court addressed Wright's concerns about being "aligned" with DCS and questioned why Wright was not "aligned" with his child's statements.  On April 14, 2021 the court stated: "And I honestly think this case could be going in a different direction if there was simply an acknowledgment that this child had been injured, that there's an acknowledgement that he's identified his step-mother as the one who injured him, and that the parent, the sole legal parent said I want to do anything and everything to get to the bottom of this as

1   opposed to sort of a blanket denial and it must be from some other source." These

2   concerns were noted in the under advisement ruling as well. **(Exhibit 28, April 14, 2021,**

3   **Dependency Trial Tr. 19:18-25; 21:14-23.)**

4         46.   On February 10, 2021, while in the care of Pugliano, L.A.W. was directly

5   admitted to Phoenix Children's Hospital ("PCH") from the GI Clinic.   On that date,

6   Encinas notified the hospital that Wright could visit the child if supervised by Pugliano.

7   PCH had limited wrist bands to provide to each family, so that issue had to be sorted out

8   by the hospital. Wright visited with L.A.W. on February 12, 2021. **(Exhibit 30, PCH**

9   **records, DCS Case File Wright 000936; Exhibit 31, PCH records, DCS Case File**

10   **Wright 000926.)**

11         47.   The state court heard Wright testify that he was made aware of L.A.W.'s

12   admission to Phoenix Children's Hospital, that he was able to visit his son while

13   hospitalized, and that he was made aware of dietary changes. **(Exhibit 32, March 15,**

14   **2021, Dependency Trial Tr. 34:1-25; 35:1-14; Exhibit 25, March 17, 2021**

15   **Dependency Trial Tr. 12:11-24; 14:3-9.)**

16         48.   On June 25, 2021, Wright emailed Encinas, in which he acknowledged that

17   L.A.W. had a medical appointment at Phoenix Children's Hospital scheduled for the

18   following Wednesday on June 30, 2021. **(Exhibit 33, Email, DCS Case File Wright**

19   **001902.)**

20         49.   The state court addressed the safety monitor issue during the contested

21   dependency trial on April 28, 2021, heard Pugliano state that she did not feel it was

22   necessary to have a safety monitor in the home, and even questioned a proposed safety

23   monitor that would replace Pugliano. **(Ex. 34, April 28, 2021, Dependency Trial Tr.**

24   **63:10-67:8; 82:22-85:13; 89:7-21.)**   The court stated in part:

25        THE COURT: Mrs. Pugliano, I am so deeply disappointed. I feel like you

26        lied the last time you were here. I feel like you were disingenuous. You

knew that your position in the home wasn't premised on your belief about whether there was a need for a safety monitor. You knew that.

And you were also asked questions specifically by Mr. Knauer about whether there were concerns regarding the length of time it may take. And you indicated no, that you had made arrangements, that you had friends who were going to come down.

I feel as though you were disingenuous and I am just, I don't really know what to make of it. I really question your veracity and your propensity for honesty to the Court at this junction.

What is the status with the – and now we have a situation were based on an adult's behavior and an adult's decision, that child may be removed again. Causing additional trauma.

(Exhibit 34, 65:9-25; 66:1-2.)

But I share Mr. Jenney's concerns of trauma to the child from removal. Which is why I think that this was absolutely planned by Mr. Wright, and Ms. Pugliano is complicit in that. And I have significant, significant concerns regarding this family's propensity for truth telling at this junction.

So I will allow the Department to conduct their full assessment, meet with Ms. Carrillo. In the [meantime] Ms. Pugliano should remain in the household. If she leaves then the Department will need to issue temporary custody and removal.

And that is not something that I want to have happen, it's something that has been created by the decisions the adults have made in this family.

(Exhibit 34 89:7-20.)

**Specific Testimony Received Regarding the Abuse**

50.   The state court heard Talamantes testify DCS was aware that the school nurse saw and changed L.A.W. multiple times per day.   This information was also contained in the Hotline report and in the police report, which was admitted into evidence

14

in the state court case. **(Exhibit 3, January 5, 2021, Temporary Custody Hearing Tr. 23:11-20; Exhibit 1; Exhibit 2; Exhibit 8.)**

51.    Wright's counsel prepared and filed a Trial Brief in the state court proceeding outlining his specific issues with the language used in the Declaration and Petition which are consistent with the issues previously raised in the state court case and this lawsuit. The Trial Brief also acknowledged that a parent's fundamental right to the care, comfort, companionship, and decision-making was at stake in the state-court case. **(Exhibit 35, Father's Trial Brief.)**

52.    Wright wrote an email to Detective Johnston on December 31, 2020 asking for documentation to show that the criminal case had closed. Detective Johnston returned an email that same date indicating the next step was presentation to the Pima County Attorney and that he would have no new information until January 19, 2021.  **(Exhibit 36, Wright's Email dated December 31, 2020.)**

53.    Michael Moore, Wright's attorney in the state case, wrote a letter to Detective Johnston on January 18, 2021, referencing the joint investigation of the child abuse allegations and knowledge that the matter was being presented to the Pima County Attorney's Office on January 19, 2021. Mr. Moore offered photos taken by Wright and Wright's conclusions as to how the child received the bruises for Detective Johnston's consideration. **(Exhibit 37, Attorney Michael Moore's letter dated January 18, 2021.)**

