Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Southern Arizona Children's Advocacy Center, <br><br> Defendants. | Case No.:  4:21-cv-00257-JGZ <br><br> **PLAINTIFFS' OBJECTIONS TO DCS DEFENDANTS' STATEMENT OF FACTS [DOC. 307] AND CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF THEIR MEMORANDUM IN OPPOSITION TO THE DCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 329]** |

Now come Plaintiffs, pursuant to Local Rule 56.1(b), and submit their Controverting Statement of Facts.

## SEPARATE STATEMENT OF FACTS SUBMITTED BY DEFENDANTS

1.     Not disputed, except for statement that "SPD did not make an arrest that day believing they did not have probable cause to arrest either parent."

2.      Not disputed that calls to the Hotline were made. Dispute that the callers identified more than a single mark as concerning.

3.      Undisputed

4.      Undisputed

5.      Undisputed

6.      Undisputed

7.      Not disputed that Talamantes arrived at the Wright home when SPD officers were executing a search warrant.

8.      Not disputed that Talamantes was at the home on December 18 and 21, 2020. Dispute he interviewed L.A.W.'s siblings on December 21, the interviews were on December 18. Plaintiffs' Exhibit 25, CSRA, Wright 00597.

9.      Undisputed

10.     Undisputed

11.     Undisputed

12.     Undisputed

13.     Not disputed that during dependency trial, numerous exhibits were identified and admitted.

14.     Dispute that Talamantes, on January 5, 2021, testified that the parents "provided multiple explanations for the injuries observed on L.A.W." Defendants' Exhibit 3.

15.     Undisputed

16.    Undisputed

17.    Undisputed

18.    Undisputed

19.    Undisputed

20.    Not disputed as to the holding of a TDM. Disputed to the extent that the Defendants' Statement implies that the determination was made by, or agreed to, by Brian Wright.

21.    Not disputed that Talamantes served the Temporary Custody Notice on Brian Wright at his home following the TDM.

22.    Undisputed

23.    Undisputed.

24.    Undisputed

25.    Undisputed

26.    Not disputed that a hearing happened on January 15, 2021. Dispute that the dependency judge "approved" that the child could move to Scottsdale with the paternal grandmother as kinship placement." Declaration of Brian Wright, ¶26 (hereafter "Wright Dec., x-x").

27.    Undisputed

28.    The content of the Dependency Court's decision dated May 28, 2021 is not disputed. Defendant's Exhibit 21.

29.    Undisputed

30.     Undisputed

31.     The dependency court's order of January 15, 2021 is not disputed. Dispute that following that hearing Ms. Pugliano refused to stay in the Wright home. Wright Dec. ¶¶27-28.

32.     Undisputed

33.     Not disputed the Minute Entry of February 10, 2021, Defendants' Exhibit 22.

34.     Undisputed

35.     Undisputed

36.     Undisputed

37.     Undisputed

38.     Not disputed that on May 28, 2021, the dependency judge ordered that the services Defendants required in the Case Plan be followed. Plaintiffs' Exhibit 108b, Case Plan.

39.     Not disputed that Brian Wright had great difficulties in securing services required by Defendants to satisfy the goals in Defendants' Case Plan.

40.     Undisputed

41.     Undisputed

42.     Not able to dispute or not dispute statements as to what the state court "addressed" in the hearings on January 5, and April 14, 2021. No dispute as to what the transcript of the hearing on those dates state. There is no transcript for the hearing of

February 10, 2021 insofar as Plaintiff is aware. The only record of that date is the Minute Entry, Defendants' Exhibit 22.

43.    Undisputed

44.    Undisputed

45.    Undisputed

46.    Not able to dispute or not dispute statements as to what the state court "addressed" in the hearings on January 5, and April 14, 2021. No dispute as to what the transcript of the hearing on those dates state. There is no transcript for the hearing of February 10, 2021 insofar as Plaintiff is aware. The only record of that date is the Minute Entry, Defendants' Exhibit 22.

47.    Undisputed

48.    Undisputed

49.    Undisputed

50.    Undisputed

51.    Undisputed

52.    Undisputed

53.    Undisputed

54.    Not disputed as to Talamantes' testimony in the dependency case. Dispute that Talamantes' testimony that "Detective Johnston denied that the investigation was closed" was truthful.

55.     Cannot dispute nor state this paragraph is undisputed. It is not a statement of fact, but conclusions, such as "The state court addressed" something, the state court "clarified" something, or the state court "challenged" something.

56.     Cannot dispute or state this paragraph is undisputed. It is unclear whether the state court "adopted" any allegation or fact. The decision of May 28, 2017 speaks for itself. Defendants' Exhibit 21.

57.     Cannot dispute or state this paragraph is undisputed. What Defendants intend to convey by the statement of what the state court "addressed" is unclear. The decision of May 28, 2017 speaks for itself. Defendants' Exhibit 21.

58.     Disputed. Mr. Wright testified that he and his wife in the past spanked their children with an open hand, but had stopped such discipline;

59.     Undisputed that Brian Wright testified on January 15, 2021, and that the transcript is an accurate statement of his testimony.

