Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al.,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br><br>Southern Arizona Children's Advocacy Center,<br><br>　　　　　Defendants. | Case No.: 4:21-cv-00257-JGZ<br><br>**PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SEVENTEENTH AND NINETEENTH CLAIMS** |

Now come Plaintiffs and submit this Supplemental Statement of Facts in support of Plaintiffs' Motion for Partial Summary Judgment, contemporaneously filed. This document supplements the Controverting Statement of Facts submitted in opposition to DCS Defendants' Motion for Summary Judgment at Doc. 346.

**SUPPLEMENTAL FACTS**

1.　DCS policy directs[1] that there are "key decision points" during an

---
[1] Throughout this Statement of Facts, when DCS policy, practice or protocol is referenced, it identifies those in place in the relevant time periods.

1

investigation in which "The clinical function of the DCS Program Supervisor is to interpret information at key decision points, review and evaluate client progress, and guide and coach the DCS Specialist." Deposition of Gerardo Talamantes, page 29, line 13 through page 31, line 14 [hereafter, "Talamantes, page:line; Deposition of Michelle Orozco Romero, page 89, line 25 through page 91, line 24 [hereafter, "Orozco Romero, page:line"]. To accomplish this goal, at each key decision point, from pre-commencement to investigative closure, the supervisor engages the investigator in a "clinical discussion" which "shall proactively prepare the DCS Specialist for key activities and decisions in the life of the case….". Deposition of Meghan Francisco, page 29, line 25, through page 30, line 20 [hereafter, "Francisco, page:line"].

2. The supervisor's responsibility includes assuring that the investigator is (1) acting within the bounds of his authority and (2) recording "complete and accurate documentation of case activity." Francisco, 32:23-33:15; Talamantes, 176:21-178:6. Reviewing documentation in clinical decision-making confirms that the information had been gathered and that decisions are based on department criteria. Francisco, 57:12-58:18.

3. The importance of accurate and complete documentation is, for example, for the Defendants to be able to justify their actions at a later time, sometimes months or years later.

4. In her supervision of Talamantes in the instant case, Talamantes testified

that Francisco actively supported his investigation. She was "actively involved" in all the decisions made during the investigation. Talamantes, 287:15-290:8. Francisco concurs. For example, in the initial determination that L.A.W. was in "present danger" on December 16th, that was a "mutual decision" between both supervisor and investigator. Francisco, 58:12-25. Also, at the final key decision point, when the decision was made to remove the child, the decision was done collaboratively by the two. Francisco, 130: 9-24.

5. The first key decision point is pre-commencement, with the investigator and supervisor planning for the initial contact with the family and conducting the [family functioning] assessment after the investigator has gathered the information required. Francisco, 107:8-24. There is a "present danger" discussion in each and every case. Francisco, 70:21-71:21.

6. The second key decision point in an investigation is the determination of "present danger." As to this, Francisco remembers Talamantes calling her from the SACAC to "talk through" his belief that the child was in present danger. She has no recollection of the substance of that clinical discussion. Nor does Talamantes. Francisco, 107:8-24; 108:21-110:12; 111:8-16; 112:16-113:24; Talamantes, 272:17-273:8.

7. Upon conclusion of the DCS investigation, the investigator and supervisor are required to conduct an assessment of family functioning. The Family Functioning Assessment [hereafter, "FFA"] determines if the child is in "impending danger."

Francisco, 130: 9-17.

8. The steps which occur following the completion of the investigation are (1) completion of FFA; (2) safety determination; and (3) if the child is deemed in impending danger, conduct of an in-home safety analysis with the family. Francisco, 149:16-151:20.

9. The preparation of the Family Functioning Assessment, and determination of whether or not the child is to be removed, is the final key decision point in the investigation. Orzoco Romero, 100:15-103:5; Plaintiff's Exhibit 56, Child Safety Intervention Discussion Guide, AZWright 0735-736.

