Appendix A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Brian Wright, et al.,                     Case No.: 4:21-cv-00257-JGZ

      Plaintiffs,

vs.

Southern Arizona Children's Advocacy

Center,

      Defendants.

_____

VIDEO DEPOSITION OF

GERARDO TALAMANTES

VOLUME I

June 22, 2023

9:07 a.m.

1303 E. Broadway Boulevard
Tucson, Arizona, 85719

REPORTED BY:  Sandra Marruffo, RPR
               Arizona CR No. 50815
Colville & Dippel
1309 E Broadway Blvd
Tucson, Arizona 85719-5824
(520) 884-9041
ArizonaDepos.com
Arizona RRF No. 1129

```
1                    The video deposition of GERARDO

2   TALAMANTES, Volume I, noticed by Michael Garth Moore,

3   Esq., was taken on June 22, 2023, from 9:07 a.m. to 4:11

4   p.m. at the Offices of Colville & Dippel, 1303 E.

5   Broadway Boulevard, Tucson, Arizona, 85719, before

6   Sandra Marruffo, Arizona certified reporter No. 50815.

7

8                       APPEARANCES OF COUNSEL

9
    Attorney for Plaintiffs:
10
                Michael Garth Moore
11              BY:  Michael Garth Moore, Esq.
                6336 North Oracle Road
12              Suite 326
                P.O. Box 119
13              Tucson, Arizona 85704
                mike@mgmoorelaw.com
14

15  Attorneys for Defendants Orozco, Francisco, Noriega,
    Encinas, Talamantes, & Sheldon:
16
                ASSISTANT ATTORNEY GENERAL
17              BY:  Claudia Acosta Collings, Esq.
                416 W. Congress Street
18              2nd Floor
                Tucson, Arizona 85701
19              Claudia.Collings@azag.gov

20
    Attorneys for Sahuarita Defendant:
21
                JELLISON & ROBENS, PLLC:
22              Rodney F.W. States, Esq.
                1881 N. Thompson Peak Parkway
23              Suite 0235
                Scottsdale, Arizona 85255
24              rodney@jrlawaz.com

25
```

```
 1                    APPEARANCES OF COUNSEL (continued)

 2

    Attorneys for Southern Arizona Children's Advocacy
 3  Center:

 4               GRASSO LAW FIRM, P.C.
                 BY:  Pari Scroggin, Esq.
 5               2250 East Germann Road
                 Suite 10
 6               Chandler, Arizona 85286
                 pscroggin@grassolaw.com
 7

 8  Attorneys for Defendant Dale Woolridge, MD:

 9               SLUTES, SAKRISON & ROGERS, P.C.
                 BY:  Tom Slutes, Esq.
10               4801 E. Broadway Boulevard
                 Suite 301
11               Tucson, Arizona 85711
                 (520) 624-6691
12               Tslutes@sluteslaw.com

13
    ALSO PRESENT:
14  Brian Wright
    Irlanda Wright
15  Michele Tomas
    Kyle Openshaw, Videographer
16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2

 3   WITNESS:    GERARDO TALAMANTES

 4

 5   EXAMINATION                                      PAGE

 6   By Mr. Moore                                     6

 7

 8

 9                     INDEX TO EXHIBITS

10   NO.          DESCRIPTION                         PAGE

11        (No exhibits were marked for identification.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  We are now recording.

2   I am Kyle Openshaw with Soltero Productions.  The court

3   reporter is Sandy Marruffo from Colville & Dippel.

4          This is the beginning of the videotaped

5   deposition of Gerardo Talamantes in the case of Brian

6   Wright, et al., v. Southern AZ Children's Advocacy

7   Center.  The case number is 4:21-cv-00257-JGZ.  Today's

8   date is June 22nd of 2023, and the time is now 9:07.

9          Counsel, please introduce yourselves and

10   the court reporter will swear in the deponent.

11          MR. MOORE:  Michael Garth Moore on behalf

12   of Plaintiffs.

13          MR. SLUTES:  Tom Slutes for Dr. Woolridge.

14          MS. SCROGGIN:  Pari Scroggin for the

15   Center defendants.

16          MR. STATES:  Rodney States for the Town of

17   Sahuarita defendants.

18          MS. ACOSTA COLLINGS:  Claudia Acosta

19   Collings for the DCS individual defendants.

20               -  -  -

21

22

23

24

25

```
 1              DEPOSITION OF GERARDO TALAMANTES

 2                      June 22, 2023

 3                         -  -  -

 4                   GERARDO TALAMANTES,

 5   having been first duly sworn to tell the truth, the

 6   whole truth, and nothing but the truth, was examined

 7   and testified as follows:

 8

 9                       EXAMINATION

10      Q.   BY MR. MOORE:  Good morning, sir.  Have we --

11   we've met before, correct?

12      A.   Yes.

13      Q.   Okay.  And I understand you've given

14   depositions before?

15      A.   Yes.

16      Q.   Okay.  In -- in a similar situation where

17   you're being asked questions by lawyers outside of the

18   court?

19      A.   Yes.

20      Q.   Okay.  And you've testified in court a number

21   of times?

