Appendix B

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

BRIAN WRIGHT, et al.,                    )
                                         )
          Plaintiffs,                    )
                                         )
     vs.                                 )        CASE NO.
                                         )        CV-21-00257-TUC-JGZ
SOUTHERN ARIZONA CHILDREN'S              )
ADVOCACY CENTER, et al.,                 )
                                         )
          Defendants.                    )
_____  )

DEPOSITION OF

MICHELLE ROMERO

October 12, 2023
9:10 a.m.
270 North Church Avenue
Tucson, Arizona

REPORTED BY:  MICHAEL H. DIPPEL, RPR
              Arizona CR No. 50716
              California CSR No. 9409
COLVILLE & DIPPEL, LLC
1309 East Broadway Boulevard
Tucson, Arizona 85719-5824
520-884-9041
ArizonaDepos.com
Arizona RRF No. 1129

1          The deposition of MICHELLE ROMERO, noticed by

2    Plaintiffs, was taken on October 12, 2023, from 9:10 a.m.

3    to 3:43 p.m., at the State Bar of Arizona, 270 North

4    Church Avenue, Tucson, Arizona 85701, before Michael H.

5    Dippel, Arizona Certified Reporter No. 50716.

6

7                     APPEARANCES OF COUNSEL

8    For the Plaintiffs:

9                 LAW OFFICE OF MICHAEL GARTH MOORE
                  BY: MICHAEL GARTH MOORE, ESQ.
10                6336 North Oracle Road, Suite 326, No. 119
                  Tucson, Arizona 85742
11                520.318.0075
                  Mike@MGMooreLaw.com
12
     For Defendants Southern Arizona Children's Advocacy Center
13   and Marie Fordney:

14                GRASSO LAW FIRM, PC
                  BY:  PAMELA JUDD, ESQ.
15                2250 East Germann Road, Suite 10
                  Chandler, Arizona 85286
16                480.739.1200
                  PJudd@GrassoLawFirm.com
17                (Appearance via videoconference.)

18   For Defendants Francisco, Talamantes, Orozco, Noriega,
     Encinas and Sheldon:
19
                  ARIZONA ATTORNEY GENERAL
20                BY: CLAUDIA ACOSTA COLLINGS, ESQ.
                      ASSISTANT ATTORNEY GENERAL
21                416 West Congress, 2nd Floor
                  Tucson, Arizona 85701-1315
22                520.638.2815
                  Claudia.Collings@AZAG.gov
23

