Appendix C

```
              UNITED STATES DISTRICT COURT

                   DISTRICT OF ARIZONA


Brian Wright, et al.,          Case No.: 4:21-cv-00257-JGZ

          Plaintiffs,

vs.

Southern Arizona Children's Advocacy

Center,

          Defendants.
_____




                    DEPOSITION OF

                  MEGHEAN FRANCISCO

                   June 21, 2023

                    9:07 a.m.

     Southern Regional Arizona Bar Association Office
               270 North Church Avenue
                Tucson, Arizona 85701




REPORTED BY:  Sandra Marruffo, RPR
              Arizona CR No. 50815
Colville & Dippel
1309 E Broadway Blvd
Tucson, Arizona 85719-5824
(520) 884-9041
ArizonaDepos.com
Arizona RRF No. 1129
```

```
 1              The deposition of MEGHEAN FRANCISCO,

 2   noticed by Michael Garth Moore, Esq., was taken on June

 3   21, 2023, from 9:07 a.m. to 4:04 p.m., at the Southern

 4   Regional AZ Bar Association Office, 270 North Church

 5   Avenue, Tucson, Arizona, 85701, before Sandra Marruffo,

 6   Arizona certified reporter No. 50815.

 7

 8                   APPEARANCES OF COUNSEL

 9
     Attorney for Plaintiffs:
10
                 Michael Garth Moore
11               BY:  Michael Garth Moore, Esq.
                 6336 North Oracle Road
12               Suite 326
                 P.O. Box 119
13               Tucson, Arizona 85704
                 mike@mgmoorelaw.com
14

15   Attorneys for Defendants Orozco, Francisco, Noriega,
     Encinas, Talamantes, & Sheldon:
16
                 ASSISTANT ATTORNEY GENERAL
17               BY:  Julie M. Rhodes, Esq.  (via Zoom)
                 416 W. Congress Street
18               2nd Floor
                 Tucson, Arizona 85701
19               Julie.Rhodes@azag.gov
                 Claudia.Collings@azag.gov
20

21   Attorneys for Sahuarita Defendant:

22               JELLISON & ROBENS, PLLC:
                 Rodney F.W. States, Esq.
23               1881 N. Thompson Peak Parkway
                 Suite 0235
24               Scottsdale, Arizona 85255
                 rodney@jrlawaz.com
25
```

```
 1                    APPEARANCES OF COUNSEL  (continued)

 2
     Attorneys for Southern Arizona Children's Advocacy
 3   Center:

 4                 GRASSO LAW FIRM, P.C.
                   BY:  Pari Scroggin, Esq.
 5                 2250 East Germann Road
                   Suite 10
 6                 Chandler, Arizona 85286
                   pscroggin@grassolaw.com
 7

 8   Attorneys for Defendant Dale Woolridge, MD:

 9                 SLUTES, SAKRISON & ROGERS, P.C.
                   BY:  Tom Slutes, Esq.
10                 4801 E. Broadway Boulevard
                   Suite 301
11                 Tucson, Arizona 85711
                   (520) 624-6691
12                 Tslutes@sluteslaw.com

13
     ALSO PRESENT:
14   Brian Wright
     Claudia Acosta Collings, Esq.
15   Michele Tomas

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2

 3   WITNESS:    MEGHEAN FRANCISCO

 4

 5   EXAMINATION                                      PAGE

 6   By Mr. Moore                                  5, 221

 7   By Ms. Rhodes                                    206

 8

 9

10                    INDEX TO EXHIBITS

11   NO.          DESCRIPTION                         PAGE

12       (No exhibits were marked for identification.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              DEPOSITION OF MEGHEAN FRANCISCO

 2                        June 21, 2023

 3                         -   -   -

 4                     MEGHEAN FRANCISCO,

 5   having been first duly sworn to tell the truth, the whole

 6   truth, and nothing but the truth, was examined and

 7   testified as follows:

 8                        EXAMINATION

 9       Q.   BY MR. MOORE:  Good morning again.

10       A.   Morning.

11       Q.   I'm Mike Moore.  As you know, I represent the

12   Wright family.

13              Would -- would you tell -- have you done a

14   deposition before?

15       A.   I've done one previous.

16       Q.   Okay.  So you have a general understanding of

17   the process.  Would you tell Sandra your full name,

18   please.

19       A.   My name's Meghean Francisco.

20       Q.   And do you prefer Ms., Mrs., Ms.?

21       A.   Ms.

22       Q.   Ms.

23       A.   Uh-huh.

24       Q.   Okay.  Ms. Francisco, I'm going to be asking

25   you some questions.  Maybe you'll be asked questions by
```

1   some of the other lawyers.  I know you've been through a

2   deposition, but just a couple of ground rules that I

3   have.  One is I'm not asking you to speculate or guess

4   about anything.  If you do give an answer which is

5   speculation or a guess, please just tell us that.  Okay?

6       **A.   Yes.**

7       Q.   Otherwise, if you give us an answer, we'll

8   assume -- I will assume you're telling me based on your

9   personal knowledge.  Okay?

10      **A.   Yes.**

11      Q.   If you need a break, if you need to chat with

12  your lawyer, anytime's fine.  We will take breaks during

13  this deposition.  And if you need a break, let us know.

14  If you need a break -- personal break, great.  If you

15  need a break to chat with your lawyer, that's fine as

16  long as there's not a question pending at the time.

17  Okay?

18      **A.   Yes.**

19      Q.   Okay.  So just -- just a little background.

20  How long have you been employed by DCS?

21      **A.   Over ten years.**

22      Q.   Okay.  And in the course of that time, what

23  positions have you held?

