Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al.,<br><br>   Plaintiffs,<br><br>vs.<br><br>Southern Arizona Children's Advocacy Center,<br><br>   Defendants. | Case No.: 4:21-cv-00257-JGZ<br><br>**MEMORANDUM OF PLAINTIFF BRIAN WRIGHT, INDIVIDUALLY AND ON BEHALF OF MINOR L.A.W. IN OPPOSITION TO DCS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE TWENTY-SECOND CLAIM DOC. 379** |

## OPERATIVE FACTS

The following are taken from Plaintiffs' Controverting Statement of Facts in Opposition to DSC Defendants' first Motion for Summary Judgment, Doc. 346, not disputed by Defendants. The three Defendants - Encinas, Sheldon, and Noriega - were directed in their actions by, and relied upon, the guidance of Defendant Orozco in the actions they took. *See*, e.g., Doc. 346, ¶43. Department policy directed that there be a sense of urgency to remedy as soon as possible the situation that caused removal to foster care in the first instance. *Id*., ¶57. The Department directed the Defendants to "[b]e

1

relentless in trying new strategies, services and supports that will work for the parent." *Id*. In this regard, Defendants were trained that parents have a fundamental right under the 14th Amendment to bear and raise children without governmental interference. Plaintiffs' Controverting Statement of Facts, Doc. 346, ¶1.

The actions required of the parents to achieve reunification during the dependency must be set out in the Safety Plan; to achieve a permanent resolution that gets DCS out of the lives of the family and a dismissal of the dependency the parents must satisfy the representatives of the Department that they have made the "behavioral changes" demanded in the Case Plan. Id., ¶¶44, 45, 47. The Case Plan "drives the case." *Id.*

It is the Defendants who, under Department policy, not the parents, who were required to *arrange, provide and coordinate services* for the child and the family to remedy the conditions that caused the removal. *Id*., ¶¶54, 56 (emphasis added).

Defendants concede that, in addition to submitting a formal complaint to the Ombudsman, Brian complained, from his first meeting with Sheldon [January 11, 2021, Doc. 346-19, Appendix 38] that (1) Talamantes had been untruthful in his testimony as to what L.A.W. allegedly disclosed in the Forensic Interview, (2) what had occurred at the removal TDM on December 28, 2020, and (3) that the Department had failed to keep in contact with him and help him identify and secure services. Doc. 346, ¶61.

As time went on, and his concerns about the lack of assistance in getting his son help caused him to question Defendants' actions, the responses are exemplified by the following exchanges with Sheldon on February 9, 2021, after the Department had

disclosed the SPD Report and Forensic Interview video [Doc. 346-20, Appendix 39, pp. 6-8/52]:

> Brian (00:12:29):
>
> Right now, my child is very emotionally ... And he's messed up in the head. He wants to go home to his family, and what you guys have done by pulling him out of his home and putting him in foster homes has traumatized my son, the actions that DCS has done. And so he needs help. He really does. He doesn't understand what's going on. I mean, yes, he's safe with my mother for the time being, but the amount of emotional damage that you guys have caused to my son is unreal, and it's going to take me years of therapy with him, working with him, till he's back to normal.
>
> Jeanette (00:13:08):
>
> Well, this is always a difficult situation for parents because it's very hard to look at, "Okay. Did I as a parent do something wrong? Should I have been doing something differently?" That's very hard, and we know that. But to continuously blame the department... We weren't in [L.A.W.'s] life when he was being hit and getting marks and bruises from being hit.
>
> Brian (00:13:37):
>
> So again, I referred to the police report that clearly states that the marks caused on [L.A.W] were from roughhousing with his brother. I also viewed the videos from the interrogation at the Children's Advocacy Center where, again, says the only time he was hit was when he was five years old with a belt. So for you to sit here and tell me these things, I'm not going to accept that. I'm not, because it's not true. So I-
>
> Jeanette (00:14:07):
>
> That makes it very difficult to do any kind of a safety plan, because if a person doesn't see the threat, isn't at least open to the possibility that what your child is saying is true ... Your child is saying that he was hit and that he was hit with objects.
>
> Brian (00:14:26):
> When did he say that, Jeanette? I've seen all the evidence. Not once did [L.A.W.]

say that his mom hit him and that's what caused the mark on his leg that the school nurse saw when he went to school that day. Not once. So where are you getting this from?

Jeanette (00:14:41):

You know-

Brian (00:14:42):

I'm open. I'm open to see it. I would like to see. I'm interested to know, because maybe you have stuff that I don't have. Maybe you've seen things I haven't seen. But every piece of evidence, all the disclosures that have been submitted, I've personally gone through, and I haven't seen that once.

