**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al., | No. CV-21-00257-TUC-JGZ |
| Plaintiffs, | **ORDER** |
| v. | |
| Southern Arizona Children's Advocacy Center, et al., | |
| Defendants. | |

This case arises out of the Arizona Department of Child Safety's (DCS) investigation into alleged child abuse and the subsequent removal of minor L.A.W. from Plaintiff Brian Wright's custody in December 2020.  In this suit, members of the Wright family assert 22 claims against multiple parties including DCS employees Gerardo Talamantes, Meghean Francisco, Joana Encinas, Jeannette Sheldon, Betina Noriega, and Michelle Orozco (the DCS Defendants). With respect to the DCS Defendants, Plaintiffs assert two claims of judicial deception (Claims 17 and 19) and one claim of First Amendment retaliation (Claim 22).  In the four pending motions for summary judgment,[1]

---

[1]  DCS Defendants first filed a motion for summary judgment on Claims 17, 19, and 22, arguing *Rooker-Feldman* doctrine, issue preclusion, and claim preclusion (**the First Motion**), (Doc. 329). The First Motion is fully briefed at Docs. 329, 307, 345, 346, 360, 376, 401.
   Plaintiffs filed a motion for partial summary judgment on the judicial deception claims in Claims 17 and 19, (**the Second Motion**), (Doc. 364). The DCS Defendants responded with a cross-motion for summary judgment, (**the Third Motion**), (Doc. 375).  The partial motion and cross-motion are fully briefed at Docs. 364, 365, 366, 375, 376, 400, 401, 408, 409.
   DCS Defendants filed a separate motion for summary judgment, with the Court's permission, as to Count 22 (**the Fourth Motion**), (Doc. 379), which is fully briefed at Docs. 379, 385, 398, 399, 410.

DCS Defendants seek summary judgment on all three claims and Plaintiffs seek partial summary judgment on Claims 17 and 19.  Oral argument was heard on July 30, 2024. After consideration of the parties' filings, the Court will grant the DCS Defendants' Third and Fourth Motions for summary judgment (Docs. 375 and 379), deny the Plaintiffs' Second Motion for partial summary judgment (Doc. 364), deny the DCS Defendants' First Motion for summary judgment (Doc. 329) as moot, and dismiss the DCS Defendants from this lawsuit.

## I.      Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 252. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  In reviewing the evidence, the court need only consider the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3). "Only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1998).

A movant is entitled to judgment as a matter of law against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  In

*Celotex*, the Supreme Court explained: "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Id.* at 322–23.

Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient...." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

## II.    Judicial Deception

Plaintiffs Brian Wright and L.A.W. assert two claims of judicial deception against Defendants Talamantes and Francisco. (Doc. 204.) In Claim 17, Plaintiffs allege these Defendants deliberately or recklessly misrepresented or omitted facts in relation to the DCS Application for Court Authorized Removal (Application), which was used to secure the *ex parte* removal order of L.A.W. (*Id.* at 48–54.) In Claim 19, Plaintiffs allege the Defendants made deliberate or reckless misrepresentations and omitted facts to secure the filing of the Dependency Petition (Petition) and obtain the temporary orders severing Brian Wright's legal custody of L.A.W. (*Id.* at 54–59.)

In the First Motion for summary judgment, Defendants Talamantes and Francisco argue Plaintiffs' judicial deception claims are precluded by the *Rooker-Feldman* doctrine, issue preclusion, and claim preclusion. (Doc. 329.) In the Second Motion, Plaintiffs move for partial summary judgment on "only two of the numerous misrepresentations identified

in the Application" and the Petition and its attachments. (Doc. 400 at 4–5.) In the Third Motion, Defendants oppose Plaintiffs' partial motion and move for summary judgment on all of the judicial deception claims. (Doc. 375.) In their cross-motion, Defendants argue no reasonable juror could conclude that the Application or Petition or any of its attachments contained material misrepresentations or omissions, or that any misrepresentations or omissions were made intentionally or with reckless disregard for the truth. (*Id.*)

### A. Elements of Judicial Deception Claim

The Ninth Circuit has recognized "the constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of child custody cases." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021) (citing *Constanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010)). Pursuant to the version of A.R.S. § 8-821(B) in effect in 2020, an Arizona court could issue an ex parte or temporary removal order only upon finding "probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect and it is contrary to the child's welfare to remain in the home." Ariz. Rev. Stat. Ann. § 8-821(B) (amended 2023). Accordingly, to demonstrate judicial deception on summary judgment, the Plaintiff must make a substantial showing that the Defendants' deliberate falsehoods or reckless disregard for the truth was material to the superior court's finding that probable cause existed to believe that temporary custody was clearly necessary to protect L.A.W. from suffering abuse or neglect and that it was contrary to his welfare to remain in the home. *See Blight v. City of Manteca*, 944 F.3d 1061, 1068 (9th Cir. 2019) (citing *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011)). "The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.'" *United States v. Johns*, 948 F.2d 599, 606–07 (9th Cir. 1991). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *Id.* (quoting *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978)). If the Plaintiffs make a substantial showing of deception, the court must determine the materiality of the

allegedly false statements or omissions by purging those statements and determining whether what remains would have provided a substantial basis for issuing the *ex parte* removal or temporary removal order. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2008).

### B. Facts Relevant to Judicial Deception Claims

#### 1. <u>Defendants</u>

Geraldo Talamantes was an investigator with DCS. (Doc. 307, DSOF at 2, ¶ 3; Doc. 346, PSOF at 2, ¶ 3.)[2] Meghan Francisco was Program Supervisor for Investigations in January 2021. (Doc. 385, DSOF at 3, ¶ 12; Doc. 399, PSOF at 2, ¶ 12.)

#### 2. <u>Report of the Incident</u>

On the morning of December 16, 2020, during a routine changing of L.A.W.'s pull-ups, the school nurse at Copper View Elementary School noticed a mark on L.A.W.'s left hamstring that she had not seen the day before. (Doc. 366, PSOF ¶ 11; Doc. 376, DSOF at 15, ¶ 11.) The nurse called the DCS Hotline to report the mark. (Doc. 366, PSSOF ¶ 12; Doc. 376, DSOF at 15, ¶ 12.) At 10:13 a.m., the Sahuarita Police Department (SPD) received the report of child abuse from Copper View Elementary. (Doc. 307, DSOF ¶¶ 1–2; Doc. 346, PSOF at 1–2, ¶¶ 1–2.) SPD Officer Carrizosa arrived at the school at

---

[2]  The undisputed facts were difficult to assemble from the numerous statements of facts and controverting statements of facts. Many of Plaintiffs' statements were not accurate and required the Court to review the underlying documents. Sometimes Plaintiffs did not rely on their statements of fact in support of a motion. For example, Plaintiffs prepared a Statement of Facts in support of their Second Motion, (Doc. 366), but do not cite the statement in the motion, (Doc. 365). Instead, Plaintiffs' motion includes citations to their Objections and Controverting Statement of Facts, (Doc. 346), filed in response to the DCS Defendants' First Motion. The paragraph numbering in Plaintiffs' Objections and Controverting Statement of Facts is confusing because Plaintiffs set forth two separate lists of sequentially-numbered paragraphs instead of one list, (Doc. 346). As a result, Plaintiffs' citation to a fact solely by paragraph number is insufficient to readily locate the fact within the document which contains multiple paragraphs of the same number. In addition, because Plaintiffs filed a Statement of Facts in support of their Second Motion but in their motion relied on the Objections and Controverting Statements of Facts filed in response to the First Motion (Doc. 346), in responding to the Second Motion, Defendants filed Controverting Facts, (Doc. 376), responding both to Plaintiffs' un-cited statement of facts, (Doc. 366), and to the First Controverting Statements of Facts, (Doc. 346), using, understandably, the duplicative paragraph numbers.

Having sorted through all of these filings, the Court, for clarity, cites to the parties' statements of fact by document number and cites each statement which contains duplicative paragraph numbers, (Docs. 346, 376), by page and paragraph number, ex. (Doc. 376, PSOF at 3, ¶ 15).

approximately 10:18 a.m. and spoke to the school healthcare assistant who made the report. (Doc. 307, DSOF ¶ 1; Doc. 346, PSOF at 1, ¶ 1.) SPD Detective Johnston arrived shortly thereafter, and L.A.W. was transported to the Southern Arizona Child Advocacy Center (SACAC) to complete a forensic interview (FI) and medical examination (FME). (Doc. 307, DSOF ¶ 1; Doc. 346, PSOF at 1, ¶ 1.)

### 3. Forensic Interview

During the FI, L.A.W. stated that when he gets in trouble, his stepmother, Irlanda Wright, hits him in the butt and that this has occurred more than once. (Doc. 307, DSOF ¶ 15(a); Doc. 346, PSOF at 2, ¶ 15.) L.A.W. stated that the last time Irlanda hit him was either two or five days previously. (Doc. 307, DSOF ¶ 15(b); Doc. 346, PSOF at 2, ¶ 15.) L.A.W. also stated that Irlanda has hit him with objects other than her hand, including a Hot Wheels track and a belt. (Doc. 307, DSOF ¶ 15(c)–(d); Doc. 346, PSOF at 2, ¶ 15.) L.A.W. said Irlanda had hit him with a belt more than once. (Doc. 307, DSOF ¶ 15(d); Doc. 346, PSOF at 2, ¶ 15.) L.A.W. denied that Irlanda left marks on him. (Doc. 346, PSOF at 19, ¶ 39(f); Doc. 376, DSOF at 8, ¶ 39(f).)

### 4. Forensic Medical Exam

The FME documented several "contusions on L.A.W. (1) Upper left back leg linear contusion 2-3 cm width; (2) upper right back leg linear contusion; (3) upper left leg inner thigh linear contusion; (4) upper right buttocks two oval/round contusions; demonstrative finding; and (5) upper right buttocks towards back linear contusions." (Doc. 307, DSOF ¶ 16; Doc. 346, PSOF at 3, ¶ 16.)

