**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wright, et al.,<br><br>       Plaintiffs,<br><br>v.<br><br>Southern Arizona Children's Advocacy Center, et al.,<br><br>       Defendants. | No. CV-21-00257-TUC-JGZ<br><br>**ORDER on Defendant SACAC's Motion for Summary Judgment (Doc. 273) and Plaintiffs' Motions for Partial Summary Judgment against SACAC and Dr. Woolridge (Docs. 288 & 283)** |

On December 16, 2020, Sahuarita Police Department (SPD) officers brought minor Plaintiff L.A.W. to Southern Arizona Children's Advocacy Center ("SACAC" or "Center") to investigate allegations of physical abuse, after a mandatory reporter at his elementary school contacted the Arizona Department of Child Safety (DCS) regarding a mark on the back of L.A.W.'s leg. (Doc. 273 at 2.) At the Center, the Medical Director, Dr. Dale Woolridge, conducted a forensic medical examination (FME) of L.A.W. (*Id*.) L.A.W.'s parents were not notified prior to the exam and there was no court order approving the exam. (Doc. 204 at 11–12.)

In the pending action, L.A.W. and Brian Wright, his father, assert § 1983 claims against Dr. Woolridge (Claims 5 and 6) and SACAC (Claims 7 and 8), alleging the FME violated their constitutional rights. In pending motions, Plaintiffs seek partial summary judgment against Dr. Woolridge (Doc. 283) and SACAC (Doc. 288) on these claims; and

SACAC filed its own motion for summary judgment on Claims 7 and 8, (Doc. 288).[1] Dr. Woolridge previously filed a motion for summary judgment on Claims 5 and 6 (Doc. 297), which was denied. (Doc. 361.)

The motions were heard on May 23, 2024. At argument, Dr. Woolridge asserted the defense of qualified immunity. Dr. Woolridge had raised this defense in his answer to the Plaintiff's third amended complaint (TAC), (*see* Doc. 389 at 8), in his previous motion for summary judgment, (Doc. 297 at 2–4), and in his response to Plaintiffs' motion for summary judgment, (Doc. 296 at 2). Plaintiffs requested the opportunity to provide additional briefing on qualified immunity, and the Court granted the request. (*See* Docs. 395, 402.)

Having considered the parties' arguments, the Court will grant SACAC's motion for summary judgment and deny Plaintiffs' motions. Further, the Court finds that Dr. Woolridge is entitled to qualified immunity on Claims 5 and 6.

**I.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Id*. at 252. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in

---

[1] SACAC's motion is fully briefed at Docs. 273, 274, 293, 310. The Plaintiffs' motion against Dr. Woolridge is fully briefed at Docs. 283, 284, 285, 296. The Plaintiffs' motion against SACAC is fully briefed at Docs. 288, 289, 300, 301, 311.

the nonmovant's favor. *Id.* at 255. In reviewing the evidence, the court need only consider the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). "Only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1998).

A movant is entitled to judgment as a matter of law against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. In *Celotex*, the Supreme Court explained: "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23.

Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient...." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

//
//
//
//
//

## II. Undisputed Facts[2]

### A. Doctor Woolridge

Defendant Dr. Woolridge is an emergency medicine doctor at Banner University Medical Center and a professor at the University of Arizona College of Medicine. (Doc. 282-1 at 8.) He also serves as the Medical Director of SACAC. (Doc. 285, PSOF ¶ 1.)[3] Dr. Woolridge is employed by SACAC part-time as an independent contractor. (Doc. 282-1 at 8.) As part of his employment, Dr. Woolridge performs FMEs of minors brought to SACAC. (Doc. 285, PSOF ¶ 3.)

### B. The Protocols

The Pima County Protocols for Multidisciplinary Investigation of Child Abuse (the Protocols) provide "guidelines to assist those who investigate and work with child abuse and domestic violence in reducing the secondary trauma that is often associated with such investigations." (Doc. 274-1 at 14.) The Protocols are intended to be a model for how child abuse cases are handled in Pima County but are non-binding and not intended to be followed with "unthinking or irrational rigidity." (*Id*.) According to the Protocols, it is law enforcement's responsibility to conduct an impartial investigation within the bounds of the

---

[2] The facts are taken from Defendant SACAC's Separate Statement of Facts in support of its motion for summary judgment, cited as Doc. 274, DSOF; Plaintiffs' Separate Statement of Facts in support of their Motion for Partial Summary Judgment Against Defendant Dale Woolridge, cited as Doc. 285, PSOF; and Defendant SACAC's Controverting Statement of Facts, cited as Doc. 301, CSOF. The facts are undisputed unless otherwise specified. Where support for an asserted fact was challenged, the Court relied on the supporting documents.