54.    The state court heard testimony by Talamantes that on December 28, 2020, they were still waiting on law enforcement to conclude their investigation and that he had contacted Detective Johnston to verify Mr. Wright's statement that the criminal investigation was closed. Detective Johnston denied that the investigation was closed. **(Exhibit 38, March 29, 2021, Dependency Trial Tr. 22:8-25, 23:1-16.)**

55.    The state court addressed whether the words in the Declaration or Petition were an inaccurate summary of what L.A.W. stated and also addressed the use of the term

"regularly."  The state court clarified that an investigation does not look only at the child's words and the child's description, but also the medical examination and the forensic interview.  The state court challenged Wright's attorney about his questioning of Talamantes and the implication that dependency petition allegations should contain verbatim quotations. Wright's attorney explained that the language was "very critical in determining whether there was probable cause or not." **(Exhibit 34, April 28, 2021, Dependency Trial Tr. 9:11-11:15, 27:19-31:17; 33:11-36:10.)**  The court stated in part:

> THE COURT: Right. And I just still don't, and I still am perplexed by the fact that there seems to be an implication that the petition should be verbatim quoting what a child or another person may have said. The allegations in the petition are not meant to be quotes. They are allegations that are in essence of summary of the conclusions of the Department's investigation.
>
> And certainly you can argue the words are inaccurate, but I don't know how much more we are going to get with this line of questioning.
>
> (Exhibit 34, 33:11-20.)
>
> THE COURT: But in addition to, you are isolating things to what a six year old child is stating. And what Mr. Talamantes made clear was that he was looking at the whole picture and that included a physical examination conducted by a medical examiner with very clear bruising that was seen not only by the medical examiner but initially seen by the school nurse who is a mandatory reporter and who felt it was necessary to contact the Department of Child Safety.
>
> (Exhibit 34, 34:11-19.)

56.    The state court adopted the statements made by L.A.W. in the dependency ruling. (**Exhibit 21.**)

57.    The state court addressed Wright's attempt to confuse the statements made by L.A.W. by parsing words, questioning the use of present tense verses past tense and aggressive cross-examination about what words were input into the case notes as

16

1    compared to the Child Risk Safety Assessment**. (Exhibit 21.)**

2       58.    The state court heard Wright testify that his wife Irlanda and he used

3    physical discipline on his children. **(Exhibit 32, March 15, 2021 Dependency Trial Tr.**

4    **21:2-14.)**

5       59.    The state court heard Wright testify on January 15, 2021, when he disputed

6    statements attributed to him by Talamantes regarding his observations of bruises and

7    marks found on L.A.W. (**Exhibit 5, January 15, 2021, Continued Temporary Custody**

8    **Hearing Tr. 10:8-25, 11:1-22.**)

9       60.    The state court heard Talamantes testify that Lance and his sister fight,

10   scratch and kick each other. (**Exhibit 17, May 3, 2021 Dependency Trial Tr. 13:22-25**.)

11      61.    Pugliano appeared in state court on January 15; March 17, 18, 22, 24, 29;

12   April 14, 28; and May 3, 2021. **(Exhibit 39, January 15, 2021, a.m. minute entry;**

13   **Exhibit 40, January 15, 2021, p.m. minute entry; Exhibit 41, March 17, 2021, minute**

14   **entry; Exhibit 42, March 18, 2021, minute entry; Exhibit 43, March 22, 2021, minute**

15   **entry; Exhibit 44, March 24, 2021, minute entry; Exhibit 45, March 29, 2021 minute**

16   **entry; Exhibit 46, April 14, 2021, minute entry; Exhibit 47, April 28, 2021, minute**

17   **entry; Exhibit 48, May 3, 2021, minute entry.)**

18      62.    The dependency trial exhibit list shows that the state court received and

19   admitted school records into evidence on April 2, 2021. **(Exhibit 8 at 3**.)

20          RESPECTFULLY SUBMITTED this   22nd   day of January, 2024.

21                                             **KRISTIN K. MAYES**
                                               **ATTORNEY GENERAL**
22
                                               /s/Julie M. Rhodes
23                                             CLAUDIA ACOSTA COLLINGS
                                               JULIE M. RHODES
24                                             Assistant Attorneys General
                                               Attorneys for Defendants Francisco,
25                                             Talamantes, Orozco, Noriega, Encinas &
                                               Sheldon
26

1

2                    <u>CERTIFICATE OF SERVICE</u>

3          I hereby certify that on 22nd day of January, 2024, I caused the foregoing

4  document to be electronically transmitted to the Clerk's Office using the CM/ECF System

   for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF

5  registrants:

6  Michael Garth Moore

7  mike@mgmoorelaw.com
   *Attorney for Plaintiffs*

8
   Tom Slutes

9  Slutes, Sakrison & Rogers, P.C.
   Tslutes@sluteslaw.com

10 *Attorneys for Defendant Dale Woolridge, MD*

11 Robert Grasso, Jr.
   Pari K. Scroggin

12 Grasso Law Firm, P.C.
   rgrasso@grassolawfirm.com

13 pscroggin@grassolawfirm.com
   *Attorneys for Defendants Southern Arizona Children's*

14 *Advocacy Center*

15 s/slf
   11818329

16

17

18

19

20

21

22

23

24

25

26

                                     18