60.     Undisputed that Talamantes, on cross-examination, had been informed before December 28th that the brothers and sister fought and kicked on another;

61.     Undisputed

62.     Undisputed

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS**

1.     The summary timeline of the Defendants' actions with regard to the Wright family are as follows:

        12/16/20       Defendant Talamantes is assigned the investigation of a DCS Hotline report involving L.A.W., goes to the SACAC, goes

to the Wright family home, secures signatures on a Present Danger Plan, and approves the maternal grandmother living in the home as a 24/7 "safety monitor" a/k/a "Responsible Adult.

12/28/20    Defendant Talamantes removes L.A.W. from the home, transports him to the DCS "Welcome Center" from which he is transported to a foster family.

1/13-1/13/21 Child has DCS supervised visitation with family at DCS offices. Brian finds bruising and scratches on child and reports it to case aide. At end of visit, child becomes hysterical and unbuckles restraints, opens van door and tries to get out. Child is removed by "emergency placement," taken to Welcome Center, and transported to new foster family in Casa Grande.

1/15/21     On order of dependency court, child taken from foster family and placed with maternal grandmother in Scottsdale. Child's behavior immediately begins to deteriorate, becoming aggressive, abusive and oppositional.

4/18/21     On maternal grandmother's initiative, child is ordered returned to Wright home with maternal grandmother as 24/7 safety monitor. Dana Carrilo, Brian Wright's choice for safety monitor, is living in home.

5/3/21      Maternal grandmother leaves for Scottsdale, Defendants approve Carrilo as safety monitor.

5/29/21     Carrilo departs Tucson by plane, for visit with family.

6/1/21      Defendant Encinas removes child from Wright home by "emergency placement". He is taken to the Welcome Center where he is housed overnight.

6/2/21      Encinas transports child to Anthem, Arizona home of Brian Wright's sister, Gina Hollman's family. Brian Wright names Samantha Gomez as replacement safety monitor.

6/2/21      Family begins reporting to Noriega and Encinas that child is inconsolable, having violent episodes.

7

6/16/21    Child hits Hollman daughter in the face at bedtime.

6/17/21    Hollmans demand child be removed and ask that child be returned home with Gomez as safety monitor. DCS removes child and places in a group home in Phoenix.

6/25/21    Child is returned to Wright home by Defendants with Gomez approved as safety monitor.

## MATERIAL FALSEHOODS, MISREPRESENTATIONS AND OMISSIONS DOCUMENTED BY DEFENDANTS TALAMANTES AND FRANCISCO

2.    Defendant Talamantes was trained in the legal definitions applicable to the determination of abuse or neglect. These statutory definitions are taught to DCS specialists. Deposition of Gerardo Talamantes page 246, line 18 to 247 line 15 [hereafter, "Talamantes, page:line]; Plaintiffs' Exhibit 87, DCS CORE training legal definitions, Wright 116, 53-54.

3.    As defined in A.R.S. § 8-201(2),

*"Abuse"* is … "the infliction of or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is diagnosed by a medical doctor or psychologist and is caused by the acts or omissions of an individual having care, custody and control of a child.

Exhibit 87, Wright 116, 53.

4.    Talamantes was taught, as well:

*"Physical injury"* is defined in A.R.S. § 13-3623(f)(4) as "the impairment of physical condition and includes bruising…"

5.    "Serious physical injury" is also defined:

*"Serious physical injury"* is defined in A.R.S. § 8-201(34) as "an injury that is diagnosed by a medical doctor and that does any one or a combination of the following:

a.   creates a reasonable risk of death
b.   causes serious or permanent disfigurement
c.   causes significant physical pain
d.   causes serious impairment of health
e.   causes loss or protracted impairment of an organ or limb."

Plaintiffs' Exhibit 61, A.R.S. §8-201(34).

6.    Talamantes, as an investigator, applied the statutory definitions in determining whether abuse had occurred. Talamantes, 45:22-46:22.

7.    These statutory definitions – including the definition of "serious physical injury" -- control as to the actions of the investigator. Deposition of Michelle Orozco Romero, Program Manager, page 145, lines 6-19 [hereafter, "Orozco page/line"]; Plaintiffs' Exhibit 61, A.R.S. ¶8-201(34).

8.    Timothy Turner, retained as an expert on the accepted practices and procedures governing the actions of child services workers, concurs with Defendant Orozco as to the obligation imposed on the investigator and supervisor. Turner's Report, Plaintiffs' Exhibit 159. Mr. Turner's report opines that the Defendants engaged in substantial deviations from accepted practices, Turner's Report, excerpts at AZWright 008176; 8179-8188; including submitting the Application for the CAR on December 28, 2020 in the absence of any evidence that the child had suffered serious personal injuries as defined in Arizona law. Turner's Report, AZWright 008183-8185.

9.     In 2020, the DCS investigator documented his or her activities and findings in a file in the "Child Safety & Risk Assessment" [hereafter, "CSRA"] section of the electronic databased called CHILDS. Talamantes, 82:25-84:16.