10. The determination that L.A.W. was in impending danger and removal was necessary was the result of a "collaborative discussion" between investigator and supervisor. Francisco, 130:10-14. Talamantes did not present Francisco with any evidence that Brian Wright had deliberately harmed his son. Nor did Francisco have evidence of serious or severe harm to the child. Francisco, 166:12-167:5.

**Events of December 16, 2020**

11. On the morning of December 16, 2020, when Ms. Mendez changes L.A.W., she notices a mark on his left hamstring that had not been seen the day before when she changed the child. After consulting with Deborah Ramirez in the CVES administration, both separately question L.A.W. about the mark. He denies knowing how he got the mark, denies that it hurts him. He becomes irritated with the questions;

12. At 10:13 a.m., Mrs. Mendez calls the DCS Hotline and makes her report. The Hotline call taker documents the following narrative of that report:

> Today, Lance came to school with a bruise on the back of his left leg. The bruise is the size of a inch. The bruise is light at the top and red at the bottom. When asked about the bruise, Lance deflected and didn't act like he normally does. Lance put his hoodie over his head and he stated he did not get the bruise from falling. Lance sometimes comes to school with "little boy bruises". Lance will usually laugh and say how he got the bruise, like from falling or playing. Today, the police were called out to the school. Lance has a rectum disability. Lace (sic) can not tell when he is popping (sic). Lance gets his diaper changed at school.

Plaintiffs' Exhibit 22A, Hotline Narrative, Wright 000013.

13.   Mrs. Ramirez also makes a call to 911, makes a report, and Officer Carrizosa of Sahuarita Police Department [hereafter, "SPD"] is dispatched to CVES;

14.   Upon being assigned a report, the first responsibility of the investigator is to engage in "pre-commencement" investigative activities before making contact with the child and family. Department of Child Safety Policy and Procedure Manual [hereafter, "the Manual"], Chapter 2, Section 2, "Pre-Commencement Activities to Prepare for an Initial Response Plaintiff's Exhibit 86, Wright 07528-7542. (Doc. __); Talamantes, 51:15-52:21.

15.   Those steps include (1) reviewing the criminal history of a caregiver, (2) reviewing past history of the family with DCS, and (3) contacting and speaking with the source of the report. Francisco, 42:8-43:24. Where there are multiple reports on the same child, the investigator is to contact and speak with all the sources. Francisco, 102:21-103:2. Those conversations should include the "maltreatment," all events leading up to the maltreatment, and any information that would affect the determination of family functioning. Francisco, 43:13-24.

16. The policy states that the investigator is to

> Contact the reporting source to corroborate information obtained by the Child Abuse Hotline and obtain other information the reporter might have on the extent of the maltreatment circumstances surrounding the maltreatment, child functioning, adult functioning, general parenting, and disciplinary and behavior management practices. Ask the reporting source for the names and contact information of other reliable collateral contacts who know the family.

Plaintiffs' Exhibit 85, The Manual, Chapter 2, Section 3, "Initial Contact and Conducting Interviews,", Wright 07543-7557, at 07551.

17. Securing from the source(s) the identification of "collaterals" – persons having information about the family – the investigator's pre-commencement activities include contacting all sources of information and collaterals to collect additional information. Francisco, 102:21-103:14; Talamantes, 73:11-74:1.

18. The Policy requires, in the case of involvement by police, that Talamantes (1) "Identify Law Enforcement agency, Detectives names, contact information and DR #," and (2) Document the status of police investigation and the outcomes. Plaintiffs'' Exhibit 86, 07539-7540; Talamantes, 71:19-72:5; 160:12-17.

19. What law enforcement investigation reveals can "have an impact" on the department's investigation. Talamantes Depo, 160:16-23. The investigator must "communicate with law enforcement" when there is a parallel investigation. Talamantes, 160:12-16.

20. Talamantes has little recollection of his pre-commencement activities in the office after being assigned the case and leaving to make contact with the family.

The CSRA "pretty much explains a lot of the pre – my pre-commencement work." Talamantes, 80:6-22; 92:11-16. There is no record in the CSRA that Talamantes contacted the nursing assistant, the reporting source, at any time.