22      A.   Yes.

23      Q.   Okay.  So let me ask you what preparation you

24   did in order to refresh your recollection about the

25   events back in December of 2020.
```

1    A.   I reviewed some of the documents, including the
2  court report.  And I really cannot go through the whole
3  list right now, but I just reviewed some of the documents
4  that are related to -- to this case.
5    Q.   Okay.  And when did you make that review?
6    A.   Specifically?  It's been on and off so there's
7  not really like one sole specific date that I just
8  reviewed it and left it as it is, you know.
9    Q.   Okay.  Do you recall answering a set of what
10 are called discovery requests that I sent on to your
11 counsel?
12   A.   Yes.
13   Q.   Okay.  And when you answered those, had you
14 already been reviewing documents?  This was back in
15 April.
16   A.   I'm not sure that I understand the question.
17   Q.   Okay.  Well, let me go on.
18   A.   Yes.
19   Q.   Are you currently an investigator with
20 Department of Child Safety?
21   A.   No.
22   Q.   When were you last an investigator?
23   A.   It must have been January or February of 2022.
24   Q.   Okay.  And what position did you take when you
25 left the investigative job?

1    A.    Team decision making facilitator.

2    Q.    Team decision making facilitator.  And in

3  that -- in that position, you don't have any

4  responsibility to investigate reports?

5    A.    That is correct.

6    Q.    Okay.  As I recall, you commenced your

7  employment with DCS in 2015?

8    A.    Yes.

9    Q.    And were you an investigator continuously from

10 2015 until the time you took the TDM facilitator

11 position?

12   A.    Yes.

13   Q.    Would that TDM facilitator position be

14 considered a lateral move?

15   A.    No.

16   Q.    Does it -- does it come with a pay increase?

17   A.    It does.

18   Q.    Okay.  Now -- and is that something you were

19 asked to do or something you -- a position you saw open

20 and you applied for it?

21   A.    I saw the position open and I thought that my

22 skills actually matched the requirements.

23   Q.    Uh-huh.  So you applied?

24   A.    Yes.

25   Q.    Okay.  Are you licensed or certified in any --

1    are off record.

2                      (A break was taken from 9:44 a.m. to

3    9:48 a.m.)

4                      THE VIDEOGRAPHER:  The time is 9:48 a.m.

5    We are on record.

6                      MR. MOORE:  While we were off the record,

7    Mr. Talamantes was shown Plaintiff's Exhibit 85, which is

8    identified as Arizona Department of Child Safety: Policy

9    and Procedure Manual, Chapter 2: Section 3.  It's the

10   State's production 7543 through 7557, and that's been

11   provided to me in the past 48 hours as a policy that was

12   in place in 2020.

13       Q.   BY MR. MOORE:  Mr. Talamantes, under the

14   heading Policy at the top of the first page, have you

15   read -- if you haven't, please read -- actually, read

16   that language and tell us when you've concluded reading

17   it.

18       A.   The whole Policy paragraph?

19       Q.   Yes, including the bullet points.

20       A.   Okay.  "The Department shall conduct

21   investi-" --

22       Q.   Oh, I'm sorry.  You don't have to read it out

23   loud.  I apologize.  Just take a look at it and tell us

24   when you've read it.

25       A.   Okay.  I -- I've done so.

1          **THE WITNESS:  Yes.**

2       Q.   BY MR. MOORE:  I'll take you back to Exhibit 57

3   for just a moment, the one we just looked at before.  And

4   I'm going to ask you to look at 7252, which is page 9 of

5   the document.

6                MS. ACOSTA COLLINGS:  Again, object to

7   foundation on this page -- on this document, Exhibit 57.

8       Q.   BY MR. MOORE:  This page identifies what are

9   the Four Steps to Successful Ca- -- Case Management,

10  identifies four items.  Would you describe to me if you

11  were trained in these four items as part of your case

12  management.

13               MS. ACOSTA COLLINGS:  Form and foundation.

14               **THE WITNESS:  I -- I was trained on those**

15  **concepts and ideas.**

16      Q.   BY MR. MOORE:  Thank you.

17               MR. STATES:  For the record, I -- I want

18  to bring out, as we did yesterday, if any of the parties

19  or attorneys object to one objection by a defendant

20  standing for all?

21               MR. MOORE:  Absolutely.

22               MR. STATES:  Any objections to that?

23               MS. SCROGGIN:  We agree.

24      Q.   BY MR. MOORE:  Mr. Talamantes, so by December

25  of 2020, did you feel comfortable that you understood the

1  laws that applied to the work that you did?

2                    MS. ACOSTA COLLINGS:  Form.

3                    MS. SCROGGIN:  Misstates his testimony.

4                    **THE WITNESS:  I feel that I knew my job**

5  **adequately.**

6      Q.   BY MR. MOORE:  Okay.  Sorry.  I can't read my

7  own writing.

8                    MR. STATES:  I hate it when that happens.

9      Q.   BY MR. MOORE:  As an investigator, do you

10  provide any services to a family?

11                    MS. ACOSTA COLLINGS:  Form.

12                    **THE WITNESS:  Not directly.**

13      Q.   BY MR. MOORE:  Okay.  Fair statement that your

14  responsibility is to investigate allegations of child

15  abuse or neglect?

16                    MS. ACOSTA COLLINGS:  Form.

17                    **THE WITNESS:  Those are -- those -- yeah,**

18  **those are my duties as an investigator.**

19      Q.   BY MR. MOORE:  Okay.  And as to those duties,

20  you understood that -- and back in 2020, you understood

21  that your job was to collect evidence that both supports

22  and refutes allegations of child abuse, correct?

23                    MS. ACOSTA COLLINGS:  Form and foundation.

24                    **THE WITNESS:  My job as an investigator is**

25  **to gather information, but the purpose is not to refute**

1   or -- or -- or prove any -- anything, but rather just

2   be -- let the -- the facts speak for themselves.

3        Q.   BY MR. MOORE:  Have you ever been instructed in

4   Arizona Law Statute 8-456?

5        A.   You would actually have to give me more

6   information.  Again, my expertise is not the law so I'm

7   not able to recall any specific statutes by --

8        Q.   Okay.

9             MR. MOORE:  Probably we can go off the

10  record.

11            THE VIDEOGRAPHER:  Like to go off the

12  record.

13            The time is 9:42.  We are now off record.

14            (A break was taken from 9:42 a.m. to

15  9:43 a.m.)

16            THE VIDEOGRAPHER:  It is 9:43.  We are now

17  on record.

18       Q.   BY MR. MOORE:  Mr. Talamantes, I'd like you to

19  take a look at Plaintiff's Exhibit 85.  Scan it and then

20  tell us when you've completed that, and I'll have some

21  questions for you.

22            MR. MOORE:  Actually, let's go off the

23  record so he can have some time to look at that

24  without ...

25            THE VIDEOGRAPHER:  Okay.  It is 9:44.  We

1    Q.    You have done so?

2    A.    Yes.

3    Q.    Okay.  So this policy required investigations

4  for, among other things, "the nature, extent, and cause

5  of any condition created by the parents, guardians or

6  custodians or adult member of the household that would

7  support or refute the allegation if the child is a victim

8  of abuse or neglect."  Does that refresh your

9  recollection that your responsibility was to collect

10 evidence that would support or refute the allegations of

11 neglect or abuse?

12                MS. SCROGGIN:  Misstates the document.

13                MS. ACOSTA COLLINGS:  Form.

14                THE WITNESS:  This does refresh my memory.

15    Q.    BY MR. MOORE:  Okay.  So I'll be asking you a

16 few more questions about that.  But one of your

17 responsibilities, if it becomes necessary, is to take a

18 child into temporary custody, correct?

19                MS. ACOSTA COLLINGS:  Form.

20                THE WITNESS:  Yes.

21    Q.    BY MR. MOORE:  Okay.  And each time you take a

22 child into temporary custody, you are to provide the

23 parent with what's called a temporary custody notice,

24 correct?

25                MS. ACOSTA COLLINGS:  Form.

1              THE WITNESS:  Yes.

2       Q.   BY MR. MOORE:  Okay.  And if -- that's true

3  even if the parent is consenting to you taking temporary

4  custody, correct?

5       A.   Yes.

6       Q.   A child who is a subject of a present danger

7  plan is not in DCS custody; am I correct?

8       A.   **Not necessarily.**

9       Q.   Not necessarily.  Under what circumstances

10 would a child not be in DCS custody if you and the

11 parents have executed a present danger plan?

12      A.   **A present danger plan includes several options,**

13 **including up to, you know, having custody of a child.  So**

14 **the fact that a present danger plan exists does not**

15 **preclude custody being served.  It is the most**

16 **restrictive present danger plan that we can implement,**

17 **but it's one of the present danger options.**

18      Q.   And whether or not that most restrictive one of

19 removal is actually part of a particular present danger

20 plan would show up on the face of the present danger plan

21 itself?

22              MS. ACOSTA COLLINGS:  Form.

23      Q.   BY MR. MOORE:  Correct?

24      A.   **I'm sorry.  Could you please repeat that**

25 **question?**

1      Q.   Yeah.  The present danger plan, if it -- it

2   includes the DCS taking temporary custody of the child,

3   that would show up on the present danger plan that the

4   parents have agreed to, correct?

5             MR. STATES:  Form.

6             **THE WITNESS:  I'm sorry.  I'm trying to**

7   **understand the question cause -- from what I heard --**

8      Q.   BY MR. MOORE:  Withdraw that.  Withdraw that.

9      **A.   Okay.**

10     Q.   You testified that there are present danger

11  plans in which the child can be under a present danger

12  plan and be in temporary custody of the department at the

13  same time, correct?

14            MS. ACOSTA COLLINGS:  Misstates.

15            **THE WITNESS:  Correct.**

16     Q.   BY MR. MOORE:  And you testified about the most

17  and least restrictive -- restrictive -- this sliding

18  scale of least restrictive to most restrictive, right?

19     **A.   Yes.**

20     Q.   And the most restrictive is actually the

21  removal of the child from the home, correct?

22            MS. ACOSTA COLLINGS:  Form.

23            **THE WITNESS:  Yes.**

24     Q.   BY MR. MOORE:  If there was a removal of the

25  child from the home as part of the present danger plan,

1   I apologize.

2               THE VIDEOGRAPHER:  It is 10:26 a.m.  We

3   are off record.

4               (A break was taken from 10:26 a.m. to

5   10:27 a.m.)

6               THE VIDEOGRAPHER:  It is 10:27 a.m.  We

7   are now on record.

8       Q.   BY MR. MOORE:  Before we get into Exhibit 86,

9   which is in front of you ...

10      A.   Okay.

11      Q.   Thank you.  Before we get into that, when you

12  were an investigator, how would you get notice that there

13  is a report that is going to be assigned to you to

14  investigate?

15      A.   They both appear on my screen on my caseload,

16  and I was given a -- a physical copy of -- of the report.

17      Q.   Okay.  And this happened every time?  This was

18  standard procedure?

19              MS. ACOSTA COLLINGS:  Form.

20              THE WITNESS:  This was -- this was -- you

21  know, this would happen.

22      Q.   BY MR. MOORE:  Okay.  And the -- the hard copy

23  that's given to you, would that be given to you by your

24  supervisor or it could be given by somebody else?

25              MS. ACOSTA COLLINGS:  Form.

1        THE WITNESS:  It could be -- it wasn't one

2   specific person.

3        Q.   BY MR. MOORE:  Okay.  So once this came up on

4   your screen and you had the hard copy, what were your

5   next steps?

6             MR. STATES:  Form.

7             THE WITNESS:  Usually what I would do is

8   read the allegations, do the background information --

9   for example, look to see if there was any prior DCS

10  history.  I would look into the criminal history.  I

11  would look into the Department of -- sorry -- I -- I -- I

12  would look at the DPS records.  I would look at the sex

13  offender registry and then try to gather some -- some

14  information from the source.

15       Q.   BY MR. MOORE:  Okay.  If we look on page 1 of

16  Exhibit 86, this is identified as Pre-Commencement

17  activities to Prepare for an Initial Response.  There's

18  some bullet-pointed items on here.  You've had a chance

19  to take a look at those?

20       A.   Yes.

21       Q.   Would those pretty much line up with -- with

22  what your usual practice is?

23       A.   Yeah, this is -- this is pretty familiar to me.

24       Q.   Okay.  Down below at the bottom of the page

25  under Procedures, it states, "Pre-Commencement activities

1  prepare the DCS Specialist for conducting the Family

2  Functioning Assessment-Investigation."  In this case when

3  it uses "DCS Specialist," does that mean an investigative

4  specialist?

5              MS. ACOSTA COLLINGS:  Form.  Foundation.

6              **THE WITNESS:  It -- it could be any- --**

7  **anybody from the department that's assigned with the task**

8  **of completing this.**

9       Q.   BY MR. MOORE:  Okay.  The next sentence is,

10  "The DCS Specialist obtains, reviews, and analyzes

11  available information prior to initiating contact with