24

25

```
 1   APPEARANCES OF COUNSEL (continued):

 2

     For Defendants Francisco, Talamantes, Orozco, Noriega,
 3   Encinas and Sheldon (continued):

 4                    ARIZONA ATTORNEY GENERAL
                      BY: JULIE M. RHODES, ESQ.
 5                        ASSISTANT ATTORNEY GENERAL
                      2005 North Central Avenue
 6                    Phoenix, Arizona 85007-2926
                      602.542.7612
 7                    Julie.Rhodes@AZAG.gov
                      (Appearance via videoconference.)
 8
     For Defendant Dale Woolridge, M.D.:
 9
                      SLUTES, SAKRISON & ROGERS, PC
10                    BY:  TOM SLUTES, ESQ.
                          MONIKA KOZAN, ESQ. (Afternoon session)
11                    4801 East Broadway Boulevard, Suite 301
                      Tucson, Arizona 85711
12                    520.624.6691
                      TSlutes@SlutesLaw.com
13                    (Appearance via videoconference.)

14   Also Present:

15                    BRIAN WRIGHT
                      MICHELE TOMAS (Via videoconference.)
16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATION

2
    WITNESS:  MICHELLE ROMERO
3

4   EXAMINATION                                    PAGE

5   By Mr. Moore                                7,  191

6   By Ms. Collings                                 185

7

8           INDEX TO PREVIOUSLY MARKED EXHIBITS

9
    PLAINTIFFS' EXHIBIT                             PAGE
10
    Exhibit 31     Application and Declaration for     147
11                 Ex-Parte Removal of Child; Bates
                   Nos. AZWRIGHT007132 through
12                 -7134

13  Exhibit 39     Temporary Custody Notice;          134
                   Bates Nos. Wright 000655 through
14                 -656

15  Exhibit 49     Present Danger Assessment and       74
                   Planning; Bates Nos.
16                 AZWRIGHT007242 through -243

17  Exhibit 50     DCS Specialist CORE Present         69
                   Danger Facilitator Guide; Bates
18                 Nos. AZWRIGHT007510 through
                   -7588
19
    Exhibit 51     Handout-01: SAFE Arizona Model      73
20                 Flow Chart; Bates No.
                   AZWRIGHT007244
21
    Exhibit 53     Pre-commencement, Interviews,       87
22                 and Information Gathering
                   Participant Workbook; Bates
23                 Nos.  AZWRIGHT007316 through
                   -7397
24

25

1  | INDEX TO PREVIOUSLY MARKED EXHIBITS (continued):

2

   | PLAINTIFFS' EXHIBIT                                    PAGE

3
   | Exhibit 56     Child Safety Intervention              100
4  |                Discussion Guide; Bates Nos.
   |                AZWRIGHT007135 through -7136
5
   | Exhibit 57     Liability, Settlement, Court            49
6  |                Orders, and Appeals; Bates Nos.
   |                AZWRIGHT007245 through -7254
7
   | Exhibit 58     Understanding CPS Laws and Working      43
8  |                with the Attorney General's Office;
   |                Bates Nos. AZWRIGHT007255 through
9  |                -7264

10 | Exhibit 61     Arizona Revised Statute 8-201           62

11 | Exhibit 62     Arizona Revised Statute 8-456           45

12 | Exhibit 63     Present Danger Plan; Bates Nos.        127
   |                Wright 000657 through -660
13
   | Exhibit 75     Arizona Revised Statute 8-821          133
14
   | Exhibit 88     Identifying Child Abuse and Neglect    122
15 |                Leader's Guide; Bates Nos.
   |                Wright 010951 through -10952, -10959
16 |                through -10963, -10968 through
   |                -10976, -10983, -10823, -10827,
17 |                10830 through -10836, and -10848
   |                through -10850
18
   | Exhibit 89     Arizona State Personnel System          15
19 |                Loyalty Oath; Bates No.
   |                Wright 006647
20
   | Exhibit 96     Arizona Department of Child Safety     154
21 |                Notes and Communications;
   |                Bates Nos. Wright 000072 through
22 |                -76

23 | Exhibit 114    Arizona Department of Child Safety     156
   |                notes; Bates Nos. Wright 000440
24 |                through -549

25

1   INDEX TO PREVIOUSLY MARKED EXHIBITS (continued):

2
    PLAINTIFFS' EXHIBIT                                              PAGE
3
    Exhibit 115    Arizona Department of Child Safety      155
4                  Supervision Documentation; Bates
                   Nos. Wright 000229 through -242
5
    Exhibit 127A   Ombudsman complaint; Bates Nos.         136
6                  Wright 003798 through -3799

7   Exhibit 127B   E-mail thread, most recent dated        136
                   January 12, 2021, from Meghean
8                  Francisco to Michelle Orozco and
                   Jason Dedmon; Bates Nos.