24      **A.   I've been a specialist, when I first started,**

25  **and that leveled through three different levels so I was**

```
 1   a Specialist I, II, and III.  I was also a program
 2   specialist.  I was a TDM advisor as well as a program
 3   supervisor.  And I'm currently a supervision coach.
 4       Q.   Excellent.  Let me stop you because I think Tom
 5   arrived -- Tom just arrived.
 6                (Thomas Slutes entered the conference
 7   room.)
 8                (A break was taken from 9:09 a.m. to
 9   9:10 a.m.)
10                MR. MOORE:  So let's go back on.
11       Q.   BY MR. MOORE:  Ms. Francisco, at the time of
12   the events here, which was in December, first part of
13   January of 2021, I understand your position was you were
14   a program supervisor?
15       A.   Correct.
16       Q.   Okay.  And I'm a little confused because
17   there's another program supervisor named Jason Dedmon --
18   it's D-E-D-M-O-N -- who's also in this -- in the
19   paperwork that I have.  Do you have a recollection of
20   whether or not you were the direct supervisor of
21   Mr. Talamantes at that time?
22       A.   I do recall.
23       Q.   Okay.  Were you?
24       A.   I was not.
25       Q.   Okay.  So if you recall, how did you get
```

1  involved in this particular case?

2      A.     Jason Dedmon was the supervisor over

3  Mr. Talamantes, and, at that time, he was on leave, so I

4  was asked to cover.

5      Q.     Fair enough.  And in terms of the

6  investigation, have you reviewed any documents to refresh

7  your recollection?

8      A.     Yes.

9      Q.     What have you reviewed?

10     A.     I've reviewed the documents that were provided

11  through email with your -- I believe motion that you

12  submitted.

13     Q.     Okay.  Are you talking about documents that --

14  Well, let me ask you this:  To your knowledge, have you

15  reviewed the DCS file in this matter?

16     A.     Could you clarify what you mean by that?

17     Q.     Well, maybe you help me.  When -- when a case

18  comes in to DCS, is there electronic filing?

19     A.     Yes.

20     Q.     And that was, at that time, CHILDS?

21     A.     Yes.

22     Q.     C-H-I-L-D-S, capital S.  And then I understand

23  there was a hard copy file with certain documents in it,

24  correct?

25     A.     Yes.

1    A.    I don't know if there's a dedicated team for
2  that at that time.

3    Q.    Okay.  In terms of that, though, when the
4  investigator had made a determination of present
5  danger --

6           You know what I'm talking about --

7    A.    Yes.

8    Q.    -- right?

9           Would that re- -- re- -- would the review
10  of that determination be done only by the supervisor such
11  as yourself or would your program manager be involved in
12  that as well?

13    A.    I don't remember at the time in 2020 the
14  directive there.

15    Q.    Okay.  Thank you.  I assume that you encouraged
16  the investigators working under you to bring any
17  questions to you that they may have?

18    A.    Yes.

19    Q.    Okay.  Are you familiar with the term
20  "strength-based clinical supervision decision"?

21    A.    Yes.

22    Q.    Tell us what that is.

23    A.    It's using the strengths within a family, a
24  child or a person to make a decision.

25    Q.    And I'm -- I'm just going to quote from the

1   policy and procedure manual, which is actually on the --

2   on the website today, and ask you if this was your

3   understanding back in 2020.  The quote is this:  "A

4   strength-based clinical supervision discussion attended

5   by the DCS Specialist and the DCS Program Supervisor

6   shall occur at key decision points during each

7   investigation, beginning with pre-commencement and

8   continuing through investigative closure."  Is that your

9   understanding of -- of what you were supposed to be doing

10  as a supervisor in that period of time?

11      A.   Yes.

12      Q.   Okay.  It goes on to say, "Clinical supervision

13  discussions shall proactively prepare the DCS Specialist

14  for key activities and decisions in the life of the case

15  and focus on ensuring" -- and there's a colon, there's a

16  number of these, but I'm going to ask you these --

17  "sufficient information collection for comprehensive

18  family assessment."  Do you recall that?

19      A.   I don't know if it was worded exactly like that

20  in 2020, but that is my understanding of the practice.

21      Q.   Okay.  And the other one is --

22           MS. RHODES:  Objection.

23           Mike, can you reference a page number or

24  something as to where you're looking exactly?  You're on

25  the DCS website policy manual?

1          MR. MOORE:  It's the Policy and Procedural
2    Manual, Chapter 7: Section 14.  And I apologize, if
3    anybody wants to pull it up --
4          MS. RHODES:  Thank you.
5          MR. MOORE:  -- I'll just wait until -- a
6    couple minutes here.
7          MR. STATES:  So, Mike, this isn't an
8    exhibit, it's just an online?
9          MR. MOORE:  Yeah.
10         MR. STATES:  Okay.
11         MR. MOORE:  Is it okay if I go ahead?
12         MS. RHODES:  Yeah.  I'm sorry.  Go ahead.
13         MR. MOORE:  Thank you.
14         **THE WITNESS:  Would I be able to look at**
15   **the policy with you?**
16         MR. MOORE:  You can -- let me hand you
17   this, which I have pulled off and hand it to you, and you
18   can -- you and Ms. Collings can check it against the
19   policy.
20     Q.   BY MR. MOORE:  I was asking you about "clinical
21   supervision discussions" and "proactively prepare the DCS
22   Specialist in key activities and decisions."  And one of
23   those was "complete and accurate documentation of case
24   activity, key case decisions, and outcomes."  That back
25   in 2020 was something that you, as supervisor, were

1 supposed to proactively work with the specialist on,

2 correct?