Jeanette (00:14:42):

Then you would have-

Brian (00:14:59):

I've seen the contrary.

Jeanette (00:15:00):

Then you would have seen that the forensic examination found that the child had multiple injuries in various stages of healing.

Brian (00:15:11):

*I took pictures of those marks. So yes, I did see that. But I'm saying, when did he ever say that his mother or me caused those marks?*

Jeanette (00:15:22):

*He said it in the forensic interview. So if you have that, you know that. And frankly, I found that you haven't been exactly honest in the things that you say.*

Brian (00:15:34):

When have I not been honest? I've been honest in going with you guys from day one from Gerardo coming into my home.

Jeanette (00:15:40):

4

Well, for instance, you're saying today that you told Casa de Los Ninos that there was a dependency.

Brian (00:15:46):

I did. I put it on my paperwork that I submitted. Do you want to see the paperwork? I'll show you. I put on there, "Dependency case, Pima County." That's what I submitted. All my paperwork. It says it clear as day on there.

Jeanette (00:15:58):
*Well, that would be good to see, because-*

Brian (00:15:59):
Okay. I'll print it out for you.

Jeanette (00:16:01):
*... they're saying-*

Brian (00:16:02):
I'll print it out for you.

Jeanette (00:16:03):
*... that you never told them that DCS was involved.*

Brian (00:16:06):
*I will print it out for you, Jeanette, because, again, I don't like to be accused of falsifying things when I haven't. I'm a very honest and open person.*

Jeanette (00:16:14):
*Okay. I haven't personally found that to be the case, but-*

This exchange displays not only the *animus* of Sheldon towards Brian Wright – which was carried on by Noriega – but the Defendants' absolutely irremediable position that the child *had* disclosed in the FI that Irlanda had hit him with an object the night of December 15th and *caused the marks found the next day.* Doc. 346, ¶60 [not disputed].

This fundamentally false position [it doesn't warrant the use of "belief" because all Defendants had to do to confirm that the child had never made that disclosure was to go to the file and read the transcript of the FI] was the ground upon which the Defendants obstructed reunification because Brian Wright would not "align" with this "disclosure." Defendants claim that they never insisted that Brian align with the Department [Doc. 376, ¶61], but that is just so much sophistry.

The reference in the exchange just quoted to Casa de los Ninos addresses Brian's desperate efforts, beginning January 22, 2021, to find services. When he found Casa, and had the intake set up, Sheldon killed it, even though the coordinator Intermountain Centers for Human Development [the agency Defendants had contracted to coordinate some services] had agreed to work with Casa to secure the services. *Id*., Doc. 346-2, ¶¶17-19. Sheldon then accused Brian of lying to Casa! Intermountain then informed Brian that they would provide no in-home services because of COVID. So, Sheldon cut off that opportunity right at the beginning.

The *animus* that Brian's insistence on the truth engendered was evidenced by Sheldon's refusal, immediately following this exchange in the meeting, to set up individual therapy for Brian, and her refusal, as well, to set up therapy for his other children, who had been traumatized by the actions of the Department Defendants. Brian Wright Declaration, Doc. 346-2, ¶20. Two days later, when presented by Sheldon and Encinas with the Case Plan [Plaintiffs' Appendix 31, CSOF Doc. 346, filed under seal] requiring specific services leading to the necessary "behavioral changes," and Brian

asked again for Defendants to set up the services, Sheldon and Encinas refused. Brian was left to do what he could on his own. *Id*., ¶¶21-22. Even after he supposedly secured family counselling, his family had only five (5) sessions before June 25, 2021. *Id*.

On April 7, 2021, Noriega doubled down that unless Brian admitted to the falsehood that L.A.W. had accused Irlanda of inflicting the marks found on his body, he would not be reunited with his son. Doc. 346, ¶63.[1]

As to the individual therapy that L.A.W. so desperately needed after being traumatized by the incident the night of January 12, 2021 and the "emergency" placement all the way up in Casa Grande the same night, Brian in the same meeting on February 9, 2021 asked Sheldon and Encinas for that needed assistance. He heard nothing until March when Encinas informed him L.A.W. was indeed receiving individual therapy. That was a flat lie. Defendants claim that L.A.W.'s "first" therapy session was on March 4, 2021. But L.A.W. had no therapy on that date, and the ICHD Progress Note written by Peter Tolhurst confirms it. Plaintiffs' Controverting Statement of Facts, Appendix B. Tolhurst's session was with L.A.W.'s grandmother, Lisa Pugliano and it was not individual therapy. The indisputable fact is that Defendants provided no therapy to the child until *after* he was returned home on June 25, 2021, six (6) months after the first removal.