### 5. Initial Investigation and Temporary Removal by DCS

The reports of physical abuse were assigned to DCS Investigator Talamantes. (Doc. 307, DSOF ¶ 3; Doc. 346, PSOF at 2, ¶ 3.) DCS's investigative activities and findings were documented in the Child Safety & Risk Assessment (CSRA). (Doc. 346, PSOF at 10, ¶ 9; Doc. 376, DSOF at 3, ¶ 9.)

On December 16, 2020, Talamantes arrived at SACAC after the FI and FME were conducted and received a verbal update. (Doc. 307, DSOF ¶ 1; Doc. 346, PSOF at 1, ¶ 1.)

That same day, Talamantes went to the Wright residence. (Doc. 307, DSOF ¶ 7; Doc. 346 PSOF at 2, ¶ 7.) When he arrived, SPD officers were in the middle of executing a search warrant.  (*Id.*) DCS did not take temporary custody of L.A.W. on December 16, 2020. (Doc. 307, DSOF ¶ 5; Doc. 346, PSOF at 2, ¶ 5.) At the residence, Talamantes and Brian Wright created a 14-day Present Danger Plan to avoid DCS taking temporary custody of L.A.W. (Doc. 307, DSOF ¶ 4; Doc. 346, PSOF at 2, ¶ 4.) Brian Wright signed the plan, which required Lisa Puligano, L.A.W.'s paternal grandmother, to stay at the Wright residence 24/7 to supervise all interactions between Brian, Irlanda, and L.A.W. (*Id.*)

Talamantes interviewed Brian and Irlanda Wright on December 18 and 21, 2020 and toured the residence on December 18, 2020. (Doc. 307, DSOF ¶ 8; Doc. 346, PSOF at 11, ¶ 16(a).) Both parents informed Talamantes that the discipline of their children includes spanking with an open hand. (Doc. 346, PSOF at 11, ¶ 16(a); Doc. 376, DSOF at 4, ¶ 16(a).) Irlanda Wright denied using objects to discipline the children. (*Id.*) Talamantes also interviewed L.A.W.'s siblings. (Doc. 307, DSOF ¶ 8; Doc. 346, PSOF at 11 ¶ 16(a).) L.A.W.'s siblings denied being fearful of anyone in the home and one sister stated that she and her siblings "fight, kick and scratch each other." (Doc. 346, PSOF ¶ 16(b); Doc. 376, DSOF at 4, ¶ 16(b).)

On December 21, 2020, Brian Wright showed Talamantes three pictures Wright took of the marks found on L.A.W.'s body on the afternoon of December 17, 2020. (Doc. 346, PSOF at 11, ¶ 14; Doc. 376, DSOF at 4, ¶ 14; Docs. 346-7, 346-8, 346-9.)

### 6. Application for Court Authorized Removal

Pugliano subsequently refused to stay at the Wright residence, and returned to her home in Scottsdale, leaving L.A.W. without an approved safety monitor in the Wright home as required by the Present Danger Plan. (Doc. 331-5 at 12, 26-27.)

At 9:00 a.m. on the morning of December 28, 2020, Talamantes prepared and submitted an Application for Court Authorized Removal (the Application). (Doc. 346, PSOF at 13, ¶ 20; Doc. 376, DSOF at 5, ¶ 20.) Paragraph 6 of the Application reads: "Probable cause exists to believe that temporary custody is clearly necessary to protect the

child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. section 8-821(A)." (Doc. 346, PSOF at 13–14, ¶ 21; Doc. 376, DSOF at 5, ¶ 21.) Another sentence in Paragraph 6 states: "LA.W. is at unreasonable risk of harm at his current home as the *parent, guardian, or custodian deliberately harmed L.A.W.* and has caused serious or severe harm to him." (Doc. 346, PSOF at 14, ¶ 22 (emphasis added); Doc. 376, DSOF at 5, ¶ 22.) Plaintiffs assert that, by this statement, Talamantes intended to convey that Brian Wright was a person who deliberately harmed L.A.W. (Doc. 346, PSOF at 14, ¶ 22.) Paragraph 6 continues: "On 12/16/2020 Lance was observed with red mark, which was turning into a bruise, in a horizontal shape on his leg area. Lance reported he got the bruise the day prior. He initially was reluctant to disclose how he received it. Lance then disclosed he recently got in trouble and his stepmother hit him with a belt." (Doc. 378-5 at 2-3.)

The Application was granted and DCS took temporary custody of L.A.W. on December 28, 2020. (Doc. 307, DSOF ¶ 5; Doc. 346 PSOF at 2, ¶ 5.)

### 7.  Team Decision Making Meeting and Temporary Custody Notice

On December 28, 2020, after securing the Court Authorized Removal (CAR), Talamantes and Francisco convened a "Team Decision Making" (TDM) meeting. (Doc. 346, PSOF at 14, ¶ 25; Doc. 376, DSOF at 5, ¶ 25.) After the meeting, a TDM Summary Report was prepared by a DCS employee.[3] (Doc. 346, PSOF at 14–15, ¶ 26; Doc. 376, DSOF at 5, ¶ 26.) Plaintiffs allege that the summary contained the same material misrepresentations and material omissions found in the Application. (Doc. 346, PSOF at 14–15, ¶ 26.) Plaintiffs specifically allege that the TDM contained a "key misrepresentation" in the notation: "Marks and bruises located on L.A.W. who *disclosed that Irlanda caused the marks*." (Doc. 346, PSOF at 15, ¶ 27.)

On December 28, 2020, at some point after 11:00 a.m., Talamantes prepared a

---

[3] Plaintiffs allege Talamantes prepared the report, but DCS disputes this, stating that the TDM Facilitator, Brian Maldonado, is the one who drafted the TDM Summary. (Doc. 376, DCSOF at 5, ¶ 26; Doc. 378-10 at 2-7.) The TDM Summary Report summarizes the discussion between the parties at the Safety Planning Meeting that took place on December 28, 2020. (*Id.*) The form shows Talamantes as the "DCS Specialist" and Maldonado as "TDM Facilitator." (*Id.*)

Temporary Custody Notice (TCN) with respect to L.A.W. (Doc. 346, PSOF at 15, ¶ 28; Doc. 376, DSOF at 5, ¶ 28.) A TCN is a legal document to be served on the parent through which DCS obtains temporary custody of a child. (Doc. 346, PSOF at 15, ¶ 29; Doc. 376, DSOF at 5, ¶ 29.) The TCN was not immediately served on Wright because he promptly left the TDM meeting; the TCN was served approximately two hours later at the Wright residence, after which L.A.W. was removed and placed in a foster home. (Doc. 307, DSOF ¶ 21; Doc. 346, PSOF at 3, ¶ 21.) Later the TCN was filed with the state court as an attachment to the Dependency Petition. (*Id.*)

The TCN is a form. (*See* Doc. 378-11.) The first part of the form instructs the person completing the form to specify the "Type of abuse or neglect requiring temporary custody" by "[s]elect[ing] the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary." (*Id.*) Twenty-two circumstances are listed. (*Id.*) On the TCN pertaining to L.A.W., Talamantes checked the circumstance: "The child has serious injuries which the caregiver and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition." (*Id.*; Doc. 346, PSOF at 15, ¶ 30; Doc. 376, DSOF at 5, ¶ 30.)

### 8. *Ex Parte* Custody Petition

Between December 28th and 31st, Talamantes gathered documentation to prepare a Dependency Petition. (Doc. 346, PSOF at 16, ¶ 32; Doc. 376, DSOF at 6, ¶ 32.) The materials were submitted to the office of the Arizona Attorney General. (*Id.*) Defendants Talamantes and Francisco reviewed a draft of the Dependency Petition before it was filed, and Talamantes executed a sworn verification that, upon information and belief, the allegations contained in the Petition were true and correct. (Doc. 346, PSOF at 16, ¶ 33; Doc. 376, DSOF at 6, ¶ 33; Ex. 14, Doc. 378-14 at 15.) The Application, the TCN, and the TDM Summary were appended to the Petition. (Doc. 346, PSOF at 16, ¶ 34; Doc. 376, DSOF at 16, ¶ 34.)

On May 28, 2021, a state court judge found DCS proved the allegations in the dependency petition by a preponderance of the evidence and made L.A.W. dependent as

to his father. (Doc. 376, DSOF at 6, ¶¶ 35, 37; Doc. 346, PSOF at 17, ¶37; Doc 378-15 at 16.)

### 9. Criminal Investigation

After interviewing Brian Wright on December 18, 2020, Talamantes contacted Detective Johnston to confirm that the criminal investigation was closed, and Detective Johnston denied that it was. (Doc. 307, DSOF ¶ 54; Doc. 346, PSOF at 5, ¶ 54.)

On December 21, 2020, Talamantes requested copies of the incident report and photographs from SPD. (Doc. 346, PSOF at 12, ¶ 16(d); Doc. 376, DSOF at 4, ¶ 16(d).) On December 23, 2020, Talamantes received and read Officer Carrizosa's SPD report. (Doc. 346, PSOF at 12, ¶ 16(g); Doc. 376, DSOF at 12, ¶ 16(g).) The report stated, among other things, that the home was searched and belts and pieces of Hotwheels track seized; after welfare checks were conducted on the other children, the writer concluded that the injuries were most likely from L.A.W. roughhousing with his siblings; and the investigation was "closed." (Doc. 346, PSOF at 12–13, ¶ 17; Doc. 376, DSOF at 12, ¶ 17.)

Detective Johnston testified that the criminal investigation was not closed until January 19, 2021. (Doc. 409, ¶ 35.) Moreover, Plaintiffs contacted Detective Johnston on December 30, 2020, asking for the status of the criminal investigation, and Johnston replied, on December 31, 2020, that the next step in the case was presentation to the Pima County Attorney, which would occur on January 19, 2021. (Doc. 378-20.)

### C. Analysis

Plaintiffs assert Defendants made numerous misstatements and omissions in the Application, Petition, and supporting documents. In their Controverting Statement of Facts,[4] Plaintiffs assert Talamantes included: six misrepresentations in the Application which were repeated in the Dependency Petition, (Doc. 346, PSOF at 16, ¶ 35); one misrepresentation solely in the Petition, (*id.* at 17, ¶ 36); and ten statements or omissions

---

[4] When asked at oral argument where the Court would find the alleged misrepresentations and omissions underlying the judicial deception claims, Plaintiffs pointed to their Controverting Statement of Facts, (Doc. 346). Plaintiffs have the burden of providing their judicial deception claim at trial. Plaintiffs' legal arguments as to the alleged misrepresentations and omissions are scarce.

in the "department file" and Application, which were either deliberately false or made with reckless disregard for the truth, (i*d*. at 17–19, ¶ 39). In the Second Motion, the Plaintiffs assert five additional misrepresentations and omissions. (Doc. 364.)