Plaintiffs failed to file a controverting statement of facts in response to SACAC's motion for summary judgment and separate statement of facts. (Doc. 274). Plaintiffs failed to file a separate statement of facts in support of their own motion for summary judgment against SACAC. Instead Plaintiffs improperly relied on the statement of facts they filed in support of their motion for summary judgment against Dr. Woolridge. (Doc. 289 at 2.) This is clearly improper. LRCiv 56.1(b). Moreover, many of the facts included are unsupported or contradicted by the documentation. Finally, although Dr. Woolridge did not dispute Plaintiffs' facts—because the facts were irrelevant to Dr. Woolridge's arguments—SACAC does. Thus, although Plaintiffs assert at times that certain facts are undisputed by "Defendants," the facts are only undisputed by Dr. Woolridge. Needless to say, Plaintiffs' improper incorporation of their statement of facts in support of a motion pertaining to a different party has caused much extra work.

[3] SACAC has two associate directors. (Doc. 285, PSOF ¶ 2; Doc. 301, CSOF ¶ 2.) The associate directors have no role in this case. Plaintiffs state the associate directors also conduct FMEs, (Doc. 285, PSOF ¶ 5), but fail to provide evidentiary support, (Doc. 301, CSOF ¶ 5).

- 4 -

law while considering the responsibilities of other organizations, such as SACAC, involved in the investigation and treatment of victims. (Doc. 274-1 at 24.) The Protocols state that a forensic examiner will not accept a case until there is law enforcement or DCS involvement. (Doc. 274-1 at 31.) The Protocols also dictate that DCS, law enforcement or the Office of Child Welfare Investigations will notify the parent or guardian when a child is taken into temporary custody and inform them of interview and examination times. (Doc. 274-1 at 58, 79.)

According to the Protocols, FMEs are "needed in most physical abuse incidents wherein legal proceedings are anticipated. It will be necessary to collect physical evidence related to the child's condition or injuries. This includes all injuries, and not just the most obvious or serious ones." (Doc. 285, PSOF ¶ 16; Doc. 301, CSOF ¶ 16; Doc. 274-1 at 34.) The purpose of FMEs is "to ensure the health and safety of the child; reassure the patient and caretaker; identify medical conditions; collect evidence of child abuse, endangerment, or neglect; diagnose sexually transmitted diseases; and screen for pregnancy." (Doc. 274-1 at 34.) FMEs are only conducted after a referral or request from law enforcement or DCS agents. (Doc. 285, PSOF ¶ 6; Doc. 301, CSOF ¶ 6.)

**C. SACAC**

SACAC was established in 1996 under an agreement signed by the Pima County Sheriff's Department, Pima County Attorney's Office, Tucson Police Department, Oro Valley Police Department, Marana Police Department, and Child Protective Services (now known as DCS). (Doc. 274-1 at 78.) SACAC is a non-profit privately-operated agency that serves as an "interagency coordinated response center" for the purpose of furthering child abuse investigations. (Doc. 274-1 at 78; Doc. 285, PSOF ¶ 9; Doc. 301, CSOF ¶ 9.) SACAC's activities are to comply with the standards published by the National Children's Alliance. (Doc. 285, PSOF ¶ 8; Doc. 301, CSOF ¶ 8.) The National Children's Alliance "Standards for Accredited members" state: "The CAC is not just a facility, but serves as an interagency coordinated response center." (Doc. 301, CSOF ¶ 9.)