10.     Plaintiffs' Exhibit 25 [Wright 0590-0611] is the CSRA in which Talamantes made his entries of the investigation of the report regarding L.A.W. *Id.* The actions documented in the CSRA constitute the entirety of the investigation conducted by Talamantes. He has no recall outside the CSRA entries. Talamantes, 170:6-10. The CSRA is the source document for many of the falsehoods entered in the documents subsequently prepared for, and submitted to, the courts.

11.     Talamantes, neither on December 16th, nor at any time after that, saw the photographs that were taken of the child by Det. Johnston at the direction of Defendant Dr. Woolridge during the Forensic Medical Examination ("FME") on the afternoon of December 16th. Talamantes, 169:20-170:1; Plaintiffs' Exhibit 19, SPD Records Request documents, AZWright 007505.

12.     Neither on December 16, nor at any time thereafter, did Talamantes examine the areas on the child, his legs, hips, buttocks and lower back to observe any mark on the child. Plaintiff's Exhibit 41, Talamantes' Response to Interrogatory 5(c); Talamantes, 108:22-109:16; 126:2-10.

13.     Talamantes did not on December 16, 2020, nor ever, interview the alleged child victim, L.A.W. Exhibit 41, Talamantes Response to Interrogatory 5(a)(d); Talamantes, 108:22-109:16; 171:20-172:9.

14.     On the afternoon of December 21, 2020. Talamantes was shown three pictures taken by Brian Wright of the child's body the afternoon of December 17, 2020. Talamantes, 169:10-19; Wright Dec., ¶¶3; Plaintiff's Exhibit 37, Exhibits 37A, 37B and 37C.

15.     In a January 5, 2021 peer review of the  Forensic Medical Examination report completed by Dr. Woolridge, done by Dr. Woolridge's colleague, Dr. Rachel Crampton, Crampton wrote that she "Cannot comment on the lesions without images." Plaintiffs' Exhibit 7, SACAC file, SACAC 00001-00029, at 0004.

16.     Between December 17, 2020 and December 28, 2020, Talamantes did the following in investigating the allegations:

a.     On December 18, 2020, he came to the Wright home and observed and interviewed the two siblings, L.W. and M.G.Z. He observed the Wright's one-year old daughter. He conducted brief interviews of both parents, without addressing the allegations. Both parents informed him that their discipline included spanking a child with an open hand. Mrs. Wright denied using objects to discipline the children. Plaintiffs' Exhibit 25, CSRA, Wright 00598-600. *Id.* 600-602.

b.     On December 18th, the children appeared clean, appropriately dressed, with no visible marks or bruises. *Id.* L.A.W.'s eight (8) year old sister "presented a pleasant and talkative demeanor." Both siblings denied being fearful of anyone in the home. The sister volunteered that she and her siblings "fight, kick and scratch each other." *Id.*, Wright 00598-602.

c.     Talamantes was shown through the home that evening by Brian Wright. Talamantes, 161:9-14;

d.     On December 21, 2020, he requested from SPD copies of the incident report and photographs. Plaintiffs' Exhibit 19, Records Request; Talamantes, 171:20-172:4. He never received the photographs before closing his investigation. See, CSOF ¶10.

e.     On the same day, he returned to the Wright home and interviewed the parents. He has no recall of what Brian Wright said to him. Plaintiffs' Exhibit 25, CSRA, Wright 00600-604; Talamantes, 158:3-20. However, both parents' response to the allegations described the happening on the evening of December 15, 2020, when the two brothers were play fighting swords with sections of Hotwheels track. *Id.*, Wright 601, 603.

f.     When he was at the home on the 21st, Brian Wright showed him three images of L.A.W. Brian had taken on December 17th, then texted those images to Talamantes. Talamantes, 169:10-19; Exhibit 37, 37A, 37B, 37C.

g.     On December 23, 2020, SPD disclosed, and Talamantes received, Officer Carrizosa's SPD Detail Incident Report. Talamantes read the document. Plaintiffs' Exhibit 5, SPD DIR No. 20120504; Talamantes, 172:5-9. Talamantes has no recall of any communications with SPD during his investigation, and, if he had had such, would have documented them in the CSRA. Talamantes,  159:14-24.

17.   The SPD Report that Talamantes received on December 23rd documented

that after the entire family was interviewed; the home was searched and belts and pieces of Hotwheels track seized; and welfare checks conducted on the other children, the Detective concluded that "the injuries are most likely from roughhousing with his siblings." The investigation, the report stated, was "closed." SPD DIR, Wright 0622. This report was the only document Talamantes received from SPD before he handed the case off to Defendants Encinas and Sheldon.      .

18.   Both parents, independently, gave consistent statements of the events of the evening of December 15, 2020, when the two brothers were play-fighting with sections of Hotwheels track, and speculated that the mark on the left hamstring had to have come from the brother hitting L.A.W. with a section of track. CSRA Wright 00601, 603.

19.   At 7:37 a.m. on the morning of December 28th, Talamantes made an entry in the CSRA in which he documented what he understood the child to have reported in the Forensic Interview [hereafter, "FI"] sixteen (16) days earlier. Plaintiffs' Exhibit 25, CSRA, Wright 00597-598. Hence, Talamantes knew precisely what the child had stated in the FI.