21. The CSRA contains a history of Brian and Irlanda's criminal background checks, and background check of prior involvement with DCS [none]. There is only a single short entry regarding Talamantes' seeking any other information. Plaintiffs' Exhibit 25, Wright 0597.

22. Talamantes wrote that at 2:37 p.m., he spoke with the "source" at SACAC, who informed him that the interview and examination had concluded," "confirmed the report," and asked "DCS to take custody." Id.

23. Dr. Woolridge's forensic medical examination [hereafter, "FME"] is documented by him in Plaintiffs' Exhibit 7, SACAC 0004-00014.

24. During the FME, the examiner looks for specific conditions which constitute, under Arizona law, "serious physical injuries." Dr. Woolridge does not note any of the specific conditions identified under the definition as being present. Deposition of Dr. Dale Woolridge, page 128, line 23 through 131 line 3 [hereafter, Woolridge, page:line"]. **The excerpts of the Woolridge deposition are filed as Appendix A, Doc. 282-1, in support of Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment Against Dr. Woolridge, Doc. 284.**

25. Dr. Woolridge, to the contrary, observes the "horizontal lesions" he circles on the body diagram to be "very superficial hyperemic lesions" which "tend to clear very fast"….' Woolridge, 132:20-133:18

26. Dr. Woolridge is unable to assess when the horizontal bruise on the left hamstring occurred, but he notes no signs of healing. Woolridge, 135:19-136:24. The injuries he identified are "consistent with accidental play, consistent with intentional injury…." This is the "pure definition" of a differential diagnosis. Woolridge Depo, 107:18; 122:1-12. The manner in which Dr. Woolridge describes the lesions in the report would not lead "trained professionals" to misinterpret him as coming to a finding that the lesions were deliberately inflicted, ruling out accidental cause as a differential diagnosis. Thus, the report isn't written as "loose information that could be extrapolated inappropriately." Woolridge Depo, 123:15-124:22.

27. DCS policy on Present Danger assessment and planning is encapsulated in the document "Present Danger Assessment and Planning." Talamantes, 74:8-15; Plaintiff's Exhibit 49, AZWright 007242-7243 [hereafter, "PDA policy"]. The PDA is the commencement of the Safe AZ process, which is charted in Plaintiff's Exhibit 51, "Safe AZ Model Flowchart'" AZWright 007244; Francisco, 64:10: 74:18-78:24.

28. The PDA policy guidance identifies specific "Present Danger Conditions" from which the investigator chooses the ones most matching the facts giving rise to present danger. Plaintiffs' Exhibit 49, PDA; Talamantes, 123:18-126:1.

29. He identified two conditions from the PDA list as those which applied to

the facts as he knew them on the 16th:

> "Injuries such as facial bruises, injuries to the head, or multiple plane injuries; different types of injuries on the child such as a *serious burn or bruising*; bruising or injuries to a non-ambulatory child, or immersion burns. And, "*Serious injuries* that the caregivers and others cannot and will not explain, or the explanation is inconsistent *with the observed or diagnosed injuries* or condition."

Talamantes, 125:12:126:2 (emphasis added).

30.     Talamantes did not identify, among the other conditions, the following three:

> Caregiver is unable or unwilling to perform essential caregiver responsibilities and there is no other appropriate caregiver immediately available;
>
> Caregiver is out of control and cannot control or manage his/her behavior in ways to properly perform parental responsibilities;
>
> Caregiver's behavior is currently violent, bizarre, erratic, incoherent, unpredictable or totally inappropriate:…

Id.

31.     Talamantes is unable to provide a definition used by the Department to identify "serious injury." Talamantes, 123:18-132:24.

32.     Talamantes did not have evidence, on the night of December 16, that Brian Wright had abused his son. Talamantes, 142:2-143:10.

32.     Talamantes, when he spoke with Brian Wright, did not reveal to the parents that the "least restrictive option" in response to a determination that the child is in present danger is that the threatening person simply leave the home. Talamantes, 144:1-146:7.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on April 11, 2024. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

Respectfully submitted,

/s/ Michael Garth Moore