12  the family; and develops a plan for the initial contact,

13  including specific information to be collected at the

14  initial contact."  Was that the practice that you engaged

15  in on the cases that were assigned to you?

16       **A.   I would try to develop a plan for initial**

17  **contact.**

18       Q.   And would you also try to develop an idea of

19  the specific information that you would want to collect

20  at the initial contact?

21       **A.   In general, yes.**

22       Q.   Is this something you would write down?  In

23  other words, would you make notes?  As you're going

24  through this pre-commencement activities, would you make

25  notes?

1    A.   It is not necessary.

2    Q.   Okay.  You testified that you would attempt,

3  upon review of the information you described, to make

4  contact with the source.  I believe you used the term

5  "source."  Right?

6    A.   Yes.

7    Q.   The source is the individual, the person that

8  makes the hotline call, correct?

9            MS. ACOSTA COLLINGS:  Form.

10           THE WITNESS:  Yes.

11   Q.   BY MR. MOORE:  Okay.  Was it your practice --

12 when you have gathered the necessary information before

13 making the initial response, was it your practice to have

14 a discussion about the case with your supervisor?

15   A.   We were encouraged to have a conversation with

16 our supervisors.

17   Q.   I understand you're saying you were encouraged.

18 That's not my question.  My question was:  Was it the

19 practice you engaged in, before you went out of the

20 office, to have a discussion with your supervisor about

21 the case?

22           MS. ACOSTA COLLINGS:  Form.

23           THE WITNESS:  I would try to have a

24 conversation --

25   Q.   BY MR. MOORE:  Okay.

1              (A break was taken from 10:55 a.m. to

2   11:10 a.m.)

3              THE VIDEOGRAPHER:  It is 11:10 a.m.  We

4   are on record.

5       Q.   BY MR. MOORE:  Mr. Talamantes, we're back on

6   and I'm going to ask you a question I ask all the folks

7   that I depose.  If during a break in the deposition, it

8   comes to you that an answer you previously gave may need

9   to be augmented or changed because it might be an error,

10  I ask everyone to tell us that.  So during the time that

11  you were off the record and we took our break, did --

12  did -- as you now come back to the deposition, is there

13  any question you recall answering where you'd like to

14  amend your answer, edit your answer or change your

15  answer?

16      A.   No --

17      Q.   Okay.

18      A.   -- not at this moment.

19      Q.   Okay.  Let me ask you to go to page 7539 of the

20  Exhibit 80- -- 86.  This is, again, in the

21  Pre-Commencement Activities.  At the bottom of the page,

22  there is a heading Joint Investigation and/or Police

23  Involvement, and at the top of the page, there's three

24  bullet points about what you as the investigator are

25  supposed to do in the event of police involvement.  I'd

1  like you to look at those three bullet points.  Just tell

2  us when you've had a chance to read them.

3         A.    Okay.

4         Q.    All right.  Is that something you for- -- were

5  familiar with back in December of 2020?

6         A.    Yes.

7         Q.    Okay.  Let me ask you to go to Exi- -- back to

8  Exhibit 85, please, page 7545, and the first full

9  paragraph of -- of this document at the top, and I'm

10 going to -- I'm going to edit a little bit, If during the

11 course of an investigation, the Department determines

12 that a criminal offense may have been committed or a new

13 allegation of abuse or neglect not previously reported as

14 present, the Department shall immediately provide

15 information to the appropriate law enforcement agency and

16 the Child Abuse Hotline.  Was that your understanding of

17 what your obligation was in the event you were involved

18 in an investigation and a new allegation of abuse or

19 neglect came to your attention?

20        A.    It seems familiar.

21        Q.    Was that what you would do, make a hotline

22 report?

23              MS. ACOSTA COLLINGS:  Form.

24              THE WITNESS:  We would -- we would

25 document it and -- and investigate it.

1      Q.   BY MR. MOORE:  So you didn't understand, back
2   in 2020, that this was the policy?
3           MS. ACOSTA COLLINGS:  Did you say "did" or
4   "did not"?
5      Q.   BY MR. MOORE:  Did not understand in 2020 that
6   the policy is as what we just read?
7           MS. ACOSTA COLLINGS:  Form, foundation.
8           THE WITNESS:  Again, it is familiar to me
9   but I cannot -- I cannot say that I was -- that it was
10  unfamiliar to me back then.
11     Q.   BY MR. MOORE:  Okay.  Another question.  7552,
12  page 7552.  At the top of the page, there's language
13  there's a heading Interviewing Collateral Contacts.  I'd
14  just like you to read that entire segment above the next
15  heading to yourself, and then just tell us when you've
16  had a chance to review it.
17     A.   Okay.
18     Q.   Were you familiar with that policy back in
19  December of 2020?
20     A.   Likely, yes.
21     Q.   And you would have attempted to follow that
22  policy, correct?
23           MS. ACOSTA COLLINGS:  Form.
24           THE WITNESS:  I would attempt to
25  contact -- and gather information including about

1   collateral contacts.

2        Q.   BY MR. MOORE:  Okay.

3                 (The reporter requested clarification.)

4                 MR. MOORE:  May I have that back.  I'm

5   going to give you another volume.

6                 Thank you.  Would hang on to that for a

7   moment, sir.

8        Q.   BY MR. MOORE:  I'm going to show you Exhibit --

9   Plaintiff's Exhibit 49, which is page 7242 and 43,

10  two-page document, and ask you if you're familiar with

11  that.

12       A.   Yes.

13       Q.   And what's your understanding of what that

14  document is?

15       A.   It's the present danger assessment.

16       Q.   Does that include in that document the

17  definition of what present danger is?

18       A.   Yes.

19       Q.   And conditions under which a child can be in

20  present danger?

21       A.   Yes.

22       Q.   Okay.  We'll come back to that in a moment.  If

23  you would just hand that back to me.  Thank you.

24                 If you would turn to Exhibit 41, please.

25  Take a look at that and just tell us when you've finished

1  reviewing it.

2              So you've had a chance to review this

3  document.  And the last page of the document is your

4  sworn affirmation about the responses to the

5  interrogatories, the questions that we made to you,

6  correct?

7       A.   Correct.

8       Q.   And you ex- -- executed this on April 14th of

9  2023, correct?

10      A.   That's what the date indicates.

11      Q.   Before you executed that, you would have

12 reviewed the previous part of that document, which is

13 Defendant Talamantes' Response to Plaintiffs Discovery

14 Requests First Set, correct?

15      A.   I'm sorry.  What was that?

16      Q.   You would have reviewed this because you were

17 swearing to the truthfulness of the interrogatory

18 responses, right?

19      A.   Yes, I would have reviewed this.

20      Q.   Okay.  Would you say that your memory of the

21 events of December 16th, 2020, is better today than it

22 was in April when you verified these responses?

23              MS. ACOSTA COLLINGS:  Form.

24              THE WITNESS:  I -- I don't -- I don't

25 know.  I mean, as time progresses, your -- your memory

1  December 2020, going to any supervisor, going to any

2  program manager with questions about the application

3  process for the court-authorized removal?

4      A.   I don't recall.

5      Q.   Okay.  Tell us -- Withdraw that.

6           You go to -- tell us what you remember on

7  December 16th, 2020, about reviewing a report that had to

8  do with alleged physical abuse of LAW.

9      A.   Again, is there anything specific about that

10  date that you -- you want some information on, cause --

11     Q.   Yeah, I specifically want to know what -- what

12  you remember about the report that came to your screen

13  and the hard copy that came to you that day.

14     A.   So are you asking for the specific allegations?

15     Q.   I'm asking what you remember about that.

16     A.   By "that," what is that?  The allegations, the

17  date, the actions --

18     Q.   Anything.

19     A.   I need you to be more specific.

20     Q.   Anything.

21     A.   Okay.  So I can actually summarize some of the

22  events that happened that day.

23     Q.   I'm not asking about the whole day.  I'm asking

24  about when you looked at the report on the screen, do you

25  remember what the report said?

1    A.   Okay.   There were some concerns about physical
2  abuse for LAW.
3    Q.   Anything else you remember about the report?
4    A.   There were some injuries or marks that were
5  observed on him, and it seemed like he had disclosed some
6  physical discipline.
7    Q.   Anything else you remember about the report?
8    A.   Not at this moment, Mr. Moore.
9    Q.   Do you remember who was identified as the
10 reporter in the hotline narrative?
11   A.   I don't recall at this moment.
12   Q.   Do you recall that the first report that came
13 in that day was at approximately 10:30 and it was made by
14 the school staff?
15             MS. ACOSTA COLLINGS:  Form.
16             THE WITNESS:  I don't recall.
17   Q.   BY MR. MOORE:  Did you see a report that you
18 recall was made that morning by the school staff?
19   A.   I don't recall.
20   Q.   Do you remember the reporter on the report you
21 did see?
22             MS. ACOSTA COLLINGS:  Form, foundation.
23             MR. STATES:  Asked and answered.
24             THE WITNESS:  I don't recall.
25   Q.   BY MR. MOORE:  Okay.  Upon the report coming to

1   you, you seeing it, what was the next thing you did?

2       A.   Would you like me to narrate the order of what

3   happened thereafter throughout the whole day after I -- I

4   received the report?  Or are you asking for a specific

5   period of time in the whole process?

6       Q.   Let's -- let's do it this way:  Before you left

7   the office to make your initial contact, what

8   pre-commencement activities did you do?

9       A.   I -- I spoke to -- I spoke to a source.  I

10  spoke to law enforcement.  I spoke to my supervisor,

11  Meghean Francisco.  And by the way, I'm not stating this

12  in the order that it happened, but just in the general

13  idea what happened.  I gathered some background

14  information for -- for the family, including DCS reports,

15  criminal history, and -- and other such information

16  that's in my CSI.

17      Q.   You remember any details other than that about

18  what you did pre-commencement?

19      A.   Not on the top of my head, but if I would see

20  those CSRA document, that pretty much explains a lot of

21  the pre -- my pre-commencement work.  Perhaps that can

22  refresh my memory if I saw that document.

23      Q.   Let's talk about the CSRA.  What is the role of

24  a CSRA in an investigation?

25               MS. ACOSTA COLLINGS:  Form.

1      A.    Yes.

2      Q.    Do you have any recollection of a conversation

3  where you and Brian and Irlanda were formulating the

4  present danger plan?

5      A.    I remember that we formulated the present

6  danger plan.  I don't remember the specifics of the

7  conversation.

8      Q.    Where were you when you formulated the present

9  danger plan with them?

10     A.    Best I remember is around the back

11  kitchen/dining room area, there was a table and we sat

12  down and we went over the plan.

13     Q.    When you say "we went over the plan," had you

14  already written all or part of the plan down before you

15  went over with them or did you have a blank document and

16  you filled it in as you were working with them?

17     A.    I don't recall.

18     Q.    All right.  So looking at Plaintiff's

19  Exhibit 49, which is the Present Danger Assessment Guide,

20  looking under the -- the Conditions, the two columns of

21  conditions -- present danger conditions that are on that

22  page, please identify which ones apply to LAW on

23  12/16/20.

24     A.    Well, I do have to note too, Mr. -- Mr. Moore,

25  that some of the conditions are actually covered up by

1  the Plaintiff's Exhibit box so I'm unable to see the full
2  picture of the document here.
3      Q.   Well, how -- how many of them are covered up
4  that you don't see?
5      A.   At least one.  But I just wanted to make a note
6  of that, that, you know, you kind of gave me a copy that
7  has some obstructions to -- to what I can see.
8      Q.   Okay.  How many times have you -- have you used
9  this document in your work?  Is this a -- a document you
10  would use regularly when you're assessing present danger
11  to help you with the definitions and conditions, that
12  kind of thing?
13     A.   Yes.
14     Q.   Okay.  So you're familiar with it, right?
15     A.   What I'm trying to indicate, Mr. -- Mr. Moore,
16  is that you're giving me a -- a document that's partially
17  obstructed with -- you know, with this, so I just want to
18  make a note that I can still answer this question, but I
19  just want to make a note we do have a big block covering
20  one of the -- one of the conditions here.  You're giving
21  me a document that's, in essence, incomplete, but I'll do
22  the best to answer that question.
23              There were serious injuries, you know,
24  observable on LAW, so that actually qualifies for at
25  least two of those.