9                  Wright 009913 through -9917

10  Exhibit 129    E-mail thread, most recent dated        175
                   May 3, 2021, from Joana Encinas
11                 to Verlydia Craig; Bates Nos.
                   Wright 009939, -9919 through
12                 -9923

13  Exhibit 133    Safety Plan; Bates Nos.                 131
                   000181Wright through -183Wright
14

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1    DEPOSITION OF MICHELLE ROMERO

2    October 12, 2023

3    - - -

4    MICHELLE ROMERO,

5    having been first duly sworn, testified as follows:

6    EXAMINATION

7    BY MR. MOORE:

8    Q.  Good morning.

9    **A.  Good morning.**

10    Q.  We've been introduced before we started, but, if

11    you would, just say and spell your name again for the

12    record.

13    **A.  My name is Michelle Romero, M-i-c-h-e-l-l-e;**

14    **last name is R-o-m-e-r-o.**

15    Q.  During the course of 2020/21, was your last name

16    Orozco?

17    **A.  It was.**

18    Q.  And that's O-r-o-z-c-o?

19    **A.  Correct.**

20    Q.  When did you move on with the name change?

21    **A.  September of last year.**

22    Q.  What's your current position today with

23    Department of Child Safety?

24    **A.  I'm a program manager.**

25    Q.  And you're a program manager of -- beginning in

1   what year?

2        A.    It will be -- I just completed my ninth year as

3   a program manager.

4        Q.    So 2014?

5        A.    '14, that's correct.

6        Q.    And before 2014, I understand you were an

7   assistant program manager?

8        A.    No.

9        Q.    Not at all?

10       A.    No.

11       Q.    So in the position immediately before program

12   manager, what job did you hold?

13       A.    I was a TDM facilitator, a team decision-making

14   facilitator.

15       Q.    And before that?

16       A.    I was a program supervisor.

17       Q.    And what program if there was one specific one?

18       A.    Just a -- it's not a specific program.

19       Q.    I know there's investigations.  I know there's

20   ongoing case management.

21             As a program manager, can you manage either

22   function?

23       A.    As a program manager?

24       Q.    Yeah.

25       A.    Yes.

1    Q.    (By Mr. Moore)  So when the practice improvement

2  person comes and looks at -- checks out a case, are they

3  just checking out one case, or do they check out more than

4  one case?

5          MS. COLLINGS:  Form and foundation.

6          **THE WITNESS:  I don't know.**

7    Q.    (By Mr. Moore)  Okay.  No problem.

8          Does this person give you any report as to what

9  she found?

10   **A.    She typically -- they typically will set up a**

11 **meeting with the unit, and I will attend that meeting, and**

12 **they'll go over what they find.**

13   Q.    And if they find that there's some procedural or

14 policy issue with how the files were created or whatever,

15 they'll tell all the folks what they need to know?

16          MS. COLLINGS:  Form and foundation.

17          **THE WITNESS:  Correct.**

18   Q.    (By Mr. Moore)  Now, do you recall files that

19 have been reviewed where the report comes back that there

20 was really some serious mishandling of this file?

21          MS. COLLINGS:  Objection.  Form, foundation.

22          Are you talking about Mr. Wright's file when you

23 say "this file"?

24          MR. MOORE:  No.  I'm talking about the file that

25 was reviewed.

1          THE WITNESS:  No, there's never been an issue

2     like that.

3          Q.   (By Mr. Moore)  You have no recollection of any

4     file review where, for example, the supervisor was

5     required to document a clinical supervision decision but

6     did not do it?

7               MS. COLLINGS:  Objection.  Form and foundation.

8               THE WITNESS:  I don't -- I'm not sure of your

9     question.

10         Q.   (By Mr. Moore)  Do you know what a clinical

11    supervision decision is?

12         A.   Discussion, you mean?

13         Q.   Yes, ma'am.

14         A.   Yes.

15         Q.   And are you aware that the supervisor is

16    required under policy to document that clinical

17    supervision decision, what went on in it and decisions

18    that were made?

19         A.   Yes.

20         Q.   And I'm just asking as an example.  You're

21    telling me that in all the times that the protective --

22    practice improvement person has come to you folks after

23    having done a review of a file, there's never been a

24    finding by them that the supervisor completely failed to

25    document a key supervision decision?

1        A.     There's --

2               MS. COLLINGS:  Form and foundation, calls for

3        speculation, irrelevant.

4               THE REPORTER:  I'm sorry.  And your answer?