3     A.   I'm sorry.  Could you break it up a little?  I

4 was trying to follow where you're at on the page.

5     Q.   I apologize.  You see where, in the current

6 policy and procedure manual, one of the key activities is

7 "complete and accurate documentation of case activity,

8 key case decisions, and outcomes"?  You see that?

9     A.   Yes.  Is it yellow on the paper?

10     Q.   Yes, ma'am.

11     A.   Okay.  I do see it.

12     Q.   And my question is simply whether, back in

13 2020, that was also one of the key decision points for

14 you as the supervisor?

15     A.   And relating to which part specifically?

16     Q.   Relating to "complete and accurate

17 documentation of case activity, key case decisions, and

18 outcomes" by the specialist.

19     A.   I'm sorry.  I'm a little confused by your

20 question.  So you had just mentioned about the specialist

21 and about my roles and sufficient information.  So could

22 you clarify the question a little bit for me?

23     Q.   Would you agree with me that, back in 2020, one

24 of your responsibilities was assuring that there was

25 complete and accurate documentation of case activity?

1      A.    Yes.

2      Q.    Key case decisions?

3      A.    Yes.

4      Q.    And outcomes?

5      A.    Yes.

6      Q.    Okay.  And then going down to the next

7  highlighted segment form, what's done here, "The clinical

8  function of the DCS Program Supervisor is to interpret

9  information at key decision points, review and evaluate

10 client progress, and guide and coach the DCS Specialist."

11 I read that correctly, right?

12     A.    Yes.

13     Q.    Is that -- was that one of your functions back

14 in 2020?

15     A.    Yes.

16     Q.    Okay.  When it says "interpret information at

17 key decision points," can you give us some guidance as to

18 what -- what kind of interpretation of information you

19 were doing?

20     A.    So I haven't thought of it as interpreting

21 information, but it is clinical supervision in the fact

22 that it would be talking with them about the information

23 that they have collected, evaluating it against our

24 process of SAFE AZ, and then making those key decisions

25 with a coaching lens.

1    Q.    And in this case, if we assume it's a priority

2  3 and there's 72 hours, you wouldn't necessarily make a

3  phone call to the investigator at that point?

4    **A.    It -- in general, it would just really depend**

5  **on the case circumstances.**

6    Q.    Okay.  So in general at what point -- Well,

7  withdraw that.

8            Was -- in terms of having this

9  pre-commencement discussion we talked about, was this

10 something where the investigator was expected to review

11 the report and come to you with an idea about how he or

12 she intended to investigate?

13   **A.    So they would review the report and engage in**

14 **the pre-commencement activities and then schedule the**

15 **discussion to be held.**

16   Q.    Okay.  And what were the pre-commencement

17 activities that the investigator was supposed to do?

18   **A.    I would -- do you have a policy that we could**

19 **look at?  Cause I know that they do list everything in**

20 **there.**

21   Q.    Yeah, I'm just asking you if you know -- well,

22 let me do it this way:  One thing they're supposed to do

23 is look and see if there's a history with this family

24 with DCS, correct?

25   **A.    Yes.**

1    Q.    One thing they're supposed to do is look --
2  make a criminal background investigation, correct?
3    A.    Yes.
4    Q.    Anything else that you recall as you sit here?
5    A.    Things that I recall from my memory are
6  checking out potential criminal history, reviewing prior
7  DCS history, as well as the two items that you mentioned,
8  and speaking with the source.
9    Q.    Speaking with the source?
10    A.    If possible.
11    Q.    If possible.  And that's before the
12  investigator and you have your conversation --
13    A.    Yes.
14    Q.    -- correct?
15          Okay.  In terms of speaking with the
16  source, was the investigator, per policy, supposed to not
17  really -- not simply get a confirmation of the material
18  that's on the screen, but to explore with the source
19  other information that may apply to this particular
20  matter?
21    A.    So when you make a source contact, it would be
22  regarding the maltreatment or alleged maltreatment, any
23  circumstances leading up to it, and any information that
24  would inform the family functioning if they have it.
25    Q.    Okay.  And we'll talk about that -- talk about

1      A.    -- that's in front of me?

2            Okay.  So, yes, I see that.

3      Q.    I understand you see it.  But are you saying

4   that -- Withdraw that.

5            In the practice and policy as you

6   understand it at DCS, can a parent be causing present

7   danger to a child because that parent allows someone else

8   to cause physical injury to the child?

9      **A.    So the way that we define present danger is**

10  **with a specific criteria, and it could potentially be any**

11  **number of things that are found, but it needs to be**

12  **significant, immediate, and clearly observable.**

13     Q.    What is it --

14     **A.    So if that -- if they were apparent and it met**

15  **that criteria, then yes.**

16     Q.    So allowing physical abuse, is -- does that

17  have a definition that you folks use in DCS, what

18  "allowing physical abuse" means?

19     **A.    Not that I'm know of.**

20     Q.    Okay.  I read Merriam-Webster dictionary when I

21  was preparing these questions, and the definition of

22  "allowing" in the dictionary is to permit something to

23  happen.  Is that your understanding of what "allowing

24  physical injury" means to you?

25            MR. STATES:  Evidence not in record.

1          MS. RHODES:  Form.

2          MS. SCROGGIN:  Calls for a legal

3   conclusion.

4          THE WITNESS:  Yeah, I -- I don't --

5      Q.  BY MR. MOORE:  Withdraw that.

6          What's your definition of "allowing

7   physical abuse"?