Defendants' disputation of the specific actions taken by them, Doc. 346, ¶64(a)-

---

[1] It needs really no emphasis to this Court that if Brian had indeed *admitted* that his wife had abused his son, there is little doubt that that admission would have been passed on to Det. Johnston, putting not only Irlanda, but Brian, in jeopardy of criminal prosecution.

(k) and ¶65(a)-(j) do not, in the main, provide facts which disprove those presented by Plaintiffs, but constitute no more than explanations and avoidances. For example, the obstruction of Casa de los Ninos, Doc. 346, ¶64(b), is "disputed" by the statement that Defendants provided an "alternative agency for services," without disputing that it was Brian Wright who was forced to try to *get* the services, and those much delayed and intermittent. Rapid Response is no "service," and these Defendants had nothing to do with its being done – Rapid Response is responsibility of the investigative unit. Likewise, a Child & Family Team Meeting is no service, nor is a "wellness check." The "services" L.A.W. received with Mrs. Pugliano as "placement" were precisely none – only Ms. Pugliano met with the family support worker Tolhurst, one time.

Consider, as well, the avoidance that Irlanda Wright participated in individual therapy. Doc. 376, ¶64(e). Defendants did not provide this, Mrs. Wright went on her own, and not because of her needing therapy to remediate her abuse of her stepson, but because of "anxiety caused by removal of her children (sic) from her home." Doc. 378-34, Exhibit 34, p. Wright 021130.

Defendants dispute Plaintiffs' evidence that the Wright family had only five (5) sessions of counselling in months. Defendants omit they never responded to Brian's repeated questions why the family was not receiving regular counselling. Doc. 346, ¶64(d).

Defendants avoid the facts regarding Noriega's and Encinas's inclusion of the demand for psychological evaluations in the Safety Plan dropped on Brian Wright on

April 7, 2021, by referring to alleged "discussion" of evaluations in the juvenile court. But that had nothing to do with inclusion of the demand in a new Safety Plan, in which Defendants inserted *three* (3) new conditions immediately upon learning that Brian had satisfied the single condition of return in the original plan dated January 15, 201. Doc. 346, ¶64(f).

On March 30, 2021, when Encinas first handed him the new Safety Plan, this exchange between Brian and Encinas summed up the situation:

> Brian (00:54:53)
> So again, I know my son, I know my family, I know my wife, I know everybody and that's why I don't believe in these allegations and that's why we're in the trial, but let's just get past all that. My thing today that I don't understand is why my safety plan is changing when the allegations are the exact same and there's been no new evidence, no new allegations. Everything from the allegations has been the same throughout the entire case. So why now that I found a safety person and I emailed you with that information. Now all of a sudden after that I'm getting a new safety plan. That's what I'm confused about.
>
> Encinas (00:55:31):
> As I said, we reevaluate. We staff every month. You gave me an individual who can be the in-home safety monitor-
>
> Brian (00:55:40):
> And did you staff after that or before?
>
> Encinas (00:55:43):
> I've staffed it before as well. We have these conditions for return. We have them written down on the court report as well. I'm telling you right now that we have staffed this. *These are the new conditions of return. These are the things that we need the parents to be able to check mark yes to. And right now I'm telling you we don't.*
>
> Doc. 346-21, Appendix 40, Wright 008519 (emphasis added)

Neither Encinas, nor Noriega, ever answered Brian's question as to "Why now?" But the timing of the imposition of new conditions, and the insistence on the psychological evaluation for months – until it was just dropped because, as Orozco admitted to Brian on June 14th, the psychological evaluation should never have been imposed at all – allows this Court and the fact-finder to draw a strong inference as to why.

Defendants address only in passing the extraordinary events following the removal on June 1, 2021, in which Brian and his sister's family were reporting grave concerns about L.A.W.'s state of mind and behaviors over the following two (2) weeks, ignored by Defendants. Brian Wright Declaration, Doc. 346-2, ¶¶62-77. This passed crisis stage on the night of June 16th when L.A.W. punched the Hollman's daughter in the face, and the Hollmans had no choice but to notify Defendants they could not longer keep him in their home – Justin Hollman strongly advising the child should be returned immediately to his family. Rather than do so, L.A.W. was taken from the Hollmans to a group home in Phoenix, without notice to Brian. Brian had been pleading for two (2) weeks for an emergency TDM so he could get the child home, but that did not happen until twenty-five (25) days after the removal. Id. ¶¶78-88. Defendant's two-line response does not even meet the facts. Doc. 376, ¶65(i). The most that can be said about Defendants' proffers are that they confirm a dispute of material fact as to the First Amendment retaliation Claim.