### 1. Statements and Omissions in Department File

Because the Plaintiffs fail to show that the "department file" was provided to the state court judge who issued the *ex parte* order for removal, alleged misrepresentations or omissions contained in that file could not, as a matter of law, have been material to the judge's decision. To the extent such misrepresentations and omissions are present in the materials attached to the Petition, the Plaintiffs do not make a substantial showing that such unsworn materials are incorporated into the Petition or allege any facts that would allow a factfinder to reasonably or justifiably infer that the state court judge relied on those materials when issuing the temporary orders which severed custody. (See Doc. 348-4.)

### 2. Misrepresentations in the Application and Petition

Plaintiffs allege Talamantes made a deliberate or reckless material misrepresentation when he stated in the Application, which was then included in the Petition, that L.A.W. reported "his step-mother regularly uses physical discipline." (Doc. 346, PSOF at 16, ¶ 35; *see also* Docs. 348-6 at 3, 348-4 at 5.) This is not a misrepresentation. According to the transcript of the FI, L.A.W. reported that when he gets in trouble his stepmother "hits me in the butt" and that such occurrence has happened "more than one time" with the most recent being either two or five days ago. (Doc. 348-1 at 7.) Further, Brian Wright testified that he and his wife used "physical discipline" to discipline their children. (Doc. 378-16 at 4–5.) As such, the Plaintiffs have not made a substantial showing that this statement was a misrepresentation.

Plaintiffs allege that Talamantes made a deliberate or reckless material misrepresentation when he stated in the Application that L.A.W. reported his stepmother "hits" him, which was then included in the Petition. (Doc. 346, PSOF at 16, ¶ 35.) During the Forensic Interview, L.A.W. stated, "She hits me in the butt." (Doc. 348-1 at 7.) L.A.W. also reported that Irlanda hit him with objects, including a Hot Wheels track and a belt.

(Doc. 307, DSOF ¶ 15; Doc. 346, PSOF at 2, ¶ 15.) Accordingly, the Plaintiffs have not made a substantial showing that this statement was a misrepresentation.

Plaintiffs allege that Talamantes made a deliberate or reckless material misrepresentation when he stated in the Application that there was an ongoing criminal investigation, a statement which was also included in the Petition. (Doc. 346, PSOF at 16, 18, ¶¶ 35, 39(c).) The Plaintiffs contend that the investigation was closed on December 16, 2020 because in the Incident Report, the disposition of the case is labeled as "Closed 12/16/20" and "Closed. No probable cause for arrest." (Doc. 346, PSOF at 18, ¶39(c); Doc. 348-2 at 2, 5.) Further, in the narrative of the Incident Report, Officer Carrizosa wrote: "Detective Johnston advised me that after conducting, the interviews and welfare checks, the injuries are most likely from roughhousing with his siblings. No probable cause exists to arrest either parent. Please reference other reports for more detail." (Doc. 348-2 at 4.) Plaintiffs note that Talamantes received a copy of Officer Carrizosa's report on December 23, 2020. (Doc. 346, PSOF at 12, ¶ 16(g).)

The evidence shows that the investigation was not closed and that Talamantes had reason to believe it was not closed when he submitted documents for the December 28, 2020 Application and the December 31, 2020 Petition. Talamantes testified at the contested dependency hearing on March 29, 2021 that he spoke to Detective Johnston both before and after interviewing Wright on December 18, 2020, that Wright had said the investigation was closed, and that Johnston denied that it was closed when asked. (Doc. 378-8 at 5.) Detective Johnston testified at his deposition that the criminal investigation was not closed until January 19, 2021. (Doc. 409, ¶ 35.) And evidence shows that Plaintiffs contacted Detective Johnston on December 30, 2020, asking for the status of the criminal investigation, and Johnston replied on December 31, 2020, that the next step in the case was a presentation to the Pima County Attorney, which would occur on January 19, 2021. (Doc 378-20.) As such, the Plaintiffs have not made a substantial showing that Talamantes made a deliberate or reckless misrepresentation about the status of the criminal investigation that was included in the Application or the Petition.

Plaintiffs allege that Talamantes deliberately lied when he stated in the Application that Wright and Irlanda reported not only that they had spanked L.A.W., but also that they had spanked his siblings on December 15, 2020, a statement which was also included in the Petition. (Doc. 346, PSOF at 16, ¶ 35.) At his deposition, Wright admitted that Irlanda had spanked L.A.W. *and* his stepbrother on December 15, 2020. (Doc. 378-16 at 3.) As such, the Plaintiffs have not made a substantial showing that this statement was a misrepresentation.

Plaintiffs allege that Talamantes deliberately lied when he stated in the Application that Brian Wright reported he "saw multiple marks and bruises on [L.A.W.]'s body" on December 17, 2020, and that Wright "reported the penny shaped bruises on [L.A.W.]'s buttocks may have been caused by [Irlanda]… ." (Doc. 346, PSOF at 16, ¶ 35.) Wright testified during the Temporary Custody Hearing on January 15, 2021, that on or around December 17, 2020, he saw a scratch on L.A.W.'s lower back as well as two penny-sized bruises on his right leg. (Doc. 378-18 at 3.) During his testimony, Wright admitted there were "two penny sized marks that [he] saw and that [he] had actually described to Mr. Talamantes…" (*Id*. at 5.) Further, in the CSRA, Talamantes recorded on December 21, 2020 that Brian Wright explained "the penny-shaped, sized bruises on [L.A.W.]'s buttocks may have been from when Mrs. Wright spanked him." (Doc. 378-9 at 16.) Additionally, on December 21, 2020, Brian Wright showed Talamantes pictures taken on December 17, 2020 of the marks on L.A.W. (Doc. 346, PSOF at 11, ¶ 14; Docs. 346-7, 346-8, 346-9; Doc. 376, DSOF at 4, ¶ 14.) Talamantes also testified during the January 5, 2021 state court dependency hearing that Brian Wright "acknowledge[d] that there was a possibility that some of the marks might have been caused by Mrs. Wright." (Doc. 331-3 at 9–10.) The Plaintiffs offer no circumstantial or direct evidence that suggests Talamantes was being untruthful and, in light of Brian Wright's testimony, the Plaintiffs have not made a substantial showing that this statement was a misrepresentation.

Plaintiffs allege that Talamantes made a deliberate or reckless material misrepresentation when he stated in the Application that Brian and Irlanda minimized

concerns about the marks on L.A.W., a statement which was also included in the Petition. (Doc. 346, PSOF at 16, ¶ 35.) However, the Plaintiffs do not dispute that Brian "described the bruises as being not that bad." (*Id.*) In addition, the Plaintiffs refer to the mark on L.A.W. as a "little boy bruise" or an "owie" multiple times in their filings. (*See* Docs. 365 at 8, 400 at 5.) And, in the TDM, the writer notes that Brian and Irlanda responded to L.A.W.'s disclosure by stating, "it's just like [L.A.W.] to tell stories like that." (Doc. 348-5 at 2.) As such, the Plaintiffs do not make a substantial showing that the statement that Brian and Irlanda "minimized concerns" is a deliberate, reckless, or material misrepresentation.

### 3. Misrepresentation in Petition

In the Plaintiffs' Controverting Statement of Facts, the Plaintiffs argue that Section VII of the Petition contains the deliberate or material misrepresentation that: "BRIAN JOSEPH WRIGHT, committed an act that constitutes a dangerous crime against children as defined in A.R.S. §13-705, or caused a child to suffer serious physical injury…." (Doc. 346, PSOF at 17, ¶ 36.) The Plaintiffs omit the following sentence, which reads, "BRIAN JOSEPH WRIGHT, knew or reasonably should have known that another person committed an act that constitutes a dangerous crime against children as defined in A.R.S. §13-705, or caused a child to suffer serious physical injury or emotional injury." (Doc. 348-4 at 6.) The Petition was drafted by the Arizona Attorney General's Office, not either of the named Defendants. (Doc. 348-4 at 13.) In order for the Plaintiffs to prove that the Defendants are liable for the contents of the Petition, they must overcome the presumption that the prosecutor executed independent judgment in drafting the petition. *Smiddy v. Varney*, 665 F.2d 261, 266–67 (9th Cir. 1981), *overruled in part on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). Here, the Plaintiffs fail to rebut that presumption. The statutory language contained in Section VII of the Petition is not found elsewhere in the record. The Plaintiffs fail to point to any evidence that either Defendant provided this legal terminology or suggested its use. As such, the Plaintiffs fail to make a substantial showing that this statement was a misrepresentation attributable to the Defendants.

- 14 -

4. <u>Additional Misrepresentations and Omissions in the Application</u>

Plaintiffs allege that Talamantes made a deliberate or reckless material misrepresentation when he stated in the Application "[L.A.W.] is at unreasonable risk of harm at his current home as the parent, guardian, or custodian deliberately harmed [L.A.W.] and has caused serious or severe harm to him." (*See* Doc. 346, PSOF at 17, ¶ 39(a); Doc. 348-6 at 2.) Plaintiffs argue that the terms "deliberate" and "serious or severe harm" are misrepresentations. (Doc. 346, PSOF at 17, ¶ 39(a).) The Application summarizes Dr. Woolridge's FME findings and describes the marks found on L.A.W.: "The medical examiner documented [L.A.W.] has multiple oval and linear contusions to his inner thigh, hamstring, and buttock area. These lesions and contusions were noted to be inflicted and in different stages of healing." (Doc. 348-6 at 3.) Talamantes concluded that, "multiple marks and bruises on [L.A.W.'s] body not only indicate a pattern which impacts the severity of the safety threat but also supports [L.A.W.'s] statements during the forensic interview." (*Id*. at 4.) Talamantes's opinion that the injuries suffered by L.A.W. were serious or severe was supported by Dr. Woolridge's findings. To the extent that the characterization of the seriousness of the harm is inflated, there is no evidence that Talamantes deliberately attempted to mislead the court. Talamantes provided the basis for his opinion—the findings in the FME—from which the judge could determine whether there was probable cause and to evaluate whether temporary custody was clearly necessary to protect the child from suffering abuse as required by A.R.S. § 8-821(A).  Thus, even if Talamantes's opinions were erroneous, they do not amount to reckless false statements. *See United States v. Smith*, 588 F.2d 737, 739–40 (9th Cir. 1978).