SACAC "provide[s] medical services to law enforcement and DCS, as well as

physicians and other health care providers, concerning suspected child maltreatment cases." (Doc. 285, PSOF ¶¶ 6–7; Doc. 301, CSOF ¶¶ 6–7.) SACAC's website states: "The Children's Advocacy Center works closely with law enforcement, the Department of Child Safety, prosecuting attorneys, and community agencies to ensure that these child victims are treated with respect and dignity and receives [sic] the services they need, while assuring offenders are held accountable for their crimes." (Doc. 285, PSOF ¶ 12; Doc. 301, CSOF ¶ 12.) SACAC does not have a written policy regarding parental notification of FMEs. (Doc. 285, PSOF ¶ 20; Doc. 301, CSOF ¶ 20.)

**D. The Incident**

On December 16, 2020, a staff member of Copper View Elementary School called 911 to report a mark on L.A.W. (Doc. 285, PSOF ¶ 26; Doc. 301, CSOF ¶ 26.) L.A.W. was taken to SACAC by an SPD Officer. (Doc. 285, PSOF ¶ 28; Doc. 301, CSOF ¶ 28.) Detective Johnston testified: "I had an active investigation, and . . ., per the investigation, I wanted [L.A.W.] to be medically checked and have a forensic interview. So he would need to be transported to the [SA]CAC." (Doc. 274, DSOF ¶ 2.) Once at SACAC, Detective Johnson signed an "Authorization to Perform Forensic Medical Examination" as the "Guardian" of L.A.W. (Doc. 274, DSOF ¶ 3; Doc. 285, PSOF ¶¶ 31–34.)[4] On the authorization form, Dr. Woolridge recorded that there was "no guardian present." (Doc 285, PSOF ¶ 35; Doc. 301 ¶ 35.) At 1:00 p.m., Dr. Woolridge conducted an FME on L.A.W. (Doc. 285, PSOF ¶ 31; Doc. 301, CSOF ¶ 31.) Dr. Woolridge testified that his "actions were done in good faith and under the authority of valid statutes and recognized public policy." (Doc. 285, PSOF ¶ 32; Doc. 301, CSOF ¶ 32.)

---

[4] The first page of the FME report is titled "Authorization to Perform Forensic Medical Examination." It reads:

> I confirm I am a legal guardian of [L.A.W.] and I authorize Dr. Woolridge (name of examiner) to perform a medical forensic examination, provide treatment, collect evidence, and photograph injuries. I also give permission to release copies of the completed report to law enforcement for purposes of continuing an investigation.

(Doc. 285, PSOF ¶ 34.)

### III. Claims 7 and 8 Against SACAC

In Claims Seven and Eight, Plaintiffs allege that the FME of L.A.W. violated their Fourth and Fourteenth Amendment rights and that the "policy and protocol approved by SACAC" was the moving force behind the unconstitutional FME. (Doc. 204 at 41-43.) To prevail on their § 1983 claims against SACAC, the Plaintiffs must prove:

(1) SACAC acted under color of state law;

(2) SACAC's employee violated Plaintiff's constitutional rights;

(3) the employee acted pursuant to an official policy or custom of SACAC; and

(4) the official policy or custom caused the employee's violation of Plaintiff's constitutional rights.

*See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1073–75 (9th Cir. 2016). Because Plaintiffs have the burden of proving their § 1983 claims, Plaintiffs must make a sufficient showing of proof of all elements of their claims.

Upon review of Plaintiffs' evidence, the Court concludes the Plaintiffs' showing is insufficient as to elements (3) and (4). Plaintiffs fail to show that SACAC has a policy of conducting FMEs on minors without parental consent or court order to further criminal investigations.[5] (Doc. 289 at 3–4.) The Plaintiffs conceded at oral argument that the Pima County Protocols do not authorize FMEs of minors without parental consent or court order and Plaintiffs fail to demonstrate that unconsented or unauthorized FMEs are SACAC's "standard operating procedure." Plaintiffs claim that Dr. Woolridge and the two Associate Medical Directors have conducted hundreds of the "same" examinations, under the "same"