20.   At 9:00 a.m., on the morning of December 28, 2020, Talamantes prepared and submitted to the Superior Court, Maricopa County, an Application for Court Authorized Removal [hereafter, "CAR"]. Plaintiffs' Exhibit 31, AZWRIGHT 007132-7134.

21.   Paragraph 6 of the Application reads: "Probable cause exists to believe that

temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. section 8-821(A)." *Id.*, AZWright 007132; Talamantes, 191:22-192:22. This was the foundation of all following paragraphs in the Application. *Id.*

22.    The second sentence of Paragraph 6 stated that "LA.W. is at unreasonable risk of harm at his current home *as the parent, guardian, or custodian deliberately harmed L.A.W.* and has caused *serious or severe harm to him.*" (emphasis added). Talamantes was intending to convey the allegation that Brian Wright was a person who deliberately harmed the child. Talamantes, 194:18-24.

23.    The record reveals that Talamantes included in the Application additional material falsehoods and exaggerations in support of the existence of probable cause, and also omitted material facts which refuted probable cause. Those have been identified in the corrected version of the Application. Wright Dec., ¶1, Plaintiffs' Exhibit 32.

24.    The CAR was executed in seven (7) minutes and returned to Talamantes. Plaintiffs' Exhibit 27, Wright 002944-2968, at 02959.

25.    Immediately following securing the CAR, Talamantes and Francisco convened a "Team Decision Making" meeting [hereafter "TDM"]. At the conclusion of the TDM, Talamantes announced that he had a court order to remove the child and would be removing to foster care.  Talamantes, 253:3-4; 255:18-21.

26.    Subsequent to the TDM, a "Team Decision Making (TDM) Summary Report was prepared and approved by Talamantes. The TDM Summary contained both

material misrepresentations and material omissions found in the Application. Those specific misrepresentations and omissions are listed in Plaintiffs' Exhibit 30(a). Wright Dec., ¶4.

27.   A key misrepresentation not articulated directly in the Application, but stated by Talamantes in the TDM, was "Marks and bruises located on L.A.W. who *disclosed that Irlanda caused the marks.*" *Id.*, Wright 007648, correction No. 2 (emphasis added).

28.   At some point before 11:00 a.m., Talamantes had prepared a Temporary Custody Notice [hereafter, "TCN"]. Exhibit 39 Wright 00655-656; Talamantes, 248:21-249:3; 256:19-257:1.

29.   A TCN is a legal document to be served on the parent through which the department obtains temporary custody of the child. Francisco, 182:12-23; Talamantes, 257:20-258:3; 269:8-11.

30.   The single condition identified by Talamantes on the TCN as justifying probable cause to remove the child was "The child has *serious injuries* which the caregiver and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.". Exhibit 39, Wright 000655-656, (emphasis added). Talamantes did not state that Brian Wright was unable nor unwilling to care for the child, nor that the father exhibited violent or erratic behavior, nor that the father was so unable to manage his behavior as to make him unable to properly parent. *Id.*

31.   The child was removed, according to the TCN, at 11:00 a.m. on the 28th of

December. Talamantes transported L.A.W. to the "Welcome Center" where he remained until he was placed with a foster family later that day.

32.   Between December 28th and the 31st, Talamantes gathered the documentation in preparation of a Dependency Petition. Those materials were submitted to the office of the Arizona Attorney General. Talamantes, 273:17-274:2.

33.   When the draft Dependency Petition was returned to Defendants, both read it before it was filed, and Talamantes executed a sworn verification that the allegations were true. Francisco Depo, 199:24-200:2; Talamantes, 257:3-5.

34.   The Application, the CAR, and TDM Summary were all appended to the Petition. The body of the Petition included specific falsehoods and omissions as noted. Exhibit 27, Wright 02944-2957, at 0092947.

35.   The specific misrepresentations and falsehoods in the Section VI of the Petition, the "Allegations" portion, are identified in bold type:

> The father neglects Lance.  Lance disclosed his step-mother **regularly uses physical discipline with him and his siblings in the home**. Lance reports his step-mother **hits** him with objects including a belt and a Hot Wheels racing track.  Lance completed a forensic medical exam on December 16, 2020. Multiple lesions and contusions were found on Lance's body in varied stages of healing.  **There is an ongoing criminal investigation into the father and step-mother.**  The father and step-mother both admit to using physical discipline on Lance. The father and step-mother report the step-mother spanked Lance **and his siblings** around bedtime on December 15, 2020. The father reports he examined Lance on December 17, 2020 after law enforcement became involved, **and he saw multiple marks and bruises on Lance's body**.  The father **reported the penny shaped bruises on Lance's buttocks may have been caused by the mother spanking Lance**.  The father described the bruises as not being that bad. The father and step-mother both **minimized** the concerns about Lance being physically disciplined **resulting in**

**him receiving bruises and lesions.**

36.    The Petition further alleged, under Section VII, "Aggravating Circumstances," that "BRIAN JOSEPH WRIGHT, committed an act that constitutes *a dangerous crime against children* as defined in A.R.S. §13-705, or caused a child to suffer *serious physical injury*…." Exhibit 27, Wright 002948 (emphasis added); Wright Dec., ¶5.