```
 1       Q.   Describe the ones that qualify.  Tell me which
 2   ones.  Read them.
 3       A.   Bruising or injuries and --
 4       Q.   Whoa.  Whoa.  Whoa.  Whoa.  Slow down.  Read
 5   exactly what it says in the document.
 6       A.   Okay.  So --
 7            MR. STATES:  Objection.
 8            Do you want his answers?
 9            MR. MOORE:  I want him to identify the
10   conditions and read those into the record as they are in
11   the document.
12       Q.   BY MR. MOORE:  Which conditions?  Just read
13   those as they appear in the document, please.
14       A.   Okay.  Now, there's something that actually
15   crosses into this, you know, specific situation cause I
16   do want to note not every situation that we encounter
17   fits neatly in the boundaries of these conditions.  But
18   we do have "Injuries such as facial bruises, injuries to
19   the head, or multiple plane injuries; different types of
20   injuries on the child such as a serious burn or bruising;
21   bruising or injuries to a non-ambulatory child, or
22   immersion burns.
23            "And serious injuries that the caregivers
24   and others cannot and will not explain, or the
25   explanation is inconsistent with the observed or
```

1  diagnosed injuries or condition."

2      Q.   When you made this determination with regard to

3  the condition that starts out "Injuries such as facial

4  bruises, injuries to the head, or multiple plane

5  injuries," you had not seen LAW's marks or bruises; isn't

6  that true?

7              MS. ACOSTA COLLINGS:  Form.  Foundation.

8              THE WITNESS:  Not directly.

9      Q.   BY MR. MOORE:  Not directly?

10     A.   Correct.

11     Q.   Okay.  So your answer to the question about

12 "injuries such as facial bruises, injuries to the head,

13 multiple plane injuries, different types of injuries such

14 as a serious burn or bruising, bruising or injuries on a

15 non-ambulatory child or immersion burns," what specific

16 one -- ones of that, such as did you understand LAW had?

17     A.   I believe that you missed the other one that I

18 also explained, Mr. Moore.  "Serious injuries that the

19 caregivers and others cannot" --

20     Q.   We'll get to that one.  We'll get to that one.

21 I'm asking about this one.

22              What injuries did LAW have, to your

23 knowledge, that met that criteria?

24     A.   And, again, being based on both of those

25 present danger conditions is what was described by -- by

1    the forensic interviewer and what was described by the

2    forensic nurse.

3                    (The reporter requested clarification.)

4                    THE VIDEOGRAPHER:  Mr. Talamantes, would

5    you move your hands from your microphone.

6        Q.    BY MR. MOORE:  What specific injuries had been

7    described to you by the --

8                    THE VIDEOGRAPHER:  Sorry.

9                    MS. ACOSTA COLLINGS:  The cord isn't long.

10                    THE VIDEOGRAPHER:  It's on the wrong side.

11   Thank you.  Pardon the interruption.  Appreciate it.

12                    MR. MOORE:  Are we on?

13                    THE VIDEOGRAPHER:  Yeah.

14       Q.    BY MR. MOORE:  What specific injuries had you

15   learned from the forensic interviewer?

16       A.    Right now at the top of my head, I cannot -- I

17   don't have them here by memory, but they are described in

18   the court report.  They are described in the -- in the

19   court-authorized removal application.  But right now, I

20   would have to see those documents to actually be able to

21   give you the specific -- the bruise type, the -- the

22   shape, the size, and -- and all of those, you know,

23   details.

24       Q.    Do you recall answering my question a few

25   minutes ago about the interrogatories, and you answered

1  that you didn't have the court re- -- or the -- you
2  didn't have the report at the time you were at the CAC?
3  You remember that?
4             MR. STATES:  Form.
5             MS. ACOSTA COLLINGS:  Form.  Foundation.
6             THE WITNESS:  I'm sorry.  That I didn't
7  have the court report?
8       Q.   BY MR. MOORE:  You didn't have the doctor's
9  report at the time you were at the CAC before you went to
10 the home, you have no recollection of seeing that,
11 correct?
12      A.   Correct.  But, Mr. Moore, I also mentioned that
13 there were several conversations that I had with source,
14 with law enforcement, and they described to me in detail
15 what -- you know, the information that they had gathered.
16      Q.   Which person at the SACAC did you speak with?
17      A.   I don't recall.
18      Q.   Which law enforcement officer -- officer did
19 you speak with?
20      A.   I don't recall.
21      Q.   You do not have a recollection today of what
22 you understood the marks or injuries to be on LAW when
23 you left the CAC to go to the Wright home, correct?
24             MS. ACOSTA COLLINGS:  Form.  Foundation.
25             THE WITNESS:  I'm sorry.  Just so I make

1   sure that I understand the question and I'm -- I'm able

2   to answer, are you asking if right now, two and a half

3   years later, I'm able to describe to you the nature of

4   the injuries?

5        Q.   BY MR. MOORE:  Yeah.

6        A.   I don't recall.

7        Q.   Okay.  You also mentioned a second one that you

8   say played into your determination.  "Serious injuries

9   that the caregivers and others cannot or will not

10  explain, or the explanation is inconsistent with the

11  observed or diagnosed injuries or condition."  That's the

12  one you also relied on, correct?

13               MR. STATES:  Form.

14               THE WITNESS:  Correct.

15       Q.   BY MR. MOORE:  What is a serious injury as

16  defined by DCS?

17               MS. ACOSTA COLLINGS:  Form.  Foundation.

18               THE WITNESS:  What was described was that

19  LAW did had bruising and LAW did had marks on -- on his

20  body, and it was described that he disclosed physical

21  discipline by Mrs. Wright.

22       Q.   BY MR. MOORE:  Your testimony that, as you

23  understand it in DCS, any bruise or any mark constitutes

24  a serious injury?

25               MS. ACOSTA COLLINGS:  Form.