5               **THE WITNESS:  There has not been.**

6        Q.     (By Mr. Moore)  If something like that happened,

7        based on your knowledge of how things work, if it turned

8        out that a supervisor had made a serious blunder by

9        failing to document her work on a file and that came up in

10       one of these and it was reported to you, what would be the

11       steps that would be taken relative to that supervisor?

12              MS. COLLINGS:  Form and foundation, speculative,

13       calls for a hypothetical, irrelevant.

14              **THE WITNESS:  Hypothetically, I would meet with**

15       **the supervisor and, if needed, elevate to my program**

16       **administrator.**

17       Q.     (By Mr. Moore)  And when you say "if needed,

18       elevate," you're saying bring in your boss?

19       **A.     Correct.**

20       Q.     And would something that serious where the

21       supervisor has completely failed to document any of her

22       activities in the file, would that be something that,

23       based upon DCS practice or policy, would subject that

24       person to some type of discipline?

25              MS. COLLINGS:  Form, foundation.  Calls for

1   speculation.  Irrelevant.

2       Q.   (By Mr. Moore)  You can answer.

3       A.   **There are different scenarios, but, again,**

4   **hypothetically, if that were to happen, it would be a**

5   **conversation with my supervisor, a verbal conversation**

6   **with my supervisor, requesting that policy and practice be**

7   **followed.  And then if it continued to be an issue, that's**

8   **where I would elevate to my program administrator to**

9   **determine next steps for disciplinary action.**

10      Q.   And if that occurred, there would be something

11  that would go into this individual's personnel file?

12          MS. COLLINGS:  Objection.  Form, foundation.

13  Calls for speculation.

14          **THE WITNESS:  When it elevates to employee**

15  **relations' involvement, it would be in their personnel**

16  **file, yes.**

17      Q.   (By Mr. Moore)  Well, wouldn't it be part of a

18  yearly review that this had occurred?

19          MS. COLLINGS:  Form, foundation.

20          **THE WITNESS:  I'm not sure what you're asking.**

21      Q.   (By Mr. Moore)  Well, supervisors are reviewed

22  yearly; correct?

23      A.   **Correct.**

24      Q.   Would that not be something that would be found

25  in the yearly review, that this individual was found to

1          MS. COLLINGS:  Form and foundation.

2          **THE WITNESS:  I don't know.  I couldn't tell you**

3    **exactly what steps need to be taken.  The supervisor is**

4    **responsible for that.**

5       Q.   (By Mr. Moore)  Supervisors, okay.

6          Let's do it this way:  The steps you recall are

7    found in DCS policy; right?

8          MS. COLLINGS:  Form and foundation.

9          What steps are you talking about, Mr. Moore?

10         MR. MOORE:  The steps following the

11   precommencement activities.

12         **THE WITNESS:  Okay.  What's your question?**

13      Q.   (By Mr. Moore)  You're aware they're found in

14   the policy?

15      **A.   Yes.**

16      Q.   Okay.  Let's go back to precommencement for a

17   moment.

18         Is the investigator to contact the source of the

19   report before he leaves the office?

20         MS. COLLINGS:  Form and foundation.

21         **THE WITNESS:  Yes.**

22      Q.   (By Mr. Moore)  It's true, is it not, that the

23   investigator is not only supposed to find out from the

24   source to confirm or corroborate what's in the narrative

25   but also to find out a bit of additional information about

1   what the source knows about the events leading up to the
2   incident, the family functioning, that type of thing;
3   correct?
4            MS. COLLINGS:  Form, foundation.
5            THE WITNESS:  Correct.
6        Q.   (By Mr. Moore)  If the investigator doesn't call
7   the source, that's a violation of the rules; isn't it?
8            MS. COLLINGS:  Form and foundation, especially
9   as to the terminology you just used.
10           THE WITNESS:  Violation of what rule?
11       Q.   (By Mr. Moore)  The policy that the individual
12  is supposed to call the source and get that information.
13           MS. COLLINGS:  Form and foundation.
14       Q.   (By Mr. Moore)  If the investigator does not
15  make the call to the source, they're not complying with
16  policy; correct?
17           MS. COLLINGS:  Form and foundation.  Calls for a
18  conclusion.  Speculation.
19           THE WITNESS:  That's correct.
20       Q.   (By Mr. Moore)  And if the individual makes the
21  call but does not gather the information required, that
22  also doesn't comply fully with policy; correct?
23           MS. COLLINGS:  Form and foundation.
24           THE WITNESS:  That's correct.