8      A.  Is permitting for those circumstances to

9   happen.  It could potentially be not intervening.

10  Knowing about it, not taking action to intervene would be

11  some of the things that I could think of.

12     Q.  Well, let's -- it's your job as a supervisor --

13  was your job to make those determinations as to whether

14  somebody was allowing physical abuse to occur by another,

15  correct?

16          MR. STATES:  Foundation.

17          THE WITNESS:  So it would been a teaming

18  approach with my investigator.

19     Q.  BY MR. MOORE:  I got it.  But the investigator

20  brings you the information, and at this key decision

21  point, you are talking, discussing with the investigator

22  and interpreting that information yourself, correct?

23     A.  So we would be engaging in clinical

24  conversation around it to make sure that the right --

25  that the information has been gathered and that the

1    decision is made based on the criteria that we have.

2        Q.   I understand that.  From your perspective in

3    this discussion, you are weighing the information that is

4    given to you by this -- the investigator to determine in

5    your own mind if there is a violation here by a parent,

6    correct?

7                    MR. STATES:  Argumentative.

8                    MS. SCROGGIN:  Misstates testimony.

9                    MS. RHODES:  Objection.  Form.

10   Foundation.

11       Q.   BY MR. MOORE:  Withdraw that.

12              Do you rely -- do you ever actually engage

13   in a decision as to whether there's present danger or do

14   you just simply rely on what the investigator tells you?

15                   MS. RHODES:  Form.  Foundation.

16                   THE WITNESS:  So it is --

17       Q.   BY MR. MOORE:  Go ahead.

18       A.   So it's a mutual decision that we make

19   together.

20       Q.   Okay.  And you've told me that, in terms of

21   allowing physical abuse to occur, you've identified three

22   things:  Permitting it to happen and knowing it

23   happened -- excuse me, two things -- and knowing physical

24   abuse is happening but not intervening.  Do you recall

25   that?

1   could be occurring, and if there is new abuse or neglect

2   that's occurring, that they would make that report.

3       Q.   BY MR. MOORE:  When you say "make that report,"

4   you're talking about a hotline report?

5       A.   Yes.

6       Q.   Okay.  And I assume they would reach out to you

7   as a supervisor and tell you, "Hey, I was investigating

8   this allegation of physical abuse, but I'm afraid these

9   kids are malnourished as well"?

10      A.   Generally, yes.

11      Q.   Okay.  You're familiar with what's called the

12  SAFE AZ model?

13      A.   Yes.

14           MR. MOORE:  And for the record, that's all

15  caps, SAFE, S-A-F-E, separated by A-Z.

16      Q.   BY MR. MOORE:  Would you agree that -- and the

17  SAFE AZ model was in place in 2020, correct?

18      A.   Yes.

19      Q.   You agree that "The philosophy of the SAFE AZ

20  model is that child welfare staff can build engaging

21  relationships with families," correct?

22      A.   Yes.

23      Q.   And that "Instead of a punitive response to

24  maltreating families, DCS Specialists must attempt to

25  partner with parents to develop plans that will shield

1  present danger exists, and told the investigator, "Go out

2  and get a medical exam of this child"?

3      A.   I have not.

4          MS. RHODES:  Form.

5      Q.   BY MR. MOORE:  So that's not something that you

6  supervisors do, correct?

7      A.   I can't speak for other supervisors.  I can

8  only speak for my supervision.

9      Q.   Well, what is the policy about medical

10  examinations?  Back in 2020, what was the policy that DCS

11  had about whether an investigator could seek a medical

12  evalu- -- examination of a child?

13          MS. RHODES:  Foundation.

14          THE WITNESS:  I don't remember.  I'd have

15  to see the policy from 2020.

16      Q.   BY MR. MOORE:  Okay.

17          THE WITNESS:  I'm sorry.

18          MS. ACOSTA COLLINGS:  What was that?

19          THE WITNESS:  That was my cup.  I'm sorry.

20      Q.   BY MR. MOORE:  Do you know whether or not

21  investigators were trained to use their experience,

22  training, and education to determine if an observed

23  injury was consistent with an explanation given as to how

24  that injury was -- how that injury occurred?

25          MS. SCROGGIN:  Foundation.

Deposition of MEGHEAN FRANCISCO
Wright vs Southern Arizona Children's Advocacy Center

Page 71

```
 1              MS. RHODES:  Form.  Foundation.
 2              THE WITNESS:  Could you clarify the
 3  question?
 4              MR. MOORE:  I don't think I can.
 5              THE WITNESS:  Could you repeat it?
 6          (The requested question was read.)
 7              THE WITNESS:  I don't know if that -- if
 8  they received that specific training.
 9     Q.   BY MR. MOORE:  Well, when investigators came to
10  you, were there times when they had -- when you had this
11  present danger discussion because each and every case,
12  the investigator and you had a discussion as to whether
13  or not there was present danger, correct?
14     A.   Yes.
15              MR. STATES:  Form.  Foundation.
16     Q.   BY MR. MOORE:  So in those cases, would the
17  investigator report to you what they observed on the
18  child and what was reported about how that child's injury
19  came about?
20     A.   That would be part of the information that they
21  would report.
22     Q.   I understand.  And so were you capable of
23  making a decision from that information as to whether the
24  report of how the injury was -- was inflicted or how it
25  occurred was consistent with the injury as it was
```

1    that in your work in this area where the information at

2    the initial present danger conference was insufficient to

3    make a determination about whether an observed injury was

4    consistent with the explanation, you would direct the

5    investigator to go out and seek additional information,

6    correct?

7        A.   Yes.

8             MR. STATES:   Foundation, incomplete

9    hypothetical.