**DISCUSSION OF LAW**

A.  **Defendants' argument from the actions of the juvenile judge in the dependency case are immaterial**

Defendants' repeated citations to, and quotes from, the dependency case are nothing more than a back door issue preclusion and absolute immunity argument. This Court should ignore the argument.

Social workers enjoy absolute immunity when performing "quasi-prosecutorial and quasi-judicial functions" such as execution of a court order. *Tamas v. Dep't of Social & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) (citation omitted). They are not entitled to absolute immunity for "investigatory conduct, discretionary decisions or recommendations." *Id*. (citation omitted). "Even actions taken with court approval or under a court's direction are not in and of themselves entitled to . . . absolute immunity." *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003). Defendants claim of their discretionary actions taken under court "monitoring" or actions approved in a May 28, 2021 Under Advisement Ruling simply don't enjoy any immunity. As to issue preclusion, Defendants already have made their argument and rehashing it here in another guise adds nothing. Defendants do not argue, as they could not, that they enjoy qualified immunity from any statement or order of the juvenile judge. This Court must disregard any argument or inference invited by Defendants that their actions complied with the First Amendment because of something done in the juvenile court.

### B. Defendants' argument that Brian Wrights' expression is not constitutionally protected is without merit

Defendants' argument, that Brians' complaints were "merely his individual disputes" that were only "personal to Wright" [Motion, Doc. 379, p. 11] is an attempt to engraft the elements of First Amendment retaliation applied to *government employees* onto that addressing citizen speech. Their support, such as *Hernandez v. City of Phoenix*, 432 F. Supp. 3d 1049 (D. Ariz. 2020), are public employee speech cases, applying the test set out in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), which, in the context of employee speech, requires the court to separate whether the plaintiff spoke as a private citizen or public employee. This Court, in denying Defendants' Motion to Dismiss, set out the elements from the controlling case of *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) and then, in holding that the speech alleged was protected, wrote that "[I]t is well settled that 'voicing criticism of [an] agency's conduct—is constitutionally protected.'" Order, Doc. 76, 26:13-19, quoting *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019). The speech was most definitely protected.

### C. The evidence meets all the elements of the test

As this Court recognized in denying Defendants' Motion to Dismiss, *Capp* cautioned that "speculation is hardly unusual in retaliation cases," and that the mere existence of a legitimate motive failed to mandate dismissal. *Id.,* at 1055. The Ninth Circuit has also concluded that a submissible case of retaliation can stem from a "chronology of events from which retaliation can be inferred," such as when a defendant allegedly mentions the constitutionally protected activity near in time to the retaliatory

action(s). *Watison v. Carter,* 668 F.3d 1108, 1114-1116 (9th Cir. 2012). In the instant case, Defendants repeatedly informed Brian that their actions were taken in response to the expression of concern and complaint he made.

This Court's attention is directed to S*ettlemeyer v. Ditsch,* 2021 U.S. Dist. LEXIS 85443 *3 (D. Arizona, May 4, 2021) (Jorgensen, J.). Judge Jorgensen found probative of retaliatory *animus* statements such as "it sounds like there's a lot of minimization, a lot of not working, a lot of shaming and blaming towards the Department" and "[t]he way that you guys are reacting to us, especially you Kitt, is not helping the situation. Because it's more likely for us to believe that things are happening in the home when you behave that way[.]" These revelations of *animus* mirror those made by Sheldon, Noriega and Encinas towards Brian Wright.

As to the actions taken by Defendants in response to Brian's ombudsman complaint, the evidence establishes that the two supervisors and the case manager took their marching orders from Orozco – who admits she was involved in the response to the complaint, but claims she never shared it with the others. That testimony is subject to the test of credibility, but Orozco cannot escape the inference that her actions were motivated – at least in part – by the complaint. Defendants' argument on this point should be rejected.