Plaintiffs allege that the statement in the TCN "that the child had suffered 'serious injuries' that Brian Wright could or would not explain or his explanation was inconsistent with the observed or diagnosed injuries on the child" was a misrepresentation. (Doc. 346, PSOF at 18, ¶ 39(b).) The statement in the TCN, actually states: "The child has serious injuries which the caregiver and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition." (Doc. 346, PSOF at 15, ¶ 30; Doc. 376,

DSOF at 5, ¶ 30.) The TCN form required Talamantes to select one or more of the 22 different types of abuse or neglect listed on the form "that most clearly describe the danger." (Doc. 348-4 at 16.) Talamantes's selection was not untrue. Brian Wright's explanation for the bruises was inconsistent with L.A.W.'s explanation and the number and type of bruises on L.A.W.'s body. Talamantes's selection was based on the information that he received from the FME. Plaintiffs do not point to a listed circumstance that more clearly describes the abuse or neglect. In addition, the Plaintiffs fail to show that this document was relied on by the judge, and therefore material, to the determination to remove L.A.W. from the home. On the evidence, the selection does not amount to the reckless inclusion of false statements. *See United States v. Smith*, 588 F.2d 737, 739–40 (9th Cir. 1978).

Plaintiffs allege that Talamantes omitted from the Application that the SPD investigation was closed and that the detective "conclud[ed] that the marks on L.A.W. were probably caused by roughhousing of siblings." (Doc. 346, PSOF at 18, ¶ 39(c).) As discussed above, the SPD investigation was not closed at the time the Application was submitted. Moreover, one officer's initial conclusion that the marks were "probably caused" by siblings is not material in light of the undisputed evidence that L.A.W. had bruises on his body and said his mom hit him with a belt and Hot Wheels track and the fact that the investigation was ongoing.

Plaintiffs allege that Talamantes made a deliberate or reckless misrepresentation when he reported that Brian Wright "had confirmed seeing marks and bruises on the child, that, [Brian Wright] suggested, could have resulted from Irlanda's hitting the child on the night of December 15th . . . ." (Doc. 346, PSOF at 18, ¶ 39(d).) Plaintiffs do not state where these statements were made. Nonetheless, as discussed above, Brian did report seeing marks on L.A.W. (Doc. 378-18 at 3, 5.) And Talamantes recorded that Brian suggested Irlanda as the cause of some of the marks after interviewing him on December 21, 2020. (Doc. 378-9 at 16.) The Plaintiffs have not made a substantial showing that this statement was a misrepresentation.

Plaintiffs argue that Talamantes purposefully omitted "in the materials provided to the court" that L.A.W.'s siblings told him that they felt safe at home, that they denied either parent hitting them with objects, that they confirmed Wright's statements regarding "progressive discipline," and that they denied that their "parents' discipline had caused any marks." (Doc. 346, PSOF at 18, ¶ 39(e).) Even if Talamantes was required to include such information in the Application, its inclusion would not have changed the result. The Application still would have provided a substantial basis for issuing the removal orders. *Ewing*, 588 F.3d at 1224. The fact that L.A.W.'s siblings felt safe and denied being hit with objects or being left with marks from discipline is immaterial because the facts showed that L.A.W. had stated he was hit with objects and had marks on his body from discipline.

Plaintiffs argue that Talamantes made material misrepresentations in the TDM Summary. (Doc. 346, PSOF at 19, ¶ 39(f).) There is no evidence that Talamantes drafted the TDM Summary. (Doc. 376, DSOF at 8, ¶ 39(h); *see also* Doc. 348-4 at 21.) Further, much like the TCN, the TDM Summary is an unsworn document attached to the Petition. (Doc. 348-4 at 21–25.) The TDM Summary, and the allegations or statements contained therein, are not incorporated into the Petition. (*See* Doc. 384-4 at 2–15.) The Plaintiffs do not show that the judge relied on the TDM Summary to make the determination of probable cause or that the removal of alleged misrepresentations from the TDM summary would have undermined the court's probable cause finding. As such, the Court finds that these alleged misrepresentations are immaterial.

Plaintiffs argue "the statement that the child had allegedly admitted the marks and bruises were caused by Irlanda was never stated in the parents' presence, hence, they had no opportunity to know this allegation." (Doc. 346, PSOF at 19, ¶ 39(g).) Plaintiffs cite the TDM Summary. Plaintiffs fail to explain the relevance of their allegation. As noted above, the Plaintiffs do not show that the judge relied on the TDM Summary, or that it was drafted by the Defendants. This allegation has no bearing on the judicial deception claim.

Plaintiffs argue that "Irlanda never said that the TDM was being held because of 'the problem involving the child and physical abuse' but that that statement was made by

Talamantes." (Doc. 346, PSOF at 19, ¶ 39(h).) As discussed above, the TDM is an unsworn document and there is no evidence that Talamantes drafted the TDM. Moreover, Plaintiffs fail to show that the judge relied on the TDM Summary or that it would undermine the Court's probable cause finding. As such, the Court finds these alleged misrepresentations immaterial.

Plaintiffs argue that the statement that L.A.W. had "disclosed he was hit by a hand and the metal [part] of the belt" is false. (Doc. 346, PSOF at 19, ¶ 39(i).) This statement was made in the TDM Summary. (Doc. 348-4 at 21.) The TDM is an unsworn document that was not drafted by the Defendants. This is the only place in the record that states that L.A.W. was hit with the metal part of the belt. Because this allegation does not appear in the Petition, nor the Application, the Court finds it immaterial to the finding of probable cause, particularly in light of evidence that L.A.W. disclosed that Irlanda did hit him with her hand, belt, and Hot Wheels track. (Docs. 331-9 at 5–9.)

Plaintiffs argue that Talamantes "stated that 'The explanations of the injuries are not consistent with what Brian and Irlanda said happened' but omitted Brian's description of the events of the night of December 17th [sic] and the conclusion reached by the SPD detective, made in response to Talamantes' allegation." (Doc. 346, PSOF at 19, ¶ 39(j).) This statement, attributed to Talamantes by the Plaintiffs, is found only in the TDM Summary. (Doc. 348-4 at 22.) There is no evidence that the TDM Summary was drafted by Talamantes and, regardless, there is no evidence that the TDM Summary was relevant to the judge's finding of probable cause. Moreover, the Application presented to the judge does contain Wright's explanation that "the mark on [L.A.W.]'s thigh might be from his sibling, [M.G.Z.], smacking him with the Hot Wheels track." (Doc. 378-5 at 3.) As such, the Plaintiffs have not demonstrated a material omission.

### 5. Additional allegations in Plaintiffs' Motion for Summary Judgement

In Plaintiffs' Partial Motion (Second Motion), Plaintiffs argue that the Defendants did not have evidence that the marks or bruises on L.A.W. constituted "serious physical injuries" or "severe injuries," as alleged in the Application. (Doc. 365 at 7.) The

Application does not contain either term. (*See* Doc. 331-11.) Thus, the Plaintiffs use of the statutory definition of these terms is immaterial.

Plaintiffs argue that the Application's statement "[L.A.W.] is at unreasonable risk of harm at his current home as the parent, guardian, or custodian deliberately harmed [L.A.W.] and has caused serious or severe harm to him" is a reckless misrepresentation because Brian Wright, L.A.W.'s only parent in the critical timeframe, was not the individual who the abuse allegations were targeted at in state court. (Doc. 365 at 13.) Plaintiffs allege that due to this single line in the Application, Talamantes and, by extension, Francisco were deliberately misleading the state court that Wright himself had harmed his son. (Doc. 365 at 14.) Plaintiffs' reading of this sentence is selective. Clearly, the statement allows for the conclusion that a custodian caused harm to L.A.W. The Application makes clear that L.A.W.'s stepmother, not Brian, was suspected of inflicting harm on L.A.W. (Doc. 331-11 at 3.) As such, the Plaintiffs fail to make a substantial showing that this was a misrepresentation.

Plaintiffs further contend that there was no evidence that Brian Wright "allowed" Irlanda to harm L.A.W. (Doc. 365 at 16.) Wright testified that Irlanda spanked L.A.W. on the night of December 15, 2020. (Doc. 378-16 at 3.) Plaintiffs offer no evidence, nor even contend, that Brian Wright did anything to stop Irlanda from spanking L.A.W. Brian Wright admits multiple times in the record that he and Irlanda use physical discipline on their children, including L.A.W. As such, the Plaintiffs fail to make a substantial showing that this was a misrepresentation.

Plaintiffs argue that the Brian Wright's explanation for the marks on L.A.W. was consistent with roughhousing. (Doc. 365 at 15.) Plaintiffs state that Talamantes should have known from the nursing assistant at L.A.W.'s school, that he had a history of "little boy bruises." (*Id.*) However, the nursing assistant at L.A.W.'s school is the person who initially reported L.A.W.'s injuries to DCS because they were *not* consistent with little boy bruises. (Doc. 331-2 at 2 (emphasis added).) Moreover, the FME described the bruises as inflicted and in different stages of healing. (Doc. 307, DSOF ¶ 16; Doc. 346, PSOF at 3, ¶ 16; Doc.

331-21 at 6–8; Doc. 331-49 at 7–14.) As such, the Plaintiffs fail to make a substantial showing that this is a material omission or misrepresentation.

Plaintiffs reiterate their argument that Talamantes omitted that he knew that the SPD investigation was closed on December 16, 2020. (Doc. 365 at 15.) As discussed above, evidence in the record does not support this assertion and, as such, Plaintiffs fail to make a substantial showing that this was a misrepresentation.