---

[5] Plaintiffs also briefly assert that SACAC has a standard operating procedure to undertake invasive "genital/anal" examinations without an allegation or evidence of sexual abuse. (Doc. 289 at 2.) Plaintiffs do not develop this argument, fail to describe the alleged policy in any meaningful way, and fail to point to any fact or evidence that would show such policy exists. Plaintiffs rely solely on Dr. Woolridge's statement that he visually examined L.A.W. as part of the "body surface exam." (Doc. 282-1 at 50:7) This statement is insufficient to show a SACAC policy of permitting invasive genital/anal examinations on children. Moreover, there is evidence that supports the need for a visual inspection of L.A.W. including the facts that the school nurse observed a mark on L.A.W.'s left thigh under his buttocks; L.A.W. reported that Irlanda spanks his butt with her hand and objects; and Dr. Woolridge's observation of other abrasions above L.A.W.'s pullup. (Doc. 301 at 13.)

circumstances, all directed by law enforcement to further criminal investigations, and all without parental notification. (Doc. 289 at 3–4.) But Plaintiffs fail to provide any evidence in support.[6] Although Dr. Woolridge testified, "It seems reasonable" that from "2007 through 2019, just before Covid, I conducted 3 to 4 exams per month," as SACAC aptly explains:

> [t]he testimony does not reference the type of exams, circumstances under which the exams were performed, whether exigent circumstances for the examinations existed, whether parents were present at the examinations, whether parents provided information for the examinations, whether signed authorized [sic] to conduct the exams were received (and if so, who signed the authorization – parents, DCS, law enforcement, Pima County Attorney, AG, etc.) or other factors that dispute Plaintiff's characterization of these examinations as "the same." Nor does Plaintiff take into consideration other factors that may prevent extrapolating an estimated number of exams per month to arrive at a total number of exams for a more extended duration, including any limitations on Woolridge's availability due to vacation, illness, or other circumstances.

(Doc. 300 at 4.) In fact, Plaintiffs fail to provide evidence of *any* other similarly-conducted exam. "Conclusory allegations unsupported by factual data will not create a triable issue of fact." *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978).

Plaintiffs cite several cases where courts found that a policy could be inferred from the evidence, but the cases are inapposite. In *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933 (C.D. Cal. 2018), the court found that the city was liable under *Monell* for the unlawful custom, practice, and policy of police interviewing minors at school without court order or consent from their parents. *Id.* at 966. But there it was undisputed that LAPD had a policy which instructed officers not to notify parents before conducting interviews of students regarding suspected abuse, and the plaintiffs presented evidence that a police

---

[6] There is no support for Plaintiffs' assertion in their statement of facts that "[w]hen a child is brought to SACAC by law enforcement and a FME is conducted, no parental notification of the intent to conduct the examination is made." (Doc. 285, PSOF ¶ 20.) The deposition testimony cited by Plaintiffs does not support this assertion. Director Forney did not "concede" that parents are not given notice of such examinations being contemplated. (Doc. 289 at 5.) She testified that *the Center* does not have a policy dealing with the notification of parents, either to notify or not to notify, prior to conducting interviews or exams. (Doc. 301, CSOF ¶ 20.)

- 8 -

officer had conducted nearly 1,000 interviews of minors and had only notified the parents two or three times. *Id*. at 965.[7]

In *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000), police officers seized children, aged two and five, and placed them in a county-run institution. *Id.* at 1143. Several days later, without obtaining judicial authorization and without notifying their parents, a police detective took them to a hospital for the performance of highly intrusive anal and vaginal physical examinations. *Id*. at 1135. The trial court entered summary judgment in the City's favor concluding in part that plaintiffs had not offered any facts or evidence showing that the city police department had a policy that caused the violation. *Id*. at 1136. In reversing, the appeals court held that a jury could reasonably infer that the city had a standard operating procedure by which the police department obtained invasive investigatory examinations without seeking judicial authorization or notifying the parents based on evidence that: (1) there was a contract between the hospital where the examinations occurred and the police department for performance of the investigatory examinations; (2) the detective testified that she removed the children in fulfillment of her investigative function; and (3) because, "given the absence of any individualized suspicion of sexual abuse, it is difficult to imagine . . . why else the Wallis children would have been subjected to the invasive examinations." *Id*. at 1143.

There is no similar evidence here, either from county law enforcement officers or SACAC employees. There is no evidence that police officers regularly fail to obtain court approval or parental consent before requesting an FME at SACAC.[8] There is no evidence that SACAC doctors regularly perform FMEs in the absence of court order or parental

---

[7] The court limited its holding to "the lawfulness of the City's policy, practice, or custom only in the context . . . where the parent or guardian of the suspected child abuse victim is not the suspected perpetrator." *Id.* at 964.