37.    On December 31, 2020, the Dependency Petition was filed, and the Juvenile Court issued *ex parte* Temporary Orders. Plaintiffs' Exhibit 33, Wright 002969-2974.

38.    One key component of Mr. Turner's opinion that both Defendants deviated substantially from accepted practices and policies in the submission of the Application for CAR and, later, the materials that were appended to the Dependency Petition, was that the Defendants asserted as a fact that L.A.W. was observed with *serious physical injuries* that necessitated removal. None of the marks or bruises diagnosed by Woolridge on December 16th met the criteria identified in A.R.S. § 8-201(34) for "serious physical injury"; and the marks in the photographs taken by Brian Wright within twenty-four (24) hours of the examination were so faint as to be almost impossible to be easily identifiable at all. Plaintiffs' Exhibit 159, Wright 008184.

39.    The most substantive falsehoods, misrepresentations and omissions, among others, documented by Defendants in the Department file and the Application for CAR as of the date Defendants were give temporary physical and legal custody are:

a.      That the child had suffered "serious or severe harm" as a result of "deliberate" acts by either or both parents.

b.      That, in the TCN, it was alleged that the child had suffered "serious injuries" that Brian Wright could not or would not explain or his explanation was inconsistent with the observed or diagnosed injuries on the child.

c.      That the SPD had an "on-going" criminal investigation into both parents, concealing that SPD had actually closed its investigation, the detective concluding that the marks on L.A.W. were probably caused by roughhousing of siblings;

d.      That Brian Wright had confirmed seeing marks and bruises on the child, that, he suggested, could have resulted from Irlanda's hitting the child on the night of December 15th, while omitting that he never disclosed the specifics of the marks noted by Dr. Woolridge and that he himself had not observed any marks except the very faint couple of marks on L.A.W. in Brian's photographs.

e.      Omitted in the materials provided to the courts that both of L.A.W.'s siblings who could verbalize told Talamantes that they, too, felt safe at home and that L.A.W.'s eight (8) year-old sister denied either parent spanked with anything other than a hand; confirmed Brian's statement of the use of progressive discipline such as taking electronics from the child or having a "time out"; and also denied that the parents' discipline had caused any marks. Plaintiffs' Exhibit 25, CSRA, Wright 00599-600.

f.      That, as documented in the TDM Summary, L.A.W. disclosed in the FI that his mother had abused him the night of December 15th, resulting in the marks and bruises seen the next day; when the child had actually denied that either parent left marks on him [Plaintiffs' Exhibit 4b, p. 21]; that when he was spanked it didn't hurt [*Id.*, pp. 17, 21, 22, 26]; that as to the single mark on the left hamstring he did not know how he got it, but it did not hurt [*Id.*, pp. 10-11]; and that he felt safe at home [*Id.*, p. 25].

g.      That the statement that the child had allegedly admitted the marks and bruises were caused by Irlanda was never stated in the parents' presence, hence, they had no opportunity to know this allegation. Plaintiffs' Exhibit 30a, Wright 007649, 007654.

h.      That Irlanda never said that the TDM was being held because of "the problem involving the child and physical abuse," but that that statement was made by Talamantes. *Id.*

i.      That L.A.W. had "disclosed he was hit by a hand and the metal [part] of the belt." This was false. In the FI, the child had not stated he was hit with the metal part of a belt. Plaintiffs' Exhibit 4b, FI, p. 20. The parents had not been given a copy of the FI audio, so could not know what the child had actually stated.

j.      That Talamantes stated that "The explanation of the injuries are not consistent with what Brian and Irlanda said happened" but omitted Brian's

19

description of the events the night of December 17th and the conclusion reached by the SPD detective, made in response to Talamantes' allegation.

40.    All the misrepresentations, falsehoods and omissions were carried forward into the Dependency Petition filed on December 31, 2020.

**RETALIATORY ACTIONS TAKEN AGAINST THE FATHER AND SON BY DEFENDANTS SHELDON, ENCINAS, NORIEGA AND OROZCO**

41.    On January 5, 2021, Talamantes and Francisco turned the case over to On-Going Case Unit of which Defendant Sheldon was the "Program Supervisor" and Defendant Encinas the "On-going Case Manager" [hereafter, "OGCM"];

42.    On February 22, 2021, Sheldon was replaced as supervisor by Defendant Betina Noriega;

43.    Defendant Orozco was Program Manager, direct supervisor of Sheldon and Noriega. Orozco was involved in the case before Sheldon took over. Deposition of Jeanette Sheldon, page 64 line 18, to page 65 line 3 [hereafter, "Sheldon, page:line"]. Noriega relied heavily on Orozco's guidance in her actions. Deposition of Betina Noriega, page 110 lines 9-15 [hereafter, "Noriega, page:line"}.