```
 1              MR. STATES:  Form.  Foundation.
 2              MS. ACOSTA COLLINGS:  Misstatement.
 3              THE WITNESS:  What I'm saying is that LAW
 4   described -- or disclosed that he was hit with an object
 5   which caused him to have those injuries.
 6       Q.   BY MR. MOORE:  I'm not asking you about what
 7   happened.  I'm asking you about the definition of what
 8   serious injuries, meaning what's on the body.  That's
 9   what I'm asking.  We'll get to the other thing that you
10   say he said.  My question is:  You say the injuries were
11   serious.  You don't recall having seen them.  You don't
12   recall the specifics.  My question is simply this:  What
13   is the definition of serious injuries that you folks used
14   in DCS?  Do you have a definition, a serious injury is?
15              MR. STATES:  Form.  Compound.
16              THE WITNESS:  Okay.  I wouldn't be able to
17   give you the exact language at this moment.  But again,
18   the information that I provided, it's based on two and a
19   half years ago, so right now I'm just trying to answer
20   everything to the best of my recollection.
21       Q.   BY MR. MOORE:  And my question is, then, you
22   understood, as best you recall, that someone had
23   described to you that LAW had bruising and marks,
24   correct?
25              MS. ACOSTA COLLINGS:  Form.  Misstatement.
```

1          THE WITNESS:  I would have to see the

2    document so I could tell you specifically what I -- what

3    I stated two and a half years ago.

4          Q.   BY MR. MOORE:  I'm not asking you what you

5    stated two and a half years ago.  I'm asking you what you

6    remember they told you.

7          A.   Right now, I don't recall the specifics of it,

8    Mr. Moore.

9          Q.   Okay.  So my question, then, is this:  You

10   can't answer my question about whether or not these

11   injuries were serious, because you don't know the

12   specifics about the injuries that you knew of on the 16th

13   of December, correct?

14               MS. ACOSTA COLLINGS:  Form, foundation.

15               MR. STATES:  Form.

16               MS. ACOSTA COLLINGS:  Misstates testimony.

17               THE WITNESS:  I cannot articulate, two and

18   a half years later, what were those conditions that I

19   observed and, you know, specifically how -- how

20   everything went about, again from memory.  If you do give

21   me those documents for me to review, I can refresh my

22   memory because those documents that I prepared from two

23   and a half years ago was with the events just recently

24   having passed by.

25          Q.   BY MR. MOORE:  My question is this:  You say

1    A.   I don't recall.

2    Q.   Okay.  In this case, at the time you came to

3  the Wright home, what evidence did you have that Brian

4  Wright had abused his son?

5              MS. ACOSTA COLLINGS:  Form.

6              THE WITNESS:  The allegation, if I

7  remember correctly -- and perhaps he -- or you will

8  probably correct me in this, Mr. Moore, is that it was

9  not Mr. Wright who actually caused the injuries, but

10 Mrs. Wright.

11   Q.   BY MR. MOORE:  Okay.  There are terms used by

12 DCS "offending parent" and "non-offending parent."

13 You're familiar with those, right?

14   A.   Somewhat, yes.

15   Q.   When you say "somewhat," do you use those in

16 your work determining who's an offending parent, who's a

17 non-offending parent?

18   A.   Yes.

19   Q.   Okay.  So in this instance, where the only

20 allegations you had that Irlanda Wright had caused the

21 injuries, that would make Brian Wright a non-offending

22 parent, correct?

23   A.   However, being an offending or non-offending

24 parent does not -- does not -- the -- the -- the -- the

25 safe- -- the safety or unsafe condition of a child is not

1   determined solely by the offending parent, but also the

2   non-offending parent and whether they are taking action

3   or -- or -- or either they're able or willing to -- to

4   take action against the offending parent.

5              So, in essence, Mr. -- Mr. Moore, if the

6   non-offending parent is unable, incapable or unwilling to

7   protect the -- a child from the offending caregiver, then

8   by default, you know, that creates an unsafe situation,

9   whether that person directly or indirectly allows for

10  those circumstances to happen.

11      Q.  And what evidence did you have the afternoon of

12  the 16th that Brian Wright was unable or unwilling to

13  protect his son?

14      A.  Again, it was not much information that we had

15  that -- at that moment that I recall.

16      Q.  Okay.  Okay.  Let me ask you a quick question.

17  Do you have a copy of Exhibit 49 in your book?

18      A.  Forty-nine.

19      Q.  Here.  No, you have it outside.  I apologize.

20  I want to go back to 49.  I'm going to reach here.  I

21  removed it at one point.  I'm not sure if it's in that

22  group of documents or not.

23              MR. MOORE:  Yeah.  Thank you.

24              MS. ACOSTA COLLINGS:  Two pages?

25              MR. MOORE:  Yeah.

1      Q.   BY MR. MOORE:  So, Mr. -- Mr. Talamantes,

2  what's the second step or the next step after you

3  determine that present danger exists?  What is supposed

4  to happen after that?

5      A.   We looked at the least intrusive option to help

6  us manage the safety threat.

7                    (The reporter requested clarification.)

8                    THE WITNESS:  The least intrusive option

9  to manage the safety threat.

10      Q.   BY MR. MOORE:  And that appears -- that

11  analysis, steps in that -- I'm sorry, the -- the flow of

12  that is in a box on the second page of Exhibit 49,

13  correct?

14      A.   Yes.

15      Q.   That box starts with the least restrictive and

16  ends up with the most restrict- -- restrictive, correct?

17      A.   Correct.

18      Q.   Okay.  When you say "we," did you go through

19  these options with Brian Wright to ask him his opinion

20  about what the appropriate plan -- safety plan was?

21                    MS. ACOSTA COLLINGS:  Form.  Foundation.

22                    THE WITNESS:  I don't recall the specifics

23  of the conversation.

24      Q.   BY MR. MOORE:  Okay.  Did you recall making any

25  inquiry as to whether the threatening person -- in this