25       Q.   (By Mr. Moore)  You're familiar with the term

1   "key decision points" in an investigation?

2        A.   Yes.

3        Q.   And this meeting that the investigator and

4   supervisor have before the investigator leaves the office,

5   one of the things they're supposed to do is to plan the

6   investigation; correct?

7             MS. COLLINGS:  Form.

8             THE WITNESS:  What do you mean?

9        Q.   (By Mr. Moore)  If you don't know what I mean,

10   that's fine.

11             Isn't one of the outcomes of this meeting at the

12   end of the precommencement activities, before the

13   investigator leaves the office, for the supervisor and the

14   investigator to plan the steps in the investigation?

15        A.   Yes.

16        Q.   Okay.  This is one of those key decision points

17   in the case; correct?

18             MS. COLLINGS:  Form.

19             THE WITNESS:  Correct.

20        Q.   (By Mr. Moore)  And that means that the

21   supervisor is supposed to have documented what went on in

22   this decision-making meeting; correct?

23             MS. COLLINGS:  Form, foundation.

24             THE WITNESS:  There's a form that they are to

25   use to document each discussion.

1      Q.    (By Mr. Moore)  I didn't ask you about a form.

2    I asked you they're supposed to document; correct?

3      **A.    In the form, yes.**

4      Q.    Okay.  And, also, is the investigator supposed

5    to document it?

6      **A.    It's not a requirement.**

7      Q.    Okay.  So they have this meeting; they plan; the

8    investigator goes out.  The first step in any

9    investigation is for the investigator to find the child;

10   correct?

11            MS. COLLINGS:  Form.

12            **THE WITNESS:  The victim child, yes.**

13     Q.    (By Mr. Moore)  Yeah, sure.  Go see the child.

14            Interview the child?

15            MS. COLLINGS:  Form and foundation.

16            **THE WITNESS:  Yes.**

17     Q.    (By Mr. Moore)  If there are any injuries,

18   observe injuries that have been reported?

19     **A.    Yes.**

20     Q.    And then, after getting the story from the child

21   and observing the injuries, then to approach the family

22   and do the initial interviews with the parents and any of

23   their siblings; correct?

24     **A.    That's correct.**

25     Q.    Now, in the course of these interviews, the

1  investigator is to be informing -- withdraw that.  Let's

2  go back for a second.

3          Present danger cannot be assessed until the

4  investigator has had the initial interviews with the

5  family; true?

6          MS. COLLINGS:  Form and foundation.  Calls for

7  an incomplete hypothetical, too.

8          THE WITNESS:  What do you mean "the family"?

9     Q.   (By Mr. Moore)  I'm talking about the parents.

10  I'm talking about father, mother, siblings.

11     A.   Not always the case.

12     Q.   In what circumstances would it not be always the

13  case?

14     A.   If they interviewed the child and they were able

15  to assess that present danger existed based on what they

16  see or what they've been told.

17     Q.   And what amount of information would be

18  necessary for the investigator to make a determination

19  that present danger exists solely on what the investigator

20  learns from the child?

21     A.   It depends on the situation.

22     Q.   Well, you've had cases like this before; right?

23          MS. COLLINGS:  Form and foundation.

24          THE WITNESS:  We have.

25     Q.   (By Mr. Moore)  Give me an example of cases

1   the present danger plan -- to question them beforehand to

2   find out about family functioning and the events that led

3   up to this incident?

4            MS. COLLINGS:  Objection.  Compound.

5       Q.  (By Mr. Moore)  What circumstance could possibly

6   exist that the investigator would not be required to do

7   that?

8            MS. COLLINGS:  Objection.  Compound.  Incomplete

9   hypothetical.  Assuming facts not in evidence.  And calls

10  for speculation.  How's that?

11      Q.  (By Mr. Moore)  Go ahead.

12           MS. COLLINGS:  If you can, answer.

13           **THE WITNESS:  I've given you circumstances**

14  **already.  I don't know what more examples I can give you.**

15      Q.  (By Mr. Moore)  Okay.  I'm going to ask you to

16  look -- I'm going to show you what's marked as Plaintiff's

17  Exhibit 56.  Take a look at that and just tell me when

18  you've looked at it.

19           (Witness examining document.)

20           **THE WITNESS:  Okay.  I've looked at it.**

21      Q.  (By Mr. Moore)  Are you familiar with the

22  document?

23      **A.   This is an older form.  Vaguely.**

24      Q.  Well, I guess my question is this:  Without any

25  specific knowledge of this document, when you look at