10            MS. RHODES:   Form.

11            MR. MOORE:   The answer was "yes."

12       Q.   BY MR. MOORE:   I put in front of you

13   Exhibit 84.   It's right there.   This was a document that

14   we received.

15            MR. MOORE:   Can I borrow Tom's real quick?

16   I don't have my file here.

17       Q.   BY MR. MOORE:   This is a document received last

18   night.   It's dated -- excuse me, it's WRIGHT 9744 through

19   48, and it's identified at the top as SAFE AZ Child

20   Safety Risk Assessment (CSRA) Documentation Guide.   Have

21   you -- have you seen this document before?

22       A.   Yes.

23       Q.   For what purpose would you or your

24   investigators utilize this document?

25       A.   This would be a tool to help them when we were

1  utilizing CHILDS to go through and document their

2  assessment.

3      Q.    Excellent.  Excellent.  Excellent.  So --

4              Actually, before I get to that -- I'm

5  almost afraid to keep pulling these out of the books, but

6  I'm going to show you what's been marked as Plaintiff's

7  Exhibit 49.  The top, Present Danger Assessment and

8  Planning.  It's WRIGHTAZ7242 and 7243.  Take a look at

9  that and I'll just have some questions for you.

10     A.    Okay.

11     Q.    You familiar with the document?

12     A.    Yes.

13     Q.    And would that also be a guide or a tool that

14 would be used by you and your investigators in making a

15 present danger determination and assessing a -- a plan to

16 alleviate that danger?

17     A.    Yes.

18     Q.    Okay.  Now, finally Exhibit 51, I'm showing you

19 an enlargement of Exhibit 51.

20             MR. MOORE:  Anybody want a copy of this?

21 I know you've got it on your screen and you can enlarge

22 it on your screen.  Does anybody want a copy, a hard

23 copy?

24             MS. ACOSTA COLLINGS:  If you have an extra

25 one, I'll take one.

 1                    MR. MOORE:  There you go.

 2                    MS. ACOSTA COLLINGS:  I like paper.

 3                    MR. SLUTES:  I don't need one.  I have it

 4     memorized.

 5        Q.   BY MR. MOORE:  So I'm showing you Exhibit 51,

 6     an enlargement of it, which is WRIGHT -- AZWRIGHT7244,

 7     and the title is Handout-01: SAFE Arizona Model Flow

 8     Chart.  Have you seen this type of flowchart before?

 9        A.   Yes.

10        Q.   Would this -- would it be accurate to say that

11     this flowchart just diagrams the basic developments and

12     happenings in a particular case, what can happen?

13        A.   So, yes, it does highlight that.

14        Q.   Okay.  So I'm at the top left portion, and the

15     first box is Report Received from Hotline.  The next is

16     Performs Present Danger Assessment.  And then the next

17     box is Present Danger Exists, I believe, and that's that

18     red diamond.

19        A.   Yes.

20        Q.   So does this accurately state the general

21     progress of any case that's being investigated?

22        A.   Yes.

23                    MS. RHODES:  Foundation.

24        Q.   BY MR. MOORE:  You -- if you want to refer --

25     you don't have to keep looking at that.  If you want to

1  refer back to it at any time, feel free.  But my question

2  now goes back to this key decision point of present --

3  determining whether or not present danger exists.  I

4  think you've already testified to this, but based on the

5  policies and procedures of the department, both you and

6  the investigator are -- were required to document the

7  discussion arriving at the present danger decision,

8  correct?

9                    MS. RHODES:  Form.

10                    **THE WITNESS:  So to respond to that, my**

11  **investigator would be the one documenting the present**

12  **danger determination.**

13      Q.   BY MR. MOORE:  Okay.  So let's -- would there

14  be any reason during the investigative phase of the case

15  for you to put anything in the electronic file or the

16  hard copy file?

17      **A.   At the end of the assessment, I would -- so,**

18  **I'm sorry, can I clarify?  Are you speaking in CHILDS or**

19  **in Guardian?**

20      Q.   Either way.

21      **A.   Because they look a little different in each**

22  **system, so clinical -- there is one box in CHILDS, if I**

23  **recall correctly, for clinical supervision, and then in**

24  **Guardian, there is a documentation tool.**

25      Q.   Okay.  Going back to CHILDS for a moment,

1   because that's where it was, what's a CSRA?

2       A.   It's a Child and -- Child's -- Child Safety

3   Risk Assessment, if I remember correctly.

4       Q.   Okay.  And that was one module or one part of

5   CHILDS, correct?

6       A.   Yes.

7       Q.   We'll get into this in detail later.  But what

8   was the purpose of the CSRA?

9       A.   The CSRA was utilized to document the

10  assessment.

11      Q.   Okay.  In making a present danger assessment,

12  does that assessment have to be included to a degree of

13  probability?

14              MS. RHODES:  I'm sorry.  I didn't hear

15  that, Mike.

16      Q.   BY MR. MOORE:  In making a present danger

17  assessment, is it required that that determination is

18  made to a degree of probability?

19              MS. RHODES:  Form.

20              THE WITNESS:  Could you clarify what you

21  mean by "probability"?

22      Q.   BY MR. MOORE:  More likely than not.

23      A.   So that's not a term that we use in our

24  criteria.

25      Q.   Okay.  I understand that.  But if you want to

1    Q.   Well, what are you familiar with?

2    A.   I -- I'm familiar with -- that the system is

3  utilized to document.  I don't recall where at in CHILDS

4  this stuff is documented.