In denying Defendants' earlier Motion, this Court wrote that "While the agency may have been acting in an advocate role as a party representing the bests interests of the child, Plaintiffs sufficiently allege that Defendants took the retaliatory actions in direct

response to Mr. Wright's speech." Order, Doc. 76, 26:23-25. The allegations set out before the Court in that Motion have been confirmed and augmented by the evidence now in the record, leading to the only reasonable conclusion – a jury must decide whether the Defendants' actions were motivated by retaliatory *animus.*

**D.     The law was clearly established, qualified immunity is unavailable**

This Court held in its Order that "Mr. Wright has sufficiently plead a violation of a clearly established right against retaliation." Order, Doc.76, 27:2-3. This Court properly cited *Capp* for the proposition that the law was clearly established. But additional Ninth Circuit authority supports that the Defendants were clearly on notice their actions were unconstitutional. The Court's attention is directed to *Sampson v. County of Los Angeles,* 974 F.3d 1012, 1019-21 (9th Cir. 2020) which held, on facts that a legal guardian complained of sexual harassment by defendant children's services workers, that the law was clearly established, denying qualified immunity. Defendants' attempt to distinguish the rule in *Capp* was rebuffed, the Court writing that

> To the contrary, Capp simply articulated, in the context of social workers, what is a longstanding, clearly established right under the First Amendment to be free from retaliation in the form of threatened legal sanctions and other similar means of coercion, persuasion, and intimidation.

*Id.,* at 1020, citing *Mulligan v. Nichols,* Mulligan, 835 F.3d 983, 989 n.5 (9th Cir. 2016) ("Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment.").

The Court observed that even if Sampson had no Fourteenth Amendment right to be free of judicial deception, it would not defeat her right to be free from First Amendment retaliation. *Id.,* at 1021.

Defendants now seek to distinguish this case from those in which only *threats* were made to deny a parent custody. Indeed, here, there were threats – but there was more – Defendants actually engaged in actions which *obstructed the parent's physical and legal reunification with his child and the child his parent.* To the extent that Defendants imply that no reasonable children's services employee would understand that actually obstructing reunification was constitutionally prohibited while only threatening to do so was not, this is an easy call for this Court. Is the right to be free from interference not sufficiently clear to every reasonable person when only the threat to interfere is already uniformly clear?

But Defendants' gloss on the defense is found in the claim that "no clearly established law exists that would prohibit social workers from complying with court orders and offering reunification service *after* a child has been removed from a parent's physical and legal custody and later adjudicated dependent." Motion, Doc. 379, 8:19-23. Let us break this down. First, whatever the validity of the statement, it has no bearing on the retaliation claim. There is no claim here that Defendants complied with any court order in doing what they did – or did not comply. Defendants have presented no evidence that the *specific* actions taken were taken in compliance with *any* court order. This is simply a rehash of the absolute immunity argument.

This Court's attention is directed to *Walter v. County of San Diego,* 2020 U.S. Dist LEXIS 22233203 (S.D. Cal. November 30, 2020), in which the plaintiff mother asserted defendant social workers retaliated against her for her complaints. The Court rejected the defendants' argument that the continued separation of mother and child was simply done in conformance with orders of the juvenile court, describing the facts before it as

> Although "Lisa was doing everything she reasonably could do to avail herself of and participate in reunification services" and Defendants "had no ongoing, legitimate, basis to continue to detain Tyler from Lisa's care," the FAC alleges "Defendants punished Lisa for her constant complaints to both them and the Juvenile Court and continued their efforts to prevent reunification."

*Id.,* at *31.

The specific actions taken which the Court held qualified as retaliatory track those taken by Defendants in the instant case. See, **28-29. The Court held that, on those facts, defendants were not entitled to qualified immunity as it was clearly established that such conduct was unconstitutional. *Id.,* at *32.

Second, Plaintiffs do not assert that the actions at issue consisted of "offering reunification services" – quite the opposite.

Third, that the child was "later adjudicated dependent" is immaterial to actions taken in the months *before* the decision, as well as immaterial to their discretionary actions. And, further, Defendants cling to the flat pronouncement that the juvenile judge adjudicated the retaliatory nature of the specific actions and found them legitimate. Motion, Doc. 379; 9:9-15. This Court will scour the record and fail to find any such analysis. But, of course, that analysis is one of issue preclusion, whether any reasonable

children's services worker would understand that obstructing the parent's efforts to reunify with the child, in response to that parent's complaints, would violate the First Amendment. That is the analysis this Court undertakes, because that legal question is only before this Court. And *Capp* and *Sampson* answer the argument.

## CONCLUSION

For the reasons set forth above, Plaintiff Brian Wright respectfully requests that this Court deny the Motion and order the claim go to trial before a jury.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 N. Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on June 4, 2024. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

          Respectfully submitted,

          /s/ Michael Garth Moore