### 6. Probable Cause Determination

Probable cause is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). In 2020, pursuant to the version of A.R.S. § 8-821(B) in effect , the Arizona court could issue a temporary removal order upon "finding that probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect and it is contrary to the child's welfare to remain in the home." As discussed above, the Plaintiffs have failed to make a substantial showing, as required at the summary judgment stage, that any of the alleged statements are misrepresentative of the facts in this case. Further, to such extent that those statements may be reasonably disputed by the Plaintiffs, removal of the challenged statements from the Application or Petition would not undermine the juvenile court's finding of probable cause and are therefore not material to such finding.

### 7. Liability of Francisco

Plaintiffs argue that Defendant Francisco is liable for Talamantes's alleged constitutional violations as the supervisor of the investigation. (Doc. 365 at 4–6.) "A supervisor is only liable for constitutional violations of [her] subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 2013). Plaintiffs argue that Francisco directly participated in and directed that the Application and Petition be filed. (Doc. 365 at 5.) Plaintiffs fail to point to evidence that supports this contention and simply recite DCS policies as conclusory "proof" that Francisco directed Talamantes. Plaintiffs do not connect specific actions of Defendant Francisco to the alleged constitutional violations

outlined above, nor do they present any evidence or testimony that Francisco knew of alleged misrepresentations and failed to correct them prior to filing the Application or Petition. As such, no reasonable juror could find Francisco liable for the alleged constitutional violations of Talamantes.[5]

### D.    Conclusion as to Claims 17 and 19

For the reasons stated above, Plaintiffs have failed as a matter of law to produce evidence sufficient to establish judicial deception as alleged in Claims Seventeen and Nineteen. The Court will therefore deny Plaintiffs' partial motion for summary judgment, (Doc. 364), and grant Defendants' cross-motion for summary judgment, (Doc. 375).

## III.   First Amendment Retaliation

In Claim 22, Plaintiffs Brian Wright, L.A.W., and Irlanda Wright allege that Encinas, Sheldon, Noriega, and Orozco retaliated against them because Brian Wright submitted a complaint to the Ombudsman's office and protested and voiced concerns about DCS's actions. (Third Am. Compl., Doc. 204 at 59–61.) Plaintiffs allege that the DCS Defendants retaliated by proceeding with the underlying dependency matter and delaying reunification services. (*Id.*) The DCS Defendants seek summary judgment on Claim 22 in both their First and Fourth Motions for Summary Judgment. (Docs. 329, 379.) In the First Motion, Encinas, Sheldon, Noriega, and Orozco argue Claim 22 is precluded based on the *Rooker-Feldman* doctrine, issue preclusion, and claim preclusion. (Doc. 329.) In the Fourth Motion, they argue they did not violate Plaintiffs' First Amendment rights, Plaintiffs lack proof to support such a claim, the rights were not clearly established, and the Defendants are entitled to qualified immunity. (Doc. 379.) Because the Court finds that Plaintiffs have failed to produce evidence sufficient to support their claims of retaliation, the Court will grant the DCS Defendants' Fourth Motion for summary judgment. The Court will not address the DCS Defendants' additional arguments for granting judgment on Claim 22.

//

---

[5] Plaintiffs fail to establish judicial deception by Francisco for the additional reason that Plaintiffs fail to establish material misrepresentations and omission were included in the Application and Petition. *See supra.*

### A.    Elements of First Amendment Retaliation Claim

Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future. *Sloman v. Tadlock*, 21 F.3d 1462, 1469–70 (9th Cir. 1994). "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

To recover under § 1983 for First Amendment retaliation, plaintiffs must prove: (1) they engaged in constitutionally protected activity; (2) as a result, they were subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). A plaintiff must ultimately "'prove the elements of retaliatory animus as the cause of injury' with causation being 'understood to be but-for causation.'" *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012).

"As with all § 1983 claims, personal participation in the retaliatory conduct, and not merely the existence of a supervisory relationship, is required to hold supervisors liable." *Hill v. Rhude*, 556 F. Supp. 3d 1144, 1151 (D. Nev. 2021). Summary judgment is also appropriate where there is no evidence to establish that a defendant was aware of the protected speech. *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (citing *Karam v. Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001)). To the extent that Defendants argue that they would have taken the same action even in the absence of the protected conduct, Defendants have the burden of proof. *See O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).

//

//

//

1

**B. Facts Relevant to First Amendment Retaliation Claim**[6]

2

    1. <u>Defendants</u>

3

    Plaintiffs name four DCS Defendants in Claim 22. Michelle Orozco was a DCS

4

Program Manager overseeing investigative, ongoing and mixed units in the South Region.

5

(Doc. 385, DSOF ¶ 1; Doc. 399, PCSOF ¶ 1.)

6

    Jeannette Sheldon was a supervisor for a DCS ongoing unit in early January 2021

7

when the Wright case was assigned to her unit until she transferred to the Victim Services

8

Unit at the end of February 2021. (Doc. 385, DSOF ¶ 2; Doc. 399, PCSOF ¶ 2.) While at

9

this ongoing unit, she supervised Joana Encinas and assigned the Wright case to her. (*Id.*)

10

    Betina Noriega was promoted to the position of supervisor for a DCS ongoing unit

11

on February 22, 2021. At that time, she became Defendant Joana Encinas's supervisor.

12

(Doc. 385, DSOF ¶ 3; Doc. 399, PCSOF ¶ 3.)

13

    Joana Encinas was the ongoing DCS case specialist for the Wright case. The case

14

was officially transferred to her on January 5, 2021, the day that the juvenile court held the

15

Preliminary Protective Hearing.  (Doc. 385, DSOF ¶ 4; Doc. 399, PCSOF ¶ 4.)

16

//

17

//

18

---

19

[6] The undisputed facts necessary to resolve the Fourth Motion for Summary Judgment are

20

also taken from the numerous statements of fact and controverting facts filed by the Plaintiffs and the DCS Defendants. The DCS Defendants complain that, in opposing their Fourth Motion for Summary Judgment, Plaintiffs' Opposition cites to Plaintiffs'

21

Controverting Statement of Facts in Opposition to the DCS Defendants' First Motion. (Doc. 410 at 2–3.) As the DCS Defendants point out, Local Rule 56.1 does not permit a party to file two separate statements of fact. (*Id.*) But the DCS Defendants invited this

22

violation of the rule when they "incorporated by reference" their First Motion for Summary Judgment and First Statement of Facts and the supporting exhibits thereto, (Docs. 307, 329,

23

331). (*See* Doc. 379 at 2.) To make matters more confusing, Plaintiffs do not include any citations to the record in their Objections to Defendants' Separate Statements of Fact as to

24

the Fourth Motion, and Plaintiffs never cite to their Objections in opposing the Fourth Motion. Instead, Plaintiffs cite to their Objection and Controverting Facts filed in

25

Opposition to the DCS Defendants' First Motion, (Doc. 346). To understand those objections, the Court had to refer to Defendants' Separate Statement of Facts in support of

26

the First Motion. As a consequence, in determining the undisputed facts, the Court reviewed multiple statements of facts and objections and supplements. (*See* Docs. 385,

27

399—Fourth Motion; Docs. 307, 346, 376, 401—First Motion). In its recitation of the undisputed facts, the Court has rejected many of Plaintiffs' unsupported objections and

28

Plaintiffs' objections that are contradicted by Plaintiffs' own evidence or admissions. Many of he objections are addressed in the footnotes in Section II.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      2.  <u>Ombudsman Complaint</u>

Plaintiffs allege Defendants retaliated against Plaintiffs after Brian Wright, on December 29, 2020, made a complaint to the DCS Ombudsman's Office regarding L.A.W.'s December 28, 2020 removal from Brian's care by DCS employees Geraldo Talamantes and Derrick Wyatt. The focus of the complaint was Wyatt's alleged threatening and intimidating conduct toward Mr. Wright. (Doc. 385, DSOF ¶ 7; Doc. 399, PCSOF ¶ 7.) Neither Talamantes nor Wyatt are named as defendants in Claim 22. The ombudsman complaint did not mention named DCS Defendants Encinas, Sheldon, Noriega, or Orozco. (Doc. 385, DSOF ¶ 8; Doc. 399, PCSOF ¶ 8.)

Wright's complaint came to the attention of Orozco when the Ombudsman Office advocate forwarded a copy of the complaint to her and DCS Investigative Supervisor Jason Dedmon by email dated December 29, 2020. (Doc. 385, DSOF ¶ 9; Doc. 399, PCSOF ¶ 9.) The Ombudsman Office advocate indicated in the email that they had recommended that Mr. Wright first try to resolve his concerns with the Investigative Supervisor. (Doc. 385, DSOF ¶ 10; Doc. 399, PCSOF ¶ 10.) The advocate also noted that the matter regarding the child's removal and the allegations to support the removal would be discussed at an upcoming team decision making meeting. (*Id.*)

On December 30, 2020, Wright acknowledged to the Ombudsman Office advocate that with his attorney, they would be addressing his concerns with the supervisor.   (Doc. 385, DSOF ¶ 11; Doc. 399, PCSOF ¶ 11.)

      3.  <u>Other Complaints</u>

In addition to his Ombudsman Complaint, Brian Wright stated that he continually expressed his "concerns" to Encinas, Sheldon, Noriega, and Orozco in calls, meetings, Child and Family Team meetings, Team Decision Making meetings, and emails in January, February, March, April, and June 2021. (Doc. 385, DSOF ¶ 50; Doc. 399, PCSOF ¶ 50.)[7]

---

[7] Plaintiffs do not detail Brian's complaints in their briefing on the Fourth Motion. In Plaintiffs' controverting statement of facts for the First Motion for summary judgment, Plaintiffs state that, from Brian's first meeting with Sheldon on January 11, 2021, he expressed his concern that Talamantes was being untruthful in his rendition of what L.A.W. had disclosed, what had happened at the TDM meeting the day L.A.W. was removed, and in the apparent failure of the Department representatives to keep in contact with him and

1

### 4. Testimony of Michelle Orozco

Orozco made DCS supervisor Meghean Francisco aware of Wright's Ombudsman Complaint in early January 2021. (Doc. 385, DSOF ¶ 12; Doc. 399, PCSOF ¶ 12.) Orozco asked Francisco to follow up with Wyatt, who was the subject of the complaint, to discuss the allegations in the complaint, and to let her and Dedmon know what Wyatt's response was. (Doc. 385, DSOF ¶ 13; Doc. 399, PCSOF ¶ 13.) Francisco met with Wyatt and provided a response to Orozco. (Doc. 385, DSOF ¶¶ 14–15; Doc. 399, PCSOF ¶¶ 14–15.) Francisco testified that she was not motivated to take any negative actions toward Mr. Wright and did not direct any negative actions toward Mr. Wright as a result of the Ombudsman Complaint. (Doc. 385, DSOF ¶ 16; Doc. 399, PCSOF ¶ 16.) Francisco is not a named Defendant in Claim 22.