[8] Plaintiffs argue that the existence of a policy permitting unconsented-to exams can be inferred from the fact that SACAC conducts FMEs only upon referral by law enforcement or DCS. (Doc. 289 at 6–7; Doc. 285, PSOF ¶ 20.) The fact that police failed to provide notice or obtain a court order before the referral of L.A.W. does not support the inference that law enforcement officers regularly fail to obtain consent or a court order prior to making referrals to SACAC. If an officer is acting in accordance with the Pima County Protocols, the officer would have provided notification to the parents prior to an FME. (Doc. 274-1 at 58, 60, 68, 86.) Plaintiffs fail to provide evidence that officers regularly fail to comply with the Protocols.

consent. And, unlike the *Wallis* case, where the court noted the absence of "any individualized suspicion of" abuse, the mark on L.A.W.'s leg and his statements to the school nurse and forensic examiner did provide a basis for suspicion. The only similarity between the present case and the *Wallis* case is the fact that SACAC acts in coordination with law enforcement to conduct forensic medical examinations.

The evidence shows that SACAC does not have an official policy regarding notification of parents and that Dr. Woolridge conducted one FME upon referral from a law enforcement officer who had not obtained court approval or parental consent. This evidence is insufficient to show the existence of a standard operating procedure.[9] Because Plaintiffs fail to provide evidence from which a reasonable juror could infer that an illegal policy exists, the Court will grant summary judgment in favor of SACAC.[10]

**IV.   Claims 5 and 6 against Dr. Woolridge**

In Claim Five, Plaintiffs allege Dr. Woolridge violated L.A.W.'s Fourth Amendment rights by conducting an FME without proper authorization. (Doc. 204 at 39–40). In Claim Six, Plaintiffs allege Dr. Woolridge violated L.A.W. and Brian Wright's First and Fourteenth Amendment rights by conducting the FME without a court order or parental consent. (*Id*. at 40–41). To prove their § 1983 claims, Plaintiffs must show that (1) acts by the defendant (2) under color of state law (3) deprived them of federal rights, privileges, or immunities and (4) caused them damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (cleaned up). In their motion for summary judgment, Plaintiffs argue the undisputed evidence establishes all of the elements of their claims. As to the second element—state action—Plaintiffs assert that the FME could only have been accomplished under color of state custom and usage. (Doc. 284 at 2.)

If Dr. Woolridge did not act under color of state law, Dr. Woolridge cannot be liable

---

[9] There is no evidentiary support cited for Plaintiffs' assertion that "the Defendant admits the customary practice that *Wallis* ruled to be unconstitutional." (Doc. 289 at 5.) The assertion is also ambiguous.
[10] In light of this conclusion, the Court does not address SACAC's alternative argument that exigent circumstances were present that would excuse the requirement of obtaining parental consent or court order to examine L.A.W., (Doc. 300 at 11). *See Mann*, 907 F.3d at 1166.

- 10 -

for violating Plaintiffs' constitutional rights. If Dr. Woolridge is a state actor, the Court must determine whether he can invoke defenses available to state actors including qualified immunity. A finding of "state action" does not require the Court to find that Dr. Woolridge is entitled to qualified immunity. *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000). Because it appears that Dr. Woolridge is likely a state actor,[11] the Court turns to the issue of qualified immunity.

### A. Availability of Qualified Immunity

The doctrine of "[q]ualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "Among the important rationales for qualified immunity are the preservation of the government's ability to serve the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability." *Jensen v. Lane County*, 222 F.3d 570, 576 (9th Cir. 2000) (citing *Wyatt*, 504 U.S. at 167). Qualified immunity protects government employees "from liability for civil damages insofar as their conduct does not violate clearly