44.    When the OGCM takes over, a Case Plan is prepared. The Case Plan is "about having a plan with the parents to address the safety concerns in the sense of, you know, what are the things  that need to change so that the child can go home.  And so that's -- that's what it addresses.  Go home in the sense that DCS is out of your life." Sheldon, 200:6-13. The Case Plan "drives the case." Noriega, l52:24-25, 153:1-2.

45.     A "Safety Plan" is the document prepared by the OGCM when a child is in foster care or kinship placement that identifies the "Conditions for Return" that must be met before the child will be returned to the home during the pendency of a case. Plaintiffs' Exhibit 130 is the Safety Plan prepared by Encinas and Sheldon and presented to Brian Wright on the evening of January 15, 2021 after the dependency judge had ordered the child be returned to the Wright home from foster care. Sheldon, 197:1-198:14; 199:18-21.

46.     The Case Plan, Plaintiffs' Exhibit 108b [Wright 00731-735], was created sometime before February 9, 2021, and was presented to Brian Wright by Sheldon and Encinas on February 11, 2021. The Case Plan had a "reassessment date" of August 11, 2021.

47.     A Case Plan sets a "Permanency Goal" set by DCS, in this case, reunification of the family, and identifies specific services required of the parents and child to remedy "diminished caregiver protective capacities" and required "behavioral change goals" that the parents must demonstrate to the OGCM in order to have the Department and recommend dismissal of the case. Noriega, 54:24-55:11; 58:6-9.

48.     Completion of all services set out in the Case Plan is required, not sufficient. The parent must also demonstrate to the OGCM the required behavioral changes. Noriega, 84:6-85:15.

49.     Department policy is that normally a Case Plan is not modified until the reassessment date is reached. Noriega, 74:15-75:22.

50.     Defendants operated under Department policy that provided OGCM does not re-investigate findings made by the Investigative Unit. Sheldon, 109:8-18.

51.     The OGCM is authorized to impose requirements on the parents in a Case Plan that are identified in the investigation, the legal reasons that the child comes into care. Noriega, 51:1-52:22; Sheldon, 201:1-4.

52.     If allegations are made against the parents that were not investigated before OGCM took over, the Department policy is that the person alleging is directed to call the Hotline, a report is made, and if the Hotline specialist decides an investigation is necessary, a case is opened and the Investigative Unit conducts a separate investigation. OSCM does not conduct such an investigation. Sheldon, 136:20-137:19; 154:4-20; 208:19-23.

53.     Department policy is that a Case Plan is prepared based on a Family Functioning Assessment On-Going ["FFA"]. The FFA is done by the OGCM after taking over the case. The OGCM is to conduct FFA's every ninety (90) days. Noriega, 63:19-64:21.

54.     Department policy is that "The Department shall provide services and supports necessary to achieve the case plan goals in the family-centered case plan." Noriega, 70:7-15.

55.     Department policy is that "The Department shall arrange, provide, and coordinate services that protect children, provide programs and services that achieve and

maintain permanency on behalf of the child and to strengthen the family." Noriega, 70:16-20.

56.     The Department "shall provide services to all parents whose parental rights have not been terminated, guardian and/or custodian that are tailored to achieve the necessary behavioral changes." Noriega, 71:24:72:7.

57.     The Department provides guidance to supervisors regarding parental readiness for change, and emphasizes the need for urgency about the parental change that is to remedy the situation as soon as possible that caused the child to be removed so the child can be returned. Noriega, 90:13-22; Plaintiffs' Exhibit 176. Specialists are directed to "Be relentless in trying new strategies, services and supports that will work for the parent." *Id.*

58.     Defendants Sheldon and Encinas, when they took over the case, learned about the investigation mostly from a meeting with the investigator, Talamantes, that was focused on the allegations and results of the investigation. Sheldon, 100:1-101:2.

59.     The same is true of Noriega, when she took over, she relied on Encinas to give her the facts about the investigation and Talamantes' results.

60.     These four Defendants' understanding of the allegations throughout the course of the case was that in the FI on December 16, 2021, L.A.W. had disclosed that his mother had hit him with an object on the night of the 15th and that that discipline resulted in the marks and bruises seen the next day. Sheldon, 247:2-6; Noriega, 50:6-12; Plaintiffs' Exhibit 143b, Wright 08332; Plaintiffs' Exhibit 147b, Wright 008447-8448;

61.    Brian Wright, from his first meeting with Sheldon, on January 11, 2021 expressed his concern that Talamantes was being untruthful in his rendition of what the child had disclosed, what had happened at the TDM meeting the day the child was removed, and in the apparent failure of the Department representatives to keep in contact with him and to help him identify and secure services. Plaintiffs' Exhibit 143b, Wright 008318-8328. He repeated those concerns in subsequent meetings with Sheldon and Encinas, then with Noriega and Encinas after the case was handed off by Sheldon. Plaintiffs' Exhibit 147b, AZWright 008458.