```
 1  case, as you understood it, the person who was a threat
 2  in terms of injury to LAW was the mother, correct?
 3              MS. ACOSTA COLLINGS:  Form.
 4              MS. SCROGGIN:  Object to form.
 5              THE WITNESS:  Again, I don't recall the
 6  specifics of the conversation.
 7      Q.  BY MR. MOORE:  I'm not asking you that.  I'm
 8  asking you who the person in the family was who, based on
 9  your information at that time, was the one who was
10  potentially a threat to injure LAW.
11              MS. SCROGGIN:  Form.
12              MR. STATES:  Form.
13              MS. ACOSTA COLLINGS:  Form.
14              THE WITNESS:  Direct or indirect threat?
15      Q.  BY MR. MOORE:  I'm not -- I don't know because
16  I'm looking at the exhibit, 7243, that says, "The
17  threatening person will leave the home."  You told me
18  earlier that your understanding was that the information
19  you had gotten was that Irlanda Wright had hit her son.
20      A.  That is the information that we had in hand.
21      Q.  Okay.  She would have been the threatening
22  person?
23              MS. ACOSTA COLLINGS:  Form.
24              MR. STATES:  Objection.
25              THE WITNESS:  Again, with the information
```

1   that we had at that moment, you know, yes, she would have
2   been the threatening person.
3       Q.   BY MR. MOORE:   Did you ask Brian and Irlanda if
4   she was willing to leave the home and thus have LAW come
5   back under Brian's care?
6       A.   I would have to go back to my previous answer,
7   Mr. Moore, that I do not recall the specifics.  And right
8   now early in the investigation, we don't know if we're
9   dealing with one threatening person or two, given that we
10  don't have the full picture yet.
11      Q.   Is it your testimony that, without any
12  allegations that Brian Wright had injured his son, you
13  considered him to be potentially a threat to his son?
14           MS. SCROGGIN:   Misstates facts and the
15  testimony.
16           MS. ACOSTA COLLINGS:   Form.
17           THE WITNESS:   I'm sorry, Mr. Moore.  Can
18  you please repeat that question.
19      Q.   BY MR. MOORE:   No.
20           Did you consider whether a response --
21  appropriate response to a present danger was "A
22  responsible adult will routinely monitor the home"?  Did
23  you consider that?
24      A.   I don't recall.
25      Q.   Did you consider whether a good -- a possible

1    Q.   Yeah.  So when you came back on the 21st, by

2    the time you came back, you had secured clearance from

3    law enforcement to do the interviews, correct?

4              MS. ACOSTA COLLINGS:  Form.  Foundation.

5              **THE WITNESS:  It appears so.**

6    Q.   BY MR. MOORE:  Well, you wouldn't have done

7    these specific inquiries about how the child got its

8    marks unless you had gotten clearance from law

9    enforcement, correct?

10             MS. ACOSTA COLLINGS:  Form.

11             MR. STATES:  Foundation.

12             **THE WITNESS:  And again, it does appear so**

13   **if I was discussing the allegation with the parents.**

14   Q.   BY MR. MOORE:  Do you have any recollection of

15   any communications with Sahuarita PD between the time of

16   16th of December and the 21st of December?

17   **A.   I don't recall.**

18   Q.   Okay.  If you had significant -- if you had

19   communications and been given information significant to

20   your investigation, you would have documented that,

21   correct?

22             MS. ACOSTA COLLINGS:  Form.

23             **THE WITNESS:  I would have likely tried to**

24   **document as much as I could.**

25   Q.   BY MR. MOORE:  Okay.  Would you agree with me

1   that what police learn in their investigation can inform
2   your assessment of the same allegations?
3                    MS. ACOSTA COLLINGS:  Form, foundation.
4                    **THE WITNESS:  Can you please repeat that?**
5        Q.   BY MR. MOORE:  You agree with me that what
6   police learn in their investigation can inform your
7   assessment of the same allegations?
8                    MS. ACOSTA COLLINGS:  Same.
9                    **THE WITNESS:  They have a different**
10  **purpose than -- again, we don't just rely solely on just**
11  **law enforcement.**
12       Q.   BY MR. MOORE:  I didn't ask you if you relied
13  solely.  I asked you if policy states that you will
14  communicate with law enforcement, you will find out about
15  their investigation and their outcomes.  You recall that?
16       A.   **Yeah, we had to communicate with law**
17  **enforcement.**
18       Q.   Right.  And when law enforcement would give you
19  information about their investigation, what they learned
20  in their investigation, that could help you in your
21  investigation, correct?
22                    MS. ACOSTA COLLINGS:  Form.  Foundation.
23                    **THE WITNESS:  It can have an impact.**
24       Q.   BY MR. MOORE:  Okay.
25                    MR. MOORE:  Let's take a short break.