1    what -- this document, does it not, it guides the

2    supervisor in conducting these clinical decision-making

3    with the investigator; correct?

4          MS. COLLINGS:  I want to object to Exhibit 56

5    that we're referring to as to foundation and authenticity

6    or whether it's even in the relative time frame of this

7    complaint.

8          Q.   (By Mr. Moore)  Do you understand my question?

9          A.   I do.  I'm just looking at this.

10         Q.   I'll just read it.  "Child Safety Intervention

11   Discussion Guide.  Use this guide for supervisory

12   consultation at key decision points.  Supervisory

13   consultation is required when the child safety specialist

14   assesses that there is or might be present danger or

15   impending danger."  And then it has specific things in

16   there.

17         And I'm not asking you to read each and every

18   one.  What I'm asking to you do is, is this in general

19   what you understand the supervisors in your office are

20   supposed to be doing at these key decision points, the

21   types of information and questions they're eliciting?

22         MS. COLLINGS:  If you know as to the scope.

23         I don't even know what the scope of your

24   question is.  Is it back then in 2020 or is it now in

25   2023?  Can you clarify your question, Mr. Moore?

1          MR. MOORE:  The witness didn't say anything.

2      Q.   (By Mr. Moore)  Is this the process that's used?

3      A.   Can you clarify, please?

4      Q.   What?

5      A.   Your question.

6      Q.   Why?

7      A.   Because I'm asking you to.

8      Q.   You don't understand my question?

9      A.   I'm asking your -- I'm asking you to please

10  clarify it.

11     Q.   You don't understand my question?

12     A.   Why are you making this so difficult?

13     Q.   I'm not trying to make it difficult.  I asked a

14  question.  The question is very simple.

15          We've identified what this document is.  It

16  identifies specific questions.  It identifies specific

17  things that the supervisor at these key decision points is

18  supposed to question and elicit from the investigator.

19          And my question is:  Is that what the people

20  that work in your office are supposed to be doing as

21  supervisors when they have these key decision discussions

22  with their investigators?

23          MS. COLLINGS:  Form and foundation as to scope

24  and time frame.

25          THE WITNESS:  So I don't know if this is

1   something that they are using now.  This is similar to a

2   process that's followed, yes.

3       Q.   (By Mr. Moore)  That's all I'm asking.  It's

4   similar to a process that's followed; correct?

5       A.   That's what I said, yes.

6       Q.   Okay.  Fine.  That's all I can ask.

7            Now, you can put it down.

8            DCS recognizes that removal of a child from his

9   home is a traumatic event for the child and the parent;

10  correct?

11           MS. COLLINGS:  Form and foundation.

12           THE WITNESS:  That's correct.

13      Q.   (By Mr. Moore)  Staff is trained that families

14  grieve removals; correct?

15      A.   Families what?  I'm sorry.

16      Q.   Staff are trained that families grieve removals;

17  correct?

18           MS. COLLINGS:  Form and foundation.

19           THE WITNESS:  That's correct.

20           MS. COLLINGS:  Mr. Moore, it's ten to noon.

21  Will we be taking a break?

22           MR. MOORE:  Yeah.  We can take a break now if

23  you'd like.

24           MS. COLLINGS:  Please.

25           MR. MOORE:  Because I've got my stuff out of

1   order, so . . .

2            Yeah, you want to take a break?  That's fine.

3            MS. COLLINGS:   Thank you.

4                (At 12:55 p.m., the lunch recess was taken.

5                 The proceedings resumed at 1:07 p.m. with

6                 all attendees present as previously

7                 indicated.)

8       Q.   (By Mr. Moore)  All right.  Good afternoon.

9       **A.   Good afternoon.**

10      Q.   So what I'd like to do is just cover -- finish

11  up a couple of  open things in my mind when we took a

12  break.  And I want to go back for a moment to the term

13  "concerning" just to try to summarize in my own mind what

14  this means.

15          So if an investigator writes in the CSRA that a

16  mark is concerning for child abuse, if you read that as a

17  supervisor, are you understanding that, when you read

18  that, the investigator is saying, "I believe it's probably

19  the result of child abuse"?

20      **A.   That's where I would need to have him present to**

21  **ask him questions.  I don't ever want to make an**

22  **assumption.**

23      Q.   Okay.  In terms of the term "inflicted injury,"

24  if you read a document in a file, say a medical report,

25  where the doctor writes that a mark is concerning for