5    Q.   Who is to document?

6    A.   The investigator.

7    Q.   Okay.  What day was it -- what date was it that

8  you had the present danger assessment discussion?

9    A.   I believe that it was December 16th of 2020.

10    Q.   And you believe that because?

11    A.   Having reviewed the PPH report, as well as the

12  other documents mentioned.

13    Q.   Does the PPH report state when present danger

14  was determined?

15    A.   I believe it was on December 16th of 2020.

16    Q.   Okay.  What time on December 16th?

17    A.   I don't recall.

18    Q.   How many hotline reports were made for this

19  case?

20    A.   I don't know.

21    Q.   If there are multiple hotline reports with

22  multiple sources for an investigation, the investigator

23  is expected to contact each source; isn't that true?

24         MS. RHODES:  Foundation.

25         THE WITNESS:  So they would contact the

1   source of every report.

2       Q.   BY MR. MOORE:   I didn't ask you about the

3   source.   I asked you if there are multiple sources,

4   different hotlines reports coming in on the same

5   allegation with the same child, it is expected that the

6   investigator will contact both sources, correct?

7               MS. RHODES:   Foundation.

8               THE WITNESS:   I think it's a little broad

9   for me to answer that question in the fact of I don't

10  know what each source is reporting.

11      Q.   BY MR. MOORE:   I just told you the source is

12  reporting the same injury to the child.

13      A.   So they would make contact with all the sources

14  and collaterals that would have information around that.

15      Q.   Okay.   What was the present danger assessment

16  discussion you had with Mr. Talamantes on December 16th,

17  2020?

18      A.   He had called me and informed me of the

19  different injuries that were found, what had happened

20  with law enforcement, the CAC, and talk -- he at that

21  time told me that he believed that present danger did

22  exist.

23      Q.   Present danger determination is made before a

24  present danger plan is prepared, correct?

25      A.   Yes.

1    Q.    What's the Children's Advocacy Center?

2    A.    It's a place that is used for forensic

3    interviewing, forensic medical exams in Southern Arizona.

4    Q.    And where did you find out about the existence

5    of the CAC?

6    A.    That would have been something through my prior

7    training.

8    Q.    Okay.  And before December 16th, 2020, had you

9    had investigators take children to the CAC for forensic

10   interviews and medical exams?

11   A.    My investigators do not take them there.

12   Q.    So the answer to the question is no?

13   A.    So, no, they wouldn't have been the ones to

14   coordinate that forensic medical exam or interview.

15   Q.    Who does that?

16            MS. SCROGGIN:  Foundation.

17            THE WITNESS:  Typically I believe that

18   would be law enforcement who would schedule those and

19   arrange for those.

20   Q.    BY MR. MOORE:  Okay.  So why was Mr. Talamantes

21   at the center that day?

22   A.    I believe that's where he initially responded

23   to the report.

24   Q.    I hear you saying "responded to the report."

25   My question is how -- what reason did he have to go to

```
 1   the center?

 2                   MS. SCROGGIN:  Foundation.

 3                   MS. RHODES:  Argumentative.

 4                   THE WITNESS:  I think that's where the

 5   victim child was at.

 6       Q.   BY MR. MOORE:  You think?

 7       A.   Yes.

 8       Q.   Okay.  So Mr. Talamantes -- so you had a

 9   pre-commencement discussion with Mr. Talamantes before he

10   went out anywhere, correct?

11       A.   I don't remember.

12       Q.   Well, you would have had one, correct?

13       A.   I don't remember.

14                   MS. RHODES:  Objection.  Form.

15       Q.   BY MR. MOORE:  I thought you told me that the

16   policy was that there would be a clinical discussion

17   after the investigator had done in the office what he or

18   she is supposed to do to plan the assessment and what the

19   investigator is going to do when he -- when he leaves the

20   office.  Isn't that the policy?

21       A.   That's as I understand it, yes.

22       Q.   Are you saying you didn't follow the policy in

23   this case?

24       A.   I'm saying I don't remember.

25       Q.   Well, in each and every case, you're supposed
```

1   to do that.  Are you saying you don't know or remember

2   today whether you violated your policy or not?

3                   MR. STATES:  Asked and answered.

4                   **THE WITNESS:  I don't remember.**

5                   MS. SCROGGIN:  Argumentative.

6                   MS. RHODES:  Form.  Foundation.

7                   **THE WITNESS:  I don't remember.**

8        Q.   BY MR. MOORE:  So the first thing you remember

9   about this case is that Mr. Talamantes called you from

10  the CAC, right?

11       **A.   I don't know if that's the first thing I**

12  **remember, but I do remember that.**

13       Q.   Well, tell me what the first thing you remember

14  is.

15       **A.   Just receiving the report on my screen for**

16  **assignment.**

17       Q.   Do you remember what the report said?

18       **A.   I don't remember verbatim, but I do recall that**

19  **there were some allegations of potential physical abuse**

20  **occurring.**

21       Q.   The first report you received was a report that

22  was -- that was sent in by the school; isn't that true?

23       **A.   I believe so.**

24       Q.   Okay.  Do you recall receiving any other

25  reports on your screen?

1        A.    I don't recall.

2        Q.    Do you recall speaking to Michelle Orozco about

3    law enforcement communicating with her?

4        A.    I don't remember.

5        Q.    Do you recall speaking to law enforcement

6    yourself?

7        A.    I don't remember.

8        Q.    Okay.  So in terms of what you do remember, the

9    first thing you remember is the -- the -- this narrative

10   appeared on your screen from the school.  The second

11   thing you remember is having a phone call with

12   Mr. Talamantes later.  And you understand and believe

13   that he was at the center when he made that call to you,

14   right?