Plaintiffs dispute Orozco's testimony that she did not share Wright's Ombudsman Complaint with Encinas, Sheldon, or Noriega and that the Ombudsman Complaint had nothing to do with Encinas, Sheldon, or Noriega, although Plaintiffs do not point to any supporting evidence. (Doc. 385, DSOF ¶ 17; Doc. 399, PCSOF ¶ 17.) Plaintiffs similarly challenge Orozco's testimony that: (1) she did not instruct or direct Encinas, Sheldon, or Noriega, or anyone under her supervision at any time, to take any adverse or retaliatory actions against Mr. Wright or his family to prevent or obstruct reunification because of his filing an Ombudsman Complaint on December 28 or 29, 2020, (Doc. 385, DSOF ¶ 18; Doc. 399, PCSOF ¶ 18); (2) she did not instruct or direct Encinas, Sheldon, or Noriega or anyone under her supervision at any time to take any adverse or retaliatory actions against Mr. Wright or his family to prevent or obstruct reunification because of his ongoing concerns, advocacy, or statements that he made during meetings, phone calls, or communications that she was involved in during the Wright case, (Doc. 385, DSOF ¶ 19; Doc. 399, PCSOF ¶ 19); and (3) she did not retaliate against Mr. Wright and his family and

---

to help him identify and secure services. He states that he repeated those concerns in subsequent meetings with Sheldon and Encinas, then with Noriega and Encinas. (*See* Doc. 346, PCSOF at 23, ¶ 60.)

1    never had the intent or motivation to do so, (Doc. 385, DSOF ¶ 21; Doc. 399, PCSOF ¶

2    21).[8]

3              5.   Testimony of Jeannette Sheldon

4              Plaintiff's do not challenge Sheldon's testimony that it was not Orozco's practice to

5    inform her if an Ombudsman's complaint had been made if it did not involve her or her

6    unit, (Doc. 385, DSOF ¶ 22; Doc. 399, PCSOF ¶ 22), but dispute Sheldon's testimony that:

7    (1) she was not aware that Mr. Wright had made a complaint to the Ombudsman's Office

8    about the investigation unit, (Doc. 385, DSOF ¶ 24; Doc. 399, PCSOF ¶ 24); (2) no one

9    directed her to take any adverse actions against Mr. Wright or his family because of his

10   filing an Ombudsman Complaint or because of his ongoing concerns, advocacy, or

11   statements that he made during meetings or phone calls that Sheldon was involved in while

12   the dependency action was open, (Doc. 385, DSOF ¶ 26; Doc. 399, PCSOF ¶ 26); (3) she

13   did not direct Encinas to take any adverse actions against Mr. Wright or his family because

14   of his filing an Ombudsman Complaint or because of his ongoing concerns, advocacy, or

15   statements that he made during meetings or phone calls while Sheldon was supervisor,

16   (Doc. 385, DSOF ¶ 27; Doc. 399, PCSOF ¶ 27); (4) neither Mr. Wright's Ombudsman's

17   Complaint nor any of his expressed concerns to Sheldon during Ms. Encinas' ongoing case

18   management of the Wright case were not factors in Sheldon's duty to provide case

19   management services or make efforts to reunify the family, (Doc. 385, DSOF ¶ 28; Doc.

20   399, PCSOF ¶ 28); and (5) she did not retaliate against Mr. Wright and his family and never

21   had the intent to do so. (Doc. 385, DSOF ¶ 29; Doc. 399, PCSOF ¶ 29).[9]

22             6.   Testimony of Betina Noriega

23             Plaintiffs dispute Noriega's testimony that she was not aware that Mr. Wright made

24   a complaint to the Ombudsman Office in December 2020 and that she would not have

25

26   [8] Plaintiffs suggest Orozco's testimony is subject to a credibility determination, but offer
     no evidence from which a jury might conclude that Orozco was untruthful. (Doc. 399,
27   PCSOF ¶¶ 17–20.)
     [9] Plaintiffs do not provide contradicting evidence in support of their objections to these
28   statements of fact, (Doc. 399, PCSOF ¶¶ 24–27, 29), and again argue that Sheldon's
     testimony is subject to a credibility determination.

known about his Ombudsman Complaint because it did not involve her as an ongoing case specialist or anyone in her ongoing unit and because she was not an ongoing supervisor at that time. (Doc. 385, DSOF ¶ 30; Doc. 399, PCSOF ¶ 30.) Plaintiffs also dispute Noriega's testimony that: (1) no one directed her to take any adverse or retaliatory actions against Mr. Wright or his family because of his filing an Ombudsman Complaint or because of his ongoing concerns, advocacy, or statements that he made during meetings or phone calls that she was involved in while the dependency action was open, (Doc. 385, DSOF ¶¶ 31–32; Doc. 399, PCSOF ¶¶ 31–32); (2) Noriega did not direct Encinas to take any adverse or retaliatory actions against Mr. Wright or his family because of his filing an Ombudsman's Complaint or because of his ongoing concerns, advocacy, or statements that he made during meetings or phone calls while she was supervisor, (Doc. 385, DSOF ¶ 33; Doc. 399, PCSOF ¶ 33); (3) neither Mr. Wright's Ombudsman Complaint nor any of his expressed concerns to Noriega during Encinas' ongoing case management or her supervision of the Wright case was a factor in Noriega's duty to provide case-management services or to make efforts to reunify the family, (Doc. 385, DSOF ¶ 34; Doc. 399, PCSOF ¶ 34); and (4) she did not retaliate against Mr. Wright and his family and never had the intent to do so, (Doc. 385, DSOF ¶ 35; Doc. 399, PCSOF ¶ 35).[10]

### 7. Testimony of Joana Encinas

Plaintiffs also dispute all of Encinas's testimony including that: (1) she was not aware that Mr. Wright had filed a complaint with the Ombudsman Office that involved the actions of the DCS employees on the day of L.A.W.'s removal, was not involved in the Ombudsman Complaint, and did not receive a copy of it, (Doc. 385, DSOF ¶ 36; Doc. 399, PCSOF ¶ 36); (2) she was never instructed or directed by anyone in DCS to not fulfill her case management duties or to obstruct the reunification process for the Wright family, (Doc. 385, DSOF ¶ 37; Doc. 399, PCSOF ¶ 37); (3) she did not obstruct Mr. Wright's efforts to reunify with L.A.W. or intentionally take any actions to prevent Mr. Wright from having physical custody of L.A.W., (Doc. 385, DSOF ¶ 38; Doc. 399, PCSOF ¶ 38); (4)

---

[10] Plaintiffs do not provide contradicting evidence in support of their objections to Noriega's testimony. (Doc. 399, PCSOF ¶¶ 30–35.)

neither Mr. Wright's Ombudsman Complaint nor any of his expressed concerns to Encinas while she was the ongoing case manager of the Wright case was a factor in her duty to provide case management services or in her efforts to reunify the family, (Doc. 385, DSOF ¶ 39; Doc. 399, PCSOF ¶ 39); and (5) she did not retaliate against Mr. Wright and his family and never had the intent to do so, (Doc. 385, DSOF ¶ 40; Doc. 399, PCSOF ¶ 40).[11]

After the juvenile court dismissed the dependency action on October 14, 2021, Encinas closed the case.  (Doc. 385, DSOF ¶ 41; Doc. 399, PCSOF ¶ 41.)

### 8.  Counseling Services and Psychological Evaluations

In January 2021, DCS placed a referral for a Rapid Response Assessment on L.A.W. and the Intermountain Centers was the contracted provider that conducted the assessment and recommended services for L.A.W. (Doc. 385, DSOF ¶ 42; Doc. 399, PCSOF ¶ 42.) Intermountain Centers provided family therapy for the Wright family including Brian Wright and L.A.W. (Doc. 385, DSOF ¶ 43; Doc. 399, PCSOF ¶ 43.)

Paternal grandmother, Lisa Pugliano, made a hotline call to DCS on February 11, 2021 expressing "lots of concerns" for L.A.W. while L.A.W. was living in the care of Brian and Irlanda Wright. (Doc. 385, DSOF ¶ 44; Doc. 399, PCSOF ¶ 44.)[12] Pugliano also expressed concerns to employees at Intermountain Centers about statements that she said Brian Wright was making to L.A.W. and that L.A.W. was repeating those statements in her home including: "Mimi, you kidnapped me"; and "Mimi is stupid, she doesn't know anything." (Doc. 385, DSOF ¶ 45; Doc. 399, PCSOF ¶ 45.)[13]

In April 2021, DCS offered psychological evaluations to Brian and Irlanda Wright, but both declined to undergo the evaluations on advice of counsel. (Doc. 385, DSOF ¶ 46;

---

[11] As with their previous objections, Plaintiffs do not provide contradicting evidence in support of their objections to Encinas's testimony. As to DSOF ¶ 38, Plaintiffs wrote, "Dispute, see evidence submitted by Plaintiffs," but did not include a citation to the record or further explanation of the evidence which might refute DSOF ¶ 38.

[12] Although Plaintiffs dispute the characterization of the Hotline call, asserting the transcript speaks for itself, Plaintiffs admitted the identical fact in their response to Defendants' request for admission number 19. (See Doc. 385-10 at 4, RFA No. 19.)

[13] Although Plaintiffs dispute the characterization of Pugliano's communications with Intermountain, Plaintiffs admitted that Brian's mother made these statements in Plaintiffs' response to Defendants' request for admission number 20. (*See* Doc. 385-10 at 4, RFA No. 20.)