---

[11] The determination of whether a private party is a state actor for purposes of § 1983 is a fact-bound inquiry. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Because the determination is dependent on the facts, Dr. Woolridge has argued that summary judgment on that issue is not proper. (Docs. 297 at 2; 402 at 2.) Although the inquiry of state action is "necessarily fact-bound," *Lugar*, 457 U.S. at 939, the facts necessary to make such determination are within the record. Applying the "close nexus/joint action test," it appears that "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). In conducting the FME, Dr. Woolridge acted at the behest of a law enforcement officer and pursuant to an established protocol designed solely to accomplish the state's purpose of enforcing its laws. *See Jensen v. Lane Cnty.*, 222 F.3d 570, 574 (9th Cir. 2000) (holding contract services provided by licensed private physicians to municipal governments in the detention and examination of persons brought into treatment facilities by police officers as possible mental patients constituted state action); *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1322 (9th Cir. 1982) (holding a towing company acted under the color of state law by towing the plaintiff's vehicle for the purpose of enforcing traffic laws). SACAC exists to collaborate with law enforcement in the furtherance of child abuse investigations. (Doc. 285, PSOF ¶¶ 6–7; Doc. 301, CSOF ¶¶ 6–7.) FMEs are used to document evidence of child abuse that may be helpful in criminal investigations and the results are provided to DCS and law enforcement. (Doc. 274-1 at 34.) Dr. Woolridge stated that he could infer pictures taken by law enforcement during the FME were to aid their investigation of child abuse. (Doc. 274-1 at 18.)

established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow*, 457 U.S. at 818).

Before qualified immunity can be invoked by a private citizen such as Dr. Woolridge, the Court must find: (1) such defense is categorically available to him, and (2) he is entitled to the defense. *Jensen*, 222 F.3d at 576 (citing *Richardson v. McKnight*, 521 U.S. 399 (1997)). To determine whether the defense is categorically available, the court must consider the historical availability and the policy considerations underpinning the doctrine.[12] *Id.* at 576.

In their Supplemental Memorandum, Plaintiffs argue Dr. Woolridge is categorically precluded from asserting qualified immunity based on the binding precedent of *Jensen*.[13] (Doc. 395 at 2.) But the availability of qualified immunity is fact dependent. *Filarsky v. Delia*, 566 U.S. 377, 393 (2012) (noting *Richardson* was a self-consciously "narrow[ ]" decision that answered the "immunity question narrowly, in the context in which it arose"). In discussing the *Richardson* factors, the Supreme Court in *Filarsky* reiterated:

> The [*Richardson*] Court made clear that its holding was not meant to foreclose all claims of immunity by private individuals. Instead, the Court emphasized that the particular circumstances of that case—"a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"—combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under § 1983. . . . Nothing of the sort is involved

---

[12] The parties do not address the historical underpinnings of the policy.
[13] Plaintiffs also argue that the only issue presented by Plaintiffs' partial motion for summary judgment is whether Dr. Woolridge is a state actor and his actions subject to liability and, therefore, the Court cannot defer entering judgment in favor of Plaintiffs to consider the untimely affirmative defense. (Doc. 395.) This argument is mistaken for two reasons. First, Dr. Woolridge did oppose Plaintiffs' motion on qualified immunity grounds, albeit initially incorrectly citing state rather than federal law. (*See* Woolridge Opposition, Doc. 296 (referring to arguments in Dr. Woolridge's motion for summary judgment) and Woolridge's Motion for Summary Judgment, Doc. 297.) Second, qualified immunity can be decided at any time, and ordinarily is decided long before trial. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Plaintiffs were provided notice of Dr. Woolridge's intent to pursue a qualified immunity defense in Dr. Woolridge's answer, motion for summary judgment, opposition to Plaintiffs' motion for summary judgment, and at oral argument, and given an opportunity to brief the issue, which they did, (*see* Doc. 395). Plaintiffs do not identify any factual disputes that the Court would need to resolve to address the applicability of qualified immunity.

>here, or in the typical case of an individual hired by the government to assist in carrying out its work.

*Id.* at 393. The factors at play in *Jensen* are not present here.

To determine the historical availability of qualified immunity, the Court must consider "the common law as it existed when Congress passed § 1983 in 1871." *Id*, 384. At common law, courts "did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Id*. at 387. In *Filarsky*, the Supreme Court stated that § 1983 is to be read "in harmony with general principles of tort immunities and defenses," unless those principles have been abrogated by the legislature. *Id*. at 389. One of these principles is that immunity "should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id*. The Supreme Court pointed to numerous examples of individuals receiving immunity for actions taken during temporary public service. *Id*. at 388–89. The Court concluded that a private attorney working part-time for the City of Rialto, CA to conduct an internal investigation had common-law grounds for claiming immunity. *Id*. at 393–94.