62.    As soon as Brian Wright received and watched the video of the FI, he repeatedly asked Encinas on March 30, 2021, and Noriega, on April 7, 2021 why they continued to insist that he must "align" with the Department and his son's disclosure that Irlanda had hit him the night of the 15th and caused the marks. He pointed out that his son had never made that statement. Plaintiffs' Exhibit 148b, AZWright 008518-8519; 008526-8527;

63.    In the first meeting involving Noriega, on April 7, 2021, the following exchange, among others like it, occurred:

Joanna:

So then, that's also another thing we need to keep in mind. Lance didn't feel comfortable to go to you to tell you that he was hit with an object by his mother. So, we need to also keep that in mind as well. We need Lance to be able to be safe in the home and to be able to come to you, and tell you, and for you to be able to acknowledge when he makes that disclosure. So him not being able to go towards you to tell you that in the beginning is also something that-

Brian:

Well, in the interview, he said that happened when he was four years old. He also said he's never been hurt by his mother or his father. And he said that anytime that he's ever been spanked it's never left a mark or bruise. So that's what I believe. Again, I think everybody needs to watch that interview and pick out exactly what he's saying and not just go off of whatever reports you guys are going off of. Because when I read through Gerardo Telemontes' case notes, it says the exact specifics of what Lance said. But then when I read his other reports that he did, like to remove my son from my home and when he swore in front of the judge, it says something completely different. So again, I think you need to watch the interview so you can see exactly what Lance says and I think you should read through the case notes that Telemontes did.

Betina:

Well, sir, again, this is something that Joanna is addressing to you, okay? Your case is in trial. This is being addressed in trial, correct? In front of the judge. The judge is going to make the final decision in regards to the allegations of why your son was removed.

Brian:

Yes, but I'm-

Betina:

... is going to make the final decision in regards to the allegations of why your son was removed. Is that clear, sir?

Brian:

Yes, but I'm trying to get my son home now.

Betina :

But it's not going to happen….

Plaintiffs' Exhibit 149b, AZWright 008553-8554

25

64.     The Defendants obstructed Brian Wright's efforts to satisfy the Case Plan services requirements in the following, among other actions:

a.     Defendants imposed upon Brian the responsibility to find and coordinate services that were demanded under the Case Plan. Wright Dec., ¶¶12-23, 84; Plaintiffs' Exhibit 104. The result of this was that all services were delayed and many never happened. *Id.*, ¶¶91-92; 96-98; 69-70.

b.     When, early on, Brian had secured an intake for his son at the provider Casa De Los Ninos, Sheldon cancelled the intake, with the explanation that the agency had a two-month waiting period. But Defendants did not provide alternatives. Wright Dec., ¶¶14-15.

c.     The Case Plan required that the child be given individual therapy, including play therapy, and Brian repeatedly urged that to happen because of the trauma the child endured in the removal and subsequent removals. Brian was told by Encinas that the child was receiving therapies. But the child did not receive any therapy until he had been returned to the home the second time, on June 25, 2021.

d.     The Case Plan called for family counselling. In seven (7) months, there were five (5) sessions of counselling. When Brian repeatedly asked why the family was not getting counselling, he got no answers. After the family was reunited for the second time, on June 25, 2021, they had three (3) sessions of

family counselling in July, and that was concluded with the therapist stating there was no need.

        e.     The Case Plan required Brian and his wife to both engage in individual therapy. As soon as that was imposed, Brian found a provider, Cathexis, and began therapy with one Michelle Bailey, paying out of his own pocket. When Bailey concluded, after several sessions, that Brian no longer needed therapy, Encinas informed Bailey that Brian could not end therapy, that he had to continue as a Condition of Return [of the Safety Plan]. Plaintiffs' Exhibit 121A. Wright Dec., ¶¶24-25. The Safety Plan in place, Exhibit 131A/131B, required both parents to submit to DCS psychological evaluations, not continue individual therapy. Irlanda never did get set up by Defendants on individual therapy and never had any.

        f.     The psychological evaluations of parents as a new Condition of Return under the new Safety Plan that replaced the one dated January 15, 2021 [Plaintiffs' Exhibit 130], was decided by Encinas and Noriega before March 30, 2021. However, in the March 30th meeting, Encinas made no mention of this added Condition of Return. Wright Dec., ¶¶35-45. It was only in Brian's first meeting with Noriega on April 17, 2021 that Defendants informed him of the new demand. Wright Dec., ¶¶47-56.. The new Condition of Return was specified in an amended Safety Plan six (6) days later, Exhibit 131b. The requirement was not removed until June 25, 2021, and neither parent ever submitted to the

examination. But, in the meeting of April 7, 2021, when Noriega first identified the condition, the following occurred:

Brian:

So I would never be able to meet that goal [condition for return] because of that?

Betina:

I mean, yeah. Right now this is what the department's asking you to do.

Brian:

So unless I take a psych evaluation, I can't accomplish that goal?

Betina:

Exactly. That is part of the conditions-

Brian:

So I will never be able to have my son returned to my home unless I do a psych evaluation.

Betina:

Unless the court says otherwise.

Plaintiffs' Exhibit 149b, AZWright 008567-8568.