```
 1              MS. ACOSTA COLLINGS:  Oh, thank you.
 2              THE VIDEOGRAPHER:  It is 2:36 p.m.  We are
 3   now off record.
 4              (A break was taken from 2:36 p.m. to
 5   2:48 p.m.)
 6              THE VIDEOGRAPHER:  It is 2:48 p.m.  We are
 7   on record.
 8              MR. MOORE:  Thank you all for the break.
 9      Q.   BY MR. MOORE:  Mr. Talamantes, we were talking
10   about your contacts with the Wright family following the
11   December 16th events.  Do you recall, at the visit you
12   made on the 18th, that -- that Brian Wright took you
13   through the home?
14      A.   I believe so, yes.
15      Q.   And that's standard procedure, isn't it, when
16   you're doing an investigation, to be able to see the
17   home?
18      A.   We do try to do a walk-through.
19      Q.   Sure.  You recall Mr. Wright informing you that
20   the children were enrolled in some type of martial arts
21   classes and that they were very active children, correct?
22      A.   I don't recall that specific information.
23      Q.   Okay.  No problem.  So when you returned on --
24   I jumped ahead of myself there.  Let's go back.
25              Do you recall meeting between yourself,
```

1    the 28th of December, and it was you that submitted the

2    application before the TDM.  Ordinarily a safety TDM is

3    conducted after the family functioning assessment is

4    complete; am I correct?

5                    MS. ACOSTA COLLINGS:  Form and foundation.

6                    THE WITNESS:  I'm -- I'm sorry again,

7    just -- just can you please repeat that question.

8         Q.   BY MR. MOORE:  Isn't it true that under the way

9    the process goes, a safety plan TDM is not set with the

10   parents, is not conducted, until your assessment of the

11   functioning of the family is complete?

12                   MR. STATES:  Form, foundation.

13                   THE WITNESS:  When -- when we have

14   sufficient information about the fam- -- family

15   functioning, we can actually have a more productive TDM.

16        Q.   BY MR. MOORE:  Who makes the decision that the

17   information is sufficient?

18        A.   To have the TDM?  Well, it's a conversation I

19   have with my supervisor at all times, just let them know

20   what's been gathered so far.

21        Q.   Okay.  And isn't it true that, at the time the

22   CSRA is completed and finalized, there is a clinical

23   discussion with the supervisor about what you've gathered

24   and what you've concluded in your investigation, correct?

25                   MS. ACOSTA COLLINGS:  Foundation.

1          THE WITNESS:  That happens throughout the
2   whole case.
3       Q.   BY MR. MOORE:  I realize that.  But if -- if we
4   look at Exhibit --
5               MR. SLUTES:  While you're getting that
6   exhibit, I'm leaving.
7               MR. MOORE:  Okay.
8               MR. SLUTES:  And I'll head out the front
9   door.  I don't -- usually I leave the back -- by the back
10  door quite quickly, but I don't want to disturb you.
11              MR. MOORE:  Thank you.  Thank you.
12              MR. SLUTES:  Nice meeting you.  Bye-bye.
13      Q.   BY MR. MOORE:  I'm just going to -- I don't
14  want to go through the process of going through this
15  whole thing, but I'm going to show you Exhibit 25 again.
16  And the last page of the exhibit, 22 of 22, there's a box
17  that said -- that says Clinical Supervision Decision, and
18  under it it says "supervision assessment in case notes -
19  Francisco, Meghean, K. 1/6/21 3:02 PM."  Are you -- you
20  aware from the policy of the agency that you must have a
21  clinical supervision discussion before that CSRA is
22  closed out?
23              MR. STATES:  Foundation.
24              MS. ACOSTA COLLINGS:  Form.  Foundation.
25              THE WITNESS:  Before the CSRA is closed

1    out, we have to make sure that all the important

2    information that we have up to date is already in there,

3    because once it's finalized, I'm unable to go back there

4    and, you know, add any new information.  So my

5    supervisor, again, really has to review the CSRA, make

6    sure that I capture all the important facts and data.

7         Q.   BY MR. MOORE:  All my question is is this:

8    Since this is on the documents produced by us as part of

9    the CSRA, isn't it true that you would have had a

10   clinical supervision discussion with Meghean Francisco at

11   the time you gave her your assessment and your

12   conclusions?

13              MS. ACOSTA COLLINGS:  Form and foundation.

14              THE WITNESS:  Again, Mr. Moore, can you

15   please repeat that question.

16        Q.   BY MR. MOORE:  Actually, I -- let's just move

17   on.

18              What you're telling me is, though, that

19   during the course of your investigation, you will

20   periodically have discussions with your supervisor where

21   you'll supply her with information about what you've

22   secured?

23        A.   That's generally the practice, yeah.

24        Q.   And would it not be the practice that you would

25   document in the case file, electronic case file, those

1   in other words, you've been assigned a potential -- a

2   potential abuse/neglect case, the child's been at school

3   and you go to the school to interview the child?  Has

4   that happened?

5       A.   Yes, I've -- I've done interviews at school.

6       Q.   Okay.  And when you interviewed the child at

7   school, have you made a determination that it's necessary

8   to take custody of the child at the school?

9       A.   I -- I'm sure that, throughout my history as an

10  investigator, that must have been the case at least once.

11      Q.   Okay.  And if you determine it's necessary for

12  whatever reason to take custody of the child at the

13  school, you prepare a TCN, correct?

14               MS. ACOSTA COLLINGS:   Form.

15               THE WITNESS:  Just to clarify, in that

16  order?  Because there's a few steps that are -- that

17  we're missing here.  When -- just to clarify, whenever we

18  take temporary legal custody of a child and the parent is

19  not there, we serve a notice -- sorry, a remove -- a

20  removal notice, which is given to, like, a non-caregiver,

21  yeah.

22      Q.   BY MR. MOORE:  Sure.  Sure.  You prepare a

23  notice of removal for the school, but you also prepare a

24  TCN for the parent, correct?

25      A.   Yes, we -- we do try to give the parent the --