15       A.    Yes.

16       Q.    Okay.  What specific facts did Mr. Talamantes

17   give you to support his determination the child was in

18   present danger?

19       A.    I don't remember all of the details, but I do

20   remember him talking about the forensic or medical exam

21   with injuries as well as a forensic interview having

22   occurred.

23       Q.    Anything else?

24       A.    I don't remember anything else.

25       Q.    Anything about the injuries?

1     A.    I don't remember.

2     Q.    Didn't he tell you the injuries were serious?

3     A.    I don't remember.

4     Q.    Well, wouldn't you expect him to tell you the

5  severity of the injuries?

6           MS. RHODES:  Foundation.  Form.

7           THE WITNESS:  No, I don't have that

8  assumption.

9     Q.    BY MR. MOORE:  When you say "I don't have that

10  assumption," did you ask Mr. Talamantes if he had

11  examined the child himself?

12    A.    I don't remember.

13    Q.    Isn't it required under policy that the

14  investigator examine the child?

15    A.    That they do have contact with the child.

16    Q.    I didn't ask you about contact.

17           Isn't it required that the investigator

18  examine the child if there are allegations of physical

19  abuse?

20           MR. STATES:  Foundation.

21           MS. RHODES:  Form.  Foundation.

22           MS. SCROGGIN:  Argumentative.

23           THE WITNESS:  I'd have to look at policy.

24  I don't remember.

25    Q.    BY MR. MOORE:  Don't remember that.  Okay.

1         And the investigator is supposed to

2   interview the child, correct?

3         MR. STATES:  Foundation.

4         MS. RHODES:  Form.  Foundation.

5         **THE WITNESS:  Yes.**

6     Q.   BY MR. MOORE:  Okay.  Let me ask you to look

7   back -- Withdraw that.

8         One question.  I think you testified

9   earlier that, in this phone call, Mr. Talamantes told you

10  something about law enforcement?

11    **A.   Yes.**

12    Q.   Did he tell you he had spoken to law

13  enforcement?

14    **A.   Yes.**

15    Q.   Did he tell you what was said?

16    **A.   No, I don't remember that.**

17    Q.   Let me ask you to look at Exhibit 20.  This was

18  produced by us, WRIGHT -- AZWRIGHT7589, 7590, Exhibit 20.

19  It's called Law Enforcement Interview Questions.  Have

20  you ever seen a document like this?

21    **A.   No, I have not.**

22    Q.   Are you -- are you aware that there was a

23  policy -- excuse me, there was guidelines put out to the

24  investigators giving them guidelines as to how to

25  interview law enforcement?

1    A.    I am not aware of that.

2    Q.    So you never had any discussion with any of

3    your superiors about these guidelines?

4    A.    No.

5    Q.    Okay.  How about in interviewing mandated --

6    what's a mandated reporter?

7    A.    That's -- it's someone who is required to

8    report alleged abuse or neglect.

9    Q.    And you're aware, are you not, that there were

10   guidelines given for the interview of mandated reporters?

11   A.    I am not aware of that.

12   Q.    Okay.  So in this phone call while

13   Mr. Talamantes was at the CAC, he gives you the

14   information and I think -- have you described for me all

15   the information you recall he gave you about this child?

16   A.    The information that I remember, yes.

17   Q.    Well, sure, that you remember.  You can't tell

18   me something you don't remember, right?

19   A.    Correct.

20   Q.    Okay.  And then you said, I believe, in your

21   testimony that he had decided there's present danger,

22   correct?

23   A.    No, I did not state that.

24   Q.    Did he say, "I believe there's present danger"?

25   A.    He was saying, yes, that he believed present

1  danger existed and wanted to talk through it.

2      Q.    Wanted to talk through it?

3      A.    Uh-huh.

4      Q.    So did you talk through it?

5      A.    Yes.

6      Q.    And what did he tell you in this talk-through?

7      A.    I don't remember the details.  I just remember

8  relying on our tool to talk through the criteria.

9      Q.    What tool?

10     A.    Our present danger assessment tool.

11     Q.    What's the exhibit?

12     A.    Forty-nine.

13     Q.    Did he discuss with you the specific condition

14 under Exhibit 49 that applied in this case?

15     A.    I don't remember the details.  I just know that

16 we did talk about condition and criteria, but I don't

17 remember what specifically was said.

18     Q.    Okay.  And you would have expected

19 Mr. Talamantes to document that conversation at least

20 when he returned to the office, wouldn't you?

21     A.    There's a guideline within 48 hours to have it

22 documented.

23     Q.    Yeah.  He was expected to do that?

24     A.    Yes.

25     Q.    Okay.  And based upon your discussion, with the

1       Q.    Okay.  So we've -- we've talked about the

2   present danger plan being in place in order for the

3   investigator to complete the family functioning

4   assessment?

5       A.    Yes.

6       Q.    And you've identified a guideline that was

7   available to you for the conduct of family functioning

8   assessments, correct?

9       A.    Yes.

10      Q.    Okay.  It's my understanding that because a

11  family functioning assessment determines, among other

12  things, whether or not the child was in impending

13  danger --

14      A.    Yes.  Excuse me, yes.

15      Q.    -- that that is a key discussion point in the

16  investigation for you and the investigator?

17      A.    Yes.

18      Q.    So, again, in this case, if it had followed the

19  standard procedure that you understood, you and

20  Mr. Talamantes would have had this discussion in which he

21  conveyed to you the facts and you had a collaborative

22  discussion about whether or not that this child was in

23  impending danger, correct?

24      A.    Yes.

25      Q.    Okay.  And again, as to documentation of that,

1  gamut of these, but one of the possibilities is that the

2  child is unsafe in the home?

3      A.   Yes.

4      Q.   And that the only option is to have the child

5  removed, correct?

6      A.   **That's not the only option.**

7      Q.   All right.  So is the FFA consideration in

8  terms of if the child's unsafe in the home after the FFA

9  is completed, doesn't that consideration involve those --

10  those descending steps of restrictiveness from least

11  restrictive to most?

12              MS. RHODES:  Form.

13              **THE WITNESS:  We do utilize a tool that**

14  **tells us if we can do an in-home or out-of-home safety**

15  **plan.**

16      Q.   BY MR. MOORE:  All right.  So from your own

17  knowledge, what is the -- what's the difference, if there

18  is, between a determination the child is in present

19  danger and the child is unsafe in the home to the point

20  that he has -- he or she has to be removed?

21      A.   **So we would use our in-home safety analysis to**

22  **determine if the child can remain in the home or if the**

23  **child should be out of the home.**

24      Q.   And this in-home safety analysis, is that -- is

25  that a document that's available to you and the

```
1   investigator?
2        A.    Yes.
3        Q.    So you and the investigator would sit down with
4   this in-home safety analysis and go through it point by
5   point?
6        A.    Yes.  We also would go through it with the
7   family.
8        Q.    At what point?
9        A.    Anytime that we would implement a safety plan.
10       Q.    You would go -- if it's determined in this
11  in-home safety analysis that there is no reasonable
12  option to keep the child in the home, at what point would
13  you go over that with the family?  After the child was
14  removed or before?
15       A.    I'm sorry.  Can you clarify the question?
16       Q.    I'm not sure I can.  You said there's an
17  in-home safety analysis.
18       A.    Yes.
19       Q.    And I said you would sit down with your
20  investigator and go over that point by point, and you
21  said, yes, and with the family.
22       A.    Yes.  So once we have gone and made our safety
23  determination, we would sit down and go through the
24  initial in-home safety analysis and then talk with the
25  family to see if there is anything we can do to make --
```

1   make them essentially what we call all yeses so that we
2   could manage the safety threat in the home.
3       Q.   Okay.  And that is done before there's any
4   consideration made about removing the child?
5       A.   It's done after the safety determination to
6   determine if the child will remain in the home or not.
7       Q.   Well, at what point do you sit down with the
8   family?  Would that be a safety plan TDM?
9       A.   We could do it at the TDM, yes.
10      Q.   Okay.  And so my question is this:  You talk
11  about going over the -- this point by point analysis of
12  whether the child can remain in the home and that can be
13  done at a TDM.  Is it your testimony that the ordinary
14  case, as you recall, the decision that the child can't
15  remain in the home is made in conjunction with the
16  family, their involvement?
17      A.   So I'm saying that we would go through the
18  in-home safety analysis.  And if there are nos, we would
19  work with the family to see if there is anything
20  available to turn those into yeses.
21      Q.   Okay.  When you say "work with the family," if
22  you have this TDM, there's a no, and the child is still
23  in the home, and then you decide there are certain steps
24  that can be taken, and then you would have a follow-up to
25  that with the child still in the home, their parents

1      A.    There's a system that we use called JAX.

2      Q.    Okay.  So I want to go through Exhibit 31 and

3  see if you have -- if -- if this assists you in

4  refreshing any facts.  I want to go to the first page of

5  31, paragraph number 6.  Mr. Talamantes writes that

6  "Probable cause exists to believe that temporary custody

7  is clearly necessary to protect the child from suffering

8  abuse or neglect, and it is contrary to the child's

9  welfare to remain in the home under A.R.S. section

10  8-821(A)."  Does this refresh your recollection that it

11  was necessary for you folks to establish probable cause

12  in order to obtain a court order?

13      A.    Yes, according to that sentence there.

14      Q.    Okay.  The next sentence -- not the next

15  sentence, but the next paragraph, which is a single

16  sentence, I'll read it.  "LAW is at unreasonable risk of

17  harm at his current home as the parent, guardian, or

18  custodian deliberately harmed LAW and has caused serious

19  or severe harm to him."

20            Does that refresh your recollection as to

21  whether or not Mr. Talamantes presented you evidence that

22  Brian Wright had deliberately harmed his son?

23      A.    I don't recall.

24      Q.    Okay.

25            MS. RHODES:  Form.  Foundation.

1      Q.   BY MR. MOORE:  Do you recall what evidence
2   Mr. Talamantes presented to you that the parent, through
3   deliberately harming LAW, caused serious or severe harm
4   to him?
5      A.   I don't recall.
6              MS. RHODES:  Form.
7      Q.   BY MR. MOORE:  Are you aware that, under
8   Arizona law, serious harm, serious injury is defined by
9   statute?
10     A.   I'm not aware of that.
11     Q.   Okay.  What does serious or severe harm --
12  Withdraw that.
13             Maybe it's something that doesn't have an
14  accepted terminology, but is there, in your work, some
15  type of accepted definition as to what serious or severe
16  harm is to a child when it's caused by physical
17  infliction of -- infliction by the parent?
18             MS. RHODES:  Form.  Foundation.
19             THE WITNESS:  I don't remember.
20     Q.   BY MR. MOORE:  Okay.  Okay.  Did -- did
21  Mr. Talamantes inform you that morning of the 28th that
22  he had secured the court order?
23     A.   Yes.
24     Q.   Okay.  And going back -- I hate to do this to
25  you, but I don't have it -- really quickly, going back to