1    Doc. 399, PCSOF ¶ 46.)[14] The juvenile court approved DCS's recommendation that Brian

2    and Irlanda Wright undergo psychological evaluations. (Doc. 385, DSOF ¶ 47; Doc. 399,

3    PCSOF ¶ 47.)[15]

4        On August 26, 2021, the Pima County Juvenile Court refused to dismiss the

5    dependency action. (Doc. 385, DSOF ¶ 48; Doc. 399, PCSOF ¶ 48.)

6        On October 14, 2021, the Pima County Juvenile Court dismissed the dependency.

7    (Doc. 385, DSOF ¶ 49; Doc. 399, PCSOF ¶ 49.)

8    **C. Discussion**

9        Defendants Orozco, Sheldon, Noriega, and Encinas argue that Plaintiffs' retaliation

10   claims fail for lack of evidence. The Defendants argue that Plaintiffs lack evidence of

11   retaliatory animus, Defendants' actions were not retaliatory, and Plaintiffs produced no

12   evidence whatsoever that any of the DCS Defendants based any of their ongoing case

13   management decisions on the Ombudsman Complaint or Brian Wright's expressed

14   concerns during the ongoing DCS case. (Doc. 379 at 12–13.)

15       A movant is entitled to judgment as a matter of law against a party who fails to make

16   a showing sufficient to establish the existence of an element essential to that party's case,

17   and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at

18   322. Although at trial Plaintiffs bear the burden of proof on their retaliation claims,

19   Plaintiffs' response to Defendants' retaliation arguments is sparse (one and a half pages in

20   length), provides little argument, and few citations to evidentiary support in the record.

21   (*See* Doc. 398 at 12-14.) Plaintiffs first suggest that Defendants' retaliatory animus is

22   evident because Defendants "repeatedly informed Brian that their actions were taken in

23   response to the expressions of concern and complaint he made." (*Id.* at 13.) Plaintiffs

24   provide no further argument and fail to point to any evidence which would support the

---

26   [14] Although Plaintiffs dispute some of the wording of this fact, Plaintiffs admitted to this
     identically-worded fact in their response to Defendants' request for admission number 21.
27   (*See* Doc. 385-10 at 4, RFA No. 21.)
     [15] Despite their objection to this fact, Plaintiffs admitted that the dependency judge ordered
28   Brian and Irlanda Wright to undergo psychological examinations. (See Doc. 385-10 at 5,
     RFA No. 22.)

1    assertion that any Defendant informed Brian that an action was taken in retaliation for

2    expressing his concerns or making a complaint.

3         Plaintiffs argue "the evidence establishes that the two supervisors and the case

4    manager took their marching orders from Orozco—who admits she was involved in the

5    response to the [ombudsman] complaint, but claims she never shared it with the others."

6    (*Id*. at 13.)  Plaintiffs' claims against Orozco fail for lack of evidence. Plaintiffs fail to

7    identify any retaliatory action taken by Orozco against Plaintiffs[16] and fail to point to any

8    evidence that Orozco directed any other person to take retaliatory action against Plaintiffs.

9    *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

10   ("The nonmoving party may not merely state that it will discredit the moving party's

11   evidence at trial and proceed in the hope that something can be developed at trial in the

12   way of evidence to support its claim."). Moreover, Orozco cannot be held vicariously liable

13   for the alleged retaliatory actions of other Defendants. *See Hill v. Rhude*, 556 F. Supp. 3d

14   at 1151 (holding "personal participation in the retaliatory conduct, and not merely the

15   existence of a supervisory relationship, is required to hold supervisors liable.").

16        Plaintiffs' claims that Encinas, Sheldon, and Noriega retaliated against Plaintiffs on

17   account of Brian's ombudsman complaint also fail for lack of evidence. Encinas, Sheldon,

18   and Noriega testified that they were not aware that Brian made a complaint. (Doc. 385,

19   DSOF ¶¶ 24–25, 30, 36); *see Karam,* 352 F.3d at 1194 (holding summary judgment is

20   appropriate where there is no evidence to establish that a defendant was aware of the

21   protected speech). Although Plaintiffs suggest that Encinas, Sheldon, and Noriega are

22   untruthful, Plaintiffs fail to identify any evidence which could discredit their testimony.

23   Plaintiffs' bare assertion is insufficient to create a credibility issue or material issue of fact,

24   particularly in light of all of the other evidence, including the undisputed fact that the

25   complaint did not mention Encinas, Sheldon, or Noriega; Orozco's testimony that she did

---

26   [16] Plaintiffs suggest that Orozco cannot escape the inference that her actions were
27   motivated, at least in part, by the Brian's filing of the complaint. (Doc. 398 at 13.)
     However, Plaintiffs do not identify any "actions" by Orozco for the Court to consider and
     Plaintiffs fail to point to any facts that would support an inference that Orozco had
28   retaliatory animus towards Plaintiffs.

not share the complaint; and Sheldon's undisputed testimony that it was not Orozco's practice to inform her if an Ombudsman's complaint had been made if it did not involve her or her unit. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630 ("The nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim."). While Plaintiffs are correct that retaliation can be inferred in instances when a defendant mentions the constitutionally protected activity near in time to the retaliatory actions, (Doc. 398 at 12–13), Plaintiffs fail to identify any evidence that would suggest such a chronology exists here. Plaintiffs provide no evidence that Encinas, Sheldon, or Noriega mentioned or were even aware of the ombudsman complaint.

Relying on *Capp v. Cnty. of San Diego*, 940 F.3d 1046 (9th Cir. 2019), Plaintiffs argue that they need not introduce proof of retaliatory animus to defeat the DCS Defendants' motion for summary judgment. Plaintiffs suggest that "speculation is hardly unusual in retaliation cases" and the mere existence of a legitimate motive for alleged retaliatory actions does not mandate dismissal. (Doc. 398 at 12.) *Capp* does not support Plaintiffs' position on summary judgment. The *Capp* court denied a Rule 12(b)(6) motion to dismiss plaintiffs' complaint in what it described as a close case. *Id*. at 1057. Taking plaintiffs' allegations in the light most favorable to plaintiffs, and emphasizing the liberal pleading standard afforded to pro se litigants, the court concluded that plaintiffs plausibly alleged that retaliation was the but-for motive for the defendant's actions at the pleading stage. *Id*. at 1058. The court stated that at summary judgment or at trial, the defendants could well marshal evidence that defendants were motivated primarily by their legal obligation to investigate allegations of child abuse, and would have made the recommendations that were made, for that reason alone. *Id*. at 1057. The court cited to *Karam*, 352 F.3d at 1194, and that court's rejection of a First Amendment retaliation claim where plaintiff's speculation as to improper motive did not rise to the level of evidence sufficient to survive summary judgment.  940 F.3d at 1057.

Finally, Plaintiffs argue "[t]he allegations set out before the Court in [the DCS Defendants' earlier 12(b)(6) motion to dismiss] have been confirmed and augmented by evidence now in the record, leading to the only reasonable conclusion—a jury must decide whether the Defendants' actions were motivated by retaliatory animus." (Doc. 398 at 14.) Yet Plaintiffs fail to (1) set forth the allegations set out in the earlier 12(b)(6) motion, (2) identify or discuss any "augmented evidence," or (3) discuss how Brian Wright's complaint or concerns were the but-for cause of an adverse action by any of the DCS Defendants. *See Karam*, 352 F.3d at 1194 (affirming summary judgment for defendant public officials because plaintiff's speculation of improper motive was insufficient to survive summary judgment); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

It appears that Plaintiffs may be attempting to present some opposing arguments in the "Operative Facts" section of their Opposition. (*See* Doc. 398 at 1–10.) In that section, Plaintiffs describe several interactions and, after some of the descriptions, declare that the interaction shows evidence of retaliatory animus. The Court addresses these alleged incidences of retaliation and retaliatory animus, but concludes Plaintiffs fail to provide evidence of retaliation and fail to establish a causal relationship between a protected activity and an adverse action. *See Karam*, 352 F.3d at 1194. The Court further concludes that the Defendants have shown they would have taken the same action even in the absence of the alleged protected conduct and no reasonable juror could conclude otherwise.

Plaintiffs assert that two recorded conversations show that Defendants obstructed reunification because Brian Wright would not agree that L.A.W. had disclosed in the forensic interview that Irlanda *had* hit him with an object the night of December 15th and *caused the marks found the next day.* (Doc. 398 at 5–7 (emphasis in original).) Plaintiffs suggest that the Defendants were requiring him to admit Irlanda *caused* the bruise discovered on L.A.W.'s thigh on December 15. Plaintiffs misread the transcript.

It is undisputed that L.A.W. reported during the FI that Irlanda hit him with objects, including a Hot Wheels track and a belt. (Doc. 307, DSOF ¶ 15; Doc. 346, PSOF at 2, ¶ 15.) The FME found multiple bruises on L.A.W. and concluded they were inflicted and in different stages of healing. (Doc. 307, DSOF ¶ 16; Doc. 346, PSOF at 3, ¶ 16; Doc. 331-21 at 6–8; Doc. 331-49 at 7–14.) Whether Irlanda caused any of the marks by hitting L.A.W. the previous night was not the focus of DCS Defendants' conversations with Brian Wright. In the two conversations cited by Plaintiffs, first Sheldon, then Noriega, explained that it was a problem that Brian Wright would not acknowledge that his son was saying that he was hit and hit with objects. (Doc. 398 at 3, 7.) Noriega told Brian that he should keep in mind that L.A.W. did not feel comfortable going to him to tell him that he was hit with an object by his mother. (Doc. 346, PSOF at 24, ¶ 63.) Noriega reiterated, "We need [L.A.W.] to be able to be safe in the home and to be able to come to you, and tell you, and for you to be able to acknowledge when he makes that disclosure." (*Id.*)[17] Brian's repeated denial that his son said that his mom hit him[18] supports the Defendants' concern that Brian was not aligned *with his son*.  DCS was not seeking to have Brian admit that Irlanda caused L.A.W.'s thigh injury, but to admit that L.A.W. was being hit.

Plaintiffs state that on February 9, 2021, Defendant Sheldon canceled intake at Casa de Los Ninos, did not provide any alternatives, and required Wright to find services. (Doc. 398 at 8; Doc. 346, PSOF at 26, ¶ 64(a)–(b).) Plaintiffs state Brian Wright made "desperate efforts, beginning January 22, 2021, to find services." (Doc. 398 at 6.) "When he found

---

[17] Defendant Encinas similarly testified during the state dependency proceedings that DCS workers did not request that Brian Wright be aligned with DCS's allegations. They asked that he be aligned with L.A.W.'s disclosures made during the Forensic Interview (FI) so Brian could protect him and so that L.A.W. would be comfortable coming to Brian if anything were to happen. (Doc. 331-17 at 14–15; Doc. 307, DSOF ¶¶ 43–44; Doc. 346, PSOF at 5, ¶¶ 43–44.)

[18] The conversations cited by Plaintiffs in their Opposition provide at least two examples of Brian denying that L.A.W. was being hit. Brian told Sheldon, "Not once did L.A.W. say that his mom hit him and that's what caused the mark on his leg that the school nurse saw when he went to school that day." (Doc. 398 at 3–4.)  Brian also said, "So again, I referred to the police report that clearly states that the marks caused on [L.A.W.] were from roughhousing with his brother. I also viewed the videos from the interrogation at the Children's Advocacy Center where, again, says the only time he was hit was when he was five years old with a belt. So for you to sit here and tell me these things, I'm not going to accept that. I'm not, because it's not true." (*Id.* at 3.)

1   Casa de Los Ninos and had the intake set up, Sheldon killed it, even though the coordinator

2   Intermountain Centers . . . had agreed to work with Casa to secure the services." (*Id*.)[19]

3   The undisputed evidence contradicts this claim. Plaintiffs admit that in early January 2021,

4   DCS placed a referral for a Rapid Response Assessment on L.A.W. and the Intermountain

5   Centers was the contract provider that conducted the assessment and recommended

6   services for L.A.W. (Doc. 385 DSOF ¶ 42; Doc. 399 ¶ 42.) Intermountain Centers provided

7   family therapy for the Wright family including Brian Wright and L.A.W. (Doc. 385 DSOF

8   ¶ 43; Doc. 399 ¶ 43.)  This evidence shows that DCS did not "force" Brian to get services

9   for his son. In addition, Brian Wright himself identifies a non-retaliatory basis for

10  cancellation of the intake at Casa de los Ninos: Sheldon told him she had postponed the

11  intake at Casa because it had a two-month waiting period for services. (*See* Doc. 346-2 ¶

12  18.) The cancellation of services at Casa can hardly be retaliatory in light of the pressing

13  need for services and the provision of those services through an available provider.[20]

14         Plaintiffs allege that the animus engendered by Brian's insistence on "the truth" is

15  evident in Sheldon's refusal, immediately following a January 22, 2021 meeting, to set up

16  individual therapy for Brian and his other children.[21] (Doc. 398 at 6.) Plaintiffs fail to

17  establish that there was a substantial causal relationship between the Brian's denial of "the

18  truth" on January 22, and the alleged adverse action of failing to set up counseling for Brian

19  and his other children. First, Plaintiffs fail to provide evidence that DCS was required to

20  set up counseling services for Brian and his other children. In his responses to

21  interrogatories, Brian Wright wrote that Sheldon and Encinas told him that DCS did not

---

[19] Plaintiffs do not cite to any statement of facts to support this assertion, but instead cite to Brian Wright's declaration, (Doc. 346-2, ¶¶ 17–19). This portion of Brian's declaration is not contained in any statement of facts. (*See* Docs. 346, 366, 399.) As such the Defendants did not have a chance to object to the statements as permitted by Federal Rule of Civil Procedure 56(c)(1)-(2) and Local Rule of Civil Procedure 56.1(b). The Plaintiffs did include the underlying allegation, referencing other paragraphs of Brian's declaration, in their statement of facts for the Second Motion (Doc. 346 at 26, ¶ 64(b)), and those allegations were disputed, (Doc. 376 at 11, ¶ 64(b)).

[20] Although Plaintiffs allege that L.A.W. did not receive any subsequent services, (Doc. 398 at 8), Brian Wright admitted that L.A.W. participated in services at Intermountain through August 2021, (Doc. 378-16 at 18).

[21] It appears that "the truth" is a reference to Brian's refusal to accept that L.A.W. said his mom had hit him. (*See* Doc. 398 at 6.)

provide services to the family or Brian's other children. (Doc. 346-25 at 5.) Sheldon testified that when people don't have insurance to pay for counseling, DCS will find a contract person. (Doc. 346-41 at 5.) Brian Wright had insurance. (Doc. 346-16 at 6.) Second, the evidence shows that Brian Wright was given help locating providers. Sheldon told Brian about potential services. She first told him that if he was eager to start services before the case plan meeting, he could check with his insurance company and find local providers for counseling. (*Id*.) At deposition, Brian did not deny that DCS and Intermountain had discussed counseling opportunities with him in February and March of 2021. (Doc. 378-16 at 10–12.) At Child and Family Team Meetings, DCS and Intermountain had suggested he reach out to his insurance company to find providers; Intermountain emailed Brian information about provider CFSS. (*Id*.) Brian admitted that several service providers told him they would not work with the Wright family because they had private insurance. (*Id*. at 12.) Finally, Plaintiffs admit that when the February 11, 2021 Case Plan required Brian and Irlanda to engage in individual therapy, Brian immediately found a provider and they began individual therapy. (Doc. 346 at 26–27, ¶ 64(d).)[22]

Plaintiffs' state the Wright family had only five sessions of counselling in seven months. (Doc. 398 at 8; Doc. 346, PSOF at 26–27, ¶ 64(d).) Nothing about this assertion suggests Defendants retaliated against Plaintiffs. Plaintiffs fail to present evidence demonstrating that they were due additional counseling or that Defendants were responsible for the number of counselling sessions.

Plaintiffs' assertion that L.A.W. was not given individual therapy until June 25, 2021, (Doc. 398 at 7), is not supported by the record, which shows L.A.W. first received individual therapy on March 4, 2021. (Doc. 399-2.)[23]

---

[22] Plaintiffs' statements as to Irlanda's therapy are inconsistent. Plaintiffs assert that "Irlanda never did get set up by Defendants on individual therapy and never had any," (Doc. 346 at 27, ¶ 64(e)), but also that "she went on her own" for therapy. (Doc. 398 at 8.)

[23] Plaintiffs argue that L.A.W. did not have individual therapy on March 4, and the ICHD Progress Note written by Peter Tolhurst confirms it. This information is not in Plaintiffs' various statement of facts. A March 4, 2021 Progress Note is found at Doc. 399-2. It lists L.A.W. as the "patient," says it is the "first session," describes L.A.W.'s symptoms as "shy, quiet," lists goals, and states that L.A.W. was in and out during the session. (Doc. 399-2 at

Plaintiffs suggest that DCS retaliated on April 7, 2021, by including three new conditions in the Safety Plan and demanding that Brian and Irlanda receive psychological evaluations as a condition of L.A.W.'s return. (Doc. 204 at 60; Doc. 398 at 8-9.) Because Plaintiffs fail to identify the three new conditions or provide any argument as to the appropriateness of such conditions, the Court does not address this part of their argument. The condition that the Wrights receive a psychological evaluation was not new in April 2021. The requirement was included, and objected to by Brian Wright, in the Case Plan signed by Brian Wright on February 11, 2021. (Doc. 378-26 at 5.) Further, it is unsubstantiated that Brian *had* satisfied the single condition contained in the January 15, 2021 safety plan, namely that "Brian and Irlanda will have responsible adults and/or safety services whenever [L.A.W.] is in the home." (Doc. 378-32 at 13-14.) L.A.W. was living in Scottsdale with Pugliano at the time and no new safety monitor had been approved. (*Id.*) Thus, it cannot be said that the April 7 requirement of a psychological evaluation was imposed "immediately upon learning that Brian had satisfied the single condition of return in the original Safety Plan dated January 15, 2021." (Doc. 398 at 9.)

Finally, Plaintiffs reference a series of events that they believe evidence DCS's delayed response to certain events. (Doc. 398 at 10.) Plaintiffs fail to develop their arguments as to these events and argue only that Defendants fail to meet the facts. (*Id.*) Plaintiffs have the burden of proof. *See supra,* Part I. Therefore, Plaintiffs' failure to provide evidence to support their claim that DCS retaliated by failing to respond timely is fatal as to these claims on summary judgment.[24]

//

//

---

2.) The note shows that L.A.W.'s grandmother was present and provided information to the therapist. The note shows that therapy was initiated with L.A.W. on March 4. The grandmother's presence at intake does not change that fact and is hardly unexpected given L.A.W.'s young age. In fact, Brian Wright admitted that he had participated in individual therapy with L.A.W. and that Brian's presence was part of the process of Lance's therapy. (Doc. 378-16 at 7.)

[24] Plaintiffs allege additional acts of retaliation in the Third Amended Complaint. (Doc. 204.) They do not assert those claims in their Opposition to Fourth Motion for Summary Judgment. It appears that they have abandoned these claims.

#### D. Conclusion as to Claim 22

For the reasons stated above, the Plaintiffs have failed as a matter of law to meet their burden of producing evidence sufficient to establish First Amendment retaliation as alleged in Claim 22. Plaintiffs fail to meet their burden to identify evidence from which a reasonable juror could infer that Defendants committed retaliatory acts or acted with a retaliatory animus. Accordingly, the Court will grant the DCS Defendants' motion for summary judgment with respect to Claim 22, (Doc. 379).

## IV.     Conclusion

For the reasons stated above,

**IT IS ORDERED:**

1.      Plaintiffs' Partial Motion for Summary Judgement (Doc. 364) is **denied.**

2.      Defendants' Cross-motion for Summary Judgment (Doc. 375) is **granted.**

3.      Defendants Motion for Summary Judgment (Doc. 379) is **granted.**

4.      Defendants' Motion for Summary Judgment (Doc. 329) is **denied as moot.**

5.      Defendants Talamantes, Francisco, Encinas, Sheldon, Noriega, and Orozco are **dismissed** from this case.

Dated this 24th day of September, 2024.

Jennifer G. Zipps
United States District Judge

- 37 -