Similarly, Dr. Woolridge was carrying out governmental responsibilities by collecting evidence for an investigation of child abuse on behalf of law enforcement and DCS. The Plaintiffs do not allege that Dr. Woolridge was doing so with malice or in bad faith. There is no dispute that a doctor employed directly by law enforcement or DCS on a full-time basis to conduct similar examinations would be entitled to seek the protection of qualified immunity. *See id.* at 394-95. Accordingly, the historical common law supports the availability of qualified immunity to Dr. Woolridge.

The policy justifications for allowing the defense of qualified immunity include: (1) "protecting the public from unwarranted timidity on the part of public officials" and "encouraging the vigorous exercise of official authority"; (2) preventing lawsuits from distracting officials from their governmental duties; and (3) "ensuring that talented candidates are not deterred by the threat of damages suits from entering public service."

*Jensen*, 222 F.3d at 577 (citing *Richardson*, 521 U.S. at 408). In *Jensen*, the plaintiff sued a psychiatrist under § 1983, for involuntarily confining plaintiff for evaluation, pursuant to state statute, but without probable cause. *Jensen*, 222 F.3d at 573. The psychiatrist worked for a private firm that contracted with the county to provide mental health evaluations to detainees at the county psychiatric hospital. *Id*. The Ninth Circuit held that the defense of qualified immunity was not available to the psychiatrist. *Id*. at 580. Referencing the *Richardson* factors, the court reasoned:

> concerns about timidity are moderated by the likelihood that [the private firm's] failure to adequately complete the commitment and psychiatric care duties for which it has contracted will lead to its replacement by competitors. Likewise, the threat of liability can be overcome by private firms subject to market forces through such devices as monetary incentives, insurance, and indemnity agreements. If the state finds that the threat of liability is deterring talented private doctors or doctor groups from contracting with it, the state can raise compensation levels and provide other incentives to maintain high levels of quality participation in this joint undertaking. These are exactly the market forces contemplated in *Richardson* and *Halvorsen*.

*Id.* at 578.

Unlike the private firm in *Jensen*, SACAC, by virtue of its structure, is not subject to similar market forces. SACAC was created through the agreement of municipal entities for the purpose of conducting forensic interviews and examinations to aid law enforcement in the investigation of child abuse. SACAC has no other function. SACAC is a non-profit and the only identified provider of these types of services in Pima County. There do not appear to be other medical providers who would organize to replace SACAC to provide FMEs should the threat of liability deter talented private doctors from contracting with SACAC. Allowing qualified immunity as a defense would protect the public from unwarranted timidity on the part of SACAC's doctors and encourage the vigorous exercise of their responsibilities.

In *Jensen*, the court stated the third *Richardson* factor[15] worked against finding

---

[15] The court in *Jensen* also noted that the threat of legal action distracting officials from their governmental duties, the second *Richardson* factor, is not independently compelling because qualified immunity never provides complete protection from the distractions of

qualified immunity on the part of the psychiatrist because: "If the state finds that the threat of liability is deterring talented private doctors or doctor groups from contracting with it, the state can raise compensation levels and provide other incentives to maintain high levels of quality participation in this joint undertaking." *Id*. But, as discussed above, because the market forces inherent in the contractual relationship in *Jensen* are not present here, the court's reasoning does not readily apply. Dr. Woolridge is a part-time employee at SACAC. (Doc. 274-1 at 78.) He also works at Banner Hospital and as a professor at the University of Arizona Medical School. (*Id*.) It is unlikely that increased compensation would cause him to continue to perform these examinations knowing he could be exposed to legal liability for assisting law enforcement in child abuse investigations.

For similar reasons, other courts have concluded that a private doctor performing services under a contract with the government may invoke qualified immunity. In *Estate of Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021), the court found that a private doctor providing medical care to prisoners and training to officers was entitled to seek qualified immunity. The physician and his physician's assistant provided a discrete function to the prison, and while they had some decision-making authority, the county was ultimately in charge of implementing medical policies and training their corrections officers. *Id* at 856. Further, due to the limited ability of the doctor to prescribe medications or authorize elective surgeries, the court found that the nature of the doctor's part-time role "does not resemble a private doctor working in a private firm." *Id*. In *Perniciaro v. Lea*, 901 F.3d 241 (5th Cir. 2018), the court found that part-time contract psychiatrists working at a state mental hospital were entitled to raise the defense of qualified immunity, because their similarly situated full-time government counterparts would also be entitled to such defense.

For these reasons, the Court finds that the defense of qualified immunity is

---

litigation. *Jensen*, 222 F.3d at 579. According to the *Jensen* court, where state law does not provide immunity, the distraction of litigation may be foreseeable. *Id*. As described in Dr. Woolridge's previous motion for summary judgment (Doc. 297), Arizona law specifically affords immunity to doctors conducting FMEs, regardless of whether they are publicly or privately employed. A.R.S. § 13-3620(J). While existence of such state immunity tends to favor Dr. Woolridge in this analysis, ultimately, the existence of a historical affirmative defense alone is insufficient to entitle a defendant to qualified immunity. *See Wyatt*, 504 U.S. at 165.

categorically available to Dr. Woolridge. The Court next considers whether the defense applies in this case.

### B. Entitlement to Qualified Immunity

"[T]o overcome qualified immunity, Plaintiffs must show that [Dr. Woolridge] (1) 'violated a federal statutory or constitutional right' and (2) 'the unlawfulness of [his] conduct was clearly established at the time.'" *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). It is within the court's discretion to bypass the first prong and determine qualified immunity applies because the right at issue was not clearly established. *Id*. at 61. To find a clearly established right, the court must consider the right at issue in a particularized sense, rather than "as a broad general proposition." *Dunn v. Castro*, 621 F.3d 1196, 1200–01 (9th Cir. 2010). "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officials] *in this case* that *their particular conduct* was unlawful. …[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted).

"The Supreme Court has repeatedly stressed that courts must not define clearly established law at a high level of generality." *Moore v. Garnand*, 83 F.4th 743, 749 (9th Cir. 2023) (quoting *Ballentine*, 28 F.4th at 64). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Whether a right is clearly established turns on whether it is "sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)).

The Court finds that Plaintiffs have failed to identify clearly established law that establishes a doctor acts in violation of the constitution by conducting an FME at the request of law enforcement to ascertain whether a child's injury is the result of child abuse.

The cases relied on by Plaintiffs in support of their Motion do not address the liability of a doctor performing medical examinations on children exhibiting signs of physical abuse. *See Wallis*, 202 F.3d at 1142 (concluding that a genuine issue of material fact existed as to whether the Wallises' constitutional rights were violated by police officers who took custody of their daughters and subjected the children to invasive medical examinations); *Mann*, 907 F.3d at 1167 (concluding that the county's policy of subjecting children to medical exams without parental notification or consent was unreasonable); *see also Wallis*, 202 F.3d at 1145 (Rymer, P., dissenting) (mentioning the doctor who conducted the exams was dismissed on immunity grounds). Because the Plaintiffs have failed to identify any case that would clearly establish a rule of conduct sufficiently definite that any reasonable doctor in Dr. Woolridge's shoes would have understood he was violating it, and because the Court concludes that the defense of qualified immunity is available to Dr. Woolridge, the Court will enter judgment in favor of Dr. Woolridge and dismiss him from this action. Accordingly,

**IT IS ORDERED:**

1. Defendant SACAC's Motion for Summary Judgment (Doc. 273) is **granted**.

2. Plaintiffs' Motion for Partial Summary Judgment against Dr. Woolridge (Doc. 283) is **denied**.

3. Plaintiffs' Motion for Partial Summary Judgment against SACAC (Doc. 288) is **denied**.

4. Defendants SACAC and Dr. Dale Woolridge are **dismissed** from this case.

5. The Clerk of Court shall enter judgment in favor of the Defendants. The Clerk of Court is directed to close this case.

Dated this 30th day of September, 2024.

Jennifer G. Zipps
United States District Judge