It was not until June 14, 2021 that Defendant Orozco admitted to Brian that a psych evaluation condition should never have been included in the Safety Plan. Wright Dec., ¶77.

g.      Under DCS policy, a Case Plan is to be created after a "Family Function Assessment – On-Going" ["FFA"] done by the OGCM that identifies

28

the strengths, weaknesses and "diminished parental protective capacities" of the parents. Noriega, 65:2-69:5.

h.    An FFA is required every ninety (90) days during the pendency of the case to assess the success of the parent in making the required "behavioral changes" on the Case Plan. Noriega, 63:19-25. No FFA was done in the Wright case.

i.    An FFA is required before a Safety Plan is created. Noriega, 96:12-23. No FFA was conducted in the Wright case.

j.    The requirement of a Psychological Evaluation for each parent was included by Sheldon and Encinas in the Case Plan. Six (6) months later, that demand was also dropped by Defendants without explanation. Wright Dec., ¶95.

k.    Though Department policy required Defendants to provide services for all children in the family, Sheldon refused to consider individual therapy for the other children, despite Brian's pleas that they had been traumatized by the removal and separation from L.A.W. Wright Dec., ¶¶20, 70.

65.    Defendants obstructed Brian's efforts to be in his son's life and to have necessary communications with doctors and educators, as follows:

a.    Although Talamantes had checked the maternal grandmother's background, and on December 16, 2020, approved her as the 24/7 safety monitor, he and Francisco did not make arrangements for the child to go to kinship placement rather than foster care before the removal of December 28, 2020. By

January 4, 2021, the grandmother had been vetted by DCS workers in Scottsdale, and signed kinship placement documents, but the child was kept in foster care. Plaintiffs' Exhibit 68, Exhibit 69.

   b.      When the child became hysterical at the supervised visitation on the evening of January 12, 2021, to the point that Sheldon decided an emergency placement was necessary to remove him from the foster home, she did not notify Brian or the grandmother of the change, nor propose to make the kinship placement. She sent the child to Casa Grande. Wright Dec., ¶¶13-15.

   c.      When Brian learned from L.A.W.'s school that he was absent the week after Christmas break, and again, on January 12, 2021, and he informed Encinas of the communication from the school, Brian was then cut off from communicating with his son's school or teachers. Encinas concealed from him that his son was hiding and refusing to attend school. She told him the absences were because of a computer issue. He had no communication with the educators for months. Wright Dec., ¶9.

   d.      When, on January 15, 2021, the dependency judge ordered the child returned home immediately, with the grandmother or grandfather as safety monitor, or, as the judge stated, Sheldon and Encinas work with the parents to make provision for voluntary services in home, Sheldon ignored that and ordered that the child go to Scottsdale with the grandmother. Sheldon lied that the grandmother refused to live in the home 24/7. Although DCS practice was to

encourage a parent to name alternates as safety monitors or kinship placement [Noriega, 131:15-132:2; 167:14-168:1] Sheldon did not engage in alternative arrangements, and concealed from Brian that a parent could have back-up safety monitors or alternative kinship placement including friends or neighbors. Wright Dec., ¶¶26-32.

  e. After his son was first removed, and for months, Brian was not allowed communications with his son's doctors, even when the child was hospitalized in February, 2021 and underwent a procedure under anesthetic. In April, 2021, Noriega and Encinas promised him at least a letter from a doctor who was contemplating further procedures. The letter never arrived. Wright Dec., ¶¶10-11.

  f. From the first Safety Plan, which was given to Brian on January 15, 2021, [Plaintiffs' Exhibit 130] even though he was not alleged to have physically abused his child, Defendants required that all his interactions with L.A.W. were supervised, even to the point of his not taking his son out of the hearing of the supervisor, nor even take him to the bathroom. This prohibition was included in every Safety Plan throughout the course of the case. Wright Dec., ¶85.

  g. Over months, Brian's and the family's visitations, and even phone calls, were few and far between. One example: when Brian learned on January 13, 2021, that Sheldon had had the child taken up to Casa Grande in response to the hysterical reaction to being taken from the family at the end of the supervised

visit the night before, he asked for a phone call with his son just to know how the child was doing. Sheldon denied him that call. Wright Dec., ¶14; Plaintiffs' Exhibit 73, Plaintiffs' Exhibit 97.

h.      Encinas and Noriega's imposition of a new Safety Plan with the added Conditions of Return on March 30th and April 7th happened shortly after Brian had informed them he had finally located a family member who would act as a safety monitor in the home 24/7 – thus satisfying the single condition of return that Brian had been given on January 15, 2021. Wright Dec., ¶¶33-34.

i.      After L.A.W. was removed from the family home by "emergency placement" on June 1, 2021, Defendants delayed approval of the alternative safety monitor, Samantha Gomez; delayed convening a TDM meeting to return the child home; ignored the family's pleas that the child was decompensating, all of which resulted in the incident the night of June 16, 2021 when L.A.W. punched the Hollmans' daughter in the face.

j.      Rather than returning the child home the day following the incident, Defendants had him removed and housed in a group home for eight (8) days, finally returning him home on June 25, 2021.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704

Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on March 11, 2024. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

Respectfully submitted,

<u>/s/ Michael Garth Moore</u>