```
1   the -- the temporary custody notice.
2        Q.   No -- no problem.  So do you ever recall having
3   taken a child from a school to the Child Advocacy Center?
4        A.   I don't recall.
5        Q.   Okay.  I'm going to show you Exhibit 5.
6             MR. MOORE:  For the record, this is
7   Wright 620 through 637 produced by the State.  It -- it
8   has the police report S20120504, has a date on it of
9   12/23/20 as a printout date.
10       Q.   BY MR. MOORE:  This -- this is a document that
11  was produced from the DCS file.  You've seen this
12  document before, correct?
13       A.   Yes.
14       Q.   Okay.  Let me ask you to turn to the third
15  page.
16       A.   What's the number at the bottom right?
17       Q.   622.  And there's a paragraph here, the third
18  full paragraph in the middle of the page, it starts with,
19  "DCS was contacted."  See that?
20       A.   Yes.
21       Q.   Okay.  I'd like to go over this line -- these
22  few lines with you.  It starts on the second -- second
23  line.  It's, "DCS was requested to come to the CAC and
24  take custody of Wright.  DCS worker Gerardo Talamantes
25  arrived at the CAC approximately 4- -- 1545 hours.  After
```

1   speaking with his supervisor, they determined that it
2   would not be safe to release Wright back to his family."
3   Does that refresh your recollection as to having had a
4   phone call with your supervisor, Meghean Francisco, after
5   you arrived at the CAC that day?
6        A.    I don't recall the -- the communication with --
7   between Meghean Francisco and myself or how they
8   occurred.
9        Q.    Okay.  Okay.  So we had Exhibit 27 here, which
10  is the dependency petition and the attachments.  When was
11  it after you took custody of the child that you began
12  work on the preparation of what became the dependency
13  petition?
14       A.    I know that we had to file within 72 business
15  hours of taking temporary legal custody, so it would have
16  to be within that time -- that window time.
17       Q.    Okay.  Do you recall something called a
18  dependency petition worksheet?  Are you familiar with
19  that document?
20       A.    Yes.
21       Q.    Did you prepare a dependency petition
22  worksheet?
23       A.    Yes.
24       Q.    Did you gather the TCN, the TDM summary, the
25  application, and the CAR for submittal to the AAG?

1       Q.    Okay.  Do you know what this particular
2   document, this form, is used for?
3       A.    Yes.
4       Q.    What is it used for?
5       A.    It has a summary of the intake information --
6   or the information that's provided usually to the DCS
7   hotline.
8       Q.    And what's the reason for that?
9       A.    For?
10      Q.    Withdraw that.
11            Isn't that information already contained
12  in CHILDS?
13      A.    Well --
14            MS. ACOSTA COLLINGS:  Foundation.
15            THE WITNESS:  Are you asking if this
16  information that's in the printed summary is also -- or
17  was also in CHILDS?
18      Q.    BY MR. MOORE:  Well, let me ask you this:  The
19  document we see here, is this a hard copy document that's
20  filled out or is on -- on the computer?
21      A.    It -- it is the printout of the information
22  that's on the computer.  It -- it extracts that
23  information and summarizes it so it's easy to read and
24  carry to our investigation.  Since carrying the
25  electronics and having to open up a program to review

1  these facts would be too cumbersome, they give us a
2  summarized copy in -- in these pages.
3      Q.   When you say "they give us a summarized copy,"
4  is this something that you receive at the time you are
5  assigned the case?
6      A.   Yeah, to -- to clarify, Mr. Moore, whenever I
7  have a case assigned, more likely than not, they do give
8  me a -- a summary of this, which has the information.  I
9  can also review it in CHILDS or now Guardian.
10      Q.   Okay.  That's fine.  So you would have had this
11  information that's in here available to you when you did
12  your investigation, correct?
13      A.   Yes.
14      Q.   Okay.  Thank you.  Let's talk about -- I
15  apologize.  In -- in an earlier answer, you identified --
16  you stated that supervisors are different.  Some of them
17  allow investigators to work -- and my client's notes here
18  says "more independently than others," something to that
19  effect.
20      A.   Yes, depending on the management style.
21      Q.   Okay.  What was the management style of
22  Ms. Francisco?
23      A.   She provides a lot of support for the
24  investigators on the field.  She keeps updates.  She kind
25  of creates that environment where we're able to ask

1  questions, where we're able to balance ideas, where we're

2  able to put, you know, our -- our thoughts and, you know,

3  and -- and just kind of like -- yeah, she -- she --

4  she -- she's a really supportive supervisor.

5       Q.   So she's more involved than, say, some other

6  types of supervisors?

7       A.   I wouldn't be able to answer that because I

8  don't know the quality of work that other supervisors do.

9  I -- I don't have the experience to compare it with.

10      Q.   Ms. Francisco was the only supervisor you ever

11 had?

12      A.   No.  But when you say "other supervisors," you

13 know, Mr. Moore, that could be mean two more supervisors,

14 that could mean the other supervisors in the state.  I

15 can only speak to the supervisor that I work with.  I

16 can -- I cannot give you like a general answer as to like

17 how she compares to the other supervisors within the

18 department or, you know, all the others.  Now --

19      Q.   How about the other ones that you work for?

20      A.   She -- she creates a very supportive

21 environment, again, for -- for there being room for

22 debate and to actually talk about, you know, any

23 particular issues.  And she does give families a lot of

24 attention and she -- and -- and a lot of respect as

25 demonstrated by the fact that when Mr. Moore -- or -- Mr.

1  Moore -- Mr. Wright showed up 24 hours after implementing

2  the present danger plan, Ms. Francisco was there at that

3  meeting to find ways that we can work with the family to

4  not disrupt, to, you know, change any -- anything in --

5  in the present danger plan to make it more viable for the

6  family.  She was flexible to allow another responsible

7  adult to take over Ms. Pugliano, who did not want to be

8  the responsible adult.  So she -- she is very supportive,

9  not just to the case workers, but to the families too.

10     Q.   So she would be a supervisor that would be

11  actively involved in supporting you in your

12  investigation?

13     A.   Supporting the families and supporting the

14  children as well.

15     Q.   I understand that.  But also supporting you in

16  your investigation, correct?

17     A.   Yes.

18     Q.   Okay.  And in this particular case -- in this

19  particular case, she was actively involved in that,

20  correct?

21               MS. ACOSTA COLLINGS:  Form.

22               THE WITNESS:  She was involved.  I mean,

23  when you say "actively," I mean, if -- if you could refer

24  to something specific, I'd be more than happy to answer.

25  Like is there any particular part of the case that you

```
 1   want to know what her input was or anything like that?
 2       Q.   BY MR. MOORE:   Right.   Yeah.   At the key
 3   decision-making points in the case, when you decided
 4   there was present danger, when you decided that it was
 5   necessary to approach the Court to get the CAR, when you
 6   decided it was necessary to remove the child, she was
 7   actively involved with you in those decisions, correct?
 8       A.   Yes.
 9       Q.   Okay.
10       A.   She was part of the conversations.
11       Q.   Okay.  Let's talk about the removal itself.  I
12   strayed away from that.  I'm not very far from the end
13   here.  We understand that Brian Wright left the TDM
14   off- -- left the DCS office abruptly at the end of the
15   TDM?
16       A.   He sped off the -- the -- the property.
17       Q.   He sped off the property?
18       A.   Yes.
19       Q.   When you say "he sped off the property," were
20   you watching his car?
21       A.   Yes.  We walked outside because he left in such
22   a state of mind that I was concerned for his safety,
23   given the fact that he was really upset.  He jumped into
24   his vehicle and that, in itself, was a concern for his
25   safety as well because someone